## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| | X | |
| FIRST NEW YORK SECURITIES, L.L.C., 850 Third Avenue, New York, New York 10022, Individually and On Behalf of All Others Similarly Situated, | : : : : | **Civil Action No.** <br><br> **CLASS ACTION** |
| Plaintiff, | : : | **JURY TRIAL DEMANDED** |
| vs. | : : | |
| SUNRISE SENIOR LIVING, INC., PAUL J. KLAASSEN, THOMAS B. NEWELL, BRADLEY B. RUSH, RONALD V. APRAHAMIAN, J. DOUGLAS HOLLADAY, THOMAS J. DONOHUE, WILLIAM G. LITTLE, TERESA M. KLAASSEN, CRAIG R. CALLEN and J. BARRON ANSCHUTZ, | : : : : : : : : | |
| Defendants. | : X | |

## CLASS ACTION COMPLAINT FOR
## VIOLATIONS OF THE FEDERAL SECURITIES LAW

## TABLE OF CONTENTS

I.      SUMMARY OF THE ACTION ................................................................................. 1

II.     JURISDICTION AND VENUE ............................................................................... 4

III.    PARTIES .................................................................................................................. 4

        A.      Plaintiff ....................................................................................................... 4

        B.      Defendants ................................................................................................... 5

        C.      Control Person Liability ............................................................................. 8

        D.      Group Pleading ........................................................................................... 9

        E.      Duties of Individual Defendants ............................................................... 10

IV.     CLASS ACTION ALLEGATIONS ....................................................................... 11

V.      FRAUD ON THE MARKET PRESUMPTION ..................................................... 13

VI.     THE SAFE HARBOR PROVISION OF THE PSLRA IS INAPPLICABLE .................. 14

VII.    BACKGROUND AND FACTS .............................................................................. 15

VIII.   DEFENDANTS' MATERIALLY FASLE AND MISLEADING
        STATEMENTS AND OMMISSIONS DURING THE CLASS PERIOD ...................... 17

IX.     THE TRUTH BEGINS TO EMERGE .................................................................... 40

X.      POST CLASS PERIOD DEVELOPMENTS .......................................................... 43

XI.     CAUSATION ALLEGATIONS .............................................................................. 47

XII.    SCIENTER ALLEGATIONS .................................................................................. 48

XIII.   SUNRISE'S GAAP VIOLATIONS ........................................................................ 51

        A.      Sunrise Prematurely Recognized Income from Its Unconsolidated
                Senior Living Centers ............................................................................... 53

        B.      Sunrise Improperly Accounted For Sales of Real Estate To Its
                Joint Venture Partners and Third Party Investors ..................................... 54

        C.      Sunrise Improperly Accounted For Back-dated Stock Options ................ 55

     D.      Defendants' Internal Control Violations................................................... 58

COUNT I:  Violations of § 10(b) Of The Exchange Act And
Rule 10b-5 Promulgated Thereunder Against All Defendants ..................................... 59

COUNT II:  Violations of § 20(a) Of The Securities Exchange Act Of 1934
Against The Individual Defendants ......................................................................... 61

COUNT III:  Violations Of § 20A Of The Securities Exchange Act Of 1934
Against The Section 20A Defendants....................................................................... 62

COUNT IV:  For Violation of § 14(a) of the Exchange Act
Against the Director Defendants............................................................................. 64

JURY DEMAND ................................................................................................... 66

1.       Plaintiff, First New York Securities, L.L.C. ("First New York" or "Plaintiff"), by its undersigned attorneys, for its Class Action Complaint (the "Complaint"), makes the following allegations against Defendants based upon an investigation conducted by and under the supervision of counsel for Plaintiff, which has included, among other things, review and analyses of: the public filings of Sunrise Senior Living, Inc. ("Sunrise" or the "Company"), including filings with the Securities and Exchange Commission ("SEC"); press releases issued by Defendants; news articles and analysts' reports concerning Defendants; and transcripts from conference calls Defendants held with analysts.

## I.       SUMMARY OF THE ACTION

2.       Plaintiff brings this action, pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of itself and all similarly situated persons or entities (collectively, the "Class") who purchased Sunrise common stock from August 4, 2005 through and including June 15, 2006 (the "Class Period") and persons who owned Sunrise common stock at the time Sunrise's 2000 through 2006 Proxy Statements were circulated to shareholders in solicitation of their votes on various issues, seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

3.       Prior to and throughout the Class Period, Sunrise engaged in a course of business which operated as a fraud and deceit on purchasers of the Company's securities. In particular, during the relevant period Sunrise issued a series of materially false and misleading statements and omitted material facts from its public disclosures concerning its financial performance and condition, falsely representing to investors that its equity in earnings in unconsolidated senior living properties were growing due to the Company's joint ventures. As investors would ultimately learn, however, Sunrise's statements were materially false and misleading because,

among other reasons, the Company failed to disclose that: (i) Sunrise was understating losses from its minority interests in joint ventures in which Sunrise's partners received preferential distributions; (ii) the Company was improperly accounting for gains on real estate sales in which it provided guarantees and commitments to venture partners and third parties; and (iii) its financial results were overstated due to option back-dating. Sunrise's false and misleading statements caused the Company's common shares to trade at artificially inflated levels during the Class Period, reaching as high as $39.49 per share on March 29, 2006.

4.      Over the past several years, Sunrise pursued an aggressive expansion program. In order for the program to succeed, the Company had to at least appear to be consistently achieving strong profits. The majority of Sunrise's new development activity and most of its acquisitions were conducted through joint ventures in which Sunrise held a minority interest. However, in order to attract joint venture partners, the Company had to offer those partners preferential distributions and guarantees from the joint ventures because the senior living facilities regularly suffered significant start-up losses and the Company had not yet established a successful track record. Under applicable accounting rules, if Sunrise structured its joint ventures with preferential distributions to partners, the Company was required to recognize 100% of the initial losses of the new facilities, rather than simply its minority share. In addition, the applicable accounting principles required Sunrise to defer some or all of the income from the sales of facilities if it provided financial guarantees in connection with those sales.

5.      Sunrise began to disclose its accounting problems on May 9, 2006, when it announced that it was rescheduling its 2006 earnings release to allow additional time for review of the accounting treatment applied to the Company's investments in unconsolidated senior living communities. The next day, May 10, 2006, Sunrise further disclosed that its internal

review was focused on the allocation of profits and losses for a limited number of joint ventures where Sunrise was a minority partner and the capital partner received a preference. Thereafter, on May 11, 2006, Sunrise announced that as a result of its review, the Company decided to use a different methodology to allocate profits and losses in its joint ventures. Following the disclosure of the accounting review, the price of Sunrise common shares declined from $39.30 per share on May 8, 2006, to $32.35 per share on May 9, 2006, and continued to decline throughout the remaining Class Period, erasing over $300 million in shareholder value.

6.    As a result of Sunrise's accounting problems described above, the Company announced it would have to restate its financial results for periods as far back as 1999 through 2005. The estimated $100 million restatement will require the Company to record additional losses in prior periods for the joint ventures with preferential distributions and to defer and/or not achieve income from the sale of real estate with guarantees or commitments.

7.    The Company's false and misleading statements concerning its earnings and growth and the resulting artificial inflation of Sunrise common shares allowed Sunrise executives to personally profit through substantial insider selling. In the aggregate, Sunrise executives sold approximately 990,576 shares of Sunrise common stock for an illegal profit of more than $37 million.

8.    In addition, as a result of its improper accounting practices, Sunrise is currently the subject of multiple ongoing investigations by the SEC. In this regard, on August 8, 2006, Sunrise announced that the SEC had requested information regarding the method used for determining Sunrise's share of equity in earnings and losses and its interpretation of certain accounting principles. Thereafter, on December 11, 2006, Sunrise announced that the SEC had

requested information regarding the Company's stock option grant practices and the insider trading of its executives.

## II.     JURISDICTION AND VENUE

9.     This action arises under Sections 10(b), 20(a), 20A and 14(a) of the Exchange Act, as amended, 15 U.S.C. §§ 78j(b), 78n(a) and 78t(a), 78(t)-1(a), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

10.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

11.     Venue is proper in this district pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Many of the acts alleged herein, including the dissemination of materially false and misleading statements in connection with the sale of a security, occurred in substantial part in this district.  Sunrise filed false and misleading SEC filings in this district and has four communities in operation or under development in Washington, D.C.  Furthermore, the Individual Defendants conduct business in this district.

12.     In connection with the acts alleged in this Complaint, Sunrise, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications, internet communications and the facilities of the New York Stock Exchange ("NYSE") market.

## III.     PARTIES

### A.     Plaintiff

13.     Plaintiff, First New York, as set forth in the accompanying certification, incorporated by reference herein, purchased Sunrise common stock at artificially inflated prices during the Class Period and has been damaged thereby.

B.    **Defendants**

14.    Defendant Sunrise, founded in 1981 by Paul and Teresa Klaassen, is a public company incorporated under the laws of Delaware, maintaining its principal executive offices at 7902 Westpark Dr., McLean, VA  22102.  Sunrise common stock is actively traded on the NYSE under the symbol SRZ.  The Company describes itself as "one of the nation's premier providers of senior living services" that "currently operates more than 420 senior living communities in 37 states, the District of Columbia, Canada, the United Kingdom and Germany."

15.    Defendant Paul J. Klaassen ("P. Klaassen"), was at all relevant times, the Company's Chief Executive Officer ("CEO") and Chairman of the Board of Directors ("Chairman").  P. Klaassen made materially false and misleading public statements during the Class Period in Company press releases, conference calls with analysts and in Sunrise's public filings with the SEC.  During the Class Period, P. Klaassen sold approximately 600,000 shares of Sunrise common stock for proceeds of approximately $21,421,000, while privy to material, non-public information, which had not been disclosed to the investing public, including Plaintiff and Class members, who purchased Sunrise common stock contemporaneously with the sales by P. Klaassen.

16.    Defendant Bradley B. Rush ("Rush") was, at all relevant times, the Company's Chief Financial Officer ("CFO").  Defendant Rush also made materially false and misleading public statements during the Class Period in the Company's public filings with the SEC.  During the Class Period, Defendant Rush sold approximately 6,937 shares of Sunrise common stock for proceeds of approximately $432,144, while privy to material, non-public information, which had not been disclosed to the investing public, including Plaintiff and Class members, who purchased Sunrise common stock contemporaneously with the sales by Defendant Rush.

17.    Defendant Thomas B. Newell ("Newell") was, at all relevant times, the Company's President. Defendant Newell also made materially false and misleading public statements during the Class Period in Company press releases, conference calls with analysts and in Sunrise public filings with the SEC. During the Class Period, Defendant Newell sold approximately 192,000 shares of Sunrise common stock for proceeds of approximately $7,399,080, while privy to material, non-public information, which had not been disclosed to the investing public, including Plaintiff and Class members, who purchased Sunrise common stock contemporaneously with the sales by Defendant Newell.

18.    Defendant J. Douglas Holladay ("Holladay") was, at all relevant times, a director on the Company's Board of Directors ("BOD"). Defendant Holladay also made public statements during the Class Period in Sunrise's public filings with the SEC. During the Class Period, Defendant Holladay sold approximately 27,000 shares of Sunrise common stock for proceeds of approximately $1,259,000, while privy to material, non-public information, which had not been disclosed to the investing public, including Plaintiff and Class members, who purchased Sunrise common stock contemporaneously with the sales by Defendant Holladay.

19.    Defendant Thomas J. Donohue ("Donohue") was, at all relevant times, a director on the Company's BOD, Chairman of the Compensation Committee and a member of the Audit Committee. Defendant Donohue also made public statements during the Class Period in the Company's public filings with the SEC. During the Class Period, Defendant Donahue sold approximately 102,666 shares of Sunrise common stock for proceeds of approximately $3,392,085, while privy to material, non-public information, which had not been disclosed to the investing public, including Plaintiff and Class members, who purchased Sunrise common stock contemporaneously with the sales by Defendant Donahue.

20.    Defendant Ronald V. Aprahamian ("Aprahamian") was, at all relevant times, a director on the Company's BOD and Chairman of the Audit Committee. Defendant Aprahamian also made public statements during the Class Period in the Company's public filings with the SEC. During the Class Period, Defendant Aprahamian sold approximately 20,000 shares of Sunrise common stock for proceeds of approximately $757,000, while privy to material, non-public information, which had not been disclosed to the investing public, including Plaintiff and Class members, who purchased Sunrise common stock contemporaneously with the sales by Defendant Aprahamian.

21.    Defendant J. Barron Anschutz ("Anschutz") was, at all relevant times, the Company's Chief Accounting Officer ("CAO"). Defendant Anschutz also made public statements during the Class Period in Sunrise's public filings with the SEC. During the Class Period, Defendant Anschutz sold approximately 5,000 shares of Sunrise common stock for proceeds of approximately $194,767, while privy to material, non-public information, which had not been disclosed to the investing public, including Plaintiff and Class members, who purchased Sunrise common stock contemporaneously with the sales by Defendant Anschutz.

22.    Defendant William G. Little ("Little") was, at all relevant times, a director on the Company's BOD. Defendant Little also made public statements during the Class Period in the Company's public filings with the SEC.

23.    Defendant Teresa M. Klaassen ("T. Klaassen") was, at all relevant times, a director on the Company's BOD. Defendant T. Klaassen also made public statements during the Class Period in Sunrise's public filings with the SEC. During the Class Period, T. Klaassen sold approximately 600,000 shares of Sunrise common stock for proceeds of approximately $21,421,000, while privy to material, non-public information, which had not been disclosed to

the investing public, including Plaintiff and Class members, who purchased Sunrise common stock contemporaneously with the sales by T. Klaassen.

24.     Defendant Craig R. Callen ("Callen") was, at all relevant times, a director on the Company's BOD and a member of the Audit and Compensation Committees. Defendant Callen also made public statements during the Class Period in the Company's public filings with the SEC.

25.     Defendants P. Klaassen, Rush, Newell, Holladay, Donohue, Aprahamian, Anschutz, Little, T. Klaassen and Callen are referred to collectively herein as the "Individual Defendants."

26.     Defendants P. Klaasen, Rush, Newell, Holladay, Donohue, Aprahamian, Anschutz and T. Klaassen are referred to collectively herein as the "Section 20A Defendants."

27.     The Defendants who were directors of Sunrise are referred to herein as the "Director Defendants."

**C.     Control Person Liability**

28.     During the Class Period, the Individual Defendants, as senior executive officers and directors of Sunrise, were privy to confidential and proprietary information concerning Sunrise and its business, operations, performance and prospects, including its compliance with applicable federal, state and local laws and regulations. Because of their high-level positions with Sunrise, the Individual Defendants had regular access to non-public information about its business, operations, performance and prospects through access to internal corporate documents and information, conversations and connections with other corporate officers and employees, attendance at management meetings and the Company's BOD, and committees thereof, and reports and other information provided to them in connection therewith.

29.   Because of their possession of the information described above, the Individual Defendants knew, or recklessly disregarded that the Company's earnings were inflated as a result of its improper accounting for its minority interests in joint ventures, real estate sales and stock options.  Accordingly, Defendants knew, or recklessly disregarded that the statements complained of herein were materially false and misleading when made.

30.   Each of the Defendants is liable as a direct participant and primary violator with respect to the wrongdoing complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and directors, were "controlling persons" within the meaning of § 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to, and did, directly and indirectly, control the conduct of Sunrise's business.

31.   The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the content of the various SEC filings, press releases and other public statements made by the Company during the Class Period.  By reason of their respective high-level management and Board positions, the Individual Defendants had the ability and opportunity to review copies of Sunrise's SEC filings, reports and press releases alleged herein to be materially misleading, prior to, or shortly after their issuance, and to prevent their issuance or cause them to be corrected.

**D.    Group Pleading**

32.   The Individual Defendants are liable for the materially false and misleading statements pleaded herein that were issued by or in the name of the Company, as those statements were each "group-published" information, the result of the collective actions of the

Individual Defendants, each of whom was intimately involved in the day-to-day operations of Sunrise. It is appropriate to treat the Individual Defendants as a group and to presume that the public filings, press releases and other public statements complained of herein, are the product of the collective actions of the narrowly defined group of Individual Defendants. The Individual Defendants, by virtue of their high-level positions within Sunrise, directly and actively participated in the management and day-to-day operations of the Company, and were privy to confidential non-public information concerning the business and operations of Sunrise. In addition, the Individual Defendants were involved in drafting, reviewing and/or disseminating the materially false and misleading statements issued by Sunrise and approved or ratified those statements, and, therefore, adopted them as their own.

E.    **Duties of Individual Defendants**

33.    Each of the Individual Defendants had the duty to make full, candid and timely disclosures of all material facts relating to the business, operations, performance and prospects of Sunrise. Among other things, Defendants were required to:

- conduct and supervise the business of Sunrise in accordance with all applicable laws and regulations;

- supervise the preparation of the Company's SEC filings and approve any reports concerning the financial reporting and results of Sunrise;

- ensure that Sunrise established and followed adequate internal controls; and

- refrain from obtaining personal benefit, at the expense of the public purchasers of Sunrise common stock, by misusing proprietary non-public information.

34.    As senior officers and controlling persons of a publicly-held Company whose common stock was, during the relevant time, registered with the SEC pursuant to the Exchange Act, traded on the NYSE, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information

with respect to the Company's performance, operations, business, and prospects, and to correct any previously issued statements that were or had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information.

35.    As a result of Defendants' failure to fulfill the foregoing obligations, Sunrise's common stock was artificially inflated during the Class Period. In response to the emergence of the truth, Sunrise's common stock fell precipitously. As a direct and proximate result of Defendants' wrongdoing, Plaintiff and other Class members were damaged.

## IV.    CLASS ACTION ALLEGATIONS

36.    Plaintiff brings this class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of a class of persons who purchased Sunrise common stock during the Class Period (or their successors in interest). Excluded from the Class are the Defendants named herein, members of the immediate families of the Defendants, any firm, trust, partnership, corporation, officer, director or other individual or entity in which a Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, heirs, successors-in-interest or assigns of any such excluded person.

37.    The Class is so numerous that joinder of all members is impracticable. During the Class Period, there were more than 50 million shares of Sunrise common stock issued and outstanding. Sunrise shares were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of geographically dispersed Class members. Record owners and Class members can be identified from records maintained by Sunrise or its

transfer agent and can be notified of the pendency of this action by mail and publication, using forms of notice similar to those customarily used in securities class actions.

38.     Plaintiff's claims are typical of the members of the Class, because Plaintiff and all of the Class members sustained damages arising from the same wrongful conduct complained of herein.

39.     Plaintiff will fairly and adequately protect the interests of the members of the Class, and Plaintiff has no interests which are contrary to, or in conflict with, the interests of the Class members that they seek to represent. Plaintiff has retained competent counsel experienced in class action litigation under the federal securities laws to ensure such protection, and intends to prosecute this action vigorously.

40.     Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members, in that, Defendants have acted on grounds generally applicable to the entire Class. The questions of law and fact common to the Class include:

- whether Defendants' acts violated the federal securities laws as alleged herein;

- whether Defendants' publicly disseminated press releases and statements during the Class Period omitted and/or misrepresented material facts and whether Defendants breached any duty to convey material facts or to correct material facts previously disseminated;

- whether Defendants participated in and pursued the common course of conduct complained of herein;

- whether Defendants acted with scienter in omitting and/or misrepresenting material facts;

- whether the price of Sunrise common stock was artificially inflated during the Class Period as a result of the material misrepresentations and omissions complained of herein;

- whether Defendants P. Klaasen, Rush, Newell, Holladay, Donohue, Aprahamian, Anschutz, Little, T. Klaassen and Callen were controlling persons as alleged herein; and

- whether members of the Class have sustained damages and, if so, the proper measure of such damages.

41.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class to individually seek redress for the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## V.    FRAUD ON THE MARKET PRESUMPTION

42.    At all relevant times, the market for Sunrise common stock was an efficient market for the following reasons, among others:

(a)    Sunrise's common stock was listed and actively traded on the NYSE, a highly efficient national market, with more than 50 million shares issued and outstanding and public trading float of 44.33 million shares;

(b)    As a registered and regulated issuer of securities, Sunrise filed periodic reports with the SEC, in addition to the frequent voluntary dissemination of information described in this Complaint;

(c)    Sunrise regularly communicated with public investors through established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures such as communications with the financial press and other similar reporting services; and

(d)    Sunrise was followed by several different securities analysts employed by major brokerage firms, including Avondale Partners LLC. Citigroup, Inc., Davenport & Company LLC, Friedman, Billings Ramsey Group. Inc., Jefferies & Co., Inc., Lehman Brothers, Inc., Stifel Nicolaus & Company, Inc. and William Blair & Company, which followed Sunrise's business and wrote reports which were distributed to the sales force and customers of their respective brokerage firms.  Those reports were publicly available and affected the public marketplace.

43.    As a result of the above, the market for Sunrise common stock promptly digested current information with respect to the Company from all publicly available sources and reflected such information in the security's price.  Under these circumstances, all purchasers of Sunrise common stock during the Class Period suffered similar injuries through their purchases of shares at prices which were artificially inflated by the Defendants' misrepresentations and omissions.  Thus, a presumption of reliance applies.

## VI.    THE SAFE HARBOR PROVISION OF THE PSLRA IS INAPPLICABLE

44.    The statutory safe harbor provided for forward-looking statements under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), which applies to forward-looking statements, does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each

of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Sunrise who knew that those statements were materially false when made.

## VII.    BACKGROUND AND FACTS

45.    Sunrise is one of the largest providers of senior living services, offering a full range of senior living services, including independent living, assisted living, care for individuals with Alzheimer's and other forms of memory loss, as well as nursing and rehabilitative care.

46.    Sunrise was founded by Paul and Teresa Klaassen in 1981, and was intended to redefine senior living in America. Sunrise has been pursuing an aggressive growth strategy and has grown quickly to currently operate more than 420 senior living communities in 37 states, the District of Columbia, Canada, the United Kingdom and Germany with a combined resident capacity of more than 52,000. In furtherance of its growth strategy, Sunrise has over 46 communities under construction.

47.    In recent years, Sunrise has moved to a management services business model. This business model provides opportunities for Sunrise to generate income in three different ways: (i) before a community is open, Sunrise generates fees by providing pre-opening services, including feasibility studies, site selection, architectural and interior design services, zoning, permitting, construction and project management, staffing, training, sales and marketing; (ii) after a community is open, Sunrise earns management fees from the long-term management contracts in place; and (iii) during the years of long-term management, the Company generates attractive returns for shareholders through their percentage ownership in these communities and from the incentives that they receive when those ventures exceed performance thresholds.

According to Sunrise's President, Thomas Newell, the business model has allowed the Company to maintain and increase its pace of development of new, purpose-built communities, and freed the Company from having to make acquisitions for growth.

48.     During its period of growth, Sunrise has engaged in joint ventures with capital partners in senior living communities. Sunrise is a minority partner in some ventures, owning an average of 20% of the community. In those ventures, the capital, or majority, partner receives certain preferences. Those preferences include cash flow preferences and preferential distributions on return of its capital over Sunrise's capital, in the event of a refinancing or sale of the venture's properties. Currently, approximately 15% of Sunrise's communities are held by joint ventures that contain such preferences. At any given time, the Company typically has many ventures in many stages, some newly formed, some with mature properties and some refinancing and selling their interests. Sunrise typically accounted for initial losses from these joint ventures by using only their minority share. However, because the capital partners received preferential distributions, the Company was required to absorb all of the initial losses, not just its minority share of the losses, which was Sunrise's previous accounting policy.

49.     In addition, when Sunrise sells real estate to its venture partners or to third parties, it provides guarantees and commitments. These guarantees and commitments have included construction completion, operating cash flow deficit guarantees to lenders and ventures, limited guarantees of net operating income and certain limited debt guarantees. As a result of these guarantees and commitments, the transactions can not be immediately accounted for as a sale, as Sunrise historically has done.

50.     Sunrise has also engaged in stock option back-dating, which occurs when a company manipulates the grant date of an option so it appears to be granted on a date when the

market price of the company's stock is lower than the market price on the actual grant date. This improper back-dating results in option grants with lower exercise prices that improperly increases the value of the options, giving the recipients instant ill-gotten profits. Back-dating constitutes to a violation of accounting rules as well as federal securities laws. According to Generally Accepted Accounting Principles ("GAAP"), if the market price on the date of the grant exceeds the exercise price of the options, the company must recognize the difference as an expense, thereby reducing the company's net income. Accordingly, the Defendants' back-dating of stock options resulted in the Company issuing materially misleading financial statements that understated expenses and overstated net profit.

## VIII.   DEFENDANTS' MATERIALLY FASLE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

51.     On April 14, 2000, Sunrise filed a Form DEF-14A Proxy Statement with the SEC. Sunrise circulated the Proxy Statement to shareholders which stated in relevant part:

> **STOCK OPTIONS**
>
> Stock options are considered an effective long-term incentive because gains are linked to increases in the stock value, which in turn provides stockholder gains. ***Stock options are granted by the stock option committee at an exercise price equal to the market price of the common stock at the date of the grant*** . . . . The full benefit of the options is realized upon appreciation of the stock price in future periods, thus providing an incentive to create value to Sunrise's stockholders through appreciation of the stock price.

(Emphasis added).

52.     The April 14, 2000 Proxy Statement was materially false and misleading because it failed to disclose that: (a) the Company was engaging in stock option back-dating, in violation of GAAP and the Company's own internal accounting policies; and (b) top officers were

17

permitted to manipulate the option grant process and had picked grant dates that were most

advantageous to them.

53.     On March 29, 2001, Sunrise filed a Form DEF-14A Proxy Statement with the

SEC.  The Proxy Statement, which was circulated to shareholders, stated in relevant part:

### COMPENSATION OF EXECUTIVE OFFICERS

The compensation policies of Sunrise are designed to enable
Sunrise to attract, motivate and retain experienced and qualified
executives.  Sunrise seeks to provide competitive compensation.
Sunrise's policy has been to provide a significant component of an
executive officer's compensation through the grant of stock
options.  Sunrise believes that grants of stock options to
executives, as well as to employees generally, help align the
interests of these persons with the interests of Company's
stockholders.

The following describes in more specific terms the
elements of compensation of executive officers for 2000:

* * *

### STOCK OPTIONS

Stock options are considered an effective long-term
incentive because gains are linked to increases in the stock value,
which in turn provides stockholder gains.  ***Stock options are
granted by the stock option committee at an exercise price equal
to the market price of the common stock at the date of the grant.***

(Emphasis added).

54.     The March 29, 2001 Proxy Statement was materially false and misleading for the

reasons set forth above in paragraph 52.

55.     On April 5, 2002, Sunrise filed a Form DEF-14A Proxy Statement with the SEC.

Sunrise circulated the Proxy Statement to shareholders which stated in relevant part:

### COMPENSATION OF EXECUTIVE OFFICERS

The compensation policies of Sunrise are designed to
enable Sunrise to attract, motivate and retain experienced and

qualified executives.  Sunrise seeks to provide competitive
compensation.  Sunrise's policy has been to provide a significant
component of an executive officer's compensation through the
grant of stock options.  ***Sunrise believes that grants of stock
options to executives, as well as to employees generally, help
align the interests of these persons with the interests of
Company's stockholders . . . .***

(Emphasis added).

56.     The April 5, 2002 Proxy Statement was materially false and misleading for the

reasons set forth above in paragraph 52.

57.     On April 9, 2003, Sunrise filed a Form DEF-14A Proxy Statement with the SEC.

The Proxy Statement, which was circulated to shareholders, stated in relevant part:

### STOCK OPTIONS

Stock options are considered an effective long-term
incentive because gains are linked to increases in the stock value,
which in turn provides stockholder gains.  Stock options were
granted by the stock option committee, and are now granted by the
compensation committee, at ***an exercise price equal to the market
price of the common stock at the date of the grant*** . . . .  The full
benefit of the options is realized upon appreciation of the stock
price in future periods, thus providing an incentive to create value
to Sunrise's stockholders through appreciation of the stock price.

* * *

### REPORT OF THE AUDIT COMMITTEE

The audit committee oversees Sunrise's financial reporting
process on behalf of the board of directors.  Management has the
primary responsibility for the financial statements and the
reporting process, including the systems of internal controls.  In
fulfilling its oversight responsibilities, the audit committee
reviewed the audited financial statements in the Annual Report on
Form 10-K for the year ended December 31, 2002 with
management, including a discussion of the quality, not just the
acceptability, of the accounting principles, the reasonableness of
significant judgments, and the clarity of disclosures in the financial
statements.

The audit committee has reviewed with the independent auditors, who are responsible for expressing an opinion on the conformity of those audited financial statements with generally accepted accounting principles, their judgments as to the quality, not just the acceptability, of Sunrise's accounting principles and such other matters as are required to be discussed with the audit committee under generally accepted auditing standards. In addition, the audit committee has discussed with the independent auditors the auditors' independence from management and Sunrise, including the matters in the written disclosure required by the Independent Standards Board and considered the compatibility of nonaudit services with the auditors' independence.

The audit committee discussed with Sunrise's independent auditors the overall scope and plans for their respective audits. The audit committee meets with the independent auditors, with and without management present, to discuss the results of their examinations, their evaluations of the Sunrise's internal controls, and the overall quality of Sunrise's financial reporting. The audit committee held four meetings during fiscal year 2002.

In reliance on the reviews and discussions referred to above, the audit committee recommended to the board of directors that the audited financial statements be included in the Annual Report on Form 10-K for the year ended December 31, 2002 for filing with the Securities and Exchange Commission.

> Respectfully Submitted,
> Ronald V. Aprahamian, Chairman
> Thomas J. Donohue
> David G. Bradley

(Emphasis added).

58.    The April 9, 2003 Proxy Statement was materially false and misleading because Sunrise failed to disclose that:

(a)    the Company underreported its losses from joint ventures in which partners receive a preference;

(b)    the Company improperly accounted for gains on real estate sales in which it provided guarantees and commitments to venture partners and third parties;

(c)    the Company engaged in stock option back-dating, in violation of GAAP and the
Company's own policies;

(d)    top officers were permitted to manipulate the option grant process and had picked
grant dates that were most advantageous to them;

(e)    the Company's financial statements were not in compliance with GAAP; and

(f)    the Company's business outlook, when reported, lacked any reasonable basis.

59.    On April 19, 2004, Sunrise filed a Form DEF-14A Proxy Statement with the SEC.
Sunrise circulated the Proxy Statement to shareholders which stated in relevant part:

**STOCK-BASED COMPENSATION**

The compensation committee considers stock options to be
an effective long-term incentive because gains are linked to
increases in the stock value, which in turn provides stockholder
gains. Stock options are granted by the compensation committee,
*at an exercise price equal to the market price of the common
stock at the date of the grant* . . . . The full benefit of the options
is realized upon appreciation of the stock price in future periods,
thus providing an incentive to create value to Sunrise's
stockholders through appreciation of the stock price.

\* \* \*

**REPORT OF THE AUDIT COMMITTEE**

The audit committee oversees Sunrise's financial reporting
process on behalf of the board of directors. Management has the
primary responsibility for the financial statements and the
reporting process, including the systems of internal controls. In
fulfilling its oversight responsibilities, the audit committee has
reviewed and discussed with management the audited financial
statements in Sunrise's Annual Report on Form 10-K for the year
ended December 31, 2003.

The audit committee has reviewed with the independent
auditors, who are responsible for expressing an opinion on the
conformity of those audited financial statements with generally
accepted accounting principles, their judgments as to the
acceptability of the audited financial statements and such other
matters as are required to be discussed with the audit committee

under generally accepted auditing standards. In addition, the audit
committee has discussed with the independent auditors the
auditors' independence from management and Sunrise, including
the matters in the written disclosure required by the Independent
Standards Board and considered the compatibility of nonaudit
services with the auditors' independence.

In reliance on the reviews and discussion referred to above,
the audit committee recommended to the board of directors that the
audited financial statements be included in the Annual Report on
Form 10-K for the year ended December 31, 2003 for filing with
the Securities and Exchange Commission.

> Respectfully Submitted,
> Ronald V. Aprahamian, Chairman
> Thomas J. Donohue
> David G. Bradley

(Emphasis added).

60.    The April 19, 2004 Proxy Statement was materially false and misleading for the

reasons set forth above in paragraph 58.

61.    On April 7, 2005, Sunrise filed a Form DEF-14A Proxy Statement with the SEC.

The Proxy Statement, which was circulated to shareholders, stated in relevant part:

**STOCK-BASED COMPENSATION**

The compensation committee considers restricted stock and
restricted stock units to be an effective long-term incentive for
individuals as it provides them with an opportunity to acquire or
increase their proprietary interest in the company and encourages
key individuals to continue to serve the company long-term. The
full benefit of the restricted stock or restricted stock unit grant is
realized upon the appreciation of Sunrise's stock price, providing
an incentive for key employees to create value for Sunrise's
stockholders through their service to Sunrise. The compensation
committee believes that restricted stock and restricted stock units
have and will continue to be helpful in attracting and retaining
skilled executive personnel.

The compensation committee also considers stock options
to be an effective long-term incentive because gains are linked to
increases in the stock value, which in turn provides stockholder

gains. Stock options are granted by the compensation committee at *an exercise price equal to the market price of the common stock at the date of the grant . . . . The full benefit of the options is realized upon appreciation of the stock price in future periods*, thus providing an incentive to create value to Sunrise's stockholders through appreciation of the stock price.

* * *

## REPORT OF THE AUDIT COMMITTEE

The audit committee oversees Sunrise's financial reporting process on behalf of the board of directors. Management has the primary responsibility for the company's financial statements and reporting process, including its systems of internal controls. In fulfilling its oversight responsibilities, the audit committee has reviewed and discussed with management the audited financial statements in Sunrise's Annual Report on Form 10-K for the year ended December 31, 2004.

The audit committee has also reviewed with the independent auditors, who are responsible for expressing an opinion on the conformity of those audited financial statements with generally accepted accounting principles, their judgments as to the acceptability of the audited financial statements and such other matters as are required to be discussed with the audit committee under generally accepted auditing standards. In addition, the audit committee has discussed with the independent auditors the auditors' independence from Sunrise and its management, including the matters in the written disclosure received by the audit committee as required by the Independence Standards Board, and considered the compatibility of nonaudit services with the auditors' independence.

In reliance on the reviews and discussions referred to above, the audit committee recommended to the board of directors that the audited financial statements be included in the Annual Report on Form 10-K for the year ended December 31, 2004 for filing with the Securities and Exchange Commission.

> Respectfully Submitted,
> Ronald V. Aprahamian, Chairman
> Thomas J. Donohue
> Craig R. Callen

(Emphasis added).

23

62.    The April 7, 2005 Proxy Statement was materially false and misleading for the reasons set forth above in paragraph 58.

63.    On August 4, 2005, Sunrise issued a press release announcing financial results for the Second Quarter of 2005, entitled "Sunrise Reports Second-Quarter 2005 EPS of $0.46 and Raises Full-Year 2005 Outlook." The press release, *"referring to growth in equity in earnings on investments in unconsolidated senior living properties,"* stated in relevant part:

> "We are extremely pleased with the results we are reporting today," said Paul Klaassen, Sunrise Senior Living chairman and CEO. "We are benefiting from our typical growth drivers which include revenue growth in our operating portfolio of management properties, additional community openings and new construction, and we expect our recent acquisitions to further fuel our growth in the second-half of 2005 and for the full-year 2006."

> *  *  *

> "At the end of the quarter, we have minority equity interests in 132 communities held in joint ventures, with a balance sheet investment book value of over $108 million," said Thomas Newell, president, Sunrise Senior Living. *"Since a substantial majority of our new development activity, most of our acquisitions, are being conducted through joint ventures, we expect our minority equity investments to continue to grow. We participate in the earnings of the joint ventures communities based on our percentage ownership and we also expect to continue to receive incentives as these ventures exceed performance thresholds. As a result, we expect to see substantial growth in our income from earnings and returns on equity investments going forward.*

(Emphasis added).

64.    The August 4, 2005 press release was materially false and misleading for the same reasons stated above in paragraph 58.

65.    Later that morning, Sunrise held a conference call with analysts to discuss the Company's business and its financial results. During the call, the following exchange occurred:

[**P. Klaassen – CEO:**]  We had an excellent second quarter.  Virtually every segment performed at or above expected levels.  As a result we have a significant increase in core earnings which were defined as total earnings excluding income from property sales and acquisitions transition expenses . . . .  We have now met or exceeded our expectations every quarter for the past six years and we continue that unbroken streak in the second quarter.  *We significantly exceeded the high end of our guidance range.  In hindsight our forecast is probably a bit conservative as we outperformed . . . earnings from joint ventures . . .*

\* \* \*

[**Question:**]  One of the things that drove number for the quarter I guess was unexpected on my part, was the equity in earnings line.  I understand that some of those were incentive fees related to sale.  I was wondering if you can give color exactly on the transaction but quarter?  And if you can give us any help on thinking about projecting that on a go forward basis, additional sales and incentive fees that we might see?

[**P. Klaassen:**]  The transaction on the quarter I will not break down too much.  We negotiate these things every day and night to not want to hurt ourselves and those negotiations by giv[ing] too much information on it.  We try to make the best deal that we can, you could see the growth that occurred in that line item, it gives to the idea of the range.  For competitive reasons I do not want to get too detailed . . . .  All I can say is that those investments are long-term.  We're happy with the structure.  We think those are good investments.  The money was spent wisely and we think over the long-term they will pay off.

66.    The statements made in the August 8, 2006 conference call were materially false and misleading for the reasons stated above in paragraph 58.

67.    The next day, on August 9, 2005, Sunrise filed its Second Quarter 2005 10-Q Report with the SEC.  The Second Quarter 2005 10-Q, which was signed by Rush and Anschutz, stated in relevant part:

|  | Three months ended 6/30 | | Six months ended 6/30 | |
|---|---|---|---|---|
|  | **2005** | **2004** | **2005** | **2004** |
| Income from operations | $12,358 | $22,184 | $22,966 | $43,307 |
| Equity in earnings and return on investment in unconsolidated | $3,696 | $2,072 | $5,220 | $3,740 |

| senior living properties | | | | |
|---|---|---|---|---|
| Net income | $10,338 | $15,132 | $18,350 | $29,063 |
| Diluted net income per common share | $0.46 | $0.66 | $0.82 | $1.26 |

68.    The Second Quarter 2005 10-Q Report also stated the following:

**Stock-Based Compensation**

Stock options are granted for a fixed number of shares to employees *with an exercise price equal to the fair market value of the shares at the date of the grant.* Sunrise accounts for stock-based compensation using the intrinsic value method in accordance with Accounting Principles Board Opinion No. 25, Accounting for Stock Issued to Employees ("APB 25"), and accordingly, *does not recognize compensation expense for stock option grants* . . .

\* \* \*

**Controls and Procedures**

We carried out an evaluation, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of Sunrise's disclosure controls and procedures as defined in Exchange Act Rule 13a-15(e). *Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective at June 30, 2005.* In connection with the evaluation by management...no changes in Sunrise's internal controls over financial reporting during the quarter ended June 30, 2005 were identified that have materially affected or are reasonably likely to materially affect Sunrise's internal control over financial reporting.

(Emphasis added).

69.    The Second Quarter 2005 10-Q Report also contained the following Sarbanes-

Oxley certifications, signed by P. Klaassen and Rush:

I, [Paul J. Klaassen/Bradley B. Rush], certify that:

1. I have reviewed this quarterly report on Form 10-Q of Sunrise Senior Living, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact

necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

> (a)  designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

> (b)  designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

> (c)  evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

> (d)  disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

> (a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

> (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 9, 2005          [Paul J. Klaassen
                               Chief Executive Officer

                               Bradley B. Bush
                               Chief Financial Officer]

* * *

## CERTIFICATION OF THE CHIEF EXECUTIVE OFFICER AND CHIEF FINANCIAL OFFICER PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002 (18 U.S.C. SECTION 1350)

The undersigned, the Chief Executive Officer and the Chief Financial Officer of Sunrise Senior Living, Inc. (the "Company"), each hereby certifies that, to his knowledge on the date hereof:

> (a) the Quarterly Report on Form 10-Q of the Company for the Period Ended June 30, 2005 filed on the date hereof with the Securities and Exchange Commission (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

> (b) information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ Paul J. Klaassen
Paul J. Klaassen

Chief Executive Officer
Date: August 9, 2005

/s/ Bradley B. Rush
Bradley B. Rush
Chief Financial Officer
Date: August 9, 2005

70.     The Second Quarter 2005 10-Q Report was materially false and misleading for the reasons stated above in paragraph 58. In addition, the statements in the Company's 10-Q above were false and misleading because:

(a)     Defendants violated Section 303 of Regulation S-K and Rule 10b-5 by misrepresenting their financial statements and business prospects, when defendants knew or recklessly disregarded that they were engaging in a scheme to defraud investors by inflating earnings through improper accounting for minority interest in joint ventures, real estate sales and stock options.

(b)     the Company violated the Sarbanes-Oxley Act of 1934 ("Sarbanes-Oxley") by issuing the false certification above; and

(c)     the Company violated Section 13(b)(2)(B) of the Exchange Act by misrepresenting the Sunrise maintained adequate internal controls, when, in fact, Sunrise's internal controls were severely deficient, allowing defendants to engage in a scheme whereby they were able to inflate earnings through improper accounting for joint ventures and stock options. Moreover, Sunrise's utter lack of controls resulted in severe inaccuracies in the Company's reporting financial statements.

71.     On November 8, 2005, the Company issued a press release, entitled "Sunrise Reports Third-Quarter 2005 Results and Re-Affirms Full Year 2005 Earnings Guidance," which stated in relevant part:

> Sunrise Senior Living, Inc. today reported third-quarter 2005 earnings per share of $0.24 (diluted) compared to $0.21 (diluted) per share in the third quarter 2004. *The 14 percent increase in third-quarter, year-over-year earnings per share reflects . . . growth in equity in earnings and return on investments in unconsolidated senior living properties.*
>
> * * *
>
> *Sunrise's income from equity in earnings and return on investments in unconsolidated senior living properties increased to $7.8 million in the third quarter of 2005 from $2.1 million in the prior year period primarily as a result of a transaction in which a venture partner sold its equity portion of 13 senior living communities.* Through this transaction, Sunrise's ownership interest in the venture increased to 25 percent from 20 percent and Sunrise received performance inventive distributions under the terms of the venture agreement. Sunrise venture agreements typically include provisions rewarding Sunrise through various performance incentives. Sunrise continues to manage these 13 senior living communities under long-term management contracts.
>
> *"We continue to benefit from our management services business model and our minority equity investments in unconsolidated properties,"* said Thomas Newell, president, Sunrise Senior Living. "At the end of the third quarter, we had minority equity investments in 152 communities in unconsolidated ventures with a balance sheet investment book value of $128 million . . . . We have set a long-term target to earn a 15 percent annual return on our investments in unconsolidated senior living properties."

(Emphasis added).

72.     The November 8, 2005 press release was materially false and misleading for the reasons stated above in paragraph 58.

73.     Later that morning, Sunrise held a conference call with analysts to discuss the Company's earnings. During the call, the following occurred:

[P. Klaassen, CEO:] Our income statement, balance sheet and cash flow are all in excellent shape and ready to support a very strong '06 outlook. Our growth drivers are producing consistent with our expectations and as a result we are able to report earnings per share excluding acquisition transition and hurricane related expenses of $0.26 a share in 2003 after our two for one stock split. . . . *As anticipated, we also continued to benefit from growth in our equity and earnings line.* Our 152 joint venture communities are making substantial contributions to our growth through our percentage ownership in these communities . . . . We target a 15% annual return on our $128 million investment in these unconsolidated senior living properties. And we expect to continue to benefit from our percentage ownership in these joint venture communities for many years to come.

\* \* \*

[Question:] I want to ask a little bit about equity and earnings and guidance. The equity and earnings bounces around a little bit because you're selling properties. You have various things coming in. I wanted to see if we could get additional guidance on that beyond what you provided and clarify maybe what your own assumptions are say in '05, '06 numbers for that.

[Newell - President:] . . . We have given a target long-term of 15% earnings on the $128 million we invested. That's through 152 properties and joint ventures and it is lumpy as you said because included in that line will be start of - startup losses from homes in development ventures as they open. As they ramp up then, we begin to share in the earnings and cash from those joints ventures. As performance hurdles are met, we begin to share disproportionately which is what you saw in this quarter and last quarter as investor partners received distributions in excess of the hurdles we generate substantial returns. Our assumptions internally that over time from those investments we will hit a 15% irr. We model out all 152 communities over a long period of time and calculate that in our guidance. It's very difficult to predict out more than one or two quarters. We have a sense of what's coming and we do our best and giving guidance what we are very confident of these are very good investments and communities that are performing very well. For the long run for Sunrise, we will generate a great return on that.

(Emphasis added).

74.    The statements in the November 8, 2005 were false and misleading for the same

reasons stated above in paragraph 58.

75.    The next day, November 9, 2005, Sunrise filed its Third Quarter 2005 10-Q

Report with the SEC.  The Third Quarter 2005 10-Q, stated in relevant part:

| | Three months ended 9/30 | | Six months ended 9/30 | |
|---|---|---|---|---|
| | **2005** | **2004** | **2005** | **2004** |
| Income from operations | $9,395 | $11,821 | $32,361 | $55,130 |
| Equity in earnings and return on investment in unconsolidated senior living properties | $7,801 | $2,095 | $13,021 | $5,834 |
| Net income | $11,049 | $8,912 | $29,379 | $37,975 |
| Diluted net income per common share | $0.24 | $0.21 | $0.66 | $0.84 |

The Third Quarter 2005 10-Q Report also stated:

**Stock-Based Compensation**

Stock options are granted for a fixed number of shares to employees *with an exercise price equal to the fair market value of the shares at the date of the grant.*  Sunrise accounts for stock-based compensation using the intrinsic value method in accordance with Accounting Principles Board Opinion No. 25, Accounting for Stock Issued to Employees ("APB 25"), and accordingly, *does not recognize compensation expense for stock option grants . . .*

* * *

**Controls and Procedures**

We carried out an evaluation, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of Sunrise's disclosure controls and procedures as defined in Exchange Act Rule 13a-15(e).  *Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective at September 30, 2005.*  In connection with the evaluation by management . . . no changes in Sunrise's internal controls over financial reporting during the quarter ended September 30, 2005 were identified that have materially affected or are reasonably likely to materially affect Sunrise's internal control over financial reporting.

(Emphasis added).

76.    In addition, the Third Quarter 2005 10-Q contained essentially the same false and misleading Sarbanes-Oxley certifications stated above in paragraph 69.

77.    The Third Quarter 2005 10-Q was materially false and misleading for the same reasons stated above in paragraph 70.

78.    On March 7, 2006, Sunrise issued a press release, entitled "Sunrise Reports Fourth-Quarter 2005 Results, Reaffirms Full-Year 2006 Earnings Guidance and Expects 15 to 20 Percent Full-Year 2007 EPS Growth," which stated in relevant part:

> Sunrise Senior Living, Inc., today reported fourth-quarter 2005 earnings of $1.01 per share (diluted) compared to $0.28 (diluted) per share in the fourth quarter of 2004. For the full year 2005, Sunrise reported earnings per share of $1.67 (diluted) compared to earnings per share of $1.12 (diluted) in 2004 . . . .
>
> "The fourth quarter and year closed strongly, as we expected, and positions us for a very good 2006 during which we will be celebrating our 25th anniversary," said Paul Klaassen, Sunrise Senior Living's chairman and CEO.
>
> *    *    *
>
> "We are extremely excited about the opportunities that lie ahead for our business," said Thomas Newell, president of Sunrise Senior Living. "As we move forward, we expect to continue to benefit from our expanded development program and our management services business model. In 2006, *we anticipate a record number of community openings and substantial returns from our minority investments in joint venture partnerships.* In addition, the strength of our balance sheet is expected to provide significant flexibility as we enter into the next phase of our growth strategy."
>
> *    *    *
>
> Sunrise's 2006 earnings per share is expected to be driven . . . by *further growth in earnings generated by Sunrise's equity investments in unconsolidated ventures.*

(Emphasis added).

79.    The March 7, 2006 press release was materially false and misleading for the same reasons stated above in paragraph 58.

80.    Later that morning, Sunrise held a conference call with analysts to discuss the Company's earnings.  During the call, the following occurred:

> **[P. Klaassen - CEO:]**  The fourth quarter closed out strongly as we expected and ended a busy and successful year for Sunrise.  All four of our growth engines are firing on all cylinders.  As you may know, those four growth engines are:  1, growth from new construction; 2, growth from new management contract; 3, internal growth from existing operations; 4, growth generated by our balance sheet. . . .  Our success in 2005 was the result of many factors . . . .  ***Regarding equity in earnings, excluding the $3.6 million one-time write-down of our original investment in that at-home venture, we would have reported equity in earnings of un [sic] - of approximately $3.8 million in Q4, and, I guess that would be $16.8 million for the year.  We expect an additional 15 percent growth in this business segment in 2006.***  Our ownership percentage in these 156 unconsolidated joint venture communities in which we have invested $138 million should therefore generate about $19 million in pretax income this year.  These minority ownership positions align our interests with our capital partners, and allows you to participate in community performance upside, without the negative impact of increased debt levels or additional amortization and depreciate quags [sic] expenses . . . .

(Emphasis added).

81.    The statements in the March 7, 2006 conference call were materially false and misleading for the same reasons stated above in paragraph 58.

82.    On March 16, 2006, the Company filed its Form 10-K Report for the fiscal year ended December 31, 2005, which included its previously reported 2003-2005 financial results and statements.  Sunrise's Form 10-K Report stated in relevant part:

> 13. Stockholders' Equity
>
> ***Stock Option Plan***
> Sunrise has stock option plans providing for the grant of incentive and nonqualified stock options to employees, directors,

consultants and advisors . . . . *Under the terms of the plans, the option exercise price and vesting provisions of the options are fixed when the option is granted . . . . The option exercise price is not less than the fair market value of a share of common stock on the date the option is granted.*

> . . . *Under the terms of the Directors' Plan, the option exercise price was not less than the fair market value of a share of common stock on the date the option was granted.*

(Emphasis added).

83.     In addition, the Form 10-K Report contained essentially the same false and misleading Sarbanes-Oxley certifications stated above in paragraph 69.

84.     The March 16, 2006 10-K Report was materially false and misleading for the same reasons stated above in paragraph 70.

85.     On April 10, 2006, Sunrise filed a Form DEF-14A Proxy Statement with the SEC. Sunrise circulated the Proxy Statement to shareholders which stated in relevant part:

### STOCK-BASED COMPENSATION

The compensation committee also considers stock options to be an effective long-term incentive because gains are linked to increases in the stock value, which in turn provides stockholder gains. Stock options are granted by the compensation committee, *at an exercise price equal to the market price of the common stock at the date of the grant* . . . . The full benefit of the options is realized upon appreciation of the stock price in future periods, thus providing an incentive to create value to Sunrise's stockholders through appreciation of the stock price.

* * *

### REPORT OF THE AUDIT COMMITTEE

The audit committee oversees Sunrise's financial reporting process on behalf of the board of directors. Management has the primary responsibility for the company's financial statements and reporting process, including its systems of internal controls. In fulfilling its oversight responsibilities, the audit committee has reviewed and discussed with management the audited financial

statements in Sunrise's Annual Report on Form 10-K for the year ended December 31, 2005.

The audit committee has also reviewed with the independent auditors, who are responsible for expressing an opinion on the conformity of those audited financial statements with generally accepted accounting principles, their judgments as to the acceptability of the audited financial statements and such other matters as are required to be discussed with the audit committee under generally accepted auditing standards. In addition, the audit committee has discussed with the independent auditors the auditors' independence from Sunrise and its management, including the matters in the written disclosure received by the audit committee as required by the Independence Standards Board, and considered the compatibility of nonaudit services with the auditors' independence.

In reliance on the reviews and discussions referred to above, the audit committee recommended to the board of directors that the audited financial statements be included in the Annual Report on Form 10-K for the year ended December 31, 2005 for filing with the Securities and Exchange Commission.

> Respectfully Submitted,
> Ronald V. Aprahamian, Chairman
> Thomas J. Donohue
> Craig R. Callen

(Emphasis added).

86.    The April 10, 2006 Proxy Statement was materially false and misleading for the reasons set forth above in paragraph 58.

87.    On April 27, 2006, Sunrise issued its 2005 Annual Report to Shareholders, which reported:

| Year Ended December 31, | 2005 | 2004 | 2003 |
|---|---|---|---|
| Operating revenues | $1,819,479 | $1,446,471 | $1,096,260 |
| Net income | $79,742 | $20,687 | $62,178 |
| Total assets | $1,328,276 | $1,105,756 | $1,009,798 |
| Stockholder's equity | $632,677 | $523,518 | $490,276 |

88.    The 2005 Annual Report to Shareholders also stated, in relevant part:

36

13. Stockholders' Equity

Stock Option Plan

Sunrise has stock option plans providing for the grant of incentive and nonqualified stock options to employees, directors, consultants and advisors . . . . *Under the terms of the plans, the option exercise price and vesting provisions of the options are fixed when the option is granted . . . . The option exercise price is not less than the fair market value of a share of common stock on the date the option is granted.*

*. . . Under the terms of the Directors' Plan, the option exercise price was not less than the fair market value of a share of common stock on the date the option was granted.*

\* \* \*

**Joint Venture Partners** Strong industry demographics, operations excellence, and our strong financial condition continue to accelerate interest among our impressive group of joint venture partners. *At the end of 2005, 156 of our communities were held in joint ventures, and nearly all of our new development and acquisitions are conducted through joint ventures.* Through our percentage ownership in these communities and the incentives we receive for exceeding performance thresholds, *these partnerships contributed significantly to our growth in 2005.* In addition, these joint venture partnerships reduce our corporate risk profile *since we share capital and construction risk with our partners.*

\* \* \*

**Equity in Earnings and Return on Investment in Unconsolidated Senior Living Communities**

Equity in earnings and return on investment in unconsolidated senior living communities represents our allocation of the results of operations and returns on our investment from the distributions of proceeds from transactions with our unconsolidated ventures.

**2005 Compared to 2004**

Equity in earnings and return on investment in unconsolidated senior living communities was $13.2 million in 2005 compared to $9.4 million in 2004, an increase of $3.8 million, or 41%, which was primarily comprised of:

- $8.8 million return on our investment pursuant to the terms of a venture agreement;

- a decrease of $4.9 million from our portion of start-up losses associated with two international development ventures. In 2005, these two ventures opened four communities which incurred losses in 2005;

- $2.9 million return on our investment whereby an unconsolidated venture sold two senior living communities to Sunrise REIT;

- $3.0 million return on our investment whereby an unconsolidated venture sold its three senior living communities and distributed the proceeds to its members. We recognized the $3.0 million of cash received in excess of our investment;

- a decrease of $3.6 million from the write-down of our interest in Sunrise at Home; and

- a decrease of $2.5 million from the results of operations from other unconsolidated ventures, including our portion of start-up losses from development ventures.

**2004 Compared to 2003**

Equity in earnings and return on investment in unconsolidated senior living communities was $9.4 million in 2004 compared to $5.3 million in 2003, an increase of $4.1 million, or 76%, which primarily resulted from improved operations and additional incentive fees.

\* \* \*

**Management's Report on Internal Control over Financial Reporting**

\* \* \*

The Company's internal control over financial reporting is supported by written policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the Company's transactions and dispositions of the Company's assets; [and] (2) *provide reasonable assurance that transactions are recorded as necessary to permit preparation of the consolidated financial statements in accordance with generally accepted accounting principles* . . . .

In connection with the preparation of the Company's annual consolidated financial statements, management has undertaken an assessment of the effectiveness of the Company's internal control over financial reporting as of December 31, 2005, based on criteria established in Internal Control - Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (the COSO Framework). *Management's assessment included an evaluation of the design of the Company's internal control over financial reporting and testing of the operational effectiveness of those controls.*

*Based on this assessment, management has concluded that as of December 31, 2005, the Company's internal control over financial reporting was effective to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. generally accepted accounting principles.*

\* \* \*

Paul J. Klaassen Chief Executive Officer
Bradley B. Rush Chief Financial Officer

\* \* \*

**Investments in Unconsolidated Senior Living Communities**

Sunrise holds an interest in ventures established to develop or acquire and own senior living communities. When these ventures are considered to be variable interest entities ("VIEs") in accordance with FASB Interpretation No. 46, *Consolidation of Variable Interest Entities* ("FIN 46R"), Sunrise consolidates the ventures if it is determined to be the primary beneficiary. When Sunrise has determined it is not the primary beneficiary or, for non-VIEs when it determines that it owns a non-controlling interest (because other partners or members control or participate in the management decisions of these ventures), *the investments are accounted for under the equity method.*

*The equity method investments are recorded at cost* and subsequently are adjusted for equity in net income (losses) and distributions. Sunrise determines its share of the investees' earnings or losses based on the distributions of cash flow from a hypothetical liquidation of the investee's assets and liabilities. The equity earnings are adjusted for the impact on the investee's reported earnings, if any, for the basis differences between Sunrise's carrying value of the equity investments and the

39

investee's underlying assets. Sunrise recognizes profits on sales of services to these ventures to the extent of the ventures' outside ownership interest.

***Sunrise owned interests in 187 unconsolidated senior living communities (31 of which are under development) through ownership interests in 30 unconsolidated ventures at December 31, 2005 that are accounted for under the equity method and one unconsolidated venture accounted for under the cost method.*** Those ventures are generally limited liability companies and partnerships. Sunrise's interest in those ventures generally range from five to 25%. Sunrise has one community in which it owns less than lo%, 147 communities in which it owns between 10% and 20%, and 20 communities in which it owns between 10% and 30%, and 19 communities in which it owns more than 30%.

**Variable Interest Entities**

At December 31, 2005, Sunrise had an interest in 11 ventures that are considered VIEs. Sunrise is the primary beneficiary and, therefore, consolidates eight of these VIEs. Seven of these consolidated VIEs are development communities in which Sunrise has a majority of the voting interest and is developing for Sunrise REIT (see Note 4). At December 31, 2005, included in Sunrise's consolidated balance sheet were $56.1 million of development costs and $50.7 million of debt, including $6.6 million of third-party construction debt secured by the development communities and $44.1 million of borrowings from Sunrise REIT guaranteed by Sunrise. The only recourse to Sunrise with respect to these seven VGFIEs is under borrowings from Sunrise REIT.

(Emphasis added).

89.    The 2005 Annual Report was materially false and misleading for the same reasons stated above in paragraph 70.

## IX.    THE TRUTH BEGINS TO EMERGE

90.    On May 9, 2006, Sunrise issued a press release, entitled "Sunrise to Reschedule First Quarter Earnings Announcement," which stated in relevant part:

Sunrise Senior Living, Inc., today announced it is rescheduling its first quarter 2006 earnings release to allow

> additional time for further review of the accounting treatment
> applied to investments in unconsolidated senior living
> communities, and to complete the review of its Form 10-Q for the
> first quarter ended March 31, 2006 . . . .

91.    As a result of the disclosure, Sunrise's stock price fell to $32.35 per share on May

9, 2006, on huge trading volume of 4.4 million shares, from a closing price of $39.30 per share

on May 8, 2006.

92.    The next day, on May 10, 2006, Sunrise issued another press release, entitled

"Sunrise Provides Update on Accounting Treatment Review and Release of First Quarter

Financial Results," which stated in relevant part:

> The accounting treatment review is focused on the allocation of
> profits and losses for a limited number of Sunrise joint ventures
> where Sunrise is a minority partner and the capital partner receives
> a preference, either on return of its capital over Sunrise's capital in
> the event of a refinancing or sale of the venture's properties, or
> cash flow from operations. Preferences on return of capital are no
> longer typical.

93.    On May 11, 2006, the Company issued yet another press release, entitled "Sunrise

Reports Preliminary Selected Financial Data For First-Quarter 2006," which stated in relevant

part:

> As a result of the review, Sunrise has decided to use a different
> methodology to allocate profits and losses in its joint ventures
> based on such rights and priorities of the partners. Sunrise is
> evaluating whether this methodology will require adjustments to
> prior period financial statements.
>
>                    *    *    *
>
> Sunrise will not file its Form 10-Q until it completes its review.
> This review encompasses a multi-year analysis of each affected
> venture and is being completed as thoroughly and quickly as
> possible . . . .

94.    Later that morning, Defendants held a conference call with analysts, hosted by P.

Klaassen. During the conference call, P. Klaassen stated in relevant part:

The issue that necessitated this additional review has to do with the accounting treatment applied to certain of our investments in unconsolidated senior living communities. Specifically, this accounting treatment review is focused on the allocation of profits and losses for those joint ventures in which Sunrise is a minority partner and the capital partner receives a preference on return of its capital over Sunrise's capital, in the event of a refinancing or sale of the venture's properties.

* * *

In connection with this review, our accounting team determined and then brought to the attention of our auditors that there is a more preferable method under generally accepted accounting principles for allocating such profits and losses among the partners of theses ventures and for determining the timing of such allocations during the lifecycle of the ventures, from startup losses to stabilized cash flow refinancing or sale or the property.

*Now, as a result, we are now in the process of assessing the implications of adopting this alternative methodology and whether adjustments are necessary to prior period financial statements . . . .*

* * *

*We will completely avoid this accounting issue in the future by no longer providing preferential return on capital in any future ventures. We were able to do this now because of the successful track record that we have established with these ventures.*

* * *

The general effect of using this different methodology – known, I am told, as the hypothetical liquidation at book value method – *is to shift more of any losses to Sunrise in the early days of any venture where the capital partner has a preference for return of capital . . . .*

* * *

Now, if this partnership were to experience 1 million of initial losses . . . Sunrise would initially recognize 20% (minority interest) or $200,000 of the $1 million of losses . . . .

Now, if the same venture has *included a capital return* preferences . . . Sunrise *would be allocated 100% or all million dollars of the initial losses . . . .*

(Emphasis added).

95.    Also during the May 11, 2006 conference call, when asked if the new accounting method was a new option to the Company or if it had been available for years, Defendant Rush admitted the new accounting method the Company was using going forward was "available for a number of years."

96.    At the end of the Class Period, June 15, 2006, *MarketWatch* published an article, entitled "Sunrise Sr. Living full-year estimated cut by Stifel Nicolaus," which stated in relevant part:

> Sunrise Senior Living Inc. (SRZ) had one quarter and two years' worth of per-share earnings estimated cut by Stifel Nicolaus on Thursday, though the firm reiterated its buy rating on the stock . . . . Preliminary first-quarter results provided by the company . . . prompted Stifel Nicolaus to take its full-year 2006 outlook to $1.15 from $1.18 a share. The firm also reduced its full-year 2007 per-share forecast to $1.32 from $1.36, and lowered its first-quarter forecast to 21 cents from 23 cents.

## X.    POST CLASS PERIOD DEVELOPMENTS

97.    On July 31, 2006, Sunrise issued a press release, entitled "Sunrise Provides Update On Accounting Review," which stated in relevant part:

> [T]he Company will *restate* its financial statements for the years ended December 31, 2003, 2004 and 2005 primarily to adjust the *accounting treatment related to ventures that contain partner preferences and the timing of sale accounting and recognition of income from prior sales of real estate.* The cumulative impact of the restatement is *expected to reduce net income for all periods impacted, including 1999 through 2005, by an estimated $60 million to $110 million . . . .* Sunrise is unable at this time to provide that precise impacts of the restatement since its review of these issues has not yet concluded.... The Company noted that its previously issued audited consolidated financial statements for the years ended December 31, 2003, 2004 and 2005, including the associated auditor's report currently on file with the SEC in the Company's 2005 Form 10-K, and its unaudited quarterly financial statements during these years *should no longer be relied upon.*

* * *

43

As the review unfolded, Sunrise looked not only at partner preferences, but also at all guarantees and commitments provided to our venture partners and third party investors. Certain of these guarantees *should have been considered at the time of the sale* of real estate to these entities . . . .

Allocation of profits and losses in those ventures in which Sunrise's partners receive a preference on cash flow. This area of the review focused on the timing of both the recognition of profits and losses from ventures and the recognition of pre-opening fees from ventures in which our partners receive a cash flow preference . . . . In the future, Sunrise will no longer offer preferences on cash flows for its ventures. Sunrise will account for its equity in earnings of unconsolidated ventures by a method knows as Hypothetical Liquidation at Book Value ("HLBV"), rather than on its historical method based upon percentage ownership.

\* \* \*

The impact of this restatement will require *Sunrise to record additional losses in prior periods for those ventures with cash flow preferences.*

\* \* \*

Effect of certain Sunrise guarantees and commitments on timing of sale accounting and recognition of income upon sale of real estate. Primarily during the period from 2000 to 2003, Sunrise sold mature senior living properties to ventures or independent third parties. In addition, as part of its development program, Sunrise sometimes owns real estate during the zoning…process and then sells or contributes the real estate to a venture of third party investor. Sunrise *historically has recognized income upon the completion of such sales.* In connection with some of Sunrise's sales of real estate . . . *Sunrise has provided limited guarantees or commitments* . . . . In accordance with SFAS 66, *Accounting for Sales of Real Estate*, based on the nature of the guarantee or commitment, *Sunrise may be required to defer some or all of the income* or may not be able to immediately record the transaction as a sale.

\* \* \*

This accounting issue should not recur as Sunrise *does not expect to offer guarantees to new ventures or lenders* that would preclude sale accounting or require deferral of income.

(Emphasis added).

98.     Also on July 31, 2006, Sunrise filed a Form 8-K with the SEC which added to the press release that "the Company expects to report a material weakness in its internal control over financial reporting in it amended 2005 Form 10-K."

99.     Subsequently, on August 8, 2006, Sunrise issued a press release, entitled "Sunrise Reports Preliminary Selected Financial and Operating Data for Second-Quarter," which proved provided an update to the Company's accounting review. In that statement, the Company announced that it was "able to narrow the range of the estimated impact to net income from the restatement. The cumulative impact . . . is currently expected to reduce net income . . . by an estimated *$65 million to $100 million.*"

100.    On the same day, Sunrise filed a Form 8-K/A with the SEC, amending its July 31, 2006 Form 8-K. In its amended filing, Sunrise announced that, based on the Company's earlier disclosures, the SEC requested additional information regarding the method used for determining Sunrise's share of equity in earnings or losses and its interpretation of SOP 78-9, *Accounting for Investments in Real Estate Ventures.*

101.    Later, on November 7, 2006, Sunrise issued a press release, entitled "Sunrise Reports Preliminary Selected Financial and Operating Data for Third-Quarter 2006," which stated in relevant part:

> Sunrise is completing its review of the accounting treatment related to ventures that contain partner preferences and to the timing of sale accounting and recognition of income from sales of real estate or partnership interests in joint ventures. Subject to completion of its auditor's review and *clearing comments from the SEC,* Sunrise currently expects to file its restated 2005 Form 10-K before year end, which will be followed by the filing of Sunrise's Forms 10-Q for the first three quarters of 2006. Sunrise currently expects to be current in its filings with the Securities and Exchange Commission upon the filing of its 2006 Form 10-K on or before March 1, 2007.

> The cumulative impact of the restatement is currently anticipated
> to reduce net income for all periods impacted, including 1999
> through 2005, by approximately *$100 million*.

(Emphasis added).

102.    Soon after, on November 20, 2006, the Service Employees International Union

("SEIU"), a shareholder of Sunrise, sent a letter to the Company calling for an independent

investigation into concerns about insider stock sales, questionable accounting practices, and

improbably-timed stock option grants.  This request came after a review of the Company's

finances by the SEIU Capital Stewardships Program found that executives sold $32 million

worth of shares, many of the stock options grants were fortuitously timed and all members of the

Audit and Compensation Committees have personal ties to the company.

103.    As a result, on December 11, 2006, Sunrise announced that its BOD had

appointed a special independent committee to review recent insider sales of Sunrise stock and the

Company's historical practices related to stock option grants.  The Company further disclosed

that the SEC had requested information relating to the Company's insider trading and stock

option practices.  In addition, the Company stated that the review by the special committee

would be conducted in parallel with the Company's ongoing efforts to complete the previously

announced restatement.

104.    Most recently, on January 15, 2006, Sunrise issued a press release, entitled

"Sunrise Provides Update on Pending Restatement," which stated in relevant part:

> Sunrise believes that is it close -- weeks, not months -- to
> submitting its recast 2005 financial information with the SEC for
> its review, the essential first step in the process.  However, due to
> factors including the complexity of the issues involved, the need to
> clear comments with the SEC, as well as the ongoing review by the
> recently formed special committee of the board of directors,
> Sunrise will not be current with all SEC filings, including the 2006

Form 10-Qs and 2006 Form 10-K by March 1, 2007, as previously anticipated.

Sunrise plans to hold its quarterly conference call on February 27, 2007 to provide a further update on this review and the progress toward completion of its restatement . . . .

## XI.   CAUSATION ALLEGATIONS

105.    At all relevant times, Sunrise's common stock was traded on the NYSE. As described above, Defendants' material misrepresentations and omissions had the effect of creating and maintaining an artificially inflated price for Sunrise's common stock. Those misrepresentations and omissions that were not immediately followed by an upward movement in the Company's stock price served to maintain the share price at artificially inflated levels by maintaining and supporting the false public perception of Sunrise's business, operations, performance and prospects, and particularly the profitability of its joint ventures.

106.    Defendants had a duty to disseminate promptly accurate and truthful information with respect to Sunrise's financial and operational condition or to cause and direct that such information be disseminated and to correct promptly any previously disseminated information that was misleading to the market. As a result of their failure to do so, the price of Sunrise's common stock was artificially inflated during the Class Period, severely damaging Plaintiff and the Class.

107.    Defendants' false and misleading statements and omissions in their press releases and other public statements directly caused losses to the Class. On the strength of these false statements, misrepresentations and material omissions in its press releases, announcements and other public statements concerning its financial condition, the Company's stock was artificially inflated to a Class Period high of $39.49 per share on March 29, 2006. Thereafter, the stock fell

to $28.54 per share by the end of the Class Period, June 15, 2006, thereby inflicting substantial damages on Plaintiff and the Class.

108.    Until shortly before Plaintiff filed this Complaint, it was unaware of all of the facts, as described herein, and could not have reasonably discovered the Defendants' fraudulent scheme by the exercise of reasonable diligence.

## XII.    SCIENTER ALLEGATIONS

109.    As alleged herein, Defendants acted with scienter in that Defendants knew or recklessly disregarded that the public statements and documents issued and disseminated in the name of the Company were materially false and misleading, knew or recklessly disregarded that such statements and documents would be issued and disseminated to the investing public, and knowingly and substantially participated and acquiesced in the issuance or dissemination of such statements and documents as primary violators of the federal securities laws.

110.    Defendants had the opportunity to commit and participate in the wrongful conduct complained of herein. Each was a senior executive officer and/or director of Sunrise and, thus, controlled the information disseminated to the investing public in the Company's press releases, SEC filings and communications with analysts. As a result, each could falsify the information that reached the public about the Company's business and performance. With respect to non-forward looking statements and/or omissions, Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information that they caused to be disseminated to the investing public.

111.    Throughout the Class Period, each of the Individual Defendants acted intentionally or recklessly participated in and orchestrated the fraudulent scheme alleged herein to defraud investors by inflating earnings through improper accounting for minority interests in

joint ventures, real estate sales and stock options, thereby allowing Sunrise to attain its aggressive growth strategy and obtain new joint venture partners. The Individual Defendants were motivated to engage in the fraud alleged herein to profit from improper insider sales. While Sunrise stock was trading at artificially inflated prices due to the Defendants false statements, the Section 20A Defendants personally profited from their wrongful conduct and scheme by selling over $35 million worth of their individual holdings in Sunrise common stock, as follows:

| Insider | Date | No. of Shares | Price Per Share | Proceeds |
|---|---|---|---|---|
| Anschutz, Barron | 11/21/2005 | 2,000 | $ 33.04 | $ 66,080.00 |
|  | 11/21/2005 | 3,000 | $ 33.00 | $ 99,000.00 |
|  | 1/3/2006 | 826 | $ 32.06 | $ 26,481.56 |
|  | 1/3/2006 | 100 | $ 32.05 | $ 3,205.00 |
| **Total for Anschutz, Barron** |  | **5,000** |  | **$ 194,766.56** |
| Aprahamian, Ronald V. | 4/18/2006 | 20,000 | $ 37.85 | $ 757,000.00 |
| **Total for Aprahamian, Ronald V.** |  | **20,000** |  | **$ 757,000.00** |
| Donohue, Thomas J. | 11/21/2005 | 24,000 | $ 33.04 | $ 792,960.00 |
|  | 11/21/2005 | 32,000 | $ 33.04 | $ 1,057,280.00 |
|  | 11/21/2005 | 10,000 | $ 33.04 | $ 330,400.00 |
|  | 11/21/2005 | 30,000 | $ 33.04 | $ 991,200.00 |
|  | 11/21/2005 | 6,666 | $ 33.04 | $ 220,244.64 |
| **Total for Donohue, Thomas J.** |  | **102,666** |  | **$ 3,392,084.64** |
| Holladay, J. Douglas | 9/23/2005 | 5,000 | $ 64.00 | $ 320,000.00 |
|  | 10/3/2005 | 4,000 | $ 67.00 | $ 268,000.00 |
|  | 11/7/2005 | 2,300 | $ 35.00 | $ 80,500.00 |
|  | 12/6/2005 | 1,700 | $ 35.00 | $ 59,500.00 |
|  | 12/12/2005 | 6,000 | $ 36.50 | $ 219,000.00 |
|  | 3/21/2006 | 8,000 | $ 39.00 | $ 312,000.00 |
| **Total for Holladay, J. Douglas** |  | **27,000** |  | **$ 1,259,000.00** |
| Hulse, Larry E. | 8/4/2005 | 15,000 | $ 57.62 | $ 864,300.00 |
|  | 8/12/2005 | 20,973 | $ 61.24 | $ 1,284,386.52 |

| | 8/12/2005 | 1.000 | $ | 61.24 | $ | 61,240.00 |
|---|---|---|---|---|---|---|
| **Total for Hulse, Larry E.** | | 36,973 | | | $ | **2,209,926.52** |

| | | | | | | |
|---|---|---|---|---|---|---|
| Klaassen, Paul J. & Teresa M. | 12/19/2005 | 50,000 | $ | 34.78 | $ | 1,739,000.00 |
| | 12/20/2005 | 50,000 | $ | 34.58 | $ | 1,729,000.00 |
| | 1/3/2006 | 50,000 | $ | 32.11 | $ | 1,605,500.00 |
| | 1/4/2006 | 50,000 | $ | 34.39 | $ | 1,719,500.00 |
| | 2/1/2006 | 50,000 | $ | 36.27 | $ | 1,813,500.00 |
| | 2/2/2006 | 50,000 | $ | 36.14 | $ | 1,807,000.00 |
| | 3/1/2006 | 50,000 | $ | 34.76 | $ | 1,738,000.00 |
| | 3/2/2006 | 50,000 | $ | 34.26 | $ | 1,713,000.00 |
| | 4/3/2006 | 50,000 | $ | 38.82 | $ | 1,941,000.00 |
| | 4/4/2006 | 50,000 | $ | 38.50 | $ | 1,925,000.00 |
| | 5/1/2006 | 50,000 | $ | 37.04 | $ | 1,852,000.00 |
| | 5/1/2006 | 50,000 | $ | 36.77 | $ | 1,838,500.00 |
| **Total for Klaaseen Paul J. & Teresa M.** | | **600,000** | | | $ | **21,421,000.00** |

| | | | | | | |
|---|---|---|---|---|---|---|
| Newell, Thomas B. | 8/22/2005 | 12,000 | $ | 60.10 | $ | 721,200.00 |
| | 9/22/2005 | 6,636 | $ | 63.01 | $ | 418,134.36 |
| | 9/22/2005 | 5,364 | $ | 63.01 | $ | 337,985.64 |
| | 10/24/2005 | 24,000 | $ | 32.52 | $ | 780,480.00 |
| | 11/22/2005 | 24,000 | $ | 33.68 | $ | 808,320.00 |
| | 12/22/2005 | 24,000 | $ | 34.66 | $ | 831,840.00 |
| | 1/23/2006 | 24,000 | $ | 35.29 | $ | 846,960.00 |
| | 2/22/2006 | 24,000 | $ | 34.20 | $ | 820,800.00 |
| | 3/22/2006 | 24,000 | $ | 38.27 | $ | 918,480.00 |
| | 4/24/2006 | 24,000 | $ | 38.12 | $ | 914,880.00 |
| **Total for Newell, Thomas B.** | | **192,000** | | | $ | **7,399,080.00** |

| | | | | | | |
|---|---|---|---|---|---|---|
| Rush, Bradley B. | 9/8/2005 | 687 | $ | 59.51 | $ | 40,883.37 |
| | 9/12/2005 | 3,000 | $ | 62.59 | $ | 187,770.00 |
| | 9/12/2005 | 2,000 | $ | 62.60 | $ | 125,200.00 |
| | 9/12/2005 | 1,150 | $ | 62.63 | $ | 72,024.50 |
| | 9/12/2005 | 100 | $ | 62.66 | $ | 6,266.00 |
| **Total for Rush, Bradley B.** | | **6,937** | | | $ | **432,143.87** |

| | | | | | | |
|---|---|---|---|---|---|---|
| **Grand Total** | | **990,576** | | | $ | **37,065,001.59** |

50

## XIII. SUNRISE'S GAAP VIOLATIONS

112.    Throughout the Class Period, Defendants represented that Sunrise's financial statements when issued were prepared in conformity with GAAP, which are recognized by the accounting profession and the SEC as the uniform rules, conventions and procedures necessary to define accepted accounting practice at a particular time. However, in order to artificially inflate the price of Sunrise's common stock, Defendants used improper accounting practices in violation of GAAP and SEC reporting requirements to falsely inflate the Company's reported earnings in the interim quarters and fiscal years during the Class Period.

113.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures, which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. § 210.10-0 1(a).

114.    Sunrise's materially false and misleading financial statements resulted from a series of deliberate senior management decisions designed to conceal the truth regarding Sunrise's actual operating results. Defendants caused the Company to violate GAAP and its own accounting policies by:

(a)    Prematurely recognizing income from its unconsolidated senior living centers;

(b)    Improperly recognizing as a sale, the transfer of assets where Sunrise provided the purchaser with certain commitments and guarantees; and

(c)    Failing to properly account for backdated stock options given to top Company

executives.

115.    As a result of these material violations of GAAP, the Defendants have now

admitted that the Company will be forced to restate its financial statements for the period 2003

through 2005, the cumulative impact of which is expected to reduce net income for 1999 through

2005 by an estimated $60 million to $100 million.

116.    As set forth in Financial Accounting Standards Board ("FASB") Statements of

Concepts ("Concepts Statement") No. 1, one of the fundamental objectives of financial reporting

is that it provide accurate and reliable information concerning an entity's financial performance

during the period being presented.  Concepts Statement No. 1, paragraph 42, states:

> Financial reporting should provide information about an
> enterprise's financial performance during a period.  Investors and
> creditors often use information about the past to help in assessing
> the prospects of an enterprise.  Thus, although investment and
> credit decisions reflect investors' and creditors' expectations about
> future enterprise performance, those expectations are commonly
> based at least partly on evaluations of past enterprise performance.

117.    As set forth in SEC Rule 4-01(a) of SEC Regulation S-X, "[f]inancial statements

filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be

misleading or inaccurate."  17 C.F.R. § 210.4-01(a)(1).  Management is responsible for preparing

financial statements that conform with GAAP.  As noted by the American Institute of Certified

Public Accountants ("AICPA") professional standards:

> financial statements are management's responsibility . . . .
> [M]anagement is responsible for adopting sound accounting
> policies and for establishing and maintaining internal control that
> will, among other things, record, process, summarize, and report
> transactions (as well as events and conditions) consistent with
> management's assertions embodied in the financial statements.
> The entity's transactions and the related assets, liabilities and
> equity are within the direct knowledge and control of management

. . . . Thus. the fair presentation of financial statements in conformity with Generally Accepted Accounting Principles is an implicit and integral part of management's responsibility.

**A.    Sunrise Prematurely Recognized Income from Its Unconsolidated Senior Living Centers**

118.    GAAP requires an investor (*e.g.*, Sunrise) holding an equity investment in a non-corporate investee that possesses the ability to exercise a significant influence over the investee (as defined under GAAP) to use the equity method of accounting to account for that investor's percentage interest in the investee.

119.    Until November 15. 2001. AICPA Statement of Position ("SOP") 78-9. *Accounting for Investments in Real Estate Ventures*, governed the method of accounting for investments in unconsolidated real estate ventures.  In November 2000. the AICPA issued new guidance for accounting for unconsolidated real estate investees. which superseded SOP 78-9 and became effective on December 15. 2001.  Under this new guidance. investors of unconsolidated real estate ventures that exercised significant influence over the investee must use the hypothetical liquidation at book value ("HLBV") equity method of accounting.

120.    Unlike the conventional "percentage of equity ownership interest" method of accounting.[1] the HLBV method requires that the investor determine its share of the earnings or losses of an investee by determining the difference between its claim on the investee's book value as of the balance sheet date.  The value of the investor's earnings or losses under the HLBV method is calculated as the amount that the investor would receive (or be obligated to pay) if the investee were to liquidate all of its assets at recorded amounts determined in accordance with GAAP and distribute the resulting cash to creditors and investors.  The new

---

[1]  Under the "percentage of equity ownership interest" method. the investor determines its share of the investee's earnings or losses by multiplying the investor's ownership percentage in the investee by the investee's earnings or losses for the period.

approach takes into account difficulties in the investee's capital structure where the investee gives different rights and priorities to its owners.

121.    As disclosed in Sunrise's financial statements, it invests in unconsolidated joint ventures where certain of the Company's joint venture partners received partner preferences, such as cash flow preferences.  Despite the AICPA's new guidance, which required the Company to use the HLBV equity method of accounting, Sunrise, continued to use the percentage of ownership interest method, in direct violation of GAAP.  As a result of the Company's misapplication of GAAP, it announced on July 31, 2006 that it would be required to restate its financial results for the period of 2003 through 2005, to record the impact of additional losses in prior periods related the cash flow preferences.

**B.    Sunrise Improperly Accounted For Sales of Real Estate To Its Joint Venture Partners and Third Party Investors**

122.    Sunrise has admitted that the Company improperly recorded as a sale, purported sales of real estate to certain of its joint venture partners and other third-party investors where the Company provided the purchasers in these transactions limited guarantees or commitments, such as operating cash flow deficit guarantees.  Under GAAP, specifically, the FASB Statement of Financial Accounting Standards ("SFAS") No. 66, *Accounting for Sales of Real Estate*, where an entity has continued involvement in the risks associated with the real estate sold by providing guarantees of the return of investment, the sale cannot be treated as a sale.  *See* SFAS No. 66, ¶¶ 25-29.  Rather, SFAS No. 66 requires the deferral of some or all of the income from the sale until such commitments are satisfied.

123.    As such, Sunrise's real estate sales where the Company provided such commitments and guarantees should not have been recognized as a sale immediately.  Instead, the income form the sale should have been deferred until the Company was no longer obligated

under the commitment or guarantee. By recording the transaction as a sale up front, however, Sunrise was able to inflate its earnings, in violation of GAAP.

**C.    Sunrise Improperly Accounted For Back-Dated Stock Options**

124.    Pursuant to Accounting Principles Board No. 25 ("APB No. 25"), *Accounting for Stock Issued to Employees* - the standard for accounting for employee stock options in effect until 1995 - any difference between the market price on the measurement date and the exercise price must be recorded in the Company's income statement as compensation expense. In 1995, FASB implemented SFAS No. 123, *Accounting for Stock-Based Compensation*, effective December 15, 1995. SFAS No. 123 requires companies to use the "fair value" method for accounting for stock-based compensation plans. In December 2004, SFAS No. 123 was revised to require recognition of the cost of options (as per the fair value method) as an expense in the income statement.

125.    In the Company's financial statements, Defendants claimed to have complied with these standards. In reality, Sunrise's financial statements and related disclosures were materially false and misleading because Defendants were back-dating options to dates when the price was lower than the market price on the day the options were actually granted. By back-dating its stock options, Sunrise was able to avoid recording additional compensation expense because the market price on the measurement date was at or near the exercise price. In reality, had the Company used the exercise price on the true grant date, it would have incurred substantial compensation expense.

126.    By engaging in the above improper accounting practices, Sunrise violated GAAP and understated its compensation expense and overstated its earnings for the period of

restatement.  As a result of its improper accounting practices, Sunrise has now announced a probe into its stock option practices.

127.    As a result of the accounting improprieties detailed at ¶¶ 108 - 122, Defendants caused Sunrise's reported financial results to violate, among other things, the following provisions of GAAP for which each defendant is necessarily responsible:

(a)    The principle that financial reporting should provide information that is useful to present and potential investors in making rational investment decisions and that information should be comprehensible to those who have a reasonable understanding of business and economic activities (FASB Statement of Concepts No. 1, ¶ 34);

(b)    The principle of materiality, which provides that the omission or misstatement of an item in a financial report is material if, in light of the surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item (FASB Statement of Concepts No. 2, ¶ 132);

(c)    The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

(d)    The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it.  To the

extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general. (FASB Statement of Concepts No. 1, ¶ 50);

(e)    The principle that financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance. (FASB Statement of Concepts No. 1, ¶ 42);

(f)    The principle that financial reporting should be reliable in that it represents what it purports to represent. The notion that information should be reliable as well as relevant is central to accounting. (FASB Statement of Concepts No. 2, ¶¶ 58-59);

(g)    The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79);

(h)    The principle of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions. (FASB Statement of Concepts No. 2, ¶ 80);

(i)    The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what

is reported represents what it purports to represent. (FASB Statement of Concepts No. 2, ¶¶ 95, 97); and

(j)    The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶10).

## D.    Defendants' Internal Control Violations

128.    Defendants also violated Section 13(b)(2) of the Exchange Act requiring that every reporting company "devise and maintain a system of internal controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit the preparation of financial statements in conformity with GAAP." Moreover, Defendants P. Klaassen and Rush violated Sarbanes Oxley, 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 1934, by issuing the false certifications above.

129.    As alleged herein, Sunrise did not have effective internal controls in place needed for accurate financial reporting. Because the Company lacked such controls, Defendants were able to execute their scheme to defraud investors by inflating earnings through improper accounting for minority interest in joint ventures, real estate sales and stock options. As a result, Sunrise overstated earnings and understated expense throughout the Class Period. Accordingly, Sunrise's lack of adequate internal controls rendered the Company's Class Period financial reporting inherently unreliable and precluded Sunrise from preparing financial statements that complied with GAAP. Nonetheless, throughout the Class Period, the Company regularly issued quarterly and annual financial statements without ever disclosing the existence of the significant and material deficiencies in its internal accounting controls and falsely asserted that its financial statements complied with GAAP.

## COUNT I

### Violations of § 10(b) Of The Exchange Act And
### Rule 10b-5 Promulgated Thereunder Against All Defendants

130.    Plaintiff incorporates by reference and realleges all preceding paragraphs as if fully set forth herein.

131.    During the Class Period, Defendants used the means and instrumentalities of interstate commerce, the mails and the facilities of national securities exchanges to: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Sunrise common stock; and (iii) cause Plaintiff and other members of the Class to purchase Sunrise common stock at artificially inflated prices that did not reflect their true value. As the truth became known in the Class Period, the trading price of Sunrise common stock fell precipitously. In furtherance of their unlawful scheme, plan and course of conduct, Defendants took the actions set forth herein.

132.    Defendants, individually and in concert, directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails and the facilities of national securities exchanges: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock, in violation of § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued as primary participants in the wrongful and illegal conduct charged herein. The Individual Defendants also are sued as controlling persons of Sunrise, as alleged below.

133.    The Individual Defendants' primary liability, and controlling person liability, arises from the following facts, among others:  (i) the Individual Defendants were high-level executives and directors at the Company during the Class Period; (ii) the Individual Defendants were privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and reports; and (iii) the Individual Defendants were aware of the Company's dissemination of information to the investing public they either knew, or recklessly disregarded, was materially false and misleading.

134.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them. Defendants' material misrepresentations and omissions were done knowingly, or recklessly, and for the purpose and effect of concealing the truth with respect to Sunrise's operations, business, performance and prospects from the investing public and supporting the artificially inflated price of its common stock.

135.    The dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, artificially inflated the market price of Sunrise's common stock during the Class Period.  In ignorance of the fact that the market prices of Sunrise's common stock were artificially inflated, and relying directly or indirectly on the materially false and misleading statements made by Defendants, or on the integrity of the market in which the Company's common stock trades, or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and other members of the Class purchased

Sunrise's common stock during the Class Period at artificially high prices. As the truth eventually emerged, the price of Sunrise's common stock fell.

136.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and other members of the Class and the marketplace known the truth with respect to the business, operations, performance and prospects of Sunrise, which was concealed by Defendants, Plaintiff and other members of the Class would not have purchased Sunrise's common stock or would not have purchased such stock at the prices they paid.

137.    By virtue of the foregoing, Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

138.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their transactions in the Company's common stock during the Class Period.

## COUNT II

### Violations of § 20(a) Of The Securities Exchange Act Of 1934
### Against The Individual Defendants

139.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

140.    Each of the Individual Defendants acted as a controlling person of Sunrise within the meaning of § 20(a) of the Exchange Act, as alleged herein. By virtue of their high-level positions, participation in and/or awareness of the Company's operations and/or intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the

content and dissemination of the various statements Plaintiff alleges were materially false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to have been misleading prior to and/or shortly after those statements were issued, and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

141.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

142.    As set forth above, Sunrise and the Individual Defendants each violated § 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are also liable pursuant to § 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## COUNT III

### Violations Of § 20A Of The Securities Exchange Act Of 1934
### Against The Section 20A Defendants

143.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

144.    This claim is asserted against the Section 20A Defendants pursuant to Section 20A of the Exchange Act by Plaintiff and on behalf of the Class members who purchased Sunrise common stock contemporaneously with the sales of the Company's common stock by the Section 20A Defendants.

145.    The Section 20A Defendants were privy to confidential, material, non-public adverse information concerning the Company as alleged herein.  Notwithstanding the Section 20A Defendants' duty to refrain from trading in Sunrise common stock unless they disclosed the foregoing material facts, the Section 20A Defendants sold, in the aggregate, approximately 990,576 shares of Sunrise common stock during the Class Period and realized proceeds of over $37 million, while in possession of material, non-public adverse information, as set forth above.

146.    The Section 20A Defendants sold their shares of Sunrise common stock as alleged above, at market prices artificially inflated by the nondisclosure, and/or misrepresentations, of such material facts in the public statements Defendants made or that they caused the Company to make.

147.    Before selling their Sunrise common stock, the Section 20A Defendants were obligated to publicly disclose the material information they possessed.

148.    By reason of the foregoing, the Section 20A Defendants, by use of the means or instrumentalities of interstate commerce, the mails and the facilities of the national securities exchanges, employed devices, schemes and artifices to defraud, and engaged in acts and transactions and a course of conduct which operated as a fraud or deceit upon Plaintiff and the other Class members, who purchased Sunrise common stock contemporaneously with the sales by the Section 20A Defendants.

149.    Plaintiff and all other Class members who purchased shares of Sunrise common stock contemporaneously with the sales of Sunrise stock by the Section 20A Defendants:  (i) have suffered substantial damages in that they paid artificially inflated prices for Sunrise common stock as a result of the violations of Section 10(b) and Section 20(a) of the Exchange Act and SEC Rule 10b-5 as alleged herein; and (ii) would not have purchased Sunrise common

stock at the artificially inflated prices that they paid, or at all, if they had been aware that the market prices had been artificially inflated by Defendants' false and misleading statements.

150.    As a result of Plaintiff's and Class members' purchases of Sunrise common stock contemporaneously with the Section 20A Defendants' sales of Sunrise common stock, Plaintiff and Class members have suffered recoverable damages. The Section 20A Defendants are liable to Plaintiff and the Class as a result of such transactions.

151.    The Section 20A Defendants are required to account for all such stock sales and to disgorge their profits or ill-gotten gains.

### COUNT IV

### For Violation of § 14(a) of the Exchange Act
### Against the Director Defendants

152.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein, except allegations of fraud or intent which are not necessary to assert this Claim for Relief.

153.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9(a).

154.    The 2000 through 2006 Proxy Statements violated § 14(a) and Rule 14a-9 because they omitted material facts, including the fact that Defendants were engaging in stock option back-dating, in violation of accounting principles and the Company's own policies.

155.    In the exercise of reasonable care, the Director Defendants should have known that the Proxy Statements were materially false and misleading.

156.    The misrepresentations and omissions in the Proxy Statements were material to Plaintiff and Class members in voting on each Proxy Statement.  The Proxy Statements were an essential link in the accomplishment of the continuation of Defendants' unlawful stock option manipulation scheme, as revelations of the truth would have immediately thwarted a continuation of shareholders' endorsement of the directors' positions, the executive officers' compensation and the Company's compensation policies, including approval or ratification of the stock option plans.

157.    Sunrise shareholders were damaged as a result of the material misrepresentations and omissions in the Proxy Statements.

**WHEREFORE**, Plaintiff prays for relief and judgment on behalf of themselves and the Class:

A.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including pre-judgment and post-judgment interest, as allowed by law;

C.    Awarding Plaintiff and the Class their costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated:  February 8, 2007

FINKELSTEIN THOMPSON LLP

By: _____
Donald J. Enright (DC Bar # 463007)
Stan M. Doerrer (DC Bar # 502496)
The Duvall Foundry
1050 30th Street, N.W.
Washington, DC  20007
Telephone:  (202) 337-8000
Facsimile:  (202) 337-8090

ENTWISTLE & CAPPUCCI LLP

Vincent R. Cappucci
Shannon L. Hopkins
Laura J. Moore
280 Park Avenue, 26th Floor West
New York, NY  10017
Telephone:  (212) 894-7200
Facsimile:  (212) 894-7272

## CERTIFICATION

FIRST NEW YORK SECURITIES, L.L.C. declares the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.      It has reviewed a copy of the complaint filed in the action, captioned *United Food And Commercial Workers Union Local 880-Retail Food Employers Joint Pension Fund and United Food And Commercial Workers Union-Employer Pension Fund v. Sunrise Senior Living, Inc.*, Civil Action No. 07-CV-00102 (D.D.C.).

2.      It did not acquire any of the relevant securities at the direction of plaintiff's counsel or in order to participate in any private action under the federal securities laws.

3.      It is willing to serve as a representative party in this action and it recognizes its duties as such, including monitoring and directing the litigation, and providing testimony at deposition and trial, if necessary.

4.      It will not accept any payment for serving as a representative party beyond its *pro rata* share of any recovery, except reasonable costs and expenses, such as lost wages and travel expenses, directly related to the class representation, as ordered or approved by the court pursuant to law.

5.      It has not sought to serve or served as a representative party for a class in any action under the federal securities laws within the past three years, except in *In re Cardinal Health, Inc. Securities Litigation*, Civil Action No. 04-CV-00575-ALM-NMK (S.D.Ohio).

6.      Its transactions during the proposed class period in Sunrise Senior Living, Inc. securities, that are the subject of this litigation, are described in the chart attached hereto as Schedule A.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this  31st  day of January 2007

By: _____
Harris Sufian
General Counsel
First New York Securities, L.L.C.

Schedule A

| Trade Date | Buy / Sell | Quantity | Price |
|---|---|---|---|
| 1/25/2005 | B | 2,500 | 43.3928 |
| 1/25/2005 | S | 2,500 | 43.4 |
| 5/3/2005 | B | 750 | 48.1 |
| 5/3/2005 | S | 1,750 | 48.0742857 |
| 5/3/2005 | S | 1,000 | 48.08 |
| 5/4/2005 | B | 1,000 | 48.948 |
| 5/4/2005 | B | 1,000 | 48.72 |
| 9/26/2005 | B | 2,500 | 63.8088 |
| 9/26/2005 | S | 2,500 | 63.7464 |
| 11/8/2005 | B | 3,000 | 33.0273333 |
| 11/8/2005 | S | 3,000 | 33.037 |
| 1/20/2006 | B | 1,000 | 36.607 |
| 1/20/2006 | S | 1,000 | 37.04 |
| 4/7/2006 | S | 5,000 | 36.714 |
| 4/10/2006 | B | 5,000 | 36.2588 |
| 5/9/2006 | S | 4,000 | 31.80975 |
| 5/10/2006 | B | 3,000 | 33.7036667 |
| 5/11/2006 | B | 1,000 | 34.63 |
| 6/12/2006 | S | 500 | 31.0583 |
| 6/12/2006 | S | 1,000 | 30.9748 |
| 6/13/2006 | S | 450 | 30.5962 |
| 6/14/2006 | S | 75 | 28.8 |
| 6/15/2006 | B | 20,000 | 28.7828 |
| 6/16/2006 | B | 50 | 28.54 |
| 6/21/2006 | B | 300 | 27.3238 |
| 6/21/2006 | B | 575 | 27.7196 |
| 6/21/2006 | B | 1,100 | 27.3579 |
| 7/12/2006 | S | 20,000 | 27.4312 |
| 7/31/2006 | B | 20,000 | 25.0155 |
| 7/31/2006 | S | 20,000 | 26.8133 |
| 8/15/2006 | B | 2,000 | 27.5395 |
| 8/15/2006 | S | 2,000 | 27.7455 |
| 11/27/2006 | B | 8,400 | 30.8439 |
| 11/30/2006 | B | 5,000 | 31.802 |
| 12/1/2006 | S | 5,000 | 31.6486 |

E-294
RBW

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

## I (a) PLAINTIFFS

First New York Securities, L.L.C.

88888

## DEFENDANTS

Sunrise Senior Living, Inc., Paul J. Klaassen, Thomas B. Newell, Bradley B. Rush, Ronald V. Aprahamian, J. Douglas Holladay, Thomas J. Donohue, William G. Little, Teresa M. Klaassen, Craig R. Callen, J. Barron Anschutz

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF       88888
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT       88888
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Donald J. Enright
Finkelstein Thompson LLP
1050 30th Street, NW
Washington, DC 20007
(202) 337-8000

CASE NUMBER  1:07CV00294

JUDGE: Reggie B. Walton

DECK TYPE: General Civil

DATE STAMP: 02/08/2007

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ◉ 2 Federal Question (U.S. Government Not a Party)
- ○ 2 U.S. Government Defendant
- ○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENS...
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

### ○ A. Antitrust
- ☐ 410 Antitrust

### ○ B. Personal Injury/Malpractice
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Medical Malpractice
- ☐ 365 Product Liability
- ☐ 368 Asbestos Product Liability

### ○ C. Administrative Agency Review
- ☐ 151 Medicare Act

**Social Security:**
- ☐ 861 HIA ((1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g)
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g)

**Other Statutes**
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

### ○ D. Temporary Restraining Order/Preliminary Injunction

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

### ◉ E. General Civil (Other)    OR    ○ F. Pro Se General Civil

**Real Property**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent, Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**Personal Property**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**Bankruptcy**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

**Property Rights**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**Federal Tax Suits**
- ☐ 870 Taxes (US plaintiff or defendant
- ☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
- ☐ 610 Agriculture
- ☐ 620 Other Food &Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 RR & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**Other Statutes**
- ☐ 400 State Reapportionment
- ☐ 430 Banks & Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation

- ☐ 470 Racketeer Influenced & Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Satellite TV
- ☐ 810 Selective Service
- ☒ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 900 Appeal of fee determination under equal access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

11

| ○ G. *Habeas Corpus/ 2255* | ○ H. *Employment Discrimination* | ○ I. *FOIA/PRIVACY ACT* | ○ J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| ○ K. *Labor/ERISA (non-employment)* | ○ L. *Other Civil Rights (non-employment)* | ○ M. *Contract* | ○ N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

⊙ 1 Original  Proceeding    ○ 2 Removed from State Court    ○ 3 Remanded from Appellate Court    ○ 4 Reinstated or Reopened    ○ 5 Transferred from another district (specify)    ○ 6 Multi district Litigation    ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**
15 USC 78j(b), 78n(a), 78t(a), 78t(-1)(a), 17 CFR 240.10b-5. Stock options backdating, misleading financial statements, and insider trading.

| **VII. REQUESTED IN COMPLAINT** | CHECK IF THIS IS A CLASS ☒ ACTION UNDER F.R.C.P. 23 | DEMAND $ ⌐ TBD ¬ JURY DEMAND: | Check YES only if demanded in complaint YES ☒   NO ☐ |
|---|---|---|---|

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES ⊗    NO ☐    If yes, please complete related case form.

DATE 2/8/07    SIGNATURE OF ATTORNEY OF RECORD

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.