**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

IN RE SUNRISE SENIOR LIVING, INC.
SECURITIES LITIGATION.

Case No. 07CV00102 (RBW)

This Document Relates To:

ALL ACTIONS.

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
## THE MOTION TO DISMISS FILED ON BEHALF OF ALL DEFENDANTS

George H. Mernick, III (DC Bar 294256)
HOGAN & HARTSON, LLP
Columbia Square
555 Thirteenth Street, NW
Washington, D.C. 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
E-mail: ghmernick@hhlaw.com

N. Thomas Connally (DC Bar 448355)
Jon M. Talotta (DC Bar 473626)
HOGAN & HARTSON, LLP
8300 Greensboro Drive, Suite 1100
McLean, Virginia 22102
Telephone: (703) 610-6100
Facsimile: (703) 610-6200
E-mail: ntconnally@hhlaw.com
E-mail: jmtalotta@hhlaw.com

*Attorneys for Sunrise Senior Living, Inc.*

Dated: August 11, 2008

John C. Millian (DC Bar 413721)
Matthew R. Estabrook (DC Bar 477880)
Elise Kochtitzky-Jacques (DC Bar 502460)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 955-8500
Facsimile: (202) 467-0539
E-mail: jmillian@gibsondunn.com
E-mail: mestabrook@gibsondunn.com
E-mail: ekochtitzkyJacques@gibsondunn.com

*Attorneys for Kenneth J. Abod, Carl G. Adams,*
*J. Barron Anschutz, Larry E. Hulse, Paul J.*
*Klaassen, Teresa M. Klaassen, Thomas B.*
*Newell, and Tiffany L. Tomasso*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION .............................................................................................. 1

STATEMENT OF FACTS ................................................................................... 3

ARGUMENT ..................................................................................................... 7

I.  Count I Should Be Dismissed Because Plaintiffs Fail to State a
    Claim under Section 10(b) and Rule 10b-5. ......................................... 8

    A.  Under the PSLRA, Plaintiffs Are Required to Allege
        Particularized Facts Creating a "Strong Inference" of
        Scienter. ........................................................................................ 8

    B.  The Allegations of Improper Accounting Practices Do Not
        Create a Strong Inference of Scienter. .......................................... 11

        1.  Insurance Reserves. ............................................................ 11

        2.  Joint Venture Income. ......................................................... 16

        3.  Real Estate Sales Revenue Recognition. ............................. 20

        4.  Earnings and Capitalization of Expenses. ........................... 22

        5.  Unearned Professional Fees. ............................................... 24

        6.  Stock-Based Compensation. ................................................ 24

    C.  Plaintiffs' Other Allegations Do Not Create a Strong
        Inference of Scienter. .................................................................. 27

        1.  Internal Controls. ................................................................ 27

        2.  Termination of Rush's Employment. .................................... 28

        3.  Insider Sales. ...................................................................... 28

        4.  The Restatement. ................................................................. 34

    D.  Plaintiffs Fail to Allege a Strong Inference of Scienter
        Against Any Individual Defendant. ............................................... 36

        1.  Abod. ................................................................................... 37

        2.  Adams. ................................................................................ 37

        3.  Anschutz. ............................................................................. 38

        4.  Hulse. .................................................................................. 38

        5.  Paul Klaassen. ..................................................................... 39

        6.  Teresa Klaassen. .................................................................. 40

        7.  Newell. ................................................................................ 41

        8.  Tomasso. .............................................................................. 41

        E.      Plaintiffs Cannot Allege a Strong Inference of Scienter
              Against Sunrise..........................................................................................42

        F.      Plaintiffs Also Fail to Allege Loss Causation for Four of
              the Six Types of Alleged Accounting Fraud. .............................................42

II.     Count II Should Be Dismissed Because Plaintiffs Cannot State a
        Claim under Section 20(a). ...................................................................................45

CONCLUSION ...............................................................................................................46

## TABLE OF AUTHORITIES

**Cases**

Abhe & Svoboda, Inc. v. Chao, 508 F.3d 1052 (D.C. Cir. 2007) ...................................10

Acito v. IMCERA Group, Inc., 47 F.3d 47 (2d Cir. 1995) ...........................................33

California Pub. Employees' Ret. Sys. v. Chubb Corp., 394 F.3d 126 (3d Cir. 2004)...................15

Central Laborers' Pension Fund v. Integrated Elec. Servs. Inc., 497 F.3d 546 (5th Cir.
      2007)...........................................................................................15

City of Austin Police Ret. Sys. v. ITT Educ. Servs., Inc., 388 F. Supp. 2d 932 (S.D.
      Ind. 2005) .....................................................................................15

City of Braxton Ret. Sys. v. Shaw Group, Inc., 540 F. Supp. 464 (S.D.N.Y. 2008).....................32

Dolphin and Bradbury, Inc. v. S.E.C., 512 F.3d 634 (D.C. Cir. 2008) .............................9

Dura Pharm., Inc. v. Broudo, 544 U.S. 336 (2005)..........................................2, 7, 42, 43

Ernst & Ernst v. Hochfelder, 425 U.S. 185 (1976)............................................9

Freeland v. Iridium World Commc'ns, Ltd., 545 F. Supp. 2d 59 (D.D.C. 2008) ...................42, 45

Higginbotham v. Baxter Intern., Inc., 495 F.3d 753 (7th Cir. 2007)...................10, 23, 29

In re Advanta Corp. Sec. Litig., 180 F.3d 525 (3d Cir. 1999)..................................36

In re Alamosa Holdings, Inc., 382 F. Supp. 2d 832 (N.D. Tex 2005).............................43

In re Baan Co. Sec. Litig., 103 F. Supp. 2d 1 (D.D.C. 2000).................................29

In re Bally Total Fitness Sec. Litig., No. 04-03530, 2007 WL 551574 (N.D. Ill. Feb.
      20, 2007).......................................................................................14

In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410 (3d Cir. 1997) ......................29

In re Ceridian Corp. Sec. Litig., 504 F. Supp. 2d 603 (D. Minn. 2007)........................19

In re Cirrus Logic Sec. Litig., 946 F. Supp. 1446 (N.D. Cal. 1996) ........................18, 21

In re Cornerstone Propane Partners, L.P., 355 F. Supp. 2d 1069 (N.D. Cal. 2005)....................13

In re eSpeed, Inc. Sec. Litig., 457 F. Supp. 2d 266 (S.D.N.Y. 2006).............................29

In re Fannie Mae Sec., Derivative, and "ERISA'" Litig., 503 F. Supp. 2d. 25 (D.D.C.
      2007)...........................................................................................passim

In re Ferro Corp., Nos. 04-01440, 04-01589, 2007 WL 1691358 (N.D. Ohio June 11, 2007).................................................................................................................................15

In re Finisar Corp. Derivative Litig., 542 F. Supp. 2d 980 (N.D. Cal. 2008)..............................26

In re IAC/InterActiveCorp Sec. Litig., 478 F. Supp. 2d 574 (S.D.N.Y. 2007) ...........................31

In re Int'l Rectifier Corp. Sec. Litig., No. 07-02544, 2008 U.S. Dist. LEXIS 44872 (C.D. Cal. May 23, 2008) .......................................................................................................31

In re Intelligroup Sec. Litig., 527 F. Supp. 2d 262 (D. N.J. 2007)........................................passim

In re Interpool, Inc. Sec. Litig., No. 04-00321, 2005 WL 2000237 (D.N.J. Aug. 17, 2005)...................................................................................................................................13

In re Nat'l Century Fin. Ent., Inc. Fin. Inv. Litig., No. 03-01565, 2007 WL 2331929 (S.D. Ohio Aug. 13, 2007) ...................................................................................................35

In re PEC Solutions, Inc. Sec. Litig., 418 F.3d 379 (4th Cir. 2005).............................................33

In re PEC Solutions, Inc., No. 03-00331, 2004 WL 1854202 (E.D. Va. May 25, 2004), aff'd 432 F.3d 571 (4th Cir. 2005) ........................................................................................29

In re Peerless Sys. Corp. Sec. Litig., 182 F. Supp. 2d 982 (S.D. Cal. 2002)...............................22

In re PIXAR Sec. Litig., 450 F. Supp. 2d 1096 (N.D. Cal. 2006).................................................32

In re St. Paul Travelers Sec. Litig. II, No. 04-04697, 2007 WL 1589524 (D. Minn. June 1, 2007) ........................................................................................................................43

In re Take-Two Interactive Sec. Litig., 551 F. Supp. 2d 247 (S.D.N.Y. 2008) ..........18, 21, 35, 43

In re Trex Co., Inc. Sec. Litig., 454 F. Supp. 2d 560 (W.D. Va. 2006) .......................................14

In re Vantive Corp. Sec. Litig., 283 F.3d 1079 (9th Cir. 2002) ...................................................31

In re XM Satellite Radio Holdings Litig., 479 F. Supp. 2d 165 (D.D.C. 2007)...........................10

Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc., __ F.3d __, No. 06-30908, 2008 WL 2894793 (5th Cir. July 29, 2008) .................................................10

Kalnit v. Eichler, 264 F.3d 131 (2d Cir. 2001)............................................................................36

Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161 (2d Cir. 2005) .............................................43

Limantour v. Cray Inc., 432 F. Supp. 2d 1129 (W.D. Wash. 2006)............................................14

Marsden v. Select Med. Corp., No. 04-04020, 2007 WL 518556 (E.D. Pa. Feb. 12, 2007)...................................................................................................................................43

Mathews v. Centex Telemanagement, Inc., No. 92-01837, 1994 WL 269734 (N.D. Cal. June 8, 1994) ..............................................................................................................30

McNamara v. Pre-Paid Legal Servs., Inc., 189 F. App'x 702 (10th Cir. 2006) ............................30

Nach v. Baldwin, No. 07-00740, 2008 WL 410261 (N.D. Cal. Feb. 12, 2008) ............................26

PR Diamonds, Inc. v. Chandler, 91 F. App'x 418 (6th Cir. 2004) ................................................34

Pugh v. Tribune Co., 521 F.3d 686 (7th Cir. 2008) ......................................................................42

Shaw v. Digital Equip. Corp., 82 F.3d 1194 (1st Cir. 1996) ........................................................10

Swack v. Credit Suisse First Boston, 383 F. Supp. 2d 223 (D. Mass. 2004) ................................10

Teachers' Ret. Sys. of La. v. Hunter, 477 F.3d 162 (4th Cir. 2007) ..............................30, 32, 43

Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499 (2007) ...................................passim

Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP, 475 F.3d 824 (7th Cir. 2007) ...............................................................................................................................43

Weiss v. Amkor Tech., Inc., 527 F. Supp. 2d 938 (D. Ariz. 2007) ................................................35

Wietschner v. Monterey Pasta Co., 294 F. Supp. 2d 1102 (N.D. Cal. 2003) ................................31

Zucco Partners, LLC v. Digimarc Corp., 445 F. Supp. 2d 1201 (D. Or. 2006) ............................14

**Statutes**

15 U.S.C. § 78u-4 .......................................................................................................................8, 23

**Other Authorities**

Peter M. Fass, Michael E. Shaff, and Donald B. Zief, Real Estate Investment Trusts Handbook § 3:48 (2007) ..........................................................................................................35

S.Rep. No. 104-98, at 4 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 683 ..................................36

## INTRODUCTION

Congress passed the Private Securities Litigation Reform Act of 1995 (as amended, the "PSLRA") to prevent shareholder plaintiffs from reflexively seeking to punish every company that corrects an error in its past financial statements. Yet, that is precisely what the Plaintiffs are attempting to do here.

Under the PSLRA, the admission of error inherent in any restatement is not enough to state a claim for securities fraud; the complaint must allege particularized facts establishing each element of fraud, including facts supporting a "strong inference" that each defendant acted with "a mental state embracing intent to deceive, manipulate, or defraud" – i.e., scienter. Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2507 (2007). Here, Plaintiffs' claims of securities fraud rest on nothing more than the fact that Sunrise Senior Living, Inc. ("Sunrise" or the "Company") restated its earnings for the years 2003 through 2005 (the "Restatement"), coupled with Plaintiffs' conclusory assertion that certain of Sunrise's current and former directors and officers must have intended to deceive investors at the time the misstatements were made. 1/ Simply put, Plaintiffs allege no facts establishing scienter on the part of any Defendant, and this suit should be dismissed.

In their attempt to allege direct evidence supporting a strong inference of scienter, Plaintiffs rely almost entirely on vague assertions of "confidential witnesses." But these allegations cannot establish scienter, given that (a) there are no specific allegations establishing that these witnesses possess the required personal knowledge of the information they purport to convey, and (b) the alleged witnesses' generalized and conclusory allegations do not specifically

---

1/    In addition to Sunrise, the defendants in this case are the following individuals: Kenneth J. Abod, Carl G. Adams, J. Barron Anschutz, Larry E. Hulse, Paul J. Klaassen, Teresa M. Klaassen, Thomas B. Newell, and Tiffany L. Tomasso (the "Individual Defendants," with Sunrise, collectively, the "Defendants").

link any particular defendant to any alleged intentional wrongdoing. In several instances, Plaintiffs rely on what they term "admissions" by Sunrise that are nothing more than blatant mischaracterizations of the results of a special independent committee investigation of the Company's historical accounting practices, as well as the contents of the Restatement itself, and they ignore other inconvenient information that weighs against the strong inference of scienter that they urge the Court to draw.

Plaintiffs' "circumstantial" allegations of fraud likewise fail. Plaintiffs cannot simply point to the fact that certain Individual Defendants signed corporate disclosures, sold Company stock or received Company stock options, and ask the Court to infer that all of the Individual Defendants engaged in a multi-year scheme to defraud investors and enrich themselves in the process. Having failed to allege facts establishing scienter, Plaintiffs cannot state a securities fraud claim.

In addition, Plaintiffs also fail to plead that they suffered any loss caused by several of the accounting errors challenged in the complaint. See Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 342 (2005) (to state a claim under Section 10(b), a plaintiff must allege a "causal connection between the material misrepresentation and the loss"). Plaintiffs claim fraud with respect to six factually distinct accounting errors, relating to (i) insurance reserves, (ii) joint venture income, (iii) real estate sales revenue recognition, (iv) earnings and capitalization of expenses, (v) unearned professional fees, and (vi) stock-based compensation. To plead the required element of loss causation under Dura Pharm, Plaintiffs had to identify a "corrective disclosure" revealing each of these distinct errors, coupled with a resulting drop in the Company's stock price. But the corrective disclosures on which plaintiffs rely to plead loss causation mention only two of these six issues – joint venture income and joint venture sales

revenue recognition. Specifically, the complaint's loss causation section alleges only that the stock price declined between May 9 and July 31, 2006 as a result of the Company's disclosure of errors in its joint venture accounting affecting Sunrise's previously issued financial statements. Plaintiffs do not identify any cognizable loss caused by accounting errors relating to insurance reserves, earnings and capitalization of expenses, unearned professional fees, or stock-based compensation.

Thus, plaintiffs allege the required element of loss causation only with respect to the Company's accounting for its joint ventures, accounting that (a) involved the application of complex rules, and (b) had been disclosed to and approved by the Company's external auditors. Such transparent conduct cannot support the strong inference of scienter necessary to allege securities fraud.

In short, the complaint succeeds only in recounting the chronology of Sunrise's discovery of accounting errors and its efforts to correct them. Plaintiffs thus have failed to state a claim under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder (Count I). Having failed to state a Section 10(b) claim, plaintiffs cannot as a matter of law state a claim under Section 20(a) of the Exchange Act (Count II). For these reasons, and as explained below in more detail, Plaintiffs' complaint should be dismissed.

## STATEMENT OF FACTS

Defendant Sunrise is organized under the laws of the State of Delaware and is headquartered in McLean, Virginia. Compl. at ¶ 16. Defendants Kenneth Abod, Carl Adams, Barron Anschutz, Larry Hulse, Paul Klaassen, Teresa Klaassen, Thomas Newell, and Tiffany Tomasso are current and former officers and directors of the Company.

-3-

Paul Klaassen and Teresa Klaassen founded Sunrise in 1981. Id. at ¶¶ 17-18. Today, the Company operates senior living communities in the United States, Canada, Germany, and the United Kingdom. Id.

On March 24, 2008, Sunrise completed a multi-year restatement of its earnings (the "Restatement"). Id. at ¶ 215; 2006 10-K at 3, Ex. 1 hereto. The Restatement was necessitated by errors identified by the Company during an internal review of its accounting practices. See 2006 10-K at 3, Ex. 1. The internal review was initiated after an error was discovered by the Company's accounting team. Compl. at ¶ 184; Tr. of May 11, 2006 Conference Call at 2, Ex. 2 hereto. The error related to the allocation of profits and losses from certain real estate joint ventures that Sunrise had entered into with partners for the ownership of senior living communities. Compl. at ¶ 184. On May 8, 2006, Sunrise announced that disclosure of its first quarter 2006 earnings would be delayed in order to allow additional time to review this issue. Compl. at ¶ 181.

As the Company's internal review proceeded, other accounting issues were discovered. See Compl. at ¶ 187. On July 31, 2006, Sunrise announced that it would restate its earnings for the years 2003 through 2005, primarily to adjust the accounting treatment related to the allocation of profits and losses from certain real estate joint ventures and the recognition of income from prior sales of real estate in which Sunrise had provided certain guarantees or commitments to the buyer or lender. SEC Form 8-K, filed July 31, 2006, at 1, Ex. 3 hereto. The restatement also would include adjustments for other items. Id.

On November 20, 2006, the Service Employees International Union Master Trust (the "SEIU"), sent a letter to Sunrise (and the news media) calling for an internal investigation into concerns SEIU expressed about sales of stock by Sunrise insiders, Sunrise's accounting

practices, and the timing of certain stock options grants. Compl. at ¶ 195; SEIU Letter, Ex. 4

hereto. In response to the SEIU letter, Sunrise announced on December 11, 2006 that its Board

of Directors had appointed a special independent committee (the "Special Committee") to review

sales of stock by Company insiders and the Company's historical practices related to stock

options grants. Compl. at ¶ 197.

In January 2007, two putative class action complaints alleging violations of

federal securities laws were filed in this Court. Those cases were consolidated into this case on

July 31, 2007. See July 31, 2007 minute entry. Pursuant to a stipulation between the parties,

Plaintiffs were permitted to await Sunrise's restated financials before filing a consolidated

complaint. See Docket No. 35.

On March 2, 2007, Sunrise announced that it had extended the mandate of the

Special Committee to include a "review of facts and circumstances relating to the historical

accounting treatment of certain categories of transactions in the pending restatement of the

Company's financial statements." Compl. at ¶ 302.

In conducting its investigation, the Special Committee was advised by its

independent counsel, WilmerHale, LLP. SEC Form 8-K, filed Oct. 1, 2007, Ex. 5 hereto.

WilmerHale engaged FTI Consulting, Inc. and Huron Consulting Group, forensic accounting

firms, to provide technical accounting guidance and analysis, as well as to assist with document

collection and review, interview support, and transaction review. Id. The Special Committee's

investigation included the collection and review, by manual inspection, electronic word search

and other means, of more than 2.5 million electronic and hard copy documents and interviews of

37 individuals, including current and former employees, current and former directors, and audit

engagement team members of Sunrise's external auditor, Ernst & Young, LLP. Id.

On September 28, 2007, the Company announced that the Special Committee had completed the fact-finding portion of its investigation with respect to three issues: (1) the timing of certain stock option grants; (2) the facts and circumstances with respect to the two accounting errors related to Sunrise's accounting for its joint ventures; (3) the timing of sales of Sunrise stock by certain insiders. Id. The Special Committee found: 2/

- "no evidence of backdating or other intentional misconduct with respect to the grants on the 38 grant dates examined, including those specifically questioned by the SEIU, or the possible errors identified by the Special Independent Committee in the accounting for stock options";

- "no evidence of an intention to reach an inappropriate accounting result with respect to the two categories of real estate accounting errors reviewed, no knowledge that these accounting errors were incorrect at the time they were made, and no evidence that information was concealed from review by the external auditors at the time the accounting judgments were made"; and

- "no evidence that any director or officer who traded in the months prior to the announcement of the accounting review had material non-public information relating to either of these two categories of real estate accounting errors."

On December 20, 2007, the Company announced the completion of the fact-finding portion of the Special Committee's investigation. Compl. at ¶ 213; SEC Form 8-K, filed Dec. 21, 2007, Ex. 6 hereto. Following consideration by the Company's Board of Directors of the results of the Special Committee's work, the Board of Directors announced the separation from the Company of Newell, the Company's president since 2000, Hulse, the Company's Chief

---

2/    In their Complaint, Plaintiffs repeatedly reference the Special Committee investigation and ask the Court to draw inferences from their characterization of the committee's findings and subsequent events. See Compl. at ¶¶ 19, 21, 22, 59, 61, 67, 195-198, 202, 210-213, 218, 220, 221, 223, 228, 229. Defendants' citations to the Special Committee investigation in this memorandum are intended solely to demonstrate that the inferences Plaintiffs suggest are not reasonable. At this stage of the proceedings, Defendants do not rely on the substantive findings of the Special Committee for any other reason.

Financial Officer from April 2000 to August 2005, and Adams, the Company's Treasurer since November 2005 and former Chief Accounting Officer from 2000 through November 2004. Id.

The Company's restated earnings for the years 2003 through 2005 were filed with the SEC on March 24, 2008. 2006 10-K, filed March 24, 2008, Ex. 1.

Plaintiffs' Amended Complaint was filed with the Court on June 6, 2008 (the "Complaint"). The Complaint alleges securities fraud in violation of Section 10(b) and Rule 10b-5 against all of the Defendants, and control person liability under Section 20(a) against all of the Individual Defendants. The class period during which these alleged violations and resulting losses purportedly occurred was between February 26, 2004 and July 28, 2006. See Compl. at ¶¶ 279-295.

## ARGUMENT

To state a claim under Section 10(b), Plaintiffs must allege particularized facts establishing: (1) a material misrepresentation or omission; (2) made with scienter; (3) in connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. Dura Pharm., 544 U.S. at 341-42. Plaintiffs fail to plead particularized facts establishing the required "strong inference" of scienter against any Defendant. Plaintiffs also fail to allege loss causation with respect to four of the six allegedly fraudulent accounting errors. As a result, Plaintiffs cannot allege the required elements of a securities fraud claim with respect to any of the challenged accounting practices and, thus, fail to state a claim against any Individual Defendant or the Company. For these reasons, Count I should be dismissed.

To state a claim under Section 20(a), Plaintiffs must allege: (1) particularized facts establishing a primary violation of Section 10(b); and (2) that a defendant exercised the requisite control over the primary violator. Because Plaintiffs fail to plead facts establishing a

primary violation, they cannot as a matter of law state a claim under Section 20(a).  For this reason, Count II should be dismissed.

I.  **Count I Should Be Dismissed Because Plaintiffs Fail to State a Claim under Section 10(b) and Rule 10b-5.**

A.  **Under the PSLRA, Plaintiffs Are Required to Allege Particularized Facts Creating a "Strong Inference" of Scienter.**

In addition to the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure, private actions alleging securities fraud under Section 10(b) are subject to special pleading standards adopted by Congress in the PSLRA.  Tellabs, 127 S. Ct. at 2507-10.  These special pleading standards were enacted to curb past litigation abuses, including "nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests, and manipulation by class action lawyers."  Id. at 2508.

A private plaintiff alleging securities fraud must: (1) "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," 15 U.S.C. § 78u-4(b)(1); and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  Id. at § 78u-4(b)(2).  If a plaintiff fails to satisfy either of these pleading requirements, "the court shall, on motion of any defendant, dismiss the complaint."  Id. at § 78u-4(b)(3)(A).

For each unlawful act or omission, the plaintiff must plead particularized facts giving rise to a strong inference that a defendant acted with the required state of mind – i.e., scienter.  Tellabs, 127 S. Ct. at 2508; see 15 U.S.C. § 78u-4(b)(2).  Moreover, in a multi-defendant case, a plaintiff "must allege specific facts demonstrating that each of the defendants acted with the requisite state of mind."  In re Fannie Mae Sec., Derivative, and "ERISA'" Litig., 503 F. Supp. 2d 25, 40 (D.D.C. 2007).

-8-

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." Tellabs, 127 S. Ct. at 2507 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 & n.12 (1976)). It "is an extreme departure from the standards of ordinary care…which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." Dolphin and Bradbury, Inc. v. S.E.C., 512 F.3d 634, 639 (D.C. Cir. 2008) (citations and quotations omitted).

The requirement to plead particularized facts giving rise to a "strong inference" of scienter is vastly different from the general rule applied in other contexts in which a reasonable inference is sufficient to survive a motion to dismiss. The "strong inference" of scienter "must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, 127 S. Ct. at 2504-05. In assessing the sufficiency of the complaint, a court is not required to accept the plaintiff's suggested inferences as true. To the contrary, if the proffered inference of scienter is not at least as compelling as an inference of non-intentional conduct, the plaintiff has failed to satisfy the PSLRA's pleading requirements. In re Fannie Mae, 503 F. Supp. 2d at 37 n.9 (citation and quotations omitted).

Because of this heightened pleading standard, a plaintiff's omission of relevant facts, as well as ambiguities in the allegations pled, count against finding a strong inference of scienter. Tellabs, 127 S. Ct. at 2510. Thus, a court must disregard "catch-all" or "blanket" assertions that do not consist of the requisite particularized fact pleading. In re Fannie Mae, 503 F. Supp. 2d. at 37 n.9 (citation and quotations omitted). On the other hand, the Court "must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the

complaint by reference, and matters of which a court may take judicial notice." 3/ Tellabs, 127 S. Ct. at 2509 (emphasis added); see Abhe & Svoboda, Inc. v. Chao, 508 F.3d 1052, 1059 (D.C. Cir. 2007) (same).

Finally, under the PSLRA, allegations attributed to unnamed sources – so-called "confidential witnesses" – must be discounted. Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc., __ F.3d __, No. 06-30908, 2008 WL 2894793, at *4 (5th Cir. July 29, 2008). 4/ In order for such allegations to be given any weight at all, the confidential witness must be described with sufficient particularity to support an inference that the person was in a position to possess the information attributed to him. At a minimum, this requires factual allegations describing the witness's employment, as well as when and how the witness obtained the information. See, e.g., In re Intelligroup Sec. Litig., 527 F. Supp. 2d 262, 290 (D. N.J. 2007) (collecting cases) (a plaintiff must identify "(1) the time period that the confidential source worked at the defendant company, (2) the dates on which the relevant information was acquired, and (3) the facts detailing how the source obtained access to the information."). Failure to plead

---

3/      This includes the "relevant entirety of a document integral to or explicitly relied upon in the complaint." Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1220 (1st Cir. 1996). Even if not attached to the complaint, a defendant may attach such a document to a motion to dismiss – and the court may consider it – without converting the motion into one for summary judgment. Id. This prevents a plaintiff from "excising an isolated statement from a document and importing it into the complaint, even though the surrounding context imparts a plainly non-fraudulent meaning to the allegedly wrongful statement." Id. (emphasis added); Swack v. Credit Suisse First Boston, 383 F. Supp. 2d 223 (D. Mass. 2004). The Court may also consider documents that are required to be filed, and actually have been filed, with the SEC. In re XM Satellite Radio Holdings Litig., 479 F. Supp. 2d 165, 174 (D.D.C. 2007). A court may consider the full text of the SEC filings, prospectus, analysts' reports and statements "integral to the complaint," even if the documents are not attached to the complaint, without converting the motion into one for summary judgment. Id. at 174 n.8.

4/      See also Higginbotham v. Baxter Intern., Inc., 495 F.3d 753, 756-57 (7th Cir. 2007) (court "steeply discounted" confidential witness's allegations because "[i]t is hard to see how information from anonymous sources could be deemed 'compelling' or how we could take account of plausible opposing inferences. Perhaps these confidential sources have axes to grind. Perhaps they are lying. Perhaps they don't even exist.").

detailed facts about a confidential source renders that source irrelevant for purposes of determining the sufficiency of a plaintiff's scienter allegations. Id. And, of course, even if sufficient facts are pled to identify the basis for a confidential witness's knowledge, the allegations attributed to that witness must nevertheless consist of particularized fact pleading to be accorded any weight.

### B.    The Allegations of Improper Accounting Practices Do Not Create a Strong Inference of Scienter.

Plaintiffs' claims of securities fraud arise from six allegedly fraudulent accounting errors. Compl. at ¶¶ 64-95. Plaintiffs assert in conclusory fashion that each of the Individual Defendants knew, or acted with extreme recklessness in not knowing, about these mistakes. But the facts pled in support of this conclusion do not establish a strong inference that any of the Individual Defendants acted with scienter with respect to these errors.

### 1.    Insurance Reserves.

Plaintiffs allege that Sunrise fraudulently manipulated excess insurance reserves to make up for earnings shortfalls in other areas of the Company's financial results. Compl. at ¶ 65. Three bases are alleged in support of this assertion: a supposed "admission" by Sunrise (id. at ¶ 67); information purportedly obtained from confidential witnesses (id. at ¶ 68-69); and an adjustment in the Restatement related to "health insurance reimbursements." Id. at ¶ 66. None can establish a strong inference of scienter.

### a.    There Was No Admission.

Plaintiffs contend that the December 2007 separation from the Company of Messrs. Newell, Hulse, and Adams constitutes an admission that the three were "directly responsible for Sunrise's manipulation of its insurance reserves...." Id. at ¶ 67. Plaintiffs allege that Sunrise stated that Newell, Hulse, and Adams "had substantial involvement in, or direct

-11-

supervisory responsibility for the Company's insurance accruals and reserves," and that the Company "fir[ed]" them as a result. Id. But an examination of the public filings on which plaintiffs supposedly are relying shows that Sunrise made no such statement.

In December 2007, Sunrise announced that the Special Committee had completed "the fact-finding portion of the previously disclosed investigation by the Special Independent Committee of the Board of Directors." SEC Form 8-K at 5, filed Dec. 21, 2007, Ex. 6. The announcement stated that, "[f]ollowing consideration by the Company's Board of Directors of the results of the Special Independent Committee's work," Newell, Adams, and Hulse had been separated from the Company. Id. A later public filing by Sunrise in March 2008 stated that the Board had separated from the Company "all officers who had any substantial involvement in, or direct or supervisory responsibility for, the accounting function that caused the errors in the restatement, which included the President [Newell], Chief Financial Officer for the period to August 2005 [Hulse], and Treasurer (who had been the Chief Accounting Officer from 2000 through 2004) [Adams]." Restated SEC Form 10-K for the year ending December 31, 2006, filed Mar. 24, 2008, at 183, Ex. 1.

The Special Committee's finding that "inappropriate accounting" had occurred (Compl. at ¶ 59) is not an admission of fraud. Sunrise's disclosures did not state that the separation of Messrs. Newell, Hulse, or Adams was – in whole or in part – based on fraudulent manipulation of insurance reserves, much less that they or anyone else at the Company had fraudulently manipulated such reserves; indeed, it did not state that Messrs. Newell, Hulse, or

Adams had any direct role in the insurance reserve errors. 5/ Plaintiffs do not have license to misstate the content of Sunrise public filings and then characterize their fictionalized versions of those filings as "admissions." Instead, plaintiffs must make their own affirmative allegations showing who committed what fraudulent acts involving insurance reserves, but their Complaint attempts to circumvent this basic requirement.

### b.    The Claims Attributed to Confidential Witnesses Cannot Be Accorded Any Weight.

Information about insurance reserves purportedly obtained from two of Plaintiffs' confidential witnesses cannot be accorded any weight to support an inference of scienter. First, CW-4 reportedly claims that he "observed a journal entry that removed some of the insurance reserve dollars after the accounting review was complete for the reporting period," and that CW-4 was told to "mind his/her own business" when he asked about the entry. Compl. at ¶ 68. CW-4 is described as "a former accountant at Sunrise between 2000 and 2001 who had responsibility for ensuring that insurance premiums were paid...." Id. CW-4 did not even work at Sunrise during the alleged class period. In addition, CW-4 is not alleged to have worked at

---

5/    Of course, the mere fact that Messrs. Newell, Hulse, and Adams were separated from the Company cannot support an inference of scienter. See, e.g., In re Interpool, Inc. Sec. Litig., No. 04-00321, 2005 WL 2000237, at *17 (D.N.J. Aug. 17, 2005) (in the absence of any factual allegations linking them to alleged fraud, company's termination of executives following internal investigation did not raise inference of scienter because "a corporation may choose to terminate employees for making errors due to negligence, oversights, etc."); In re Cornerstone Propane Partners, L.P., 355 F. Supp. 2d 1069, 1092-93 (N.D. Cal. 2005) (officers' termination following restatement did not support inference of scienter because company did not admit that officers were involved in any fraud and "major stock losses are often accompanied by management departures, and it would be unwise for courts to penalize directors for these decisions").

Sunrise's headquarters at any time. 6/ As such, CW-4's allegations are immediately valueless. See, e.g., In re Trex Co., Inc. Sec. Litig., 454 F. Supp. 2d 560, 570 (W.D. Va. 2006) ("Because neither of the witnesses worked for the company during the class period, their input is rendered substantially less meaningful."); In re Bally Total Fitness Sec. Litig., No. 04-03530, 2007 WL 551574, at *7 (N.D. Ill. Feb. 20, 2007) ("Courts have rejected descriptions of localized problems by local employees as a sufficient basis for scienter because those employees do not and cannot know whether or how such problems were incorporated into the company's overall financial statements.").

Moreover, CW-4 does not identify the purported journal entry, when it was made, who made it, who ordered it, or that the alleged reduction in the reserve account was not warranted as a correct accounting entry, much less allege that any of the Individual Defendants knew about it. In short, CW-4's allegations consist of speculation and hearsay, and thus cannot be credited. See, e.g., Limantour v. Cray Inc., 432 F. Supp. 2d 1129, 1142 (W.D. Wash. 2006) (confidential witness's allegations that she observed a non-defendant make an allegedly improper journal entry did not support inference of scienter against a defendant because (1) the defendant did not make the entry and (2) the witness did not make the journal entry, which "suggests that [her] knowledge of the effect" of the entry was limited); Zucco Partners, LLC v. Digimarc Corp., 445 F. Supp. 2d 1201, 1207 (D. Or. 2006) (allegations based on hearsay do not meet the PSLRA requirement that confidential witnesses' allegations must be based on personal knowledge).

---

6/    Plaintiffs identify other confidential witnesses as having worked at "Sunrise headquarters." See Compl. ¶¶ 76 ("manager at Sunrise headquarters"), 82 ("accounting manager at Sunrise headquarters"); 83 ( "accounting manager at Sunrise headquarters"). Where Plaintiffs identify a confidential witness as having worked only "at Sunrise," it is assumed that the witness did not work at Sunrise headquarters.

Second, "a former senior Sunrise executive" claims that, "in the third-quarter of 2005, Defendant Tomasso ordered the Company's then-CFO to…reverse a portion of Sunrise's health insurance reserves (approximately $2 million) into income in order to make up for an earnings shortfall that Sunrise was experiencing as a result of problems with its Fox Hill venture." Compl. at ¶ 69. Plaintiffs do not plead any specific facts about the purported "former senior Sunrise executive" – no information about his position, the dates of his employment, or how he obtained "direct personal knowledge" of the matters alleged. Under the PSLRA, Plaintiffs' generic description is patently deficient. Central Laborers' Pension Fund v. Integrated Elec. Servs. Inc., 497 F.3d 546, 552 (5th Cir. 2007) (confidential source statements were of no scienter value because they lacked specific details, such as particular job descriptions, individual responsibilities, and specific employment dates for the witnesses); City of Austin Police Ret. Sys. v. ITT Educ. Servs., Inc., 388 F. Supp. 2d 932, 943 (S.D. Ind. 2005) ("[T]he allegations fail to provide any indication as to how the witnesses, who are identified by their job titles in the sparest terms, would be in a position to know about the acts to which they attest.…[T]here is no way to tell if they are relaying information received first, second, or even third hand.").

Moreover, the information attributed to this purported "former senior Sunrise executive" is mere speculation – the witness does not even allege that the purported request to reverse insurance reserves was carried out or, if it was, how or why such an adjustment was substantively incorrect. See, e.g., California Pub. Employees' Ret. Sys. v. Chubb Corp., 394 F.3d 126, 144 (3d Cir. 2004) ("Generic and conclusory allegations based upon rumor or conjecture are undisputedly insufficient to satisfy the heightened pleading standard" of the PSLRA); In re Ferro Corp., Nos. 04-01440, 04-01589, 2007 WL 1691358, at *12 (N.D. Ohio June 11, 2007) ("In order for the statements to evidence scienter, the [c]ourt must be able to tell

-15-

whether a confidential witness is speaking from personal knowledge, or merely regurgitating gossip and innuendo.").

### c. The Restatement Alone Cannot Support an Inference of Scienter.

Plaintiffs allege that the purported manipulation of insurance reserves inflated Sunrise's income by $32.7 million over a three-year period and accounted for 23% of the overstatement of income during the alleged class period. Compl. at ¶ 66. First, it is clear from the Complaint that Plaintiffs have utilized some sleight of hand to grossly overstate the magnitude of this issue. Plaintiffs' purported $32.7 million figure for insurance reserves comes directly from the Restatement and covers "Insurance Reserves" and "'Other' Adjustments." See Summary of Restatement, Compl. at ¶ 64. Indeed, no adjustment in this broad category "individually [was] in excess of 3% of the total cumulative restatement net income impact." See 2006 SEC Form 10-K at 118, Ex. 1. Moreover, Plaintiffs' suggestion that the sheer magnitude of a restated accounting error is sufficient to establish a strong inference of scienter is flatly wrong as a matter of law. As discussed below, an inference of scienter cannot be drawn from the mere fact that a company restates its financials, regardless of the amount restated. In re Fannie Mae., 503 F. Supp. 2d. at 41; In re Intelligroup, 527 F. Supp. 2d at 286 (collecting cases).

### 2. Joint Venture Income.

Plaintiffs allege that Sunrise fraudulently violated GAAP by failing to properly account for income and losses from joint ventures. Compl. at ¶ 73. This allegation is based entirely on information purportedly obtained from three confidential witnesses – CW-4, CW-5, and CW-6. Id. at ¶¶ 74-76. None of their allegations comes close to supporting a strong inference of scienter.

By way of background, and as Plaintiffs acknowledge, Sunrise often entered into real estate joint ventures in which Sunrise owned a minority interest. Compl. at ¶ 70. Some of the joint venture agreements provided preferences concerning cash flows from operations, capital events, and/or liquidation. Id. at ¶ 71. Historically, Sunrise had accounted for these joint ventures using the equity method of accounting based on the percentage of Sunrise's legal ownership interest in the joint venture. 2006 SEC Form 10-K at 62, Ex. 1. For example, in a joint venture in which Sunrise held a 20% interest and its partner an 80% interest, and where the venture suffered $1 million in losses during its start-up phase, Sunrise would recognize 20% of the loss, or $200,000. Compl. at ¶ 73.

Sunrise subsequently determined that, under Statement of Position No. 78-9, "Accounting for Investments in Real Estate Ventures" ("SOP 78-9"), the Company should account for profits and losses using a method known as "hypothetical liquidation at book value" ("HLBV"). 2006 SEC Form 10-K at 62, Ex. 1. Rather than allocating profits and losses based on the percentage of ownership, HLBV takes into account the individual partners' preferences in determining their respective shares of profits and losses. Compl. at ¶ 73; 2006 SEC Form 10-K at 62, Ex. 1. Thus, as in the example provided above, in a venture in which Sunrise held a 20% interest, it is possible that Sunrise should have recognized more than 20% of the venture's early losses. See Compl. at ¶ 73.

Plaintiffs' complaint wholly omits the critical facts that led the Special Committee to conclude that the joint venture accounting error "did not result from an intention to reach an inappropriate accounting result and that the erroneous accounting analyses were not known to be

incorrect at the time they were prepared." 7/  Specifically, the complaint fails to mention that the method by which Sunrise had accounted for its joint venture revenues and expenses had been thoroughly documented and presented to its outside auditors for review, and those auditors had approved it and issued "clean" opinions for the financial statements.  "The preferences were contained in written transaction documents and the accounting analyses for these preferences were documented in writing and reviewed by the company's external auditors in a timely manner."  Oct. 1, 2007, SEC Form 8-K at 4, Ex. 5.  This transparency in the documentation and external review of the Company's accounting methodology completely undercuts any inference that Sunrise officials were trying to engage in any deceitful conduct.  See In re Cirrus Logic Sec. Litig., 946 F. Supp. 1446, 1465 (N.D. Cal. 1996) (external auditor's review and approval of company's revenue recognition practices negated inference of company's scienter).

Moreover, there is no basis whatsoever to draw an inference of scienter from the assertions attributed to Plaintiffs' confidential witnesses.  The first assertion is attributed to CW-4, who is alleged to have been "responsible for reviewing accounting for Sunrise's managed services."  Compl. at ¶ 74.  Initially, as discussed above, CW-4 did not work for the Company during the class period, and is not alleged to have ever worked at Sunrise's headquarters.  Id. at ¶ 68.  In any event, Plaintiffs assert that CW-4 "was present at a meeting with Defendant Adams," at which it "was apparent…that Defendant Adams was not properly accounting for the income from joint ventures."  Id. at ¶ 74.  Plaintiffs do not identify when the alleged meeting took place, the nature of the purported accounting error, or why it "was apparent" to anyone that

---

7/      Oct. 1, 2007, SEC Form 8-K at 4, Ex. 5.  See In re Take-Two Interactive Sec. Litig., 551 F. Supp. 2d 247, 303 (S.D.N.Y. 2008) (because plaintiffs relied in part on special committee's report to support their allegations, "the ultimate conclusions of that report…bear upon the [c]ourt's comparative analysis of the available plausible inferences that may be drawn from the record").

Adams was doing it incorrectly, much less that he was <u>trying</u> to do it incorrectly. Thus, CW-4's allegations cannot support Plaintiffs' conclusion that Adams "was responsible for [the] inflation of joint venture income." <u>Id.; see, e.g.,</u> <u>In re Ceridian Corp. Sec. Litig.</u>, 504 F. Supp. 2d 603, 619 (D. Minn. 2007) (witness's allegations not credited because they "merely inform[ed] the [c]ourt that [defendants] attended meetings at which accounting issues were sometimes discussed and that the individual defendants participated generally in accounting decisions, [and] were responsible for accounting policies and procedures....[T]he [c]ourt could have surmised as much from the individual defendants' job titles").

The second assertion is attributed to CW-5, who is described as "a former senior regional business manager and controller at Sunrise through late 2003 with responsibility for monthly financial statements...." Compl. ¶ 75. This allegation is essentially worthless because Plaintiffs have not identified the dates of CW-5's alleged employment or the types of monthly statements for which he was responsible (or even that CW-5 worked at Sunrise headquarters).

In any event, the assertions attributed to CW-5 are far too vague. CW-5 alleges that he "left Sunrise primarily because [he] disagreed with the Company's questionable business practices, [and] confirmed that Sunrise improperly accrued accounts receivable from its joint ventures." CW-5 claims that "Sunrise accrued expected revenue from its joint ventures for each month to make their bottom line look better, even though the Company never knew how much money it was going to actually receive." <u>Id.</u> CW-5, however, does not identify the joint ventures to which he was referring, much less when and how he knew (or, more importantly, that any Individual Defendant knew) that Sunrise was improperly accounting for them, and his assertions, even if read broadly, amount to charges of incompetence, not fraud.

-19-

The third assertion is attributed to CW-6, who is described as "a manager at Sunrise headquarters from 2001 to 2003 who attended staff meetings at the Company's headquarters at which joint venture arrangements were discussed...." Id. at ¶ 76. Plaintiffs' description of CW-6 as a "manager at Sunrise headquarters" is patently insufficient. No facts are alleged detailing CW-6's job responsibilities. In addition, no facts are alleged identifying which joint ventures were purportedly discussed, or the context in which those joint ventures were discussed. Indeed, CW-6 is not even alleged to have worked in an accounting-related capacity. Thus, there is no basis to credit the conclusory and extremely vague assertion that CW-6 "believed that at least some of the joint venture deals and management contracts that Sunrise entered into were designed with the intent of overstating Sunrise's actual joint venture income." Id.

### 3.    Real Estate Sales Revenue Recognition.

Plaintiffs also allege that Sunrise fraudulently violated GAAP by failing to properly account for revenue from real estate sales. Compl. at ¶ 77. This assertion is based entirely on information purportedly obtained from two confidential witnesses (CW-7 and CW-8). Id. at ¶¶ 82-83. None of the Individual Defendants is identified by name in connection with this allegedly improper accounting practice.

By way of background, and as Plaintiffs acknowledge, in some instances Sunrise extended guarantees and commitments to capital partners and lenders through joint venture sales agreements. Id. at ¶ 77. Historically, Sunrise had recognized income from such transactions to the extent the cash received from the sale exceeded the proportionate cost of the venture's assets. Sunrise subsequently determined that, under SFAS No. 66, the Company should have limited the amount of profit recognized based on its ongoing obligations in the venture. In other words, if

-20-

all the risk of loss from the venture was not transferred to a third party, the Company should not have recognized all of the income from the sale. See 2006 10-K at 61, Ex. 1; Compl. at ¶¶ 77-80.

Once again, the Complaint omits the key facts that led to the Special Committee's finding that these "errors did not result from an intention to reach an inappropriate accounting result and that the erroneous accounting judgments in this category were not known to be incorrect at the time they were made," in particular the fact that the details of these transactions and of Sunrise's historical method of accounting for them were not in any way concealed from the Company's outside auditors. 8-K filed Oct. 1, 2007, at 4, Ex. 5. See In re Take-Two Interactive, 551 F. Supp. 2d at 303. When, as here, corporate officials tell their external auditors what accounting methodology they are employing, and enable the auditors to review and assess the correctness of that methodology, such transparency negates any reasonable inference of scienter. See In re Cirrus Logic, 946 F. Supp. at 1465.

In addition, there is no basis to accord any weight to the assertions attributed to Plaintiffs' confidential witnesses, and thus there is no basis to draw an inference of scienter from them. The first assertion is attributed to CW-7, who is described as "a former accounting manager at Sunrise headquarters from 2001 to 2006 who handled the books and accounting for joint ventures." Compl. ¶ 82. CW-7 reportedly said that he "was not surprised by the recent problems at Sunrise because it was clear to this witness that the Company was overstating profits through improper accounting for real estate sales, and that the 'corporate heads' were the individuals responsible for that practice." Id. This assertion is too vague to be accorded any weight. CW-7 does not even identify the purportedly "improper accounting," much less the "corporate heads" allegedly responsible for it.

The second assertion is attributed to CW-8, who is described as "an accounting manager at Sunrise headquarters from 2004 through 2007 who handled the allocation of expenses related to various programs at the joint venture communities." Compl. at ¶ 83. CW-8 reportedly said that "nothing at Sunrise including sales and acquisitions was properly planned out." Id. CW-8 also claims that "costs were not properly accrued, often there was no information from which to determine where costs and expenses originated from, and allocations for expenses were not timely." Id. "[B]ecause costs were not expensed correctly, Sunrise's earnings were overstated." Id. Even if these assertions were not as vague as they are, they do nothing more than describe what CW-8 perceives as disorganization -- they certainly do not allege fraud or intentional misconduct on the part of anyone at the Company, much less that any of the Individual Defendants knew, or were reckless in not knowing, about any of these issues.

### 4.    Earnings and Capitalization of Expenses.

Plaintiffs also allege that Sunrise fraudulently violated GAAP by improperly recognizing losses on projects under construction and improperly capitalizing costs relating to the sales and marketing of condominium units. Id. at ¶¶ 84-86. These allegations are purportedly based on information obtained from Bradley Rush (Sunrise's former CFO who was terminated in May 2007) and two confidential witnesses. Id. at ¶¶ 84, 88-89.

Plaintiffs make several allegations about loss recognition in paragraph 84 of the Complaint and suggest that at least some are attributed to Rush, but it is not clear which allegations are Rush's and which are Plaintiffs' own. On this basis alone, none of the allegations in paragraph 84 can be credited. See In re Peerless Sys. Corp. Sec. Litig., 182 F. Supp. 2d 982, 994 (S.D. Cal. 2002) (citations and quotations omitted) ("plaintiffs must couple each separate allegation in the [complaint] with details identifying the sources upon which such beliefs are based"). Even if all of these allegations are attributed to Rush, they are far too vague and

-22-

speculative to support an inference of scienter.  The only Individual Defendant even mentioned

is Kenneth Abod, but there are no facts alleged to support the assertion that Abod was

"personally involved" in the allegedly fraudulent conduct.  Compl. at ¶ 84.  Indeed, as Plaintiffs

concede, Rush merely "suspected" Abod's involvement in allegedly improper accounting.  Id. at

¶ 24. 8/

The sweeping conclusions in paragraphs 85 and 86 of the Complaint are not

attributed to any source and, as such, cannot support an inference of scienter.  Tellabs, 127 S. Ct.

at 2508 (for each unlawful act or omission, the plaintiff must plead particularized facts giving

rise to a strong inference of scienter); see 15 U.S.C. § 78u-4(b)(2).

The remaining allegations in paragraphs 88 and 89 of the Complaint are attributed

to two confidential witnesses who are insufficiently described and, in any event, the allegations

themselves are far too vague to be accorded any weight.  First, CW-3 is described as "a former

senior manager at Sunrise from 2003 through mid-2005."  Compl. ¶ 63.  CW-3 is not alleged to

have been a manager of or involved in accounting-related matters, or even to have worked at

Sunrise's headquarters.  CW-3 asserts that Sunrise "had no capital controls at all," and that he

"frequently protested" the Company's accounting for expenses "but management persisted in its

improper practices."  Id. at ¶ 88.  No basis is alleged for CW-3 to have known about the

Company's capital controls.  CW-3 does not identify anyone, much less an Individual Defendant,

---

8/    In addition, Rush's allegations should be discounted in light of the fact that Plaintiffs do
not allege that they have even spoken to Rush.  Rather, they appear to be cribbing from
allegations made in a lawsuit that Rush filed against the Company in Virginia state court after the
Company terminated his employment in 2007.  Compl. at ¶ 224.  Cf. Higginbotham, 495 F.3d at
757 (stating that the court would discount allegations from a witness who may have "axes to
grind").

who was aware of his purported protests or who engaged in the allegedly improper accounting practices. 9/

Second, CW-9 is described only as "a facility controller at Sunrise from 2003 until 2007 who had accounting responsibilities for the facilities that [he] oversaw (including financial reporting, budgeting, analysis, and expense control)." Compl. at ¶ 89. According to CW-9, "senior management was expressly aware of these improper capitalization practices but allowed them to persist unchecked and unrectified for years." This conclusory assertion is devoid of any factual specificity and, as such, cannot support any inference of scienter.

### 5.    Unearned Professional Fees.

Plaintiffs' assertion of fraudulent recording of unearned professional fees is based entirely on an accounting error made with respect a Sunrise subsidiary. Compl. ¶¶ 91-92. No Individual Defendant is identified as having any knowledge of this issue, and the allegations supporting Plaintiffs' assertion do not identify any fraudulent conduct by anyone. As such, no inference of scienter can be drawn.

### 6.    Stock-Based Compensation.

Plaintiffs allege that Sunrise fraudulently violated GAAP by failing to properly account for stock-based compensation. Compl. at ¶ 93. Specifically, Plaintiffs allege that Sunrise improperly "backdated" certain stock-options grants and did not properly account for the backdated grants. Id. at ¶¶ 94-95, 239-259. As with their insurance reserve allegations (discussed above), Plaintiffs' backdating allegations rely on the false premise that Sunrise

---

9/    Similarly, the allegations of improper conduct attributed to CW-3 in paragraph 63 of the Complaint are vague and unsubstantiated by any specific factual allegations. As such, they cannot be accorded any weight either.

-24-

admitted that stock options were fraudulently backdated.  Compl. at ¶ 95.  Sunrise made no such statement.

On September 28, 2007, the Company disclosed that the Special Committee had concluded the fact-finding portion of its inquiry with respect to three issues.  SEC Form 8-K, filed Oct. 1, 2007, at 2, Ex. 5.  The first involved the timing of certain stock-option grants.  Id. The Special Committee found "no evidence of backdating or other intentional misconduct with respect to the grants on the 38 grant dates examined...or the possible errors identified by the Special [] Committee in the accounting for stock options."  Id.; see 2006 SEC Form 10-K at 59, Ex. 1.  The Special Committee identified accounting issues under GAAP in connection with certain of the option grants reviewed, including "unintentional errors" made in connection with the accounting for a September 1998 repricing and certain other stock-option grants.  2006 SEC Form 10-K at 60, Ex. 1.  Plaintiffs' assertion that the disclosure of "unintentional errors" constitutes an admission of fraud is preposterous.

Moreover, there is no basis to accord any weight to Plaintiffs' purported "Merrill Lynch analysis" that allegedly establishes that intentional backdating occurred.  Compl. at ¶ 243, 245, 249, 251, 253, 256, 258.  The person who conducted this supposed analysis is not identified, the methodology is not explained, and the information relied upon is not identified.  The reader is left to speculate about every aspect of Plaintiffs' "analysis" – from how Plaintiffs analyzed the challenged options grants, to what, if anything, the purported results mean.  As alleged, this

phantom "analysis" cannot possibly support an inference of scienter. 10/ See, e.g., Nach v. Baldwin, No. 07-00740, 2008 WL 410261, at *7 (N.D. Cal. Feb. 12, 2008) ("the [c]ourt will not rely on a Merrill Lynch-style analysis that consists entirely of two sentences and lacks any explanation of how plaintiff arrived at his conclusions").

      Nor is there any basis to accord any weight to Plaintiffs' remaining allegations of backdating based on the 10 challenged options grants. In fact, there is not a word to be found in the Complaint describing in any manner, much less with particularity, who at Sunrise deliberately backdated any options, or how any of the Individual Defendants supposedly knew that any such backdating had occurred. Rather, Plaintiffs offer only speculative, circumstantial logic – the price went up shortly after these options were granted, so they must have been backdated – that does not begin to overcome the strong inference of non-intentional conduct arising from the Special Committee's findings after investigating 38 options grants. Indeed, at least six of the 10 challenged options grants were investigated by the Special Committee, and were determined not to have been intentionally backdated. 11/ As such, Plaintiffs' attempt to

---

10/    Furthermore, based just on the limited description alleged in the Complaint, it is clear that Plaintiffs' "analysis" is inherently flawed. Plaintiffs failed to account for all options grants during the relevant time period. The only options grants analyzed are the ones alleged to have been backdated. No inference of backdating can be drawn from an analysis limited to a few cherry-picked options grants that appear to have been favorably timed with the benefit of hindsight, without consideration of grants that appear to have been neutral or unfavorable. See, e.g., In re Finisar Corp. Derivative Litig., 542 F. Supp. 2d 980, 993 (N.D. Cal. 2008) ("[P]laintiffs do not indicate what percentage the 12 selected grants represent of the total grants to directors and officers over the period to permit the court to consider the probability of the particular grant dates being selected randomly rather than deliberately.").

11/    Plaintiffs challenge options granted on: May 2, 1997; Aug. 28, 1997; Nov. 4, 1997; Sept. 14, 1998; Dec. 10, 1998; Mar. 5, 1999; Nov. 10, 1999; Feb. 25, 2000; Mar. 28, 2000; and Sept. 11, 2000. Compl. at ¶¶ 242-258. The Special Committee investigated options granted on six of these dates: May 2, 1997; Sept. 14, 1998; Nov. 10, 1999; Feb. 25, 2000; Mar. 28, 2000; and Sept. 11, 2000. 2006 10-K at 59, Ex. 1; SEIU Letter, Ex. 4.

support an inference of scienter against Hulse, Newell, Paul Klaassen, and Tomasso, based on their alleged receipt of purportedly backdated options, must fail.

In sum, Plaintiffs' allegations do not support any inference that backdating occurred, much less that any Individual Defendant knew, or was reckless in not knowing, about any errors in accounting related to stock-based compensation.

## C.    Plaintiffs' Other Allegations Do Not Create a Strong Inference of Scienter.

Plaintiffs' other allegations cannot support a strong inference of scienter.

### 1.    Internal Controls.

No inference of scienter can be drawn based on Plaintiffs' allegations that the Individual Defendants were "directly responsible" for internal control weaknesses at the Company. See Compl. at ¶ 98; see In re Fannie Mae, 503 F. Supp. 2d. at 41. These allegations are based on the Restatement, and the conclusory assertions of a confidential witness, neither of which can support an inference of scienter. The Restatement, quoted at paragraph 94 of the Complaint, does not state or suggest that any Individual Defendant knew, or was reckless in not knowing, about internal control weaknesses at the Company. CW-6 is identified as the source of sweeping assertions about internal-controls weaknesses at the Company. Comp. at ¶ 98 (Sunrise was "a public company run like" Paul and Teresa Klaassen "still owned it privately." Id. "[A]ny internal control would have to pass muster" with Paul and Teresa Klaassen. Id. "If it was something that they did not like, they could get around it." Id.). No facts are alleged identifying how CW-6 had any basis to make such assertions, or how his opinions about the Klaassens could possibly establish scienter on the part of any Individual Defendant.

2.     **Termination of Rush's Employment.**

Plaintiffs' suggestion that the termination of Rush's employment on May 2, 2007 supports an inference of scienter is illogical, at best. See Compl. at ¶ 224. The Company disclosed on July 31, 2006, that it intended to restate prior years' financial statements. Id. at ¶ 187. Although described by Plaintiffs as a "whistleblower," Rush's employment was terminated more than nine months after the disclosure of the Restatement. 12/ The Company had already blown its own whistle long before Rush's employment was terminated.

Furthermore, none of the allegations that Plaintiffs copied from Rush's state-court complaint against the Company raise an inference of scienter against any Individual Defendant. Based on Rush's complaint, Plaintiffs allege that Rush first discovered problems with the company's accounting function in mid to late 2005 (id. at 226), and subsequently identified additional problems (id.); he brought the problems to the attention of management (id.); and management concluded that the errors were serious enough to warrant a restatement. Id. at 227. These allegations, if true, refute rather than support any inference of intentional misconduct, because they show that the Company did exactly what it was supposed to do when suspected errors were reported – it investigated them, corrected them, and timely reported that it was doing both.

3.     **Insider Sales.**

Plaintiffs allege that sales of Sunrise stock during the alleged class period by Defendants Anschutz, Hulse, Paul Klaassen, Teresa Klaassen, and Newell support an inference

---

12/     Sunrise disclosed that Rush was terminated by the Board "following a briefing to the independent directors by independent legal counsel retained by the special independent committee of the Board [because the] Board concluded that actions taken by Mr. Rush were not consistent with the document retention directives issued by the Company." See 8-K filed Apr. 26, 2007, Ex. 7 hereto; 8-K filed May 3, 2007, Ex. 8 hereto.

of scienter against them. Compl. at ¶¶ 230-238. The Court should not "infer fraudulent intent from the mere fact that some officers sold stock....Instead, [p]laintiffs must allege that the trades were made at times and in quantities that were suspicious enough to support the necessary strong inference of scienter." In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1424 (3d Cir. 1997) (Alito, J.); see also In re Baan Co. Sec. Litig., 103 F. Supp. 2d 1, 19 (D.D.C. 2000) (plaintiff must plead facts about stock sales to raise suspicion); In re PEC Solutions, Inc., No. 03-00331, 2004 WL 1854202, at *15 (E.D. Va. May 25, 2004), aff'd 432 F.3d 571 (4th Cir. 2005) (same).

Plaintiffs assert that the challenged stock sales were suspicious, but do not allege any facts establishing that they were "dramatically out of line with prior trading practices." Moreover, several of the Individual Defendants – Abod, Adams, and Tomasso – who are alleged to have had knowledge of the accounting errors at issue are not alleged to have sold any shares during the alleged class period. See Compl. at ¶ 230. This weighs against an inference of scienter on the part of all of the Individual Defendants. Higginbotham, 495 F.3d at 759 ("[O]ne possible inference [from] the absence of sales by other managers who would have [allegedly] been in the know...implies that nothing was thought to be out of the ordinary....[T]he absence of any demonstration that [the period in question] was an unusual period for managerial sales means that the complaint lacks the required 'strong' demonstration of scienter."). 13/

Also weighing against an inference of scienter are (1) the absence of any allegations regarding the profits, as opposed to gross revenues, derived from the challenged stock sales, see, e.g., In re eSpeed, Inc. Sec. Litig., 457 F. Supp. 2d 266, 290 (S.D.N.Y. 2006) (ruling

---

13/    See also, e.g., In re Burlington Coat Factory, 114 F.3d at 1423 (inference of scienter on the part of all defendants diminished by fact that two of five defendants did not sell any stock during class period).

that motive allegations were insufficient because complaint, inter alia, failed to specify profit garnered through defendants' stock sales); (2) the Company's repurchase of its own shares during the class period, 14/ McNamara v. Pre-Paid Legal Servs., Inc., 189 F. App'x 702, 717 (10th Cir. 2006) (company's repurchase of its own stock during class period diminished inference of scienter on part of defendants) 15/; and (3) Plaintiffs' assertion of a 29-month-long class period. Teachers' Ret. Sys. of La. v. Hunter, 477 F.3d 162, 185 (4th Cir. 2007) ("[A]lleging a lengthy class period weakens any inference of scienter that could be drawn from the timing of defendants' trades.....[T]he lengthy period strengthens a competing inference that the plaintiffs filed their complaint simply to embark on a fishing expedition with the hope of catching a valid claim").

Finally, Plaintiffs do not even attempt to come to grips with whether the challenged stock sales were made pursuant to a 10b5-1 automatic trading plan. Nor do Plaintiffs allege why the existence of such a plan does not negate their suggested inference of scienter. Indeed, stock sales made pursuant to a 10b5-1 automatic trading plan support an inference that

---

14/    See Nov. 17, 2005 press release, Ex. 9 hereto (announcing Board's approval of $50 million stock repurchase program).

15/    See also Mathews v. Centex Telemanagement, Inc., No. 92-01837, 1994 WL 269734, at *8 (N.D. Cal. June 8, 1994) (inference of scienter diminished by Company's repurchase of its own shares because "[i]t would have made no sense to purchase that stock if defendants knew the prices to be inflated").

such sales were <u>not</u> made with scienter. <u>16/</u> <u>See, e.g.</u>, <u>In re Int'l Rectifier Corp. Sec. Litig.</u>, No. 07-02544, 2008 U.S. Dist. LEXIS 44872, at *60-62 (C.D. Cal. May 23, 2008); <u>In re IAC/InterActiveCorp</u>, 478 F. Supp. 2d at 605.

　　　　As detailed below, Plaintiffs cannot support an inference of scienter against any Individual Defendant based on their challenged stock sales.

### a.　　Anschutz.

　　　　Plaintiffs do not plead any facts suggesting that Anschutz's sale of small number of Sunrise stock was unusual or suspicious. Indeed, no such allegations are possible because the circumstances of Anschutz's sales are unsuspicious. Plaintiffs fail to allege that Anschutz's stock sales were not made pursuant to a 10b5-1 automatic trading plan. His first sale of 5,000 shares in November 2005 coincided with his one-year anniversary with Sunrise, when he first became eligible to exercise his original grant of stock options. <u>17/</u> Such stock sales are not probative of scienter because the absence of earlier trading history precludes a determination of whether the trades are out of the ordinary. <u>See, e.g.</u>, <u>In re Vantive Corp. Sec. Litig.</u>, 283 F.3d 1079, 1095 (9th Cir. 2002) (allegations of stock sales not probative when defendant joined the

---

<u>16/</u>　　Unlike insider trading allegations where a 10b5-1 plan is an affirmative defense, a 10b5-1 plan may be used at the motion to dismiss stage to rebut a claim that insider trading raises an inference of scienter. <u>Compare</u> <u>In re Fannie Mae</u>, 503 F. Supp. 2d at 39 (not allowing use of 10b5-1 trading plan as affirmative defense to insider trading claim on motion to dismiss) with <u>Wietschner v. Monterey Pasta Co.</u>, 294 F. Supp. 2d 1102, 1117 (N.D. Cal. 2003) (shares sold under individual SEC Rule 10b5-1 trading plans "could raise an inference that the sales were pre-scheduled and not suspicious"); <u>In re IAC/InterActiveCorp Sec. Litig.</u>, 478 F. Supp. 2d 574, 605 (S.D.N.Y. 2007) (Plaintiff's stock trades were made pursuant to a 10b5-1 sales plan entered into on May 30, 2003 (during the class period), and therefore the timing and amount of the sales did not raise a strong inference of scienter).

<u>17/</u>　　On November 17, 2004, Anschutz was named Senior Vice President and Chief Accounting officer of the Company. Form 8-K filed on Nov. 17, 2004, Ex. 10 hereto. Anschutz received 20,000 stock options (split-adjusted) on that date. Form 3 filed on November 23, 2004, Ex. 11 hereto. The options vested at a rate of 25% per year beginning on November 17, 2005. <u>Id.</u> See SEC Form 4s (filed 11/22/05 and 1/4/06), Exs. 12 and 13 hereto.

company during the class period and thus had no earlier opportunity to sell stock); In re PIXAR

Sec. Litig., 450 F. Supp. 2d 1096, 1105 (N.D. Cal. 2006) ("Bax joined Pixar in 2004 and his

options did not begin vesting until May 3, 2005, and thus he did not have any Pixar shares to sell

before the Class Period began.  Without a meaningful trading history from which to compare, the

Court cannot conclude that Bax's trades were suspicious and thus supportive of scienter.").

Moreover, this sale and later sale of 926 shares in January 2006 were accomplished at prices well

below the class period high, were not near in time to the release of any alleged misstatement, and

occurred seven and five months before the first disclosure relating to any accounting problem at

the Company.  See Teachers' Ret. Sys. Of La., 477 F.3d at 184-85 (sale of stock below class

period highs inconsistent with scienter); City of Braxton Ret. Sys. v. Shaw Group, Inc., 540 F.

Supp. 464, 476 (S.D.N.Y. 2008) (same; sales 10 weeks before disclosure of accounting errors

requiring restatement not suspicious).  Accordingly, Plaintiffs have failed to plead any inference

of scienter based upon stock sales.

### b.    Hulse.

Similarly, Hulse's stock sales do not support an inference of scienter because

Plaintiffs fail to allege whether his sales of Sunrise stock were made pursuant to a 10b5-1

automatic trading plan. 18/  Moreover, the sales occurred in August 2005 (Compl. at ¶ 230), nine

months before the first disclosure of an accounting problem at the Company, and Plaintiffs have

not alleged that Hulse's sales were "dramatically out of line" with his prior trading practices.

Indeed, Plaintiffs offer no information about Hulse's trading practices other than basic details of

the August 2005 sales.

---

18/    Plaintiffs allege in paragraph 234 of the Complaint that Hulse sold stock in November
2005.  Yet, in the table of alleged stock sales at paragraph 230 (p. 94) of the Complaint, Plaintiffs
list no actual sales.

### c.    Paul Klaassen and Teresa Klaassen.

Plaintiffs fail to allege that stock sales by Paul Klaassen and Teresa Klaassen were not made pursuant to a 10b5-1 automatic trading plan. Moreover, the sales involved only a small portion of the Klaassens' total holdings. On December 19, 2005, the date of the first sale cited by Plaintiffs (100,00 shares), the Klaassens owned, jointly or individually, a total of 5,849,468 shares of Sunrise stock valued at more than $200 million. SEC Form 4 filed Dec. 30, 2005, Ex. 14 hereto. Over the next five months (after the initial December sale), as part of a series of planned sales, the Klaassens sold 500,000 shares in regular monthly blocks of 100,000 shares each. In the aggregate, the total shares sold amounted only 10% of their holdings. A defendant's planned sale of a relatively small portion of his or her stock over an extended period of time does not support an inference of scienter. See, e.g., Acito v. IMCERA Group, Inc., 47 F.3d 47, 54 (2d Cir. 1995) (defendant's sale of stock involving less than 11 percent of his holdings did not support an inference of scienter); In re PEC Solutions, Inc. Sec. Litig., 418 F.3d 379, 390 (4th Cir. 2005) (defendant's sale of stock involving 13 percent of his stock did not support an inference of scienter because it was a "de minimis" amount of his holdings).

### d.    Newell.

Newell's stock sales do not support an inference of scienter because Plaintiffs fail to allege whether his sales of Sunrise stock were made pursuant to a 10b5-1 automatic trading plan. Moreover, the sales are not suspicious because they represented a small portion of Newell's holdings and because Plaintiffs have not alleged that the sales were "dramatically out of line" with Newell's prior trading. Indeed, Plaintiffs allege that Newell sold shares in a mechanical fashion between March 22, 2004 and April 24, 2006, with each sale involving small percentages of his holdings, and occurring between the 22nd and 24th of the month. See chart,

Compl. at ¶ 230 (p. 94). There is thus no basis to infer that these sales were "timed" to take advantage of any undisclosed information.

### 4.    The Restatement.

As discussed in Section I.B.1(c) above, no inference of scienter can be drawn from the Restatement itself, regardless of its magnitude. In re Intelligroup, 527 F. Supp. 2d at 286 (collecting cases); In re Fannie Mae., 503 F. Supp. 2d. at 41. "Courts have uniformly held that allegations of scienter based on GAAP violations do not create the requisite strong inference of scienter unless [the] complaint alleges 'more.'" In re Intelligroup, 527 F. Supp. 2d at 286 (collecting numerous circuit cases). The "more" contemplated by the courts consists of "facts which could sufficiently indicate that defendants had clear reasons to doubt the validity of [their] financials but, nonetheless, kept turning a blind eye to all such factual 'red flags.'" Id. at 287 (collecting cases).

In cases involving issuers rather than auditors, GAAP violations may indicate scienter "only where the provisions of GAAP so coincide with conclusions obvious to any business person and present recitals of knowledge so common to the business – rather than accounting – community, that a violation of this type of GAAP provision equates to a self-evident business nonsensicality which cannot be made by a defendant with a non-culpable state of mind." Id. at 352; see also PR Diamonds, Inc. v. Chandler, 91 F. App'x 418, 440 (6th Cir. 2004) (citations and quotations omitted) (courts will not infer scienter on the basis of GAAP violations unless the violations are "the sort of 'in your face' accounting violations that, without additional 'specific, highly suspicious facts and circumstances,' support a strong inference of scienter").

In this case, no "red flags" are alleged. While Plaintiffs allege several violations of GAAP, they cannot allege that the violations involved errors so obvious that Defendants must

-34-

have been aware of them. Plaintiffs assert that "the accounting rules at issue...are simple and straightforward in application." Compl. at ¶ 263. But they do not attempt to explain why this is so, nor do they allege how or why the external auditors could have approved Sunrise's earlier financial statements if these errors were so "simple and straightforward." 19/ Indeed, Plaintiffs merely describe, in boilerplate language, each accounting rule at issue and what the particular rule requires. Plaintiffs then conclude, based on the Restatement, that Sunrise violated the particular accounting rule. See id. at ¶¶ 66, 72-73, 78, 84, 85, 86, 92. Nothing "more" is alleged.

        Plaintiffs fail to allege facts that would establish that any of the accounting rules at issue are demonstrably "basic," or "simple and straightforward," such that the accounting errors identified in the Restatement must have been made with the requisite state of mind. Accordingly, the Restatement and accounting errors disclosed therein do not support a strong inference of scienter against any Defendant.

---

19/    For example, Plaintiffs repeatedly contend that the accounting rules governing joint ventures – SFAS No. 66 and SOP 78-9 – are "basic" (id. at ¶ 73) and "simple and straightforward in application." Id. at ¶ 263. Yet, one treatise notes that "[t]he accounting for joint ventures has become increasingly complex particularly for those arrangements in which terms provide for varying distribution priorities and buy/sell options." Peter M. Fass, Michael E. Shaff, and Donald B. Zief, Real Estate Investment Trusts Handbook § 3:48 (2007) (discussing SOP 78-9 and SFAS No. 66); see also In re Nat'l Century Fin. Ent., Inc. Fin. Inv. Litig., No. 03-01565, 2007 WL 2331929, at *7 (S.D. Ohio Aug. 13, 2007) (plaintiff's "allegation that [defendant] chose the wrong accounting method for joint ventures does not, without more, support a strong inference that the alleged violation was incapable of being committed negligently"). Similarly, courts have recognized that "errors in the accounting for [stock] options grants may not be readily apparent [to corporate executives] because of the complexity of options accounting." In re Take-Two Interactive, 551 F. Supp. 2d at 302 (citation omitted); see also Weiss v. Amkor Tech., Inc., 527 F. Supp. 2d 938, 949 (D. Ariz. 2007) ("[A]ccounting rules at issue [with accounting for stock options], specifically APB No. 25, are complex and require accounting expertise and judgment.").

### D.    Plaintiffs Fail to Allege a Strong Inference of Scienter Against Any Individual Defendant.

Count I should be dismissed because Plaintiffs fail to create the required strong inference of scienter against any Individual Defendant with respect to any of the six challenged accounting practices that form the basis for Count I.  As its name suggests, the Private Securities Litigation Reform Act was enacted to put an end to dragnet suits (like this one) "based on nothing more than a company's announcement of bad news, not evidence of [a particular defendant's] fraud."  S.Rep. No. 104-98, at 4 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 683; see Tellabs, 127 S. Ct. at 2504.  The PSLRA proscribes claims based on the sort of generalized and conclusory allegations – based on group, "fraud by hindsight" and "must have known" pleading – that Plaintiffs rely on here.

In order to state a claim under Section 10(b), Plaintiffs were required to establish a strong inference of scienter on the part of each Individual Defendant.  In re Fannie Mae, 503 F. Supp. 2d. at 40 (a plaintiff "must allege specific facts demonstrating that each of the defendants acted with the requisite state of mind").  Generalized allegations of scienter are insufficient.  Scienter cannot be inferred solely because a defendant is a corporate officer.  Id. ("[S]cienter cannot be inferred solely because a defendant is a corporate officer.") (citing In re Advanta Corp. Sec. Litig., 180 F.3d 525, 539 (3d Cir. 1999)).  Nor can scienter be inferred solely from a defendant's signature on an allegedly false or misleading disclosure or certification, e.g., In re Intelligroup, 527 F. Supp. 2d at 352, or from an allegation that a defendant misrepresented the corporation's financial condition to inflate the stock price and protect his compensation.  See e.g., Kalnit v. Eichler, 264 F.3d 131, 139 (2d Cir. 2001).

Courts may consider only particularized factual allegations. Because the Complaint lacks such allegations, Plaintiffs have failed to create a strong inference of scienter against of any Individual Defendant.

### 1.    Abod.

As it relates to Abod, the Complaint is more interesting for what it does not allege. In particular, Plaintiffs do not allege that Abod received allegedly backdated stock options or that he sold any Sunrise stock during the alleged class period. Plaintiffs also do not contend that Abod had anything to do with the preparation of any supposedly false or misleading statements. Indeed, Abod, who was not a named defendant in the original complaint, has been swept into the current Complaint only as an apparent afterthought once Plaintiffs learned that Abod had been mentioned in Rush's state-court complaint against Sunrise. See Compl. at ¶ 24. Plaintiffs mention Abod in just four paragraphs of the 301-paragraph Complaint, Compl. at ¶¶ 24, 25, 84, 223, and in doing so, rely solely on the vague and conclusory assertions in the Rush state-court complaint. As explained in Section I.B.4 above, the limited allegations cribbed from the Rush complaint are wholly insufficient. The Complaint thus fails to create a strong inference of scienter against Abod, and he should be dismissed from the lawsuit.

### 2.    Adams.

Adams is identified in just 15 paragraphs of the 301-paragraph Complaint. See Compl. ¶¶ 8, 22, 25, 59, 67, 68, 74, 104, 112, 121, 129, 213, 218, 222, 226. Of those references, only one includes a factual allegation relating to his purported role in any of the six alleged accounting errors underlying Plaintiffs' Section 10(b) claim – accounting of joint venture income. See id. at ¶ 74. As explained in Section I.B.2, above, that allegation is insufficient to support a strong inference that Adams knew, or was reckless in not knowing, about the accounting error.

-37-

Adams is not alleged to have received any purportedly backdated stock options, and he is not alleged to have made any stock sales during the class period. As explained in Section I.B.1, above, Plaintiffs' assertion that Adams was "fired" as a result of his purported manipulation of insurance reserves is not supported by any particularized factual allegations. The Complaint fails to create a strong inference of scienter against Adams, and he should be dismissed from the lawsuit.

### 3. Anschutz.

The 10 paragraphs of the Complaint that include Anschutz's name do nothing more than generally describe his brief tenure at Sunrise and note that he signed some of the relevant SEC filings. See Compl. at ¶¶ 23, 25, 138, 146, 156, 162, 171, 216, 230, 234. None of Plaintiffs' confidential witnesses mention Anschutz, and Plaintiffs do not allege any other facts describing his involvement in any of the challenged accounting decisions. This is not surprising. Anschutz was employed at Sunrise for only 17 months – from November 2004 through April 2006. Compl. at ¶ 23. This means that Anschutz was not at Sunrise at the inception of the alleged fraud, nor at the end. The only "cogent" inference that can be drawn from these few factual allegations is that Anschutz was not a participant in the alleged fraud. The lone reason alleged for Anschutz's appearance in the Complaint is the fact that he exercised and sold a small number of the Sunrise options he received as employment compensation. Id. As explained above in Section I.C.3, the mere fact that a corporate insider sold stock does support a strong inference that he engaged in fraud. The Complaint thus fails to create a strong inference of scienter against Anschutz, and he should be dismissed from the lawsuit.

### 4. Hulse.

Plaintiffs' only attempt to directly link Hulse to any of the six alleged accounting errors underlying their Section 10(b) claim is pled in paragraph 61 – relating to accounting for

earnings. Those allegations cannot be accorded any weight because they consist entirely of vague speculation and hearsay.  See In re Intelligroup, 527 F. Supp. 2d at 360-61 (dismissing allegation based on "common knowledge" as rumor).  Plaintiffs' indirect allegations of scienter against Hulse also are lacking.  As explained in Section I.B.1, above, Plaintiffs' assertion that Hulse was "fired" as a result of his purported manipulation of insurance reserves is not supported by any particularized factual allegations.  As explained in Section I.C.3, above, Plaintiffs' allegations about Hulse's stock sales during the alleged class period also are insufficient.  As explained in Section I.B.6, above, no inference of scienter can be drawn against Hulse based on his receipt of allegedly backdated stock options, because Plaintiffs fail to plead facts establishing that any intentional backdating occurred or that Hulse knew, or was reckless in not knowing, about errors in the accounting for certain stock options.  Nor can an inference be drawn from the mere fact that he was an officer of the Company, or that he signed certifications for certain of the Company's SEC filings (Compl. at ¶¶ 175-180).  In re Fannie Mae., 503 F. Supp. 2d. at 40; In re Intelligroup, 527 F. Supp. 2d at 352.  The Complaint thus fails to create a strong inference of scienter against Hulse, and he should be dismissed from the lawsuit.

### 5.    Paul Klaassen.

Plaintiffs' only direct allegations of scienter against Paul Klaassen are the conclusory assertions that he was personally responsible for the Company's internal controls (Compl. at ¶ 98) and that he received allegedly backdated stock options.  Compl. at ¶ 93.  As explained in Sections I.C.1 and I.B.6, above, neither of these allegations can support a strong inference of scienter.  The conclusory assertions about Paul Klaassen's involvement in the Company's internal controls lack any specific factual basis.  Likewise, no inference of scienter can be drawn against him based on his receipt of allegedly backdated of stock options, because Plaintiffs fail to plead facts establishing that any intentional backdating occurred or that Paul

Klaassen knew, or was reckless in not knowing, about errors in the accounting for certain stock options. Indeed, the challenged options granted to Paul Klaassen (Sept. 11, 2000) were investigated by the Special Committee, which found neither evidence of backdating or other intentional misconduct with respect to these grants nor errors in the accounting of these stock options. As explained in Section I.C.3, above, Plaintiffs' allegations regarding Paul Klaassen's sale of a small percentage of his stock holdings cannot support an inference of scienter. Nor can a strong inference of scienter be drawn from the mere fact that he signed certifications for certain of the Company's SEC filings (Compl. at ¶¶ 175-180). In re Intelligroup, 527 F. Supp. 2d at 352. The Complaint thus fails to create a strong inference of scienter against Paul Klaassen, and he should be dismissed from the lawsuit.

### 6.    Teresa Klaassen.

Teresa Klaassen is identified in just 13 paragraphs of the 301-paragraph Complaint. Compl. at ¶¶ 18, 25, 34, 98, 104, 138, 171, 196, 216, 230-233. Plaintiffs do not allege that she was involved in any of the six alleged accounting errors underlying their Section 10(b) claim. The direct scienter allegations pled against her are the suggestion that she was personally responsible for the Company's internal controls (Compl. at ¶ 98) and that she sold (with Paul Klaassen) a small percentage of her stock holdings during the alleged class period. As explained in Sections I.C.1 and I.C.3, above, neither of these allegations supports a strong inference of scienter. Like the conclusory assertions against her husband, the assertions about Teresa Klaassen's involvement in the Company's internal controls lack any factual basis. No inference of scienter can be drawn from the challenged stock sales. The Complaint thus fails to create a strong inference of scienter against Teresa Klaassen, and she should be dismissed from the lawsuit.

### 7.    Newell.

Plaintiffs' direct allegations of scienter against Newell consist of his separation from the Company, his alleged receipt of purportedly backdated stock options, and his stock sales during the alleged class period.  As explained in Section I.B.1, above, Plaintiffs' assertion that Newell was "fired" as a result of his purported manipulation of insurance reserves is not supported by any particularized factual allegations.  As explained in Section I.C.3, above, his stock sales during the alleged class period do not support an inference of scienter.  As explained in Section I.B.6, above, no inference of scienter can be drawn against Newell based on his receipt of allegedly backdated of stock options, because Plaintiffs fail to plead facts establishing that any intentional backdating occurred or that Newell knew, or was reckless in not knowing, about errors in the accounting for certain stock options.  The Complaint thus fails to create a strong inference of scienter against Newell, and he should be dismissed from the lawsuit.

### 8.    Tomasso.

Tomasso is identified in just 13 paragraphs of the 301-paragraph Complaint.  Compl. at ¶¶ 20, 25, 62, 69, 93, 216, 225, 237, 239, 240, 241, 244, 248, 249, 254 255.  Plaintiffs' direct allegations of scienter are pled in paragraphs 62, 69, and 93.  Plaintiffs' allegations in paragraph 62 (CW-2 alleges that Tomasso was a difficult boss) and in paragraph 69 (an unidentified confidential witness alleges she manipulated insurance reserves) are irrelevant and can be disregarded because no factual details are provided about the bases for the alleged knowledge of these purported witnesses.  As explained in Section I.B.6, above, no inference of scienter can be drawn against Tomasso based on her receipt of allegedly backdated of stock options, because Plaintiffs fail to plead facts establishing that any intentional backdating occurred or that Tomasso knew, or was reckless in not knowing, about errors in the accounting for certain stock options.  Moreover, she is not alleged to have sold stock during the alleged class

-41-

period.  The Complaint fails to create a strong inference of scienter against Tomasso, and she should be dismissed from the lawsuit.

      **E.**      **Plaintiffs Cannot Allege a Strong Inference of Scienter Against Sunrise.**

      Count I should be dismissed because Plaintiffs cannot allege a strong inference of scienter against Sunrise.  A corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer who made or approved the allegedly misleading statement had the requisite level of scienter at the time the statement was made or approved.  Pugh v. Tribune Co., 521 F.3d 686, 697 (7th Cir. 2008).  Because the Complaint fails to create a strong inference of scienter against any Individual Defendant, it also fails to create a strong inference of scienter against the Company.  As such, Plaintiffs' cannot state a claim under Section 10(b), and Count I should be dismissed.

      **F.**      **Plaintiffs Also Fail to Allege Loss Causation for Four of the Six Types of Alleged Accounting Fraud.**

      In addition to the absence of particularized facts establishing a strong inference of scienter, Plaintiffs also fail to adequately allege the required element of loss causation – the "causal connection between the material misrepresentation and the loss," Dura Pharm., 544 U.S. at 342; see Freeland v. Iridium World Commc'ns, Ltd., 545 F. Supp. 2d 59, 79 (D.D.C. 2008) (citations omitted).

      To establish loss causation under Section 10(b), a plaintiff may not simply allege that the misrepresentation "'touches upon' a later economic loss." Dura Pharm., 544 U.S. at 343.  Rather, a plaintiff generally must allege a corrective disclosure relating to the defendant's challenged representation, followed by a decline in the company's stock price. Id. at 342-43.  An inflated stock price "will not itself constitute or proximately cause the relevant economic loss." Id. at 342.  Likewise, if a shareholder sells "before the relevant truth begins to leak out, the

misrepresentation will not have led to any loss." Id. The facts alleged must support an inference that the defendant's misrepresentations concealed circumstances such that, absent the alleged fraud, the "plaintiff would have been spared all or an ascertainable portion of [its] loss." Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 175 (2d Cir. 2005). 20/

Accordingly, courts have held that, where a complaint alleges several types of factually distinct misconduct, the plaintiff must plead loss causation for each. In re St. Paul Travelers Sec. Litig. II, No. 04-04697, 2007 WL 1589524, at *4 (D. Minn. June 1, 2007). A plaintiff cannot simply point to a corrective disclosure about certain errors affecting a company's financial statements and then claim that the loss attributable to that disclosure satisfies the loss causation element for other factually distinct errors. Id. at *7 (rejecting the proposition that "a corrective disclosure about any questionable conduct that impacts a company's financial statements is a sufficient disclosure about any other questionable conduct...because it would create a boundless rule, rendering meaningless the loss causation requirement"). 21/ In other words, a plaintiff must identify a specific corrective disclosure and loss for each of its distinct theories of liability. E.g., Marsden v. Select Med. Corp., No. 04-04020, 2007 WL 518556, at *4-5 (E.D. Pa. Feb. 12, 2007).

Here, the Plaintiffs allege several factually distinct types of accounting fraud: (1) manipulation of insurance reserves (Compl. at ¶¶ 65-69); (2) inflation of joint venture income

---

20/    See also Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP, 475 F.3d 824, 843 (7th Cir. 2007); Teachers' Ret. Sys. of La., 477 F.3d at 186-88.

21/    See also In re Take-Two Interactive, 2008 WL 1757823, at *27 (company's statement that grand jury had subpoenaed "certain [of its] compensation and human resources documents" did not support loss causation element of plaintiff's claim based on stock-options backdating because the statement "ma[de] no mention of options, options backdating, or the manner in which [defendant] accounted for its options grants"); In re Alamosa Holdings, Inc., 382 F. Supp. 2d 832, 862 (N.D. Tex 2005) ("[B]ecause none of the other alleged misrepresentations or omissions...were the subject of a corrective disclosure followed by a drop in stock price, there can be no finding that such misrepresentations or omissions caused [p]laintiffs' losses.").

(id. at ¶¶ 70-76); (3) improper joint venture sales revenue recognition (id. at ¶¶ 77-83);

(4) improper capitalization of expenses and manipulation of earnings (id. at ¶¶ 84-90);

(5) improper recording of unearned professional fees (id. at ¶¶ 91-92); and (6) improper

accounting of stock-based compensation. Id. at ¶¶ 93-95. Yet, Plaintiffs plead loss causation

only with respect to joint venture income and joint venture sales revenue recognition.

       Specifically, Plaintiffs' loss causation allegations state only that the stock price

declined on May 9, June 13, and July 31, 2006 as a result of the company's disclosure of errors

in its joint venture accounting affecting Sunrise's previously issued financial statements. Compl.

at ¶¶ 181-191; 265-273. 22/ Plaintiff does not identify any stock price declines related to the

market learning of the other accounting errors upon which they base their claims of securities

fraud. See Compl. ¶¶ 192-215.

       As such, Plaintiffs fail to allege two required elements of a securities fraud claim

(scienter and loss causation) for four of the six different accounting practices underlying Count I

of the Complaint. The only alleged accounting errors for which there is any arguable claim of

loss causation are those related to joint venture income and real estate sales revenue recognition.

As explained in Sections I.B.2 and I.B.3, above, given that the Company's accounting on joint

venture income and real estate sales revenue recognition had been reviewed by its outside

---

22/    The referenced statements mentioned only accounting issues related to "investments in
unconsolidated senior living communities," (Compl. at ¶ 181; May 9, 2006, press release, Ex. 15
hereto); "the allocation of profits and losses for a limited number of Sunrise joint ventures,"
(Compl. at ¶ 182, May 10, 2006, press release, Ex. 16 hereto); the "allocat[ion of] profits and
losses in [Sunrise's] joint ventures" (Compl. at ¶ 183, May 11, 2006, press release, Ex. 17
hereto); "the allocation of profits and losses for those joint ventures in which Sunrise is a
minority partner and the capital partner receives preferences," (Compl. at ¶ 184, Tr. of May 11,
2006 conference call, Ex. 2); Sunrise's "development joint ventures," (Compl. at ¶ 186); and
"ventures that contain partner preferences and the timing of sale accounting and recognition of
income from prior sales of real estate." Compl. at ¶ 187, July 31, 2006, press release, Ex. 18
hereto.

auditors, there is no basis to support any inference of scienter with respect to these two remaining mistakes. For these reasons as well, Count I should be dismissed.

**II.     Count II Should Be Dismissed Because Plaintiffs Cannot State a Claim under Section 20(a).**

In Count II, Plaintiffs allege control person liability under Section 20(a) against all of the Individual Defendants. Compl. at ¶¶ 296-301. To state a claim under Section 20(a), Plaintiffs must allege: (1) particularized facts establishing a primary violation of Section 10(b); and (2) that a defendant exercised the requisite control over the primary violator. Freeland, 545 F. Supp. 2d at 81 (citation omitted). As discussed in Section I above, Plaintiffs fail to plead facts establishing a primary violation. 23/ Thus, as a matter of law, Plaintiffs cannot state a claim under Section 20(a).

---

23/     In addition, a plaintiff "must adequately plead 'culpable participation' on the part of the defendants in the underlying primary securities violation." In re Fannie Mae, 503 F. Supp. 2d. at 44. Even if they had pled a primary violation, Plaintiffs do not allege particularized facts establishing "culpable participation" by any Individual Defendant nor any particular facts describing any Individual Defendants' control over an alleged primary violator.

-45-

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that their Motion to Dismiss be granted.

Respectfully submitted,

**HOGAN & HARTSON, LLP**

 /s/ Jon M. Talotta

George H. Mernick, III (DC Bar 294256)
Columbia Square
555 Thirteenth Street, NW
Washington, D.C. 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
E-mail: ghmernick@hhlaw.com

N. Thomas Connally (DC Bar 448355)
Jon M. Talotta (DC Bar 473626)
8300 Greensboro Drive, Suite 1100
McLean, Virginia 22102
Telephone: (703) 610-6100
Facsimile: (703) 610-6200
E-mail: ntconnally@hhlaw.com
E-mail: jmtalotta@hhlaw.com

*Attorneys for Sunrise Senior Living, Inc.*

Dated: August 11, 2008

**GIBSON, DUNN & CRUTCHER LLP**

John C. Millian (DC Bar 413721)
Matthew R. Estabrook (DC Bar 477880)
Elise Kochtitzky-Jacques (DC Bar 502460)
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 955-8500
Facsimile: (202) 467-0539
E-mail: jmillian@gibsondunn.com
E-mail: mestabrook@gibsondunn.com
E-mail: ekochtitzkyJacques@gibsondunn.com

*Attorneys for Kenneth J. Abod, Carl G. Adams,*
*J. Barron Anschutz, Larry E. Hulse, Paul J.*
*Klaassen, Teresa M. Klaassen, Thomas B.*
*Newell, and Tiffany L. Tomasso*

## CERTIFICATE OF SERVICE

I certify that on August 11, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, and mailed via U.S. Mail, postage prepaid, a copy of the foregoing to:

Steven J. Toll
Daniel S. Sommers
Elizabeth S. Finberg
COHEN, MILSTEIN, HAUSFELD &
TOLL, P.L.L.C.
1100 New York Ave., N.W.
West Tower, Suite 500
Washington, D.C.  20005-3964

*Liaison Counsel for the Class*

William C. Fredericks
Laura Gundersheim
BERNSTEIN LITOWITZ BERGER &
GROSSMANN LLP
1285 Avenue of the Americas, 38th Fl.
New York, NY 10019

*Co-Lead Counsel for the Class*

Michael J. Pucillo
Jay W. Eng
BERMAN DEVALERIO PEASE
TABACCO BURT & PUCILLO
Esperante Building
222 Lakeview Avenue, Suite 900
West Palm Beach, FL 33401

*Co-Lead Counsel for the Class*

Robert D. Klausner
KLAUSNER & KAUFMAN, PA
10059 N.W. 1st Court
Plantation, FL 33324

*Additional Counsel for the City of Miami
General Employees' & Sanitation Employees'
Retirement Trust*

  /s/ Jon M. Talotta
Jon M. Talotta
HOGAN & HARTSON, LLP
8300 Greensboro Drive, Suite 1100
McLean, Virginia  22102
Telephone:  (703) 610-6100
Facsimile:   (703) 610-6200
E-mail: jmtalotta@hhlaw.com

# EXHIBIT  1



# FORM 10-K

## SUNRISE SENIOR LIVING INC - SRZ

**Filed: March 24, 2008 (period: December 31, 2006)**

Annual report which provides a comprehensive overview of the company for the past year

# Table of Contents

10-K - 10-K

## PART I

| | |
|---|---|
| Item 1. | Business 6 |
| Item 6 | to this Form 10-K, Selected Financial Data, shows the impact of the restatement adjustments on income before provision for income taxes for 2005, 2004, 2003 and 2002 and presents the statements of income for 2003 and 2002 as previously reported and |
| Item 7 | to this Form 10-K, Management s Discussion and Analysis of Financial Condition and Results of Operations, includes a discussion of the restated annual information for 2004 and 2005 and restated quarterly information for 2005. |
| Item 1. | Business |
| Item 1A. | Risk Factors |
| Item 1B. | Unresolved Staff Comments |
| Item 2. | Properties |
| Item 3. | Legal Proceedings |
| Item 4. | Submission of Matters to a Vote of Security Holders |

## PART II

| | |
|---|---|
| Item 5. | Market for Registrant s Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities |
| Item 6. | Selected Financial Data |
| Item 7. | Management s Discussion and Analysis of Financial Condition and Results of Operations |
| Item 7A. | Quantitative and Qualitative Disclosure About Market Risk |
| Item 8. | Financial Statements and Supplementary Data |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure |
| Item 9A. | Controls and Procedures |
| Item 9B. | Other Information |

## PART III

| | |
|---|---|
| Item 10. | Directors, Executive Officers and Corporate Governance |
| Item 11. | Executive Compensation |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence |
| Item 14. | Principal Accountant Fees and Services |

Part IV

**Item 15.**    Exhibits and Financial Statement Schedules

SIGNATURES

EXHIBIT INDEX

EX-2.8 (EX-2.8)

EX-4.1 (EX-4.1)

EX-10.14 (EX-10.14)

EX-10.20 (EX-10.20)

EX-10.21 (EX-10.21)

EX-10.22 (EX-10.22)

EX-10.23 (EX-10.23)

EX-10.30 (EX-10.30)

EX-10.32 (EX-10.32)

EX-10.33 (EX-10.33)

EX-10.41 (EX-10.41)

EX-10.42 (EX-10.42)

EX-10.43 (EX-10.43)

EX-10.44 (EX-10.44)

EX-10.45 (EX-10.45)

EX-10.46 (EX-10.46)

EX-10.47 (EX-10.47)

EX-10.48 (EX-10.48)

EX-10.49 (EX-10.49)

EX-10.50 (EX-10.50)

EX-10.61 (EX-10.61)

EX-10.62 (EX-10.62)

EX-10.65 (EX-10.65)

EX-21 (EX-21)

EX-31.1 (EX-31.1)

EX-31.2 (EX-31.2)

EX-32 (EX-32)

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**FORM 10-K**

**ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)**
**OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2006**

**Commission File Number 1-16499**

**SUNRISE SENIOR LIVING, INC.**
(Exact name of registrant as specified in its charter)

| Delaware | 54-1746596 |
|---|---|
| (State or other jurisdiction incorporation or organization) | (I.R.S. Employer Identification No.) |
| 7902 Westpark Drive McLean, VA | 22102 |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: (703) 273-7500

Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| Common stock, $.01 par value per share | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☑

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☐ No ☑

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☑    Accelerated filer ☐    Non-accelerated filer ☐    Smaller reporting company ☐
(Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐    No ☑

The aggregate market value of the Registrant's Common Stock held by non-affiliates (based upon the closing price of $27.65 per share on the New York Stock Exchange on June 30, 2006 was $1,235 million. Solely for the purposes of this calculation, all directors and executive officers of the registrant are considered to be affiliates.

The number of shares of Registrant's Common Stock outstanding was 50,486,492 at February 29, 2008.

**DOCUMENTS INCORPORATED BY REFERENCE**

Source: SUNRISE SENIOR LIVIN, 10-K, March 24, 2008

## TABLE OF CONTENTS

|  |  |  | Page |
|---|---|---|---|
| **PART I** |  |  |  |
| | Item 1. | Business | 6 |
| | Item 1A. | Risk Factors | 30 |
| | Item 1B. | Unresolved Staff Comments | 47 |
| | Item 2. | Properties | 48 |
| | Item 3. | Legal Proceedings | 48 |
| | Item 4. | Submission of Matters to a Vote of Security Holders | 52 |
| **PART II** |  |  |  |
| | Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 53 |
| | Item 6. | Selected Financial Data | 54 |
| | Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 57 |
| | Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 106 |
| | Item 8. | Financial Statements and Supplementary Data | 107 |
| | Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 175 |
| | Item 9A. | Controls and Procedures | 175 |
| | Item 9B. | Other Information | 187 |
| **PART III** |  |  |  |
| | Item 10. | Directors, Executive Officers and Corporate Governance | 188 |
| | Item 11. | Executive Compensation | 192 |
| | Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 221 |
| | Item 13. | Certain Relationships and Related Transactions, and Director Independence | 226 |
| | Item 14. | Principal Accountant Fees and Services | 230 |
| **PART IV** |  |  |  |
| | Item 15. | Exhibits and Financial Statement Schedules | 231 |
| **SIGNATURES** |  |  | 232 |

2

Source: SUNRISE SENIOR LIVIN, 10-K, March 24, 2008

*This annual report on Form 10-K contains forward-looking statements that involve risks and uncertainties. Although we believe the expectations reflected in such forward-looking statements are based on reasonable assumptions, there can be no assurance that our expectations will be realized. Our actual results could differ materially from those anticipated in these forward-looking statements as a result of various factors, including, but not limited to:*

- *the time required for us to prepare and file our 2007 Form 10-K, Form 10-Q for the quarter ending March 31, 2008 and Form 10-Qs for the first three quarters of 2007, and for Ernst & Young LLP to audit our 2007 financial statements and review our Form 10-Qs;*
- *our ability to remediate material weaknesses in our internal controls over financial reporting;*
- *the outcome of the Securities and Exchange Commission's ("SEC") investigation;*
- *the outcomes of pending putative class action and derivative litigation;*
- *the outcome of the lawsuit filed by our former CFO;*
- *the outcome of the Trinity OIG investigation and qui tam proceeding;*
- *the outcome of the IRS audit of the Company's tax returns for the tax years ended December 31, 2005 and 2006 and employment tax returns for 2004, 2005 and 2006;*
- *the outcome of the exploration of strategic alternatives;*
- *our ability to comply with the terms of the amendments to our bank credit facility or to obtain a further extension of the period for providing the lenders with required financial information;*
- *development and construction risks;*
- *acquisition risks;*
- *licensing risks;*
- *business conditions;*
- *competition;*
- *changes in interest rates;*
- *our ability to manage our expenses;*
- *market factors that could affect the value of our properties;*
- *the risks of downturns in general economic conditions;*
- *availability of financing for development; and*
- *other risk factors contained in this Form 10-K.*

*Information provided in this Form 10-K for 2007 and 2008 is preliminary and remains subject to audit by Ernst & Young LLP. As such, this information is not final or complete, and remains subject to change, possibly materially.*

*We assume no obligation to update or supplement forward-looking statements that become untrue because of subsequent events. Unless the context suggests otherwise, references herein to "Sunrise," the "Company," "we," "us" and "our" mean Sunrise Senior Living, Inc. and our consolidated subsidiaries.*

**Explanatory Note**

**Accounting Restatement**

This Form 10-K for the year ended December 31, 2006 was delayed due to the time required to perform a comprehensive accounting review to restate our previously filed financial statements to correct various accounting errors ("Accounting Review"), as well as to complete the independent inquiry conducted by a Special Independent Committee of our Board of Directors. As previously disclosed, we have not filed our quarterly reports on Form 10-Q for the quarters ended March 31, 2006, June 30, 2006, September 30, 2006, March 31, 2007, June 30, 2007 or September 30, 2007, and we did not file our Form 10-K for the fiscal year ended December 31, 2007 by the required due date. This Form 10-K includes certain unaudited quarterly financial information for the years 2005 and 2006. The quarterly information for 2005 is restated to give effect to the restatement adjustments. As previously disclosed, we no longer plan to file a 2005 Form 10-K/A or 2006 Form 10-Qs, as we believe the amount of time and monetary resources that would be required to produce this information does not justify any related benefit that would result. We also have not provided quarterly information for 2004 as we believe the amount of time and monetary resources that would be required to produce this information does not justify any related benefit that would result. This 2006 Form 10-K filing is expected to be followed by the filing of the 2007 Form 10-K, and Form 10-Qs for the quarters

3

Source: SUNRISE SENIOR LIVIN, 10-K, March 24, 2008

2006, there were 24 communities under construction held in unconsolidated ventures. At December 31, 2007, there were 30 communities under construction held in unconsolidated ventures. See "Liquidity and Capital Resources" for a description of guarantees provided to certain of our development ventures.

We receive fees from our development ventures for services related to site selection, zoning, and design. Services provided prior to transferring the land to a venture or a third party for further development are recognized in "Gain on the sale and development of real estate and equity interests" in our consolidated statements of income. Services provided for construction supervision, employee selection, licensing, training and marketing efforts after the land has been transferred are recognized as operating revenue and are included in "Professional fees from development, marketing and other" in the consolidated statements of income. See "Liquidity and Capital Resources" for a description of development completion guarantees provided to certain of our development ventures.

From time to time we also develop wholly owned senior living communities. At December 31, 2006, we had five wholly owned communities under construction with a resident capacity of over 700 residents. At December 31, 2007, we had eight wholly owned communities under construction with a resident capacity of over 900 residents. We expect most of these communities to be sold to a venture or third party before construction is completed or, in some cases, upon receipt of a certificate of occupancy. We provide funding for the construction, not otherwise financed by construction loans, and capitalize the development costs associated with construction prior to the contribution of the development community to a venture or third-party owner. For communities that remain wholly owned, we often recognize operating losses during the initial one to two years prior to the community achieving stabilization.

### Senior Living Condominium Developments

We began to develop senior living condominium projects in 2004. By the first quarter of 2008, we had discontinued or suspended the development of all but one of our condominium development projects.

## Special Independent Committee Inquiry and Accounting Review

### Special Independent Committee Inquiry

In December 2006, Sunrise's Board of Directors established a Special Independent Committee to review certain allegations made by the SEIU. In March 2007, Sunrise's Board of Directors expanded the scope of the Special Independent Committee's mandate to include the review of facts and circumstances relating to the historical accounting treatment of certain categories of transactions in the restatement, and to develop recommendations regarding any remedial measures, including those pertaining to internal controls and processes over financial reporting, that it may determine to be warranted.

On September 28, 2007, the Company disclosed that the Special Independent Committee had concluded the fact-finding portion of its inquiry with respect to three issues. The first involved the timing of certain stock option grants. The second involved the facts and circumstances with respect to two significant categories of errors in the pending restatement relating to real estate accounting for the effect of preferences provided to the buyer in a partial sale, certain Sunrise guarantees and commitments on timing of sale accounting and recognition of income upon sale of real estate, and accounting for allocation of profits and losses in those ventures in which Sunrise's partners received a preference on cash flow. The third involved whether directors and executive officers traded in Sunrise common stock when in possession of non-public knowledge of possible accounting errors related to these real estate transactions prior to Sunrise's May 2006 announcement of its accounting review. With respect to these three issues, the Special Independent Committee found:

- no evidence of backdating or other intentional misconduct with respect to the grants on the 38 grant dates examined, including those specifically questioned by the SEIU, or the possible errors identified by the Special Independent Committee in the accounting for stock options;
- no evidence of an intention to reach an inappropriate accounting result with respect to the two categories of real estate accounting errors reviewed, no knowledge that these accounting errors were incorrect at the time they were made, and no evidence that information was concealed from review by the external auditors at the time the accounting judgments were made; and

Source: SUNRISE SENIOR LIVIN, 10-K, March 24, 2008

- no evidence that any director or officer who traded in the months prior to the announcement of the Accounting Review had material non-public information relating to either of these two categories of real estate accounting errors.

The Special Independent Committee identified a number of accounting issues under GAAP in connection with certain of the option grants reviewed. As a result of the Special Independent Committee's findings, the Company concluded that unintentional errors were made in connection with the accounting for a September 1998 repricing and certain other stock option grants. These errors were corrected as part of the restatement of our historical consolidated financial statements as set forth in Note 2 to our Consolidated Financial Statements. See "Restatement of Consolidated Financial Statements — Accounting for Stock-Based Compensation" for additional information.

On December 20, 2007, the Company announced the completion of the fact-finding portion of the Special Independent Committee inquiry with respect to the last issue being reviewed by it. This portion of the inquiry primarily related to the review of certain judgmental accruals and reserves. The Special Independent Committee found that inappropriate accounting occurred with respect to certain adjustments in these accruals and reserves during the third quarter of 2003 through the fourth quarter of 2005. This inappropriate accounting was corrected as part of the restatement of our historical consolidated financial statements as set forth in Note 2 to our Consolidated Financial Statements.

For information regarding remedial issues recommended by the Special Independent Committee and adopted by the Board of Directors, please refer to Item 9A in this Form 10-K.

During 2007, we have incurred approximately $42 million in professional fees and other costs in connection with the Company's Accounting Review and the Special Independent Committee's inquiry.

*Accounting Review*

The financial statements as of and for all periods prior to December 31, 2005 were subject to a comprehensive Accounting Review to correct various accounting errors. The Accounting Review resulted in the following major restatement categories:

- real estate sales;
- costs of real estate projects;
- equity method investments with preferences;
- revenue recognition for Greystone contracts;
- stock-based compensation;
- reimbursed expenses; and
- other adjustments.

Note 2 to the consolidated financial statements provides a reconciliation between amounts previously reported and the restated amounts in the Consolidated Statements of Income for the years ended December 31, 2005 and 2004 and the Consolidated Balance Sheet as of December 31, 2005. As shown in Note 2 to our Consolidated Financial Statements, the impact to 2005 and 2004 pre-tax income was an increase of $15.6 million in 2005 and a reduction of $79.8 million in 2004. The impact to net income was an increase in 2005 of $7.3 million and a reduction in 2004 of $49.6 million. In addition, certain of the adjustments impacted periods prior to 2004 and the net effect of these prior adjustments is a $101.1 million reduction in total stockholders' equity at January 1, 2004. The adjustment for real estate sales and equity method investments with preferences was a $160.6 million reduction to pre-tax income. A large portion of these adjustments result from delayed recognition of sales transactions, which have been recognized in 2006 or may be recognized in subsequent periods as ventures are recapitalized or sold or guarantees expire due to the passage of time. When recognized, these transactions are reflected in "gain on the sale and development of real estate and equity interests" and/or "Sunrise's share of earnings and return on investment in unconsolidated communities" in the consolidated statements of income. In 2006, the gain on the sale and development of real estate included $36.8 million related to recognition of sales for GAAP purposes that had been corrected in the Accounting Review. We anticipate that gain on the sale and development of real estate will

60

Source: SUNRISE SENIOR LIVIN, 10-K, March 24, 2008

include approximately $70 million in 2007 related to recognition of sales for GAAP purposes that had been recognized in prior periods and have now been corrected in the Accounting Review.

### Accounting for Real Estate Sales

Since 1997, Sunrise has entered into various real estate transactions, the most significant of which involved either: (i) the sale of a partial interest in a development venture in which Sunrise retained an interest and entered into a management contract or (ii) the sale of mature senior living properties or a partial interest in such properties to a third party where Sunrise simultaneously entered into a management contract.

In most cases, Sunrise retained some form of continuing involvement including a partial ownership interest, coupled with a preferential return to the buyer, an obligation to complete the development, operating deficit funding obligations, support obligations or in some instances, options or obligations to reacquire the property or the buyer's interest in the property. The following describes the sale accounting issues adjusted in the restatement.

In certain projects, Sunrise acquired land and commenced development activities in a newly formed wholly owned venture (generally owned in the legal form as a limited liability company). Sunrise sold a majority of the venture interests to a third party and recapitalized the venture while development of the project was underway. Sunrise acted as the developer and earned development fees from the venture. In addition, Sunrise sold certain senior living properties or a partial interest in such properties to a third party where Sunrise simultaneously entered into a management contract. Sunrise previously recognized income for such transactions to the extent cash received from the new venture exceeded the proportionate cost of the venture's assets. Sunrise has reviewed all ventures entered into between 1997 and 2005, and has corrected the accounting for these transactions to consider the adequacy of the initial investment and various forms of continuing involvement as set forth in FASB Statement No. 66, *Accounting for Sales of Real Estate* ("SFAS 66").

#### Initial Investment and Options to Reacquire

In four of the transactions, the buyer's initial investment was not adequate to achieve sale accounting treatment, and under SFAS 66, the Company has now applied the deposit method. In addition, for two of the transactions, Sunrise retained the option to repurchase the property at a stated rate of return to the other venturer. In these instances, the financing method of accounting has now been applied. Under both of these methods (which are described in more detail in Note 3 to our Consolidated Financial Statements), the real estate remains on Sunrise's books and any amounts received from the buyer are recorded as a liability.

#### Cash Flow Preferences

In most instances when a partial sale as described above occurred, the other venturer received a preference as to the cash flows of the venture. Historically, Sunrise did not consider these preferences in accounting for the sale of real estate. When transactions with these preferences exist, Sunrise has now applied all cash proceeds received from the venturer against its remaining investment and profit is recognized only to the extent that proceeds from the sale exceed costs related to the entire property.

#### Continuing Support Obligations

Sunrise provided an uncapped guaranteed return on investment to the buyers in sale transactions for many of the mature communities. Historically, Sunrise did not recognize the impact of these guarantees unless they considered payment under the guarantees to be probable. However, when these forms of guarantees exist for an extended period of time, SFAS 66 precludes sale accounting and the Company has now applied the profit sharing method regardless of the probability of payment. If the guarantee is for a limited period of time, the deposit method has now been applied until the operations of the property cover all operating expenses, debt service, and contractual payments. At that time, profit is recognized on the basis of performance of services method as described below. Under both the deposit and profit sharing method, the property remains on Sunrise's books and depreciation continues. Of the sale transactions evaluated, Sunrise identified four that are for an extended period of time and revised the accounting to the profit sharing method, while 10 were revised to the deposit and performance of services methods of accounting due to the limited period of time covered by the guarantees.

61

Source: SUNRISE SENIOR LIVIN, 10-K, March 24, 2008

Sunrise also provided uncapped guarantees to support operations of certain ventures. If the guarantees are for an extended period of time, the Company applied the profit sharing method and the property remained on Sunrise's books, net of any cash proceeds received from the buyer. If the guarantees are for a limited period of time, partial sale accounting was achieved; however, profit is recognized by the basis of performance of services method under SFAS 66. Under the basis of performance of services method, performance of those services is measured by the costs incurred and to be incurred (including operating costs of the venture) over the period during which the services are performed. Profit is recognized when there is reasonable assurance that future rent receipts will cover operating expenses and debt service. Of the sale transactions evaluated, Sunrise identified four where the guarantees are for an extended period of time and revised the accounting to the profit sharing method and eight where the guarantees are for a limited period and revised the accounting to be on the basis of performance of services method.

### Accounting for Costs of Real Estate Projects

In connection with Sunrise's development activities, Sunrise historically capitalized all costs incurred for projects under development after acquisition of the land or purchase of an option to acquire the land. Sunrise then provided a reserve for project costs that may not be realizable based upon an estimated probability of success of the project. Sunrise also capitalized certain indirect costs to active projects where such costs were not clearly related to those projects. In accordance with FASB Statement No. 67, *Accounting for Costs and Initial Rental Operations of Real Estate Projects ("SFAS 67")*, preacquisition costs must be expensed as incurred unless: (i) the costs are directly identifiable with a specific property; (ii) the costs would be capitalized if the property were already acquired; and (iii) acquisition of the property is probable. In addition, indirect costs that are not clearly related to projects should be expensed as incurred. Sunrise has now capitalized only those costs that meet the criteria set forth above and has allocated such costs to specifically identifiable projects.

In addition, Sunrise has historically capitalized direct and indirect costs relating to the sales and marketing of condominium units which were being developed for sale to residents. SFAS 67 allows for capitalization of costs for tangible assets used throughout the selling process and other direct costs where their recovery is reasonably expected from future sales. Sunrise now capitalizes only those direct costs that are reasonably expected to be recovered from future sales and has charged all indirect costs (advertising, promotion, etc.) to expense as incurred. Tangible assets that are expected to be recovered through future sales continue to be capitalized.

### Accounting for Equity Method Investments with Preferences

Sunrise historically recognized its share of profit or loss of ventures which it accounts for using the equity method of accounting based on the percentage of Sunrise's legal ownership interest in the venture. In accordance with Statement of Position No. 78-9, *Accounting for Investments in Real Estate Ventures*, ("SOP 78-9") the allocation of profit and losses should be analyzed to determine how an increase and decrease in net assets of the venture (determined in conformity with GAAP) will affect cash payments to the investor over the life of the venture and on its liquidation. Because certain venture agreements contain preferences with regard to cash flows from operations, capital events and/or liquidation, the allocation of profits and losses previously recorded by Sunrise was not consistent with the provisions of SOP 78-9. Sunrise has restated its accounting to reflect its share of profits and losses by determining the difference between its "claim on the investee's book value" at the end and the beginning of the period. This claim is calculated as the amount that the investor would receive (or be obligated to pay) if the investee were to liquidate all of its assets at recorded amounts determined in accordance with generally accepted accounting principles and distribute the resulting cash to creditors and investors in accordance with their respective priorities. This method is commonly referred to as the hypothetical liquidation at book value method.

### Revenue Recognition for Greystone Contracts

Included in "Professional fees from development, marketing and other" are fees earned by our Greystone subsidiary related to its development consulting agreements. From the acquisition date of May 10, 2005 through December 31, 2005, revenues were recognized based on billing milestones scheduled in the agreements. During the course of the Accounting Review Sunrise determined that these were multiple element arrangements and since there is not sufficient objective and reliable evidence of the fair value of undelivered elements at each billing milestone,

Source: SUNRISE SENIOR LIVIN, 10-K, March 24, 2008

**Sunrise Senior Living, Inc.**

**Notes to Consolidated Financial Statements — (Continued)**

*Grant of Stock Options to CEO*

During 2000, the Compensation Committee of Sunrise's Board of Directors negotiated an employment contract with our CEO, Paul Klaassen. As part of the employment agreement, our CEO was granted 700,000 options. While approval by the Compensation Committee occurred in September 2000, the final required granting action was the approval of the employment agreement by the Board of Directors, which did not occur until November 2000. In that time period, the fair value of our common stock increased. In 2000, Sunrise did not record this additional compensation expense. Sunrise has determined that additional compensation expense totaled approximately $3.2 million on a cumulative basis for all periods through December 31, 2005. All of this expense related to periods prior to 2004.

*Other Miscellaneous Stock Option Issues*

Sunrise also identified several other less significant measurement date issues of approximately $4.3 million that were corrected.

The total amount of additional stock compensation expense identified in the Company's accounting review as part of its restatement ("Accounting Review") is $43.5 million, prior to the tax impact, on a cumulative basis for all periods through December 31, 2005, of which $40.5 million relates to periods prior to 2004. Stock compensation expense is increased by $2.3 million and $0.7 million for 2005 and 2004, respectively. The stock compensation expense is offset by an increase to contributed capital so there is no net impact to total stockholders' equity resulting from this restatement adjustment.

**Accounting for Reimbursed Expenses**

Consistent with EITF Issue No. 99-19, *Reporting Revenue Gross as a Principal Versus Net as an Agent ("EITF 99-19")*, expenses incurred by Sunrise and reimbursed by a managed community are reported as community contract services reimbursement expense with corresponding reimbursement revenue in Sunrise's Consolidated Statements of Income. Sunrise manages most of its communities under contracts which provide payment to Sunrise of a monthly management fee plus reimbursement of certain operating expenses, including payroll and related expenses of Sunrise employees, and food, supplies or services acquired by Sunrise for the communities. Sunrise has determined that errors occurred in the accumulation of these amounts resulting in an overstatement of the reported costs and related reimbursement revenue. Sunrise has adjusted both reimbursed expenses and revenues in the restated statements of income to correct these errors. The adjustments of these amounts had no impact on previously reported pre-tax income.

**Other Adjustments**

Sunrise also adjusted its financial statements for other less significant adjustments that were found as part of the Accounting Review, including interest capitalized on equity method investments, health insurance reimbursements, income taxes accounting for certain guarantees and accounting for variable interest entities. None of these adjustments are individually in excess of 3% of the total cumulative restatement net income impact.

Source: SUNRISE SENIOR LIVIN, 10-K, March 24, 2008

**Remediation Steps to Address Material Weaknesses**

Without significant changes to the information systems and finance organization, we will be utilizing short-term, time consuming workaround solutions to address identified control issues as opposed to streamlining and building sustainable processes that involve the effective execution of stronger and more efficient monitoring and prevent controls. At the transaction process level, we need to improve upon the balance between detect and prevent controls. We continue to rely heavily on manual and detect controls in the context of processes that are overly complex and fragmented. Accordingly, in response to the identified material weaknesses, management, with oversight from the Audit Committee of the Company's Board of Directors, has dedicated significant resources, including the engagement of consultants, to support the Company's efforts to improve the control environment and to remedy the identified material weaknesses. We expect that full implementation of the remedial measures set forth herein will take significant time and effort, due to the complexity and extensive nature of some of the remediation required and a need to coordinate remedial efforts within the organization.

In connection with the preparation of the financial statements for 2006 and prior years we implemented compensating controls and procedures designed to assure that any weaknesses in internal control did not impact the preparation of the consolidated financial statements through increased account analysis and improved documentation. While efforts are ongoing, management believes that the Company has made improvements to the control environment and to the accounting operations primarily through extensive changes in senior management and other personnel, extensive organizational changes, increased staffing and increased focus on controls. This effort included comprehensive reviews of all sales of real estate, all equity transactions, including venture recapitalizations and other significant non-routine transactions. In addition, all balance sheet accounts were reconciled, reviewed and certified by the process owner to be materially correct. Management, under the direction of the CEO and CFO, has been directing remediation efforts. These remediation efforts have now been integrated with the directives from the Board remedial framework discussed above. Significant accomplishments to date include:

*Changes in Senior Management.* As indicated above, the Board separated from Sunrise all officers who had any substantial involvement in, or direct or supervisory responsibility for, the accounting function that caused the errors in the restatement, which included the President, Chief Financial Officer for the period prior to August 2005, and Treasurer (who had been the Chief Accounting Officer from 2000 through 2004). Other members of the senior finance team had either resigned or been separated from Sunrise previously. As a result, the entire senior finance organization responsible for the accounting errors now being restated is now no longer with the Company. The Board has retained a new senior finance management team, from outside Sunrise, with strong accounting and financial reporting skills and a proven record of integrity and ethical behavior. It recruited a new CFO, Richard J. Nadeau, and had previously appointed a new Chief Accounting Officer, Julie A. Pangelinan.

*Expansion of the Accounting Policy Group.* The Company expanded its Accounting Policy Group from one professional to six professionals. In March 2007, the Company established a policy that all proposed significant transactions be subject to a formal review and analysis to document the proper accounting treatment by the Accounting Policy Group prior to closing a transaction. Management is developing a charter for this group that makes it clear that the Accounting Policy Group is responsible for resolution of difficult accounting questions and for technical accounting interpretations and that this group has the "last word" on such issues.

*Other Additional Accounting Personnel.* In June 2006, the Company added the position of Assistant Controller. In October 2006, the Company named a new Controller. The Company has also added four additional staff members in the financial reporting group, three additional corporate staff members in the international reporting group and three additional staff members in the operations accounting group.

*Change in Reporting Relationships.* The reporting relationships have been revised so that all accounting functions report through the Chief Accounting Officer.

*SOX Compliance Officer.* In October 2006, the Company hired a Senior Director of SOX Compliance, who reports to the Chief Accounting Officer.

*Improved Disclosure Controls.* Management has developed a robust Disclosure Committee Policy for the 2006 Form 10-K process that was designed to ensure that information disclosed to the public is recorded, processed, summarized and reported accurately.

183

Source: SUNRISE SENIOR LIVIN, 10-K, March 24, 2008

# EXHIBIT  2

Westlaw.                                                      NewsRoom

5/11/06 FINDISCLOSURE 15:00:00                                          Page 1


5/11/06 Fin. Disclosure Wire 15:00:00

FD Wire
Copyright 2006 CCBN, Inc. and FDCH e-Media, Inc.

**May 11, 2006**

Q1 2006 **Sunrise   Senior   Living** Earnings Conference Call - Final

 OPERATOR: Good morning, everyone. Welcome to **Sunrise   Senior   Living's** earnings conference call, announcing Sunrise's preliminary financial results for their first quarter, ended March 31, 2006. Today's speakers are Paul Klaassen, Chairman and Chief Executive Officer; Tom Newell, President; Brad Rush, Chief Financial Officer; and Tiffany Tomasso, Chief Operating Officer.

 This call is being recorded and will be available for replay on Sunrise's website or by dialing the following number -- 1-719-457-0820. The access code for the replay is 8647163. The conference call replay is available through May 18, 2006.

 Estimates of future earnings are and certain other matters discussed on this conference call may be forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. Although Sunrise believes the expectations reflected in such forward-looking statements are based on reasonable assumptions, there can be no assurances that its expectations will be realized. Sunrise's actual results could differ materially from those anticipated in these forward-looking statements as a result of various factors, including those risks detailed in the Company's annual report on Form 10-K, which is on file with the Securities and Exchange Commission. The Company assumes no obligation to update or supplement forward-looking statements that become untrue because of subsequent events.

 In addition, certain financial information discussed on this conference call may be considered a non-GAAP financial measure under SEC regulations. A reconciliation of these non-GAAP financial measures to the most directly comparable financial measures calculated as presented in accordance with GAAP is included in Sunrise's earnings release, a copy of which can be found in the investor relations section of Sunrise's web site.

 I would now like to introduce your host for today's conference call, Mr. Paul Klaassen. Mr. Klaassen, You may begin your conference.

 PAUL KLAASSEN, FOUNDER, CHAIRMAN, CEO, **SUNRISE SENIOR LIVING**, INC.: Thank you. Good morning, and welcome to **Sunrise Senior Living's** conference call to review our preliminary first-quarter 2006 results. First of all, I would like to apologize for the rescheduling of our release and for this conference call and for the anxiety that this delay has created for some of our shareholders. I am sure many of our shareholders are asking, what happened and why now?

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

During the final preparation of our first-quarter Form 10-Q, an issue arose that required additional time for review by our team and our outside accountants to ensure the integrity and the accuracy of our financial statements. The issue that necessitated this additional review has to do with the accounting treatment applied to certain of our investments in unconsolidated senior living communities. Specifically, this accounting treatment review is focused on the allocation of profits and losses for those joint ventures in which Sunrise is a minority partner and the capital partner receives a preference on return of its capital over Sunrise's capital, in the event of a refinancing or sale of the venture's properties.

Now, approximately 15% of Sunrise's communities are held by joint ventures that would fall into this category. Throughout the year, and in connection with our quarterly filings, we conduct a review of our various accounting policies, including the methodology we use to allocate profits and losses in our joint ventures where our capital partner is entitled to a preferential return. In connection with this review, our accounting team determined and then brought to the attention of our auditors that there is a more preferable method under generally accepted accounting principles for allocating such profits and losses among the partners of these ventures and for determining the timing of such allocations during the lifecycle of the ventures, from startup losses to stabilized cash flow to refinancing or sale of the property.

Now, as a result, we are now in the process of assessing the implications of adopting this alternate methodology and whether adjustments are necessary to prior-period financial statements. In order to have time to effectively complete this review, we will not be filing our Form 10-Q with the Securities and Exchange Commission today. Instead, we will take the time it takes to carefully review and finalize this matter. While we have not yet concluded on this issue, we do not expect the outcome of this review to adversely affect our previously furnished earnings guidance for 2006 or 2007, due to the limited number of current joint ventures affected and because of the various stages of those ventures.

In addition, this issue does not affect the Company's cash flows, and of course these accounting allocations have absolutely no effect on the operations of the communities involved. Indeed, each of these partnerships which have been concluded to date have been very successful, and they have produced returns for our capital partners well in excess of any preference. In essence, our capital partners negotiated for a preference which was not needed, as their actual returns were in excess of their preference. Now, this is a positive indicator for our capital partners and for our shareholders, as it demonstrates the solid performance of these partnerships and our management services business model.

As Sunrise has grown, we have had fewer capital return preferences in our joint ventures, and we will completely avoid this accounting issue in the future by no longer providing preferential return on capital in any future ventures. We were able to do this now because of the successful track record that we have established for these ventures.

In any given year, we typically have many ventures in many stages, some newly formed, some with a blend of properties in lease-up and stable, some with only mature properties generating significant cash flow. And we have had several ventures successfully refinance or sell their interest in the last several years. Some of the ventures in question began as early as 1997, and a substantial number have capital transactions in these last three

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

years. The review we are conducting is to go back to the beginning of each affected venture and recast the profit and loss allocation for each year under the new method.

 Now, to complete this thorough review and check it and recheck it and run it through our auditors will take some time. The general effect of using this different methodology -- known, I am told, as the hypothetical liquidation at book value method -- is to shift more of any losses to Sunrise in the early days of any venture where the capital partner has a preference for return of capital. Correspondingly, as the venture matures, Sunrise will be allocated more of the profits from operations for any capital transaction such as a refinancing or property sale. Now, in a typical venture, the ultimate or total allocation of profits and losses under this new method should not change from the previous methodology, which essentially allocated profits and losses initially based on the percentage of equity contributed. The timing of such allocations, however, may change.

 Perhaps a simplified example will help illustrate this rather technical and complicated issue. Assuming a one-property development venture built a $20 million Sunrise community, if the venture obtains 75% or $15 million of construction debt, the partners would contribute $5 million of equity. If it is a typical 80/20 partnership, our share of the equity would be 1 million and our capital partner would contribute 4 million. In our now typical model, where there is no capital return preference to our partner, all losses and profits would be allocated 80/20, according to the percentage of the contributed capital, until Sunrise began to receive incentive distributions, which typically begin after we and our partner have received our capital back and some return, usually as a result of a refinancing or sale.

 Now, if this partnership were to experience 1 million of initial losses and later take $6 million of profit from a capital event, Sunrise would initially recognize 20% or $200,000 of the $1 million of losses, and then receive $1.2 million of the profit from the capital event before adding incentives, for a total of $1 million profit from the venture. The losses would be recognized early in the cycle and the profits later in the cycle.

 Now, if the same venture had included a capital return preference, the timing would be a little different but the ultimate result would be the same, ignoring for this example the enhanced incentive that we would receive in exchange for the capital preference. In a capital preference venture, under the hypothetical liquidation and book value method, Sunrise would be allocated 100% or all million dollars of the initial losses, then would record a $2 million gain as a result of the capital event, resulting in the same $1 million net profit recorded as in the first example.

 I believe what this example shows is that the careful review of these partnership allocations and their timing is relatively complicated and will take some time to get exactly right. What we do know with certainty is that the health of Sunrise's operations is excellent, as our operating metrics show from average daily rate growth to expense control to occupancy and to development pace. We also know that our business model is similarly very solid, and continues to provide the significant benefits to our shareholders that we anticipated when we transitioned to a management services company.

 And our management fee revenue stream, which we collect from hundreds of long-term contracts, is secured and unaffected. Although we are unable to provide final financial results for the quarter until we complete this review, we did want to provide investors

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

with as much preliminary data about the quarter as soon as we could.

 2006 is a significant year for Sunrise. This year, we celebrate 25 years of service to seniors. We began 25 years ago with $15,000 in the bank and a sincere desire to improve quality of life for all seniors. We developed new residence center senior living models, and along the way we were joined by tens of thousands of dedicated team members who are similarly passionate about serving seniors well.

 Today, we operate 423 senior living communities in four countries, with a team of over 40,000 employees. We have an additional 46 senior living communities under construction right now, and expect to open a record 26 of those in 2006. During the first quarter of 2006, our capacity increased to over 51,000 residents in four countries. Our management and professional services revenue from operating communities grew to 34 million, which includes 4.75 million in buyout fees that we received from one management contract. And we closed the quarter with $174 million in cash and $92 million of debt.

 We continue to benefit from excellent performance by our operations team, as well as from our focus on major metro markets and a growing wealth of the senior population in those markets. During the first quarter, each of our four growth drivers contributed strongly. These drivers include, one, growth from existing operations; two, growth from new construction; three, growth from acquisitions; and, four, balance sheet-driven growth.

 Our primary growth driver, growth from existing operations, was strong in Q1 as we grew same-community revenue by 6.3%. We also held operating expense growth to 5.7% in Q1.

 Our second growth driver, new constructions, continued to increase at a healthy pace. During the first quarter, we began construction on four new communities, and we had 46 communities under construction as of March 31, representing a 39% increase over the 33 communities that we had under construction at the end of Q1 2005. We opened 8 new communities in Q1, and we expect to open 11 more in Q2, and as I said earlier, a record 26 for the year.

 Our third growth driver is acquisitions, and in the first quarter we acquired three management contracts, and continue to benefit from the integration of the Greystone and The Fountains acquisitions that we completed last year. We are right now pursuing new acquisition opportunities.

 Our fourth growth driver, our balance sheet, continued to drive additional growth for Sunrise in Q1, as net interest income grew to $2 million, given our substantial cash balances.

 Our business model provides opportunities for Sunrise to generate income in three different ways. One is before a community is open, we generate fees by providing preopening services, amongst them feasibility studies, site selection, architectural and interior design services, zoning, permitting, construction and project management, staffing, training, sales and marketing. After a community is open, we earn management fees from the long-term management contracts in place. And during those years of long-term management, we generate attractive returns for our shareholders through our percentage ownership in these communities and from the incentives that we receive when those ventures exceed performance thresholds.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Now, a few of the highlights from the first quarter. Revenue for all communities managed by Sunrise increased 14% to 531 million for the first quarter. Our revenue under management run rate continues to grow, despite the buyout of 16 management contracts that occurred at the end of last year. We ended the quarter with 423 operating communities, which represents a 10% increase over the prior-year period. We also experienced a notable increase in resident capacity in the first quarter, which grew 17.5% year over year as a result of operating 39 additional communities in the first quarter of 2006 versus 2005.

We continue to see strong results from our same-community portfolio. Our same-community revenue growth increased 6.3% as our occupancy level rose 3.5 percentage points to 94.2% over the first quarter of 2005.

We also made great progress with our international expansion in Q1. During the quarter, we increased the number of open communities that we have in Europe from 7 to 11, with 8 of those in the UK and 3 in Germany. We anticipate opening an additional 5 communities during the remainder of this year in Europe, which would bring our total there to 16 by year end. We also plan to have at least 10 new European construction starts in 2006. Given the favorable demographics and lack of quality competition, we see good opportunity within the European market.

The senior living sector and Sunrise are enjoying a period of excellent underlying fundamentals -- positive demographics, rapidly growing senior wealth, favorable supply/demand metrics and growing consumer enthusiasm for new senior living models, to name just a few. I regret the delay of our final financial results and the temporary lack of clarity that may cause, because that may distract from the otherwise sound fundamentals of our organization and the environment in which we operate.

Now, before I turn the call over to Tom, I do want to express my appreciation to our 40,000 plus team members for their dedication to our mission. Their commitment to improving quality of life for those we serve really is the key to our success. Without their extraordinary contributions, we would not have been able to reach the milestones that we have achieved in these, our first 25 years.

With that, I would like to turn the call over to Tom Newell, Sunrise's President.

TOM NEWELL, PRESIDENT, **SUNRISE SENIOR LIVING**, INC.: Thanks, Paul. Given we are only providing preliminary results today and are in the middle of an accounting review related to our investments in unconsolidated senior living communities, our outlook and guidance is necessarily more limited than usual. We will issue our standard detailed guidance when we report final results.

As Paul mentioned earlier, we do not expect the outcome of our current accounting review to adversely affect our guidance for 2006 or 2007. As indicated in our fourth-quarter 2005 earnings press release, our 2006 EPS guidance includes stock option expenses of approximately $0.04 a share and incentive income deferred from a property sale in 2004 of $0.02 a share. In addition, we expect our 2006 earnings to now include an additional $0.85 per share over our previous guidance, to be generated by the payment of a buyout fee with respect to ten management contracts that we currently expect to receive in the third quarter of 2006.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Our 2006 and 2007 EPS growth is otherwise expected to be driven by higher management and professional services revenue resulting from a growing number of construction starts; 26, a record number of expected new development openings from Sunrise's expanded development pipeline; full-year contributions from The Fountains and Greystone acquisitions; and by further growth in earnings generated by our equity investments in unconsolidated ventures.

We operate in a very dynamic industry, where healthcare and real estate merge to form an industry with vast opportunity. We believe our move to a management services business model has allowed us to maintain and increase our pace of development of new, purpose-built communities, and freed us from having to rely on acquisitions for growth. Our business model has also allowed us to participate in the value appreciation of our communities through recapitalization and our ownership interest in these ventures. We do drive a hard bargain to get the best business deal possible for our shareholders when we negotiate those ventures, and that will not change, regardless of the outcome of this accounting review.

Our operating numbers reported today are strong. We continue to achieve substantial growth in our management and professional services business, and we anticipate additional growth as we take advantage of positive industry demographic trends and very high industrywide occupancy rates. We are very fortunate to have such a quality group of team members to execute our mission and business objectives and that positively impact the daily lives of our more than 50,000 residents.

Now, I will turn the call back over to Paul.

PAUL KLAASSEN: Thanks, Tom. I would like to thank everybody for their interest in Sunrise and for joining us today, and we will now open the line for questions that you might have.

OPERATOR: (OPERATOR INSTRUCTIONS). Frank Morgan.

FRANK MORGAN, ANALYST, JEFFERIES & CO.: I think I must have misunderstood this in your opening comments, Paul, but you didn't say that your accountants brought this to their attention to make this potential change, did you?

PAUL KLAASSEN: Yes, I did.

FRANK MORGAN: Your accountants brought this to their attention?

PAUL KLAASSEN: That's correct.

FRANK MORGAN: So this is something that you want to do? It seems like it has caused a lot of chaos here, but, okay, I just wanted to make sure of that. What would be the advantage of making this change, from your perspective?

BRAD RUSH, CFO, **SUNRISE SENIOR LIVING**, INC.: Throughout the year, and in connection with our quarterly filings, we're constantly reviewing our various accounting policies, including this policy, to assure that we are applying the appropriate method. In connection with our review, we determined that there was a better method to use under GAAP, and this prompted us to use a different methodology to allocate profits and losses.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

So it's just to assure that we're conducting a thorough and complete review of our accounting.

 TOM NEWELL: The lens is focused on this area of joint ventures, and we are constantly refocusing our lens. And you have it right that our internal accounting team, in reviewing the normal quarterly package, focused the lens on this particular topic and raised questions which led us to decide we should use a better method. We went to our auditors with that method, and that now is requiring us to go back. And we're in the process of doing that, to open up for review internally the prior audited statement. And that is going to take some time. As Paul said, these ventures go back into the mid-90s, and we're going to make sure we get it right and we use the best method to make this allocation. It will likely result in some timing changes for individual ventures. It's difficult right now, impossible right now, to know how they all add up. So if each ventures shifts timing, you look at the cumulative effect of that for any one year, and we don't know how that comes out yet.

 FRANK MORGAN: So does better mean just more conservative, or does it --?

 BRAD RUSH: It's better-timed with actual results of the ventures.

 FRANK MORGAN: So just better in the sense it's more reflective of what GAAP accounting is, matching up things better? Okay. So it sounds like that over the economic life of these ventures, that at the end of the day nothing has really changed, and it's more kind of timing and geography and time. But I guess, is it fair to say that there could be -- I know you are not doing this anymore on new partnerships. But could there be some residual bleed-over into the future periods that might be negative? Or the things that you are recasting -- will they be so far along -- is there a possibility that since everything is kind of back-end loaded from your perspective, could your numbers be better?

 TOM NEWELL: That's a good question. It's hard for us to know for sure until we go back to 1997 and do the roll-forward. But why we are able to say they should be no adverse effect on our guidance for 2006 and 2007 is where we are today, as you see in our supplement, there are 162 communities in joint ventures. There are 33 joint ventures that reflect those 162 communities. Of those, 8 of them have a capital preference and are getting the focus, and there are 46 communities in those 8 ventures.

 Now, these are mature ventures, meaning that they are more toward the end of the their life than the beginning. And so we would not expect this review to reduce our profits and losses expected from those ventures in 2006 and 2007. We don't know for sure how it affects it until we go back to 1997 and do the roll-forward for every one, for every year, and see how they overlap. But you're right in essentially this is a timing issue.

 FRANK MORGAN: So at the end of the day, we may actually come back and we are pleasantly surprised, as opposed to temporarily negatively surprised? Is that fair?

 TOM NEWELL: Wait and see.

 OPERATOR: Matthew Ripperger, Citigroup.

 MATTHEW RIPPERGER, ANALYST, CITIGROUP: In your release today, you did not provide

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

preopening revenues or preopening expenses, and I just wanted to know if that was in any way tied to this accounting review.

 TOM NEWELL: It is, and let me explain why. We don't expect that to have a significant effect on our numbers. But in the ventures where we are paid a preopening services fee, we have always deferred a portion of that fee based on our ownership interest in the ventures. So if it's an 80/20 venture, we would not recognize 20% of the fees that we receive. We pay the cash, but we don't take it as income because we are paying ourselves the 20%. As you roll back to look at economic ownership on various periods of time, you have to evaluate what the right level of deferral is for various periods of time for preopening fees. So it is a little bit tied up in this, and in an abundance of caution we want to hold that number as well until we know how this plays out.

 It does not mean we didn't start as many construction projects as we expected; in fact, we did. It doesn't mean that we have not ramped up our pipeline and that we have not received the cash for that preopening service. It just means we don't know 100% for sure yet how much the deferral will be this year, last year, the year before, the year before that. So you highlighted a good point; it is tied up in this.

 MATTHEW RIPPERGER: The second question that I had -- I just wanted to clarify -- in the example that Paul gave, under a preference accounting methodology it seems like you got 100% of the losses early and then roughly a bigger gain later. And given that a lot of these properties are more mature and being recapitalized and you are getting gains from them, how does a potential change to a more equitable non-preference accounting methodology potentially benefit you now?

 TOM NEWELL: It's not being done to benefit us, it's being done to be right. And because the effect of this will move profit later in the ventures, if you have a balance of more mature ventures, you should potentially have a higher profit. And that's the outcome that we're analyzing. [You will] result in more losses in the early years, and if [the year] you have an abundance of the early ventures, you would tend to have more losses in those years. If you have an abundance of mature ventures being recapitalized, you would tend to have more profits in those years. And it's the overlay of all the ventures in all the years that is taking the time right now. The net-net at the end for each venture should be, as Paul indicated in his example, no change. But it will result in potential changes in any given year, depending on the timing and the age mix of the ventures.

 OPERATOR: Kevin Fischbeck, Lehman Brothers.

 KEVIN FISCHBECK, ANALYST, LEHMAN BROTHERS: Once you get the balance back -- I know you incurred more losses at the beginning and more profit at the end. But once you get that balance back to the 80/20%, do you then book 80/20 from there on?

 TOM NEWELL: We would book -- and I'll let Brad give a more detailed answer, but the business answer is, once the capital has been returned we would typically be in a preference mode. It would be 80/20 or more of the profits -- 80/20, 20 to Sunrise, or more if we are into the incentive period. Is that right, Brad?

 BRAD RUSH: Yes. Kevin, you are right that as soon as we made these accounting adjustments for the earlier periods, we would resume the normal 80/20 with the operating distributions from the communities, and then the larger piece of the gain would arise from capital [then]

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

either refinancing or sale.

 KEVIN FISCHBECK: And that is how you currently account for those?

 BRAD RUSH: Yes.

 KEVIN FISCHBECK: So this only impacts those facilities which recently went from a loss to a gain? That is where the income shift would really show up?

 BRAD RUSH: It will affect -- we're applying the method to all of our ventures, so I don't want to carve out a certain timeline. We have so many ventures in various stages, so it's really difficult to say at which point each one turns. But again, start to finish, we're going to see the same result.

 TOM NEWELL: [I think if I] understand that it will affect both ventures in startup and ventures that are mature. The ventures in startup -- there are not very many of them, anymore -- that have preferences would tend to have higher losses than the 80/20 method. And those ventures at the mature stage, in the recap stage, would have more profit. And [we thought that] moving away from this preference, we don't have to give them any more in order to get the best incentive, the highest incentive that we can. It was a business decision that we made. We were rewarded in incentives for providing the preference. The risk allocations of us and our partners were different. And, as Paul said, all of the partnerships have concluded the preference didn't matter. The returns were substantially above that threshold, so we earned incentives for providing some insurance that didn't cost us anything and benefited us.

 KEVIN FISCHBECK: But in those cases where you have already exceeded the preferences a year ago or two years ago, the accounting really doesn't change any from how you were doing it to how you are doing it now? Or you do actually -- will benefit, potentially, from this?

 BRAD RUSH: Could you ask her question again? I don't understand it.

 PAUL KLAASSEN: (Indiscernible) -- well, go ahead and ask the question again, Kevin.

 KEVIN FISCHBECK: If you fulfilled the preference a year ago or two years ago, and the Company continued to be profitable, then the accounting for those joint ventures is exactly the same as how you were doing it previously. You are still booking the 80%, and then you're booking more based upon incentive comp (multiple speakers)?

 TOM NEWELL: That's correct. If we have cleared the preference, it does resume normal treatment.

 KEVIN FISCHBECK: And have you guys thought about what the profits will be when you release your Q? I'm assuming there's going to be some -- the moving pieces. Are you going to issue another press release or have another conference call?

 TOM NEWELL: Yes.

 KEVIN FISCHBECK: You'll do both?

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

TOM NEWELL: Yes.

KEVIN FISCHBECK: And did you have a cash flow number in the quarter?

TOM NEWELL: Not yet.

KEVIN FISCHBECK: Is the cash flow affected by the accounting restatement?

BRAD RUSH: No, it's not, but we're unable to release financial information.

TOM NEWELL: We're under strict instructions to only issue limited information, not talk about income statement or balance sheet beyond what we did.

KEVIN FISCHBECK: And I guess my last question is, if you could just spend a little bit more time on the Five Star contracts. You generally talk about a 43% margin on a typical contract. But once you get a significant presence in a market, five or ten facilities, that margin could actually be higher because the incremental cost is not as great. Is there any way to go through what the margin on those contracts is? Is 43% the right number to look at, or is a number that's higher than that the right number to look at?

TOM NEWELL: It would typically be the marginal savings in G&A from termination in a contract that is not tremendously high. And what we're in the middle of doing is careful G&A management. If you look at the G&A number which we did release, it was down from Q4 substantially for two reasons. One, we had a number of one-time items in Q4, transition expenses, hurricane, et cetera. But we're also managing our G&A to try to maintain it at about the 4% of revenue under management level, which results in that 40% margin you mentioned. It will take some time, and frankly, it will be done more by growth than by cost-cutting as we acquire and open new communities in those markets.

PAUL KLAASSEN: That would be more of an issue if we were not growing as fast as we are. It was on about $90 million of G&A. We have a substantial amount, and frankly, we need all the good people we can get. And we can effectively deploy them, given the growth from existing operations, new construction and then ongoing acquisitions, as you saw from our growth in resident capacity, even with the terminations we have at 17.5% resident capacity growth in one year. So it would have been higher without it, without the terminations or the buyouts.

TOM NEWELL: We factored in the contracts that were terminated into our guidance. What we would expect is a lower G&A number in the early part of the year than we gave you guidance on. We gave a specific G&A number. As we manage the cost and wait for the openings to grow, we don't (indiscernible) plan significant cutting. We have a lot of openings, and we see some visibility on new management contracts that should bulk up our revenue back to support the G&A level that we have.

KEVIN FISCHBECK: I think you had provided guidance for Q1 last time. Is that guidance potentially going to change because of this timing issue, but you are reaffirming the full-year guidance?

TOM NEWELL: We gave guidance for Q1. It's a little premature to know how Q1 is affected.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

I can tell you that our press release for the quarter was at the printer when we decided to pull back and delay, but I can't tell you what it was going to say.

 OPERATOR: Robert Hawkins, Stifel Nicolaus.

 ROBERT HAWKINS, ANALYST, STIFEL NICOLAUS: I am in for Jerry Doctorow, who is traveling right now. I just want to confirm a couple of things that I have heard on the call. And I had to come in late; there was a technical problem trying to get on the call. The VIEs that we're talking about, the eight ventures -- if I'm hearing things right, these are mature ventures now? Is that correct?

 TOM NEWELL: The majority of them are.

 ROBERT HAWKINS: The majority of them are mature? And --

 TOM NEWELL: Are they VIEs, Brad?

 BRAD RUSH: They are not VIEs.

 PAUL KLAASSEN: They are joint ventures. They are not --

 ROBERT HAWKINS: I guess, the joint ventures that are under this VIE FASB --?

 BRAD RUSH: No, that's a different application perspective. This is under SOP 78-9 accounting for the real estate investments. But go ahead with your question.

 ROBERT HAWKINS: So these are mature?

 TOM NEWELL: The majority of them are.

 ROBERT HAWKINS: -- facilities as they are right now?

 TOM NEWELL: The majority of the ventures, the majority of the eight, they are still involved with preferences that are towards the back end of their lifecycle.

 ROBERT HAWKINS: The 26 that you are adding this year -- they are not going to be dropped into any of these (multiple speakers)?

 TOM NEWELL: Some of them will.

 ROBERT HAWKINS: Some of them will be, then?

 TOM NEWELL: Yes.

 PAUL KLAASSEN: A minority.

 TOM NEWELL: Right. Some of them well, but it's a minority, a substantial minority.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

PAUL KLAASSEN: A substantial minority (indiscernible).

ROBERT HAWKINS: Okay, yes.

PAUL KLAASSEN: It's not very many of them. Some of these joint ventures that are old and have a number of properties in them, you know --

ROBERT HAWKINS: A few of the properties will be dropped in, then?

PAUL KLAASSEN: Correct.

ROBERT HAWKINS: -- as a startup? Okay.

And then, to guidance -- you are keeping the 2006 guidance as it stands right now, including the cash flow guidance for the year?

TOM NEWELL: It should not affect cash flow. We said that we don't expect it to adversely affect our 2006/2007 guidance.

OPERATOR: (OPERATOR INSTRUCTIONS). Derrick Dagnan, Avondale Partners.

DERRICK DAGNAN, ANALYST, AVONDALE PARTNERS: Is the new accounting method or the new treatment under GAAP -- is that a new option to you, or has that been available to you for a number of years and you just recently found it?

BRAD RUSH: It has been available for a number of years. And again, with the scrutiny that Paul and Tom mentioned earlier, it came into consideration late in 2005. And when we took a look at it, we thought we should look deeper.

DERRICK DAGNAN: I was wondering, on these JV's, do you have a higher than normal number of properties that used the preference treatment, that may be approaching a recapitalization event, given that they are more mature?

TOM NEWELL: I'm not sure what is normal. Definitely, the eight preference partnerships that have the 46 communities are, on balance, more mature than our other ventures. Is that what you're asking?

DERRICK DAGNAN: Yes.

TOM NEWELL: Yes, because preferences -- the preference negotiating tactic dates back a few years. We moved away from it when we could. When we were able to get the same incentive without having to offer the preference, we did. So that tactic dates back to an earlier Sunrise time in negotiations, and a less robust industry environment and less hunger from capital partners that do business with us, et cetera, et cetera. So the businesspeople who were negotiating these, including me, used it when we needed to, to get the incentives, and went away from it when we could, without ultimately affecting the best business deal we could get.

OPERATOR: Seth Rosen, Imminence Capital.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

SETH ROSEN, ANALYST, IMMINENCE CAPITAL: Did you give D&A in the quarter?

BRAD RUSH: No.

SETH ROSEN: You didn't. Is that affected by this, or can we get that?

BRAD RUSH: It has the potential of being impacted because of the basis in these ventures. So until we complete our review, we're unable to release that.

TOM NEWELL: And I'll give a layman's explanation for why that could be. If you are recognizing additional losses earlier, your basis will drop and therefore your amortization in later periods will drop. And so that's why it could be affected.

SETH ROSEN: So if we take the number that you reported, and I just drop in kind of very rough numbers for depreciation, tax rate, share count, it looks like the management side of the Company -- and ex- the Five Star termination, it looks like the management company earned like $0.12 or $0.13 a share. The rest is all the development stuff, which we don't have the numbers for yet. Is that the right way to look at it?

TOM NEWELL: Probably not. I would advise you to wait. The Five Star payment is a gross payment. You need the amortization off that. For example, the 4.75 million that we received for the Five Star termination in Q1, there is 1.5 million of amortization expense that will go against that. So I would advise not to get ahead. I know it's frustrating. Believe me, it's frustrating for us. I would wait until we're able to perform and able to deliver full Q1 results before we get into too much analysis of the quarter.

OPERATOR: And there are no further questions at this time. I will turn the conference back over to Paul for any additional or closing remarks.

PAUL KLAASSEN: Well, I would like to thank everybody for their interest in Sunrise, and we look forward to speaking with you again as soon as possible. Thank you.

OPERATOR: And that does conclude today's conference. We thank you for your participation. You may now disconnect.

[Thomson Financial reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON FINANCIAL OR THE APPLICABLE COMPANY FOR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.]

[Copyright: Content copyright 2006 Thomson Financial. ALL RIGHTS RESERVED. Electronic format, layout and metadata, copyright 2006 Voxant, Inc. (www.voxant.com) ALL RIGHTS RESERVED. No license is granted to the user of this material other than for research. User may not reproduce or redistribute the material except for user's personal or internal use and, in such case, only one copy may be printed, nor shall user use any material for commercial purposes or in any fashion that may infringe upon Thomson Financial's or Voxant's copyright or other proprietary rights or interests in the material; provided, however, that members of the news media may redistribute limited portions (less than 250 words) of this material without a specific license from Thomson Financial and Voxant so long as they provide conspicuous attribution to Thomson Financial and Voxant as the originators and copyright holders of such material. This is not a legal transcript for purposes of litigation.]

---- INDEX REFERENCES ----

COMPANY: CITIGROUP INC

NEWS SUBJECT:  (Corporate Financial Data (1XO59); Joint Ventures (1JO05); Business Management (1BU42); Investment Banking (1IN86); Major Corporations (1MA93); Corporate Groups & Ownership (1XO09))

INDUSTRY: (Theoretical Analysis (1TH79); Housing (1HO38); Regional Web Presences (1RE47); Internet (1IN27); Science & Engineering (1SC33); Online Services (1ON37); Retirement Communities (1RE03); Financial Services (1FI37); E-Commerce Industries (1EC99); Accounting, Consulting & Legal Services (1AC73); Business Theory (1BU14); Accounting (1AC78); E-Commerce (1EC30); Real Estate (1RE57))

REGION:  (Europe (1EU83))

Language:  EN

OTHER INDEXING:  (AVONDALE; BROTHERS; CITIGROUP; EPS; EXCHANGE COMMISSION; FINANCIAL; FOUNTAINS; FRANK MORGAN; FRANK MORGAN FRANK; GAAP; GREYSTONE; JV; LEHMAN; MORGAN; NEWELL; SECURITIES; SECURITIES AND EXCHANGE COMMISSION; SITE; **SUNRISE SENIOR LIVING**; TOM NEWELL; TOM NEWELL: YES; TRANSCRIPTION; TRANSCRIPTS; UK; USERS; VOXANT; YES TOM NEWELL)  (Brad; Brad Rush; Derrick Dagnan; Doctorow; Kevin; Klaassen; Paul; Paul Klaassen; Paul Klaassen.; Robert Hawkins; SEC FILINGS; Sunrise; Tiffany Tomasso; Tom; Tom Newell)

Word Count: 7908
5/11/06 FINDISCLOSURE 15:00:00
END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# EXHIBIT  3



# FORM 8-K

## SUNRISE SENIOR LIVING INC - SRZ

**Filed: July 31, 2006 (period: July 30, 2006)**

Report of unscheduled material events or corporate changes.

# Table of Contents

8-K - FORM 8-K

Item 2.02.     Results of Operations and Financial Condition

Item 4.02.     Non-Reliance on Previously Issued Financial Statements or a Related
               Audit Report or Completed Interim Review.

Item 9.01.     Financial Statements and Exhibits.

SIGNATURES
INDEX TO EXHIBITS
EX-99.1 (EX-99.1)

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, D.C. 20549

# FORM 8-K

## CURRENT REPORT PURSUANT TO SECTION 13 OR 15 (d)
## OF THE SECURITIES EXCHANGE ACT OF 1934

**Date of Report (Date of earliest event reported): July 30, 2006**

# SUNRISE SENIOR LIVING, INC.
(Exact name of registrant as specified in its charter)

| **Delaware** | **1-16499** | **54-1746596** |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Commission File Number) | (I.R.S. Employer Identification No.) |

**7902 Westpark Drive**
**McLean, Virginia 22102**
(Address of principal executive offices) (Zip Code)

**(703) 273-7500**
(Registrant's telephone number, including area code)

**Not Applicable**
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

This Current Report on Form 8-K and Exhibit 99.1 contain forward-looking statements within the meaning of the federal securities laws. These forward-looking statements are based on current expectations and are not guarantees of future performance. Further, the forward-looking statements are subject to the limitations listed in Exhibit 99.1 and in the reports filed by Sunrise Senior Living, Inc. ("Sunrise" or the "Company"), including that actual events or results may differ materially from those in the forward-looking statements.

### Item 2.02.  Results of Operations and Financial Condition

On July 31, 2006, Sunrise issued a press release announcing that it will restate its financial statements for the years ended December 31, 2003 through 2005. A copy of the press release is furnished with this Current Report on Form 8-K as Exhibit 99.1, and is incorporated by reference herein. The information contained in Exhibit 99.1 shall not be deemed "filed" with the Securities and Exchange Commission (the "SEC") or incorporated by reference in any registration statement filed by the Company under the Securities Act of 1933, as amended.

### Item 4.02.  Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.

Based on the recommendations of the Company's management and the Company's Audit Committee, the Company's Board of Directors determined on July 30, 2006 that the Company will restate its financial statements for the years ended December 31, 2003 through 2005 primarily to adjust the accounting treatment related to ventures that contain partner preferences and the timing of sale accounting and recognition of income from prior sales of real estate. As a result, the Company's Board of Directors determined on July 30, 2006 that the Company's previously issued audited consolidated financial statements for the years ended December 31, 2003, 2004 and 2005, including the associated auditor's report currently on file with the SEC in the Company's 2005 Form 10-K, and Sunrise's unaudited quarterly financial statements filed with the SEC for these years, should no longer be relied upon.

The cumulative impact of the restatement is expected to reduce net income for all periods impacted, including the years 1999 through 2005, by an estimated $60 million to $110 million. Sunrise expects the substantial majority of the reduction to be recaptured in 2006 and 2007. Sunrise is unable at this time to provide the precise impacts of the restatement since its review of these issues has not yet concluded.

Upon completion of its accounting review, Sunrise will report relevant financial information and file amendments to its 2005 Form 10-K and 2005 Form 10-Qs, as well as its Form 10-Qs for the first and second quarters ended March 31, 2006 and June 30, 2006. Adjustments for periods prior to 2003 will be reflected in the opening balance for retained earnings in 2003. The Company is not able to predict at this time when these filings will be made.

In the last several years, the accounting for real estate ventures has received increased attention and new interpretations of the accounting treatment for ventures have developed. The accounting for real estate ventures is determined in accordance with SOP 78-9, *Accounting for Investments in Real Estate*. Sunrise, in consultation with its auditors, considered these new interpretations and its accounting for the profits and losses of its ventures. As this review unfolded, Sunrise looked not only at partner preferences, but also at all guarantees and commitments provided to our venture partners and third party investors.

Certain of these guarantees and commitments should have been considered at the time of the sale of real estate to these entities. Consequently, Sunrise is reviewing the timing of its income recognition associated with the sale of real estate and the potential financial statement presentation of the associated real estate. The following is a summary of Sunrise's restatement by category.

- <u>Allocation of profits and losses in those ventures in which Sunrise's partners receive a preference on cash flow.</u> This area of review focused on the timing of both the recognition of profits and losses from ventures and the recognition of pre-opening fees from ventures in which Sunrise's partners receive a cash flow preference. Sunrise will restate its financial statements to account for its equity in earnings of unconsolidated ventures by a method known as Hypothetical Liquidation at Book Value ("HLBV"), rather than on its historical method based upon percentage of equity ownership. The principal difference between the two methods is that HLBV presumes liquidation at the depreciated book value in considering cash flow preferences when allocating income and losses, while historically Sunrise has allocated profits and losses on the basis of percentage of equity ownership, taking into consideration any potential reduction in basis due to an assumed hypothetical liquidation at fair value. The impact of this restatement will require Sunrise to record additional losses in prior periods for those ventures with cash flow preferences. Sunrise is unable at this time to provide the precise impacts of this restatement since it has not yet completed the quantification of the impacts of this item.

- <u>Effect of certain Sunrise guarantees and commitments on timing of sale accounting and recognition of income upon sale of real estate.</u> Primarily during the period from 2000 to 2003, Sunrise sold mature senior living properties to ventures or independent third parties. In addition, as part of its development program, Sunrise sometimes owns real estate during the zoning and permit process and then sells or contributes the real estate to a venture or third party investor. Sunrise historically has recognized income upon the completion of such sales. In connection with some of Sunrise's sales of real estate, either mature properties or development properties, Sunrise has provided limited guarantees or commitments. These guarantees or commitments have included construction completion, operating cash flow deficit guarantees to lenders and ventures, limited guarantees of net operating income (credit support) and certain limited debt guarantees. The existence of these guarantees, as well as the amounts funded by Sunrise, have been previously disclosed in Sunrise's publicly filed financial statements. In accordance with SFAS 66, *Accounting for Sales of Real Estate*, based on the nature of the guarantee or commitment, Sunrise may be required to defer some or all of the income or may not be able to immediately record the transaction as a sale. Sunrise's review is currently focusing on the nature of the guarantees and commitments it has previously provided and determining whether the Company may be required to defer income and/or not achieve sale accounting over the life of the guarantee or commitment. Sunrise is unable at this time to provide the precise impacts of this restatement since its review of these items has not yet concluded.

- <u>Other</u>. As part of the restatement, Sunrise will also adjust its financial statements for the periods to be restated for certain other items, including the following:

    — Historically, Sunrise has capitalized interest to its equity investments in ventures with multiple properties until the final property in such venture commences operations.

Source: SUNRISE SENIOR LIVIN, 8-K, July 31, 2006

Sunrise will restate its financial statements to capitalize interest to these investments only until the first property in a venture commences operations in accordance with FAS 58. As a result of this adjustment, net income in 2003, 2004 and 2005 is expected to be reduced by approximately $729,000, $1.1 million and $1.8 million, respectively. These impacts are included in the estimated range of reduction in net income expected to result from the restatement set forth in the second paragraph of this Item 4.02.

— Sunrise is reviewing certain other items to determine what other adjustments need to be made, including with respect to the recognition of pre-opening fees, the allocation to prior periods of the December 2005 write down of Sunrise's investment in Sunrise At Home Senior Living, Inc., and the valuation of certain guarantees disclosed previously in its publicly filed financial statements. Sunrise does not expect that any such adjustments, to the extent they ultimately are required to be made, would be material to the Company's financial position or results of operations.

The Audit Committee and the Board of Directors have discussed the matters disclosed in this Item 4.02 with Ernst & Young LLP.

The Company is aware that the occurrence of a restatement of previously issued financial statements is a strong indicator that material weaknesses in internal controls exist. At this time, the Company expects to report a material weakness in its internal control over financial reporting in its amended 2005 Form 10-K.

**Item 9.01.  Financial Statements and Exhibits.**

   **(c) Exhibits:**

| Exhibit No. | Description |
| --- | --- |
| 99.1 | Sunrise Press Release dated July 31, 2006 |

**SIGNATURES**

    Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

SUNRISE SENIOR LIVING, INC.
(Registrant)

Date: July 31, 2006

        By: /s/ Bradley B. Rush
           Bradley B. Rush
           Chief Financial Officer

Source: SUNRISE SENIOR LIVIN, 8-K, July 31, 2006

## INDEX TO EXHIBITS

| Exhibit No. | Exhibit Name | Page No. |
|---|---|---|
| 99.1 | Sunrise Press Release dated July 31, 2006 | |

Exhibit 99.1



**NEWS RELEASE**
**For Immediate Release**
**July 31, 2006**

Contact:   **David Spille**
**Vice President, Investor**
**Relations and Capital Markets**
**(703) 744-1787**

### SUNRISE PROVIDES UPDATE ON ACCOUNTING REVIEW

**Company to Restate 2003 – 2005 Financial Statements to Adjust Timing of Net Income;**
**No Change to Cash Flow or Business Prospects;**
**Cumulative Net Income to be Reduced for 2003-2005 and Recaptured in Future Periods;**
**Earnings Guidance Expected to Increase for the period 2006 through 2007**

**First-Quarter and Second-Quarter Results to be Reported upon Completion of Accounting Review**

McLean, Va.—Sunrise Senior Living, Inc. (NYSE: SRZ), today provided an update to its ongoing accounting review and said the Company will restate its financial statements for the years ended December 31, 2003, 2004 and 2005 primarily to adjust the accounting treatment related to ventures that contain partner preferences and the timing of sale accounting and recognition of income from prior sales of real estate. The cumulative impact of the restatement is expected to reduce net income for all periods impacted, including the years 1999 through 2005, by an estimated $60 million to $110 million. The Company expects the substantial majority of the reduction to be recaptured in 2006 and 2007. Sunrise is unable at this time to provide the precise impacts of the restatement since its review of these issues has not yet concluded. A further discussion of the accounting review appears later in this press release. The Company noted that its previously issued audited consolidated financial statements for the years ended December 31, 2003, 2004 and 2005, including the associated auditor's report currently on file with the SEC in the Company's 2005 Form 10-K, and its unaudited quarterly financial statements during these years should no longer be relied upon.

"We are committed to maintaining the highest possible standards of financial reporting and have expanded our complicated and detailed accounting review to include every venture and every significant real estate transaction," said Brad Rush, Sunrise Senior Living's chief financial officer. "This restatement does not affect the cumulative amount of profits and losses we generate from our venture partnerships or sales of real estate, but rather the timing of the income we recognize. With no impact to the Company's cash flow or the operations of our communities, and with continued high demand for our resident-centered approach to senior living, we fully expect to maintain our strong financial momentum in the fast-growing senior living industry."

Upon completion of its accounting review, Sunrise will report relevant financial information and file amendments to its 2005 Form 10-K and 2005 Form 10-Qs, as well as its Form 10-Qs for the first and second quarters ended March 31, 2006 and June 30, 2006. Adjustments for periods prior to 2003 will be reflected in the opening balance for retained earnings in 2003. As announced in a separate

release today, Sunrise will provide a further update on August 8, 2006, when it provides its preliminary second-quarter selected financial and operating data.

## Discussion of Accounting Review

In the last several years, the accounting for real estate ventures has received increased attention and new interpretations of the accounting treatment for ventures have developed. The accounting for real estate ventures is determined in accordance with SOP 78-9, *Accounting for Investments in Real Estate.* Sunrise, in consultation with its auditors, considered these new interpretations and its accounting for the profits and losses of its ventures. A discussion of this consideration is addressed in the first bullet below. As this review unfolded, Sunrise looked not only at partner preferences, but also at all guarantees and commitments provided to our venture partners and third party investors. Certain of these guarantees and commitments should have been considered at the time of the sale of real estate to these entities. Consequently, Sunrise is reviewing the timing of its income recognition associated with the sale of real estate and the potential financial statement presentation of the associated real estate. This area of the review is discussed in the second bullet below. The following is a summary of Sunrise's restatement by category.

- <u>Allocation of profits and losses in those ventures in which Sunrise's partners receive a preference on cash flow</u>. This area of review focused on the timing of both the recognition of profits and losses from ventures and the recognition of pre-opening fees from ventures in which our partners receive a cash flow preference. As Sunrise previously indicated, neither of these areas of review impact the total economics to be received from these ventures, but rather the timing of the recognition of profits and losses. A limited number of Sunrise's ventures have these cash flow preferences. In recent years, Sunrise has been moving away from providing preferences to partners. In the future, Sunrise will no longer offer preferences on cash flows for its ventures. Sunrise will account for its equity in earnings of unconsolidated ventures by a method known as Hypothetical Liquidation at Book Value (HLBV), rather than on its historical method based upon percentage of equity ownership. The principal difference between the two methods is that HLBV presumes liquidation at the depreciated book value in considering cash flow preferences when allocating income and losses, while historically Sunrise has allocated profits and losses on the basis of percentage of equity ownership, taking into consideration any potential reduction in basis due to an assumed hypothetical liquidation at fair value. An example demonstrating the difference between the two methodologies can be found at the end of this press release.

  The impact of this restatement will require Sunrise to record additional losses in prior periods for those ventures with cash flow preferences. Sunrise expects to recapture these amounts as additional income in future periods upon the recapitalization, refinancing or sale of these ventures, most of which are expected to occur in 2006 and 2007. Sunrise believes that it will recapture these amounts because the ventures impacted are now generally older ventures in which the investment partner has indicated an interest in recapitalizing, refinancing or selling their partnership interests. Several recapitalization transactions are currently scheduled for 2006 and Sunrise expects the others to occur in 2007. Based on current market conditions, a recapitalization, refinancing or sale of these ventures would trigger the recognition of income by Sunrise and the recapture of the reduction of net income caused by the restatement.

- <u>Effect of certain Sunrise guarantees and commitments on timing of sale accounting and recognition of income upon sale of real estate</u>. Primarily during the period from 2000 to 2003, Sunrise sold mature senior living properties to ventures or independent third parties. In addition, as part of its

Source: SUNRISE SENIOR LIVIN, 8-K, July 31, 2006

development program, Sunrise sometimes owns real estate during the zoning and permit process and then sells or contributes the real estate to a venture or third party investor. Sunrise historically has recognized income upon the completion of such sales. In connection with some of Sunrise's sales of real estate, either mature properties or development properties, Sunrise has provided limited guarantees or commitments. These guarantees or commitments have included construction completion, operating cash flow deficit guarantees to lenders and ventures, limited guarantees of net operating income (credit support) and certain limited debt guarantees. The existence of these guarantees, as well as the amounts funded by Sunrise, have been previously disclosed in Sunrise's publicly filed financial statements. In accordance with SFAS 66, *Accounting for Sales of Real Estate*, based on the nature of the guarantee or commitment, Sunrise may be required to defer some or all of the income or may not be able to immediately record the transaction as a sale. Sunrise's review is currently focusing on the nature of the guarantees and commitments it has previously provided and determining whether the Company may be required to defer income and/or not achieve sale accounting over the life of the guarantee or commitment.

Deferral of income recognition or delay in achieving sale accounting does not change the ultimate economics of a sale, but rather the timing of the recognition of income. Sunrise will recapture the recognition of this deferred income when the guarantees or commitments expire or the ventures are recapitalized, refinanced or sold, which Sunrise believes will occur primarily in 2006 or 2007. This will result in full sale accounting for the prior transactions and the recapture of deferred income. This accounting issue should not recur as Sunrise does not expect to offer guarantees to new ventures or lenders that would preclude sale accounting or require the deferral of income.

- Other. As part of the restatement, Sunrise will also adjust its financial statements for certain other miscellaneous items described in the Company's Form 8-K filed with the SEC earlier today, the estimated impact of which are included in our estimated range of reduction in net income.

**Additional Accounting Item Under Review**

EITF 04-5 – Rights of limited partners in ventures. The Company typically serves as the general partner or managing member of its ventures. EITF 04-5, effective January 1, 2006 for all ventures, provides guidance that the general partner or managing member in a venture is not deemed to control and, therefore, does not consolidate the venture when the limited partners have certain substantive participating rights within the venture. Sunrise believes its partners have substantive participating rights. From time to time, the SEC will review public company filings as part of its standard review cycle. Sunrise received such a comment letter from the SEC accounting staff with respect to its Form 10-K for the year ended December 31, 2005 which included a request for additional information regarding the application of EITF 04-5 to Sunrise's unconsolidated ventures. Sunrise has responded to the comment letter but is unable to predict the timing or outcome of the SEC accounting staff's review of its response.

**Outlook**

Excluding the impact of accounting adjustments described above, Sunrise's business has performed in line with expectations through the first half of the year. The Company continues to experience strong occupancy, increasing average daily rates, the benefits of the industry leading development pipeline (which has produced 16 new community openings adding 1,400 to resident capacity in the first half of 2006) and robust acquisition opportunities. As announced in a separate press release today, Sunrise will acquire three additional communities in the San Francisco Bay area. This accretive acquisition, as well as Sunrise's anticipated acquisition of management of six Florida

communities announced on June 30, 2006, which is also expected to be accretive in 2007, should add to Sunrise's EPS in 2007. As of June 30, 2006, Sunrise's balance sheet remains strong with cash in excess of $250 million and the lowest debt levels in over 10 years.

Sunrise anticipates that its earnings guidance for the period 2006 through 2007 will be increased due to the expected recapture in those years of the substantial majority of the expected $60 million to $110 million reduction in prior period income from the accounting adjustments. Sunrise will provide updated earnings guidance for 2006 and 2007 when it has completed its accounting review and filed its restated financial statements.

## Conference Call Information

Sunrise will host a conference call today, Monday, July 31, 2006 at 8:30 a.m. ET to discuss the restatement of prior period financial results. Paul Klaassen, chairman and chief executive officer, Thomas Newell, president, Tiffany Tomasso, chief operating officer and Brad Rush, chief financial officer, will host the call. The conference call can be accessed by dialing (719) 457-2654 or (888) 208-1812 (access code not required) or via the Investor Relations section of the Company's web site (www.sunriseseniorliving.com). Those unable to participate in the live call may hear a rebroadcast by dialing (719) 457-0820 or (888) 203-1112 (access code: 4773234). The rebroadcast will be available through August 7, 2006. In addition, a link to a recording of the call and a copy of this earnings release will be available on the Company's Web site in the Investor Relations section.

## About Sunrise

Sunrise Senior Living, a McLean, Va. based company, employs approximately 40,000 people. As of June 30, 2006, Sunrise operated 422 communities in the United States, Canada, Germany and the United Kingdom with a combined capacity for approximately 50,000 residents. Sunrise also had 43 communities under construction in these countries with a combined capacity for more than 6,000 additional residents. Sunrise offers a full range of personalized senior living services, including independent living, assisted living, care for individuals with Alzheimer's and other forms of memory loss, as well as nursing and rehabilitative care. Sunrise's senior living services are delivered by staff trained to encourage the independence, preserve the dignity, enable freedom of choice and protect the privacy of residents. To learn more about Sunrise, please visit http://www.sunriseseniorliving.com.

## Forward-Looking Statements

*The estimated range of the financial statement impacts of the Company's restatement, the Company's expected recapture of restatement amounts in future periods, the anticipated earnings contributions from the two recent acquisitions and the anticipated increase in Sunrise's earnings guidance are, and certain other matters discussed in this press release may be, forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. Although Sunrise believes the expectations reflected in such forward-looking statements are based on reasonable assumptions, there can be no assurances that its expectations will be realized. Sunrise's actual results could differ materially from those anticipated in these forward-looking statements as a result of various factors, including, but not limited to, completion of Sunrise's accounting review and finalization of the restatement, the actual performance of the recent acquisitions, development and construction risks, licensing risks, business conditions, competition, changes in interest rates, Sunrise's ability to manage its expenses, market factors that could affect the value of its properties, the risks of downturns in general economic conditions, satisfaction of closing conditions, availability of financing for development and*

*acquisitions and other risks set forth in the Company's annual report on Form 10-K filed with the SEC. The Company assumes no obligation to update or supplement forward-looking statements that become untrue because of subsequent events.*

Sunrise To Restate Financial Statements For 2003 Through 2005 / Page **6**

**Example of Venture Allocations**

Assumes a single community venture, revenues from the community of $6,000,000 with NOI of $2,000,000 upon stabilization, 33% margin after a 7% management fee, annual debt service of $1,000,000, and refinancing of the community at the end of year three. Assumes that venture partner has a preference in the return of capital, and that they also apply HLBV. Refinancing assumed value of $28,500,000 based upon a 7% cap rate applied to year three NOI of $2,000,000. Sunrise receives a 10% incentive upon a capital event.

| | | Former Method | | HLBV | |
| --- | --- | --- | --- | --- | --- |
| | | 20% Sunrise | 80% Partner | 20% Sunrise | 80% Partner |
| Community value | 20,000,000 | | | | |
| Debt | 15,000,000 | | | | |
| Equity | 5,000,000 | 1,000,000 | 4,000,000 | 1,000,000 | 4,000,000 |
| | | | | | |
| Results of Operations | | | | | |
| Year One | | | | | |
| Income (loss) from operations | (1,000,000) | (200,000) | (800,000) | (900,000) | (100,000) |
| Less cash distributed | 500,000 | 100,000 | 400,000 | 100,000 | 400,000 |
| Balances at end of Year One | 3,500,000 | 700,000 | 2,800,000 | —— | 3,500,000 |
| | | | | | |
| Year Two | | | | | |
| Income (loss) from operations | 750,000 | 150,000 | 600,000 | 200,000 | 550,000 |
| Less cash distributed | 1,000,000 | 200,000 | 800,000 | 200,000 | 800,000 |
| Balances at end of Year Two | 3,250,000 | 650,000 | 2,600,000 | —— | 3,250,000 |
| | | | | | |
| Year Three | | | | | |
| Income (loss) from operations | 2,000,000 | 400,000 | 1,600,000 | 200,000 | 1,800,000 |
| Less cash distributed | 1,000,000 | 200,000 | 800,000 | 200,000 | 800,000 |
| Balances at end of Year Three | 4,250,000 | 850,000 | 3,400,000 | —— | 4,250,000 |
| | | | | | |
| Refinancing proceeds | 21,500,000 | | | | |
| Less debt balance, incl costs | 15,000,000 | | | | |
| Net proceeds | 6,500,000 | | | | |
| | | | | | |
| Cash distributed to partners from refinance, 30% to Sunrise | | 1,950,000 | 4,550,000 | 1,950,000 | 4,550,000 |
| Gain from refinancing | | 1,100,000 | 1,150,000 | 1,950,000 | 300,000 |
| | | | | | |
| Initial investment | | (1,000,000) | (4,000,000) | (1,000,000) | (4,000,000) |
| Cash distributed | | 2,450,000 | 6,550,000 | 2,450,000 | 6,550,000 |
| Income (loss) allocated, including gain | | 1,450,000 | 2,550,000 | 1,450,000 | 2,550,000 |

### ###

Source: SUNRISE SENIOR LIVIN, 8-K, July 31, 2006

# EXHIBIT  4



**SEIU**

**Stronger Together**

November 20, 2006

Board of Directors
Sunrise Senior Living, Inc.
7902 Westpark Drive
McLean, VA 22102

Dear Members of the Sunrise Board of Directors,

Sunrise Senior Living shareholders have lost $300 million since May 2006, when the company failed to file its first quarter 2006 financial statements. What management first termed a review of accounting affecting a "limited number of Sunrise joint ventures"[1] has since prevented Sunrise from filing financial statements for the past three quarters; required it to restate previously filed financial statements for 2003 to 2005; led it to disclose material weakness in internal controls over financial reporting; and precipitated a corrective letter from the Securities and Exchange Commission regarding the company's disclosure.

The accounting problems alone call into question the performance of the audit committee of the Sunrise board of directors. In addition, our own review has uncovered questionably timed insider stock sales. For example, Ronald V. Aprahamian, chair of the audit committee, sold 20,000 shares for $757,040 just three weeks before the company announced its first filing delay, which triggered a 34% share price decline over the next two months.[2] We have also found improbably dated executive stock option grants, including a grant of 350,000 options to CEO Paul Klaassen on September 11, 2000, the date of the lowest price for the rest of the year.

The SEIU Master Trust is a long-term beneficial owner of Sunrise shares and an active proponent of sound corporate governance as a vital means to protect and enhance shareholder value. These developments at Sunrise raise serious concerns with respect to the Sunrise board, its key committees, and individual directors. We therefore call on the board of directors to immediately appoint an experienced external Monitor who will retain independent counsel to investigate:

1. The joint venture and revenue recognition accounting practices that led to the accounting review and SEC involvement at Sunrise, the timing and handling of disclosure about the accounting review, the impact of projected financial restatements on past executive compensation, and the performance of the audit committee in exercising oversight of the company's accounting and compliance practices;

2. The more than $32 million of stock sales by Sunrise executives and directors between late 2005, when management stated it first began contemplating the change of accounting methodology, and May 2006, when Sunrise announced the accounting change and filing delay that prompted the 34% decline in its share price; and

SERVICE EMPLOYEES
INTERNATIONAL UNION, CLC

SEIU MASTER TRUST

1313 L Street, NW
Washington, DC 20005
202.639.0890
800.458.1010
www.SEIU.org

---

[1] Sunrise Senior Living, "Sunrise Reports Preliminary Selected Financial Data For First-Quarter 2006," Press Release, May 11, 2006.
[2] SEC Form 4, Filed April 20, 2006.

2908 440his, 9.05

3.  The timing of and accounting treatment for executive stock option grants between June 1996 and October 2005 and for the repricing of options in September 1998.

We make the extraordinary request for an external monitor because at least six of the seven directors at Sunrise appear to be involved in the activities within the scope of the proposed investigation.
Furthermore, the nature, extent, and seriousness of the issues lead us to insist that both the external Monitor and the independent counsel have no personal or business ties to the company, its officers, or its directors. Counsel should be empowered to investigate the full range of issues raised above, report its findings to the Monitor, and recommend remedies for any past misconduct, including the disgorgement of ill-gotten gains, return of any bonuses and performance-based compensation, and the cancellation of stock options. Counsel should also be authorized to propose cures for any ongoing deficiencies in the areas of accounting, financial controls, compliance, and corporate governance, including measures to enhance the independence and accountability of the board. Because shareholders have a right to understand what has happened and the corrective action that will be taken, we ask that the board make public the counsel's findings and recommendations.

With Sunrise under mounting investor and regulatory scrutiny, we urge you to move swiftly to restore investor confidence in the integrity of the Sunrise board and the accuracy of its financial statements. We therefore request that you respond to this letter by December 15, 2006, informing us as to the appointment of an external Monitor, his or her identity, and the identity of the appointed independent counsel.

We detail our concerns further below.

Accounting Practices
Independent financial analysts have long questioned the clarity and propriety of Sunrise accounting practices, but the most recent accounting problems have had a profoundly adverse material impact on shareholders. The value of our company fell 34% after management delayed the filing of first quarter financial statements, announced a change in accounting methodology, and then went silent for eleven weeks. The market capitalization of the company remains nearly 20% below its pre-announcement level, while the expanding scope, changing content, and continuing nature of the accounting review has shaken shareholder confidence in management and the board of directors.

The growing list of problematic accounting practices at Sunrise includes three areas of concern to the SEC, as delineated in the company's 8-K/A of August 8, 2006. . First, the company's method for accounting for profits, losses, and pre-opening fees from joint ventures where partners receive a preference on cash flow did not meet the provisions of SOP 78-9 Accounting for Investments in Real Estate Ventures. Second, the SEC has requested additional information about how Sunrise determines its equity in earnings or losses. And third, the SEC has questioned the company's application of EITF 04-5 Rights of Limited Partners in Ventures to its unconsolidated joint ventures. It is possible that the SEC would require the company to consolidate some of its joint ventures on its financial statements, eliminating its ability to recognize certain forms of income from real estate transactions, thereby reducing prior and future earnings.

Another significant potential problem is the company's adherence to SFAS 66 Accounting for Sales of Real Estate. According to the same 8-K/A, the company may be required to defer some or all of the income from past sales or to not record certain transactions as sales. This has required the company to review hundreds of transactions, with the impact of that review, which could be quite material, still undetermined.

The company stated that it will alter its capitalization of interest to its equity investments that include multiple properties, causing a restatement that will reduce net income in 2003, 2004, and 2005, by approximately $729,000, $1.1 million, and $1.8 million, respectively.[3] Sunrise is also reviewing and may need to adjust its accounting for the recognition of pre-opening fees, the allocation of the company's December 2005 write down of its investment in Sunrise At Home Senior Living Services, Inc., and the valuation of certain guarantees.[4]

Sunrise has said that cumulative impact of its restatements will reduce net income for the years 2003, 2004, and 2005 by $50 million.[5] This represents 26% of total net income for the period.

Sunrise expects it will report a material weakness in its internal controls over financial reporting.[6]

Sunrise's disclosures of its accounting difficulties are troubling for several reasons. First, the company initially underestimated the scope of the accounting review, saying in May the focus was on the accounting treatment of profits and losses at just eight "joint ventures in which Sunrise is a minority partner and the capital partner receives a preference on return of its capital."[7] As the above list of problems makes clear, the accounting review quickly expanded to include many additional accounting practices involving many more activities.

Second, management has not provided complete disclosures about the facts and circumstances that prompted its accounting review. Despite receiving an information request from the SEC dated April 27, 2006, the company did not disclose the SEC's concerns in press releases, an 8-K filing, or a conference call discussing the accounting issues during the period May 9-11, 2006.[8] When Sunrise finally disclosed the SEC's involvement, in a press release dated July 31, 2006, it failed to disclose all of the SEC's concerns. Only after the SEC sent a letter, on August 3, 2006, insisting that the company do so, did the company acknowledge additional SEC concerns.[9]

Third, in all of its public filings, press releases, and conference calls before August 8, 2006, Sunrise mischaracterized its accounting review as a change in accounting methodology, rather than the correction of an accounting error. Originally, the company stated that it had "decided to use a different methodology," and management called the new practice "a more preferable method under generally accepted accounting principles," implying it had a choice in the matter.[10] Again, it took the SEC letter of August 3rd to prompt the company to acknowledge that its prior accounting was in fact improper.

Significant questions remain about the accounting review. Given that the company indicated that neither SEC involvement nor new accounting rules or interpretations stimulated the accounting review, what prompted the company to review its joint venture accounting in the first instance? Could the company have continued its earlier accounting practices while completing the accounting review, thereby avoiding

---

[3] Sunrise Senior Living, Form 8-K/A, Filed August 8, 2006.
[4] Ibid.
[5] Sunrise Senior Living, "Sunrise Reports Preliminary Selected Financial and Operating Data for Third-Quarter 2006," Press Release, November 7, 2006.
[6] Ibid.
[7] Thomson StreetEvents, "SRZ - Q1 2006 Sunrise Senior Living Earnings Conference Call," May 11, 2006, p. 2.
[8] The existence of the April 27, 2006 letter from the SEC is discussed in Bradley B. Rush to Mr. Larry Spirgel, August 8, 2006, available on EDGAR.
[9] Mr. Larry Spirgel to Mr. Bradley Rush, August 3, 2006, available on EDGAR.
[10] Thomson StreetEvents, "SRZ - Q1 2006 Sunrise Senior Living Earnings Conference Call," May 11, 2006, p. 2, 6.

the delay in its quarterly filings and the accompanying shareholder anxiety? Which directors and managers were responsible for the decisions surrounding the accounting review and its disclosure? Did the past overstatement of earnings trigger compensation payouts to senior executives and, if so, should compensation based on incorrectly inflated earnings be returned? Is there any connection between the timing of the company's announcement concerning its accounting review and the pattern of insider stock sales described below?

Insider Stock Sales

Sunrise directors and top executives "dodged a bullet" when they realized proceeds of more than $32 million from insider sales in the six months before May 9, 2006, when the company announced its accounting review and associated filing delay. After this date, the Sunrise share price fell 34% over the next two months, eliminating more than $660 million in shareholder value. According to CFO Bradley B. Rush during a conference call on May 11, 2006, financial managers at Sunrise, under the direction of CEO Paul Klaassen and president Thomas B. Newell, began contemplating the change of accounting methodology "late in 2005."[11]

Thus, the public record suggests that insider sales were planned and executed during the same period management was contemplating an accounting change that could have significant adverse impact on the company's share price. At minimum, insiders appear to have acted for their own benefit in a manner misaligned with the interests of other shareholders. We cannot dismiss the possibility that executives and directors were cognizant of material non-public information and structured their share trading, including the adoption of 10b5-1 plans, to take advantage of the strong share price before it fell.

The biggest insider sellers during this period were the biggest shareholders: chairman of the board, CEO, and founder Paul Klaassen and his spouse, Teresa Klaassen, founder, director, chief cultural officer, executive vice president, and secretary. They disposed of 600,000 shares in 12 sales between December 19, 2005, and May 2, 2006, for total proceeds of $21,426,580.[12] Initiated as a series of planned sales in December 2005, around the time the company first contemplated its accounting review, these sales represented the first outright stock sales by the Klaassens since the company went public in 1996.[13] The last two sales, netting more than $3.6 million, took place just one week before the filing delay was announced.

Director Thomas J. Donohue, who sits on all four board committees and chairs the compensation committee, sold 102,666 shares for approximately $3.4 million on November 21, 2005.[14] Presumably, as an audit committee member, he was involved in the decision to adopt the accounting change.

Likewise, Ronald V. Aprahamian, director, audit committee chair, and compensation committee member, was in a position to know of the impending accounting change. He sold 20,000 shares for $757,040 on April 18, 2006, barely three weeks prior to the filing delay. [15]

---

[11] Ibid., p. 14.

[12] SEC Form 4, filed December 30, 2005, January 5, February 3, March 3, April 4, and May 3, 2006.

[13] In May and June of 2005, the Klaassens entered into a prepaid variable forward contract relating to the forward sale of up to 750,000 shares of common stock. They received total payment of approximately $29.8 million, approximately 75% of the then-current value of the shares. SEC Form 4, filed May 31, 2005, and June 1, 13, 17, 2005. Under then-current IRS rules, this payment was considered non-taxable, given the structure of the forward contract, which mimics an equity options collar, rather than a sale. Floyd Norris, "A Clever Tax Strategy May Backfire," *New York Times*, December 30, 2005.

[14] SEC Form 4, Filed November 22, 2006.

[15] SEC Form 4, Filed April 20, 2006.

J. Douglas Holladay, chair of the nominating and corporate governance committee, sold 18,000 shares in four sales for $671,000 between November 7, 2005, and March 21, 2006.[16]

Stock Option Grants

According to company proxy statements, Sunrise granted stock options to its CEO and highest paid executives on 13 different occasions between June 1, 1996, and October 1, 2005, which we detail in the attached memorandum. Close to half of these option grants were fortuitously timed, with strike prices at or near periodic or yearly stock price lows that preceded rapid and/or long-term stock price increases. We are concerned about the wide discrepancy between stock price performance before and after the grants, as it raises the possibility that the grants were manipulated.

Overall, we calculate that the average return in the 30 days prior to each grant was negative, -2.7%. In the 30 days after each grant, the average return was positive, 12.1%.[17] Additionally, Sunrise stock performed worse than the overall market before option grants and better after them. During the period the stock traded on NASDAQ (covering a majority of the grants), the average return in the 30 days before an option grant was -4.1%, compared to an average gain of 15% in the 30 days after an option grant. By comparison, the NASDAQ Composite index gained an average of 3.9% in the 30 days before stock option grants and lost an average of 0.6% in the 30 days after. A similar pattern has occurred since the stock moved to the NYSE.[18]

The company's sole instance of option repricing is also troubling. On September 14, 1998, after shareholders watched the company's stock price fall more than 45% in barely four months, the stock option committee, chaired by Thomas J. Donohue, repriced all options with an exercise price (split adjusted) above $14.50, issuing new grants with an exercise price of $12.50.[19] This exercise price was 40 cents above the preceding day's close of $12.09375, which, coincidently, was the third-lowest close of the year, the lowest and second lowest closing prices having occurred the preceding week. Sunrise executives were thus blessed twice: first to have their underwater options repriced and second to have the stock option committee pick the third-lowest closing price of the year as the strike price for their repriced options.

---

[16] SEC Form 4, Filed November 23, December 8, December 13, 2005 and March 22, 2006.
[17] Calculated as the average stock price appreciation for the 13 periods before and the 13 periods after the 13 stock grants.
[18] See the attached memorandum, "Sunrise Senior Living Executive Stock Option Grants 1996-2005."
[19] Sunrise Senior Living, Form DEF 14A, Filed April 6, 1999.



**Sunrise 1998 Option Grants**

The stock option committee stipulated that the grants could not be exercised within six months of the grant date or before the price exceeded $16.25 for five trading days. Yet, as the chart above indicates, the price shot past that threshold in just four trading days and returned over 19% in the 30 days after the grant. Additional charts, available in the accompanying memorandum regarding Sunrise stock option grants, illustrate further questions we have about the timing of Sunrise option grants.

Stock options grants are meant to align executives' interests with those of shareholders by encouraging management to engage in actions that increase share price. Thus, to reprice option grants contradicts shareholders' interests. To backdate a repricing would be doubly troubling. Speaking to the *Wall Street Journal*, Arthur Levitt, former chairman of the SEC said stock option backdating "represents the ultimate in greed… It is stealing, in effect. It is ripping off shareholders in an unconscionable way."[20]

Committee Independence
While the current members of the audit and compensation committees may meet the minimal bright-line tests of independence in the NYSE listing standards, we think several conflicts of interest impair their objectivity in setting and enforcing company policy in the key areas of compensation, financial reporting, and compliance.

---

[20] Charles Forelle and James Bandler, "Five More Companies Show Questionable Options Pattern," *Wall Street Journal*, May 2 2, 2006, p. 1.

Thomas J. Donohue, Craig R. Callen, and Ronald V. Aprahamian comprise both the audit committee and the compensation committee at Sunrise. Each has or has recently had more than a trivial connection to Sunrise and its executive officers, as detailed in company filings and the press.

Mr. Donohue has numerous personal and business connections to Mr. and Ms. Klaassen. Both Mr. Donohue and Mr. Klaassen sit on the board of directors of the U.S. Chamber of Commerce and its affiliated Foundation. In an interview published in January 2000, Mr. Donohue also revealed that Mr. Klaassen previously worked for him at the Chamber, that Mr. Klaassen and his wife lived with him for a time, and that he invested in the Klaassen's first home.[21] Of even greater concern, the *New York Times* recently reported and company proxy statements confirm that in the mid-1990s, before Sunrise went public, Mr. Donohue more than doubled a $500,000 investment in roughly three years through a related-party transaction with Sunrise.[22] Proxy advisory firm Glass Lewis does not consider Mr. Donohue to be independent.

Mr. Callen's ties to Sunrise are of a business, rather than personal, nature. During virtually his entire seven-year tenure as a Sunrise director, Mr. Callen and/or his employers have done significant business with Sunrise. At the time he joined the Sunrise board in 1999, Mr. Callen was managing director of Health Care Investment Banking at Donaldson, Lufkin & Jenrette Securities Corporation, which provided financial advisory services to Sunrise. DLJ and several of its affiliates also entered into joint ventures with Sunrise to raise up to $70.8 million for the development of assisted living communities. Mr. Callen held a 1.375% membership interest in two of these ventures.[23]

After Credit Suisse First Boston bought DLJ in 2000, Mr. Callen became one of its managing directors and head of its U.S. Health Care Investment Banking, and the relationship with Sunrise expanded. As of January 2001, CSFB affiliates had provided more than $50 million in equity capital to Sunrise joint ventures, bought a tranche of Sunrise convertible subordinated notes, and participated in a $92 million term facility provided to Sunrise.[24] One of the ventures in which Mr. Callen held his interest was sold in 2003, with an undisclosed gain for Mr. Callen. In connection with the formation of Sunrise REIT in December 2004, the second joint venture in which Mr. Callen held an interest was acquired by Sunrise and immediately contributed to Sunrise REIT. Mr. Callen's interest was repurchased as part of this transaction for approximately $137,500.[25]

In April 2004, Mr. Callen joined Aetna as senior vice president, strategic planning and business development. From January 1, 2004, Aetna Healthcare, a subsidiary of Aetna, Inc., has been Sunrise's health plan administrator, dental plan administrator, health benefit stop-loss insurance carrier, and long-term care insurance provider, with Sunrise payments to Aetna Healthcare for property and services accounting for less than 2% of Aetna Healthcare's consolidated gross revenues.[26]

Mr. Aprahamian has been a director at Sunrise for more than a decade, in itself an impediment to independence according to some institutional investors and proxy advisory services. Additionally, while a

---

[21]Kirstie, James "We are playing with courage," *Directors & Boards*, January 1, 2000.

[22] Morgenson, Gretchen, "Taking Care of Business, His Way", *New York Times*, February 20, 2005; Sunrise Senior Living, From DEF 14A, Filed April 28, 1997, p. 10.

[23] Sunrise Senior Living, Form DEF 14A, Filed April 14, 2000, p. 11-12.

[24] Sunrise Senior Living, Form DEF 14A, Filed April 5, 2002, p. 9-10.

[25] Sunrise Senior Living, Form DEF 14A, Filed April 10, 2006, p. 5.

[26] Sunrise Senior Living, Form DEF 14A, Filed April 7, 2005, p. 5.

director, Mr. Aprahamian served as a consultant to the company from May 1997 to September 1998. During the first nine months of 1998, he received $63,405 from Sunrise for his consulting services.[27]

The accounting problems at Sunrise, particularly the fact that the company will report a material weakness in its internal controls, further heighten our concerns about the independence of these three directors, who have responsibility for establishing and implementing policies regarding financial reporting, compensation, compliance, and disclosure. In addition, Sunrise has corporate governance policies, such as a classified board and a poison pill, that can insulate the board from accountability to shareholders.

For all these reasons we urge you to select an external Monitor who will appoint an independent counsel empowered to conduct a thorough review of the company's actions and controls related to its accounting review, insider trading, stock option grants, and board composition, and make its results and recommendations public. This action is necessary to assuage shareholder concerns about the integrity of the Sunrise board of directors and the reliability of its financial statements.

Thank you for your prompt attention to this matter. We look forward to hearing from you by December 15, 2006.

Sincerely,

Stephen Abrecht
Executive Director, Benefit Funds

SA:SW:bh

---

[27] Sunrise Senior Living, Form DEF 14A, Filed April 6, 1999, p. 4, 8.

# EXHIBIT  5



# FORM 8-K

## SUNRISE SENIOR LIVING INC - SRZ

**Filed: October 01, 2007 (period: September 28, 2007)**

Report of unscheduled material events or corporate changes.

# Table of Contents

8-K

**Item 8.01.**    Other Events.

**Item 9.01.**    Financial Statements and Exhibits.

SIGNATURES

INDEX TO EXHIBITS

EX-99.1 (Exhibits not specifically designated by another number and by investment companies)

# UNITED STATES

# SECURITIES AND EXCHANGE COMMISSION

**WASHINGTON, D.C. 20549**

# FORM 8-K

**CURRENT REPORT PURSUANT TO SECTION 13 OR 15 (d)
OF THE SECURITIES EXCHANGE ACT OF 1934**

Date of Report (Date of earliest event reported): **September 28, 2007**

# SUNRISE SENIOR LIVING, INC.

(Exact name of registrant as specified in its charter)

| **Delaware** | **1-16499** | **54-1746596** |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Commission File Number) | (I.R.S. Employer Identification No.) |

**7902 Westpark Drive
McLean, Virginia 22102**
(Address of principal executive offices) (Zip Code)

**(703) 273-7500**
(Registrant's telephone number, including area code)

**Not Applicable**
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Source: SUNRISE SENIOR LIVIN, 8-K, October 01, 2007

**Item 8.01. Other Events.**

On September 28, 2007, Sunrise Senior Living, Inc. (the "Company") issued a press release providing a status report on the investigation by the Special Independent Committee of the Company's Board of Directors and providing updates on management's internal control review efforts and on legal proceedings. A copy of the Company's press release dated September 28, 2007 is attached as Exhibit 99.1 hereto and is incorporated herein by reference.

**Item 9.01. Financial Statements and Exhibits.**

(a) Not applicable

(b) Not applicable

(c) Not applicable

(d) Exhibits.

| Exhibit No. | Description |
| --- | --- |
| 99.1 | Company press release dated September 28, 2007 |

Source: SUNRISE SENIOR LIVIN, 8-K, October 01, 2007

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

SUNRISE SENIOR LIVING, INC.
(Registrant)

Date: October 1, 2007                    By:    /s/ John G. Gaul

                                                John G. Gaul
                                                General Counsel

3

Source: SUNRISE SENIOR LIVIN, 8-K, October 01, 2007

**INDEX TO EXHIBITS**

| Exhibit No. | Exhibit Name | Page No. |
|---|---|---|
| 99.1 | Company press release dated September 28, 2007 | |

4

Source: SUNRISE SENIOR LIVIN, 8-K, October 01, 2007

**SUNRISE PROVIDES STATUS REPORT ON SPECIAL INDEPENDENT COMMITTEE INVESTIGATION; PROVIDES UPDATES ON MANAGEMENT'S INTERNAL CONTROL REVIEW EFFORTS AND ON LEGAL PROCEEDINGS**

MCLEAN, Va., September 28, 2007 /PRNewswire-FirstCall/ -- Sunrise Senior Living, Inc. (NYSE: SRZ) today announced an update on the status of the independent investigation being conducted by the Special Independent Committee of its Board of Directors, provided an update on management's Sarbanes-Oxley Section 404 internal control review efforts and provided an update on legal proceedings.

**Special Independent Committee Investigation**

As previously disclosed, in December 2006, Sunrise's Board of Directors established a Special Independent Committee to review certain allegations made by the Service Employees International Union ("SEIU") that questioned the timing of certain stock option grants to Sunrise directors and officers over a period of time, and stock sales by certain directors in the months prior to the May 2006 announcement of the Company's accounting review. As also previously disclosed, in March 2007, Sunrise's Board of Directors expanded the scope of the Special Independent Committee's mandate to include the review of facts and circumstances relating to the historical accounting treatment of certain categories of transactions in the pending restatement, and to develop recommendations regarding any remedial measures, including those pertaining to internal controls and processes over financial reporting, that it may determine to be warranted. The Special Independent Committee, advised by its independent counsel, WilmerHale, has been conducting that investigation. In support of the investigation, WilmerHale engaged FTI Consulting, Inc. and Huron Consulting Group, forensic accounting firms, to provide technical accounting guidance and analysis, as well as to assist with document collection and review, interview support, and transaction review.

The Special Independent Committee has now concluded the fact-finding portion of its investigation with respect to three issues. The first involves the timing of certain stock option grants. The second involves the facts and circumstances with respect to two significant categories of errors in the pending restatement relating to real estate accounting: accounting for the effect of certain Sunrise guarantees and commitments on timing of sale accounting and recognition of income upon sale of real estate; and accounting for allocation of profits and losses in those ventures in which Sunrise's partners received a preference on cash flow. The third involves whether directors and executive officers had non-public knowledge of possible accounting errors related to these real estate transactions prior to Sunrise's May 2006 announcement of its accounting review.

As described in greater detail below, the Special Independent Committee found:

- no evidence of backdating or other intentional misconduct with respect to the grants on the 38 grant dates examined, including those specifically questioned by the SEIU, or the possible errors identified by the Special Independent Committee in the accounting for stock options;

- no evidence of an intention to reach an inappropriate accounting result with respect to the two categories of real estate accounting errors reviewed, no knowledge that these accounting errors were incorrect at the time they were made, and no evidence that information was concealed from review by the external auditors at the time the accounting judgments were made; and

- no evidence that any director or officer who traded in the months prior to the announcement of the accounting review had material non-public information relating to either of these two categories of real estate accounting errors.

The investigation of the Special Independent Committee is continuing with respect to certain other categories of restatement items and issues identified in work done to date, primarily related to certain accruals and reserves, which may produce material adjustments to the Company's historical financial statements in addition to those previously disclosed by the Company, and with respect to remedial recommendations. Based on the current status of its review, the Special Independent Committee expects to complete its review by December 15, 2007.

The Special Independent Committee believes that its investigation of the three issues reported on today was comprehensive and thorough. The investigation included the collection and review, by manual inspection, electronic word search and other means, of more than 2.5 million electronic and hard copy documents and interviews of 37 individuals, including current and former employees, current and former directors and audit engagement team members of its external auditor, Ernst & Young, LLP ("E&Y"). The Special Independent Committee held frequent in-person meetings throughout the course of the investigation, as well as regular update calls and other communications with WilmerHale and its experts. The Company and its officers, employees and directors cooperated fully with the investigation. The Special Independent Committee and WilmerHale also received good cooperation from other individuals, including E&Y professionals and former employees of the Company.

<u>Options Investigation.</u> With respect to its options investigation, the Special Independent Committee comprehensively examined grants made on 14 grant dates comprising approximately 46% of the options granted during the period from June 1996 (when the Company went public through an IPO) to May 2006. Those grants included all of the grants specifically questioned by SEIU, including all grants at the four lowest quarterly closing stock prices for Sunrise stock in each quarter that involved more than 80,000 shares (split-adjusted) regardless of the recipients; and all of the grants at the four lowest monthly closing stock prices in each month that involved grants to directors or executive officers regardless of size, or grants of more than 500,000 shares (split-adjusted) in aggregate. The Special Independent Committee also reviewed certain limited written material on additional grants made on 24 other grant dates, which represent all of the remaining post-IPO grants involving 20 or more employees, officers and/or directors and/or one or more senior Sunrise officers. Based on its review of this written material for the 24 different grant dates, the Special Independent Committee concluded that no further review of those grants was warranted. The Special Independent Committee found no evidence of backdating or other intentional misconduct in connection with the award of grants that were examined.

2

Source: SUNRISE SENIOR LIVIN, 8-K, October 01, 2007

The Special Independent Committee identified a number of accounting issues under U.S. Generally Accepted Accounting Principles ("GAAP") in connection with certain of these option grants. The Special Independent Committee concluded that these accounting issues did not result from intentional misconduct by Company employees. Evidence developed during the course of the investigation indicates that these accounting issues were caused, or contributed to, by a variety of different factors, including but not limited to the improper application of GAAP, lack of technical expertise regarding appropriate GAAP standards, inadequate or poor recordkeeping, and inadequate controls. The grants identified by the Special Independent Committee investigation with possible accounting issues that have the potential to affect the accuracy of the Company's previously reported financial results include:

- The September 1998 option repricing, after which a substantial period of time elapsed from the date the Stock Option Committee approved the repricing and when most employees signed their repricing acknowledgments, and during which the Company's stock price increased substantially.

- Grants made in 2000 and 2001 in connection with an opportunity provided to certain employees with options exercisable above the then applicable market price to cancel those options and receive new, market-priced options.

- Three grants in which the exercise price for the options was set at the closing price for the Company's stock on the date of the grant, rather than at the closing price of the trading date immediately prior to the date of the grant, as contemplated by the terms of the Company's stock option plans.

- Certain grants which lacked sufficient documentation to determine when the stock option grant was authorized.

- Certain grants in connection with which the Company corrected administrative errors retroactively, which included adding grants to new hires who had been inadvertently omitted from a recommendation list and correcting the number of options granted to individuals.

- Certain grants in which the Company modified the terms of a grant after it was made.

- Certain grants in which the Company granted options to consultants but accounted for such options as grants issued to employees.

The Special Independent Committee has provided its findings to the Company. As disclosed in the Company's July 25, 2007 press release, the Company has concluded that errors were made in connection with the accounting for the September 1998 repricing and certain other stock option grants.

The Company is in the process of quantifying the amount of the non-cash stock compensation expense that it will be required to record as part of its restatement related to the 1998 repricing and these other stock option grants, which amount is likely to be material. The Company has retained Navigant Consulting, Inc. to assist with stock compensation matters. Once the Company has quantified such amount and E&Y has reviewed the Company's calculation, the Company will promptly report such amount. The Company is also reviewing whether there are any tax impacts with respect to the accounting errors relating to stock options.

3

<u>Review of Two Significant Categories of Real Estate -Related Accounting Errors.</u> The Special Independent Committee also has concluded its fact finding on:

- the accounting for the effect of certain Sunrise guarantees and commitments on timing of sale accounting and recognition of income upon sale of real estate; and

- the accounting for allocation of profits and losses in those ventures in which Sunrise's partners received a preference on cash flow.

Errors in the first category resulted from erroneous judgments made by the Company regarding the proper application of GAAP to account for sales of real estate where Sunrise had continuing involvement in the real estate in the form of guarantees and preferences to partners. The nature of certain guarantees and their duration and the recognition of the sales and/or income from the sales of the property were not concealed from review by the external auditors at the time the accounting judgments were made. Based on the totality of the evidence available to the Special Independent Committee, the Special Independent Committee concluded that this large group of errors did not result from an intention to reach an inappropriate accounting result and that the erroneous accounting judgments in this category were not known to be incorrect at the time they were made.

Errors in the second category resulted from failure by the Company to understand relevant accounting guidance regarding accounting for preferences in distributions of income to joint venture partners. The preferences were contained in written transaction documents and the accounting analyses for these preferences were documented in writing and reviewed by the company's external auditors in a timely manner. Based on the totality of the evidence available to the Special Independent Committee, the Special Independent Committee concluded that these errors did not result from an intention to reach an inappropriate accounting result and that the erroneous accounting analyses were not known to be incorrect at the time they were prepared.

<u>Review of Insider Trading by Certain Directors and Executive Officers.</u> The Special Independent Committee investigated whether certain directors and executive officers had material, non-public knowledge of the two real estate accounting errors discussed above when they sold Sunrise stock in the months prior to May 2006 when Sunrise announced its accounting review. The Special Independent Committee concluded that Sunrise's executive officers and members of its Board of Directors had no such knowledge at the time that any of those trades were made.

**Sarbanes-Oxley Section 404 Internal Control Review Efforts of Management**

As previously disclosed by the Company, the occurrence of a restatement of previously issued financial statements is a strong indicator that material weaknesses in internal controls exist. In connection with the Company's pending restatement of its historical financial statements, the Company's management is evaluating management's report on internal controls included in the Company's previously filed Annual Report on Form 10-K for the year ended December 31, 2005 to assess the effectiveness of its internal control over financial reporting as of December 31, 2005. To date, the Company's management has preliminarily identified the following three control deficiencies:

4

- Lack of personnel with sufficient technical accounting expertise to determine and document the appropriate application of accounting principles. This deficiency impacted the Company's accounting for real estate sales, capitalization of direct and indirect costs of real estate projects, equity accounting for variable interest entities, accounting for guarantees and accounting for stock options.

- Lack of policies and procedures to ensure proper accounting of significant transactions. This deficiency impacted the Company's accounting for real estate sales and equity accounting.

- Lack of a sufficient level of experienced personnel to enable the Company to close its books in a timely and accurate manner.

Additional control deficiencies may be identified by the Company's management or the Special Independent Committee as part of its ongoing review. At the present time, the Company's management expects to conclude that some of the identified control deficiencies were material weaknesses as of December 31, 2005. In addition, E&Y's audit reports are also expected to concur with management's preliminary conclusions regarding weaknesses in internal controls over financial reporting by the Company as of December 31, 2005. The Audit Committee and management have been evaluating appropriate remediation measures to address these control deficiencies and intend to develop and oversee a comprehensive remediation plan to address these control deficiencies.

The Company's management believes the accounting errors previously disclosed by the Company indicate a need to improve the quality and staffing of the Company's internal accounting resources. The following are among the changes implemented by the Company to date, which are in addition to any remedial measures that may be recommended by the Special Independent Committee and adopted by the Board following completion of the Special Independent Committee investigation:

- *New Chief Financial Officer*. As previously disclosed, on September 6, 2007, Richard J. Nadeau was hired as the Company's new Chief Financial Officer.

- *New Chief Accounting Officer*. As previously disclosed, in April 2006, Julie A. Pangelinan was hired as the Company's new Chief Accounting Officer.

- *Expansion of Accounting Policy Group*. The Company has expanded its accounting policy group from one professional to six  professionals, including five certified public accountants.

- *SOX Compliance*. In October 2006, the Company hired a Senior Director of SOX Compliance, who reports to the Chief Accounting Officer.

5

Source: SUNRISE SENIOR LIVIN, 8-K, October 01, 2007

- *Other Additional Accounting Personnel.* In June 2006, the Company added the position of Assistant Controller. In October 2006, the Company named a new Controller. The Company has also added four additional staff members in the financial reporting group, three additional corporate staff members in the international reporting group and three additional staff members in the operations accounting group.

Separately, at the Board level and as previously disclosed, in June 2007, the Company's Board of Directors appointed Stephen D. Harlan as a new member of the Board and as a member of the Audit Committee. In connection with his appointment to the Audit Committee, the Board determined that Mr. Harlan qualified as an "audit committee financial expert" as defined under the rules of the SEC.

As also previously disclosed, effective September 5, 2007 Sunrise's Board of Directors also appointed Lynn Krominga as a new member of the Board. On September 28, 2007, the Board of Directors appointed Ms. Krominga as a member of the Audit Committee.

## Update on Legal Proceedings

CGB Occupational Therapy. As previously disclosed, Sunrise is a defendant in a lawsuit filed by CGB Occupational Therapy, Inc. ("CGB") in September 2000 in the U.S. District Court for the Eastern District of Pennsylvania. CGB provided therapy services to two nursing home communities in Pennsylvania that were owned by RHA Pennsylvania Nursing Homes ("RHA") and managed by one of Sunrise's subsidiaries. In 1998, RHA terminated CGB's contract. In its lawsuit, CGB alleged, among other things, that in connection with that termination, Sunrise tortiously interfered with CGB's contractual relationships with RHA and several of the therapists that CGB employed on an at-will basis. In a series of court decisions during 2002 through 2005, CGB was awarded compensatory damages of $109,000 and punitive damages of $2 million. In 2005, Sunrise appealed the punitive damages award. On August 23, 2007, a panel of the U.S. Court of Appeals for the Third Circuit vacated the $2 million punitive damages award and remanded the case with instructions that the district court enter a new judgment for punitive damages in the amount of $750,000. On September 5, 2007, CGB filed a petition for rehearing with the U.S. Court of Appeals for the Third Circuit. That petition was denied on September 24, 2007. Either party may file a petition for certiorari in the Supreme Court by December 24, 2007.

Trinity OIG Investigation and *Qui Tam* Action. As previously disclosed, on September 14, 2006, Sunrise acquired all of the outstanding stock of Trinity Hospice, Inc. ("Trinity") for a purchase price of approximately $76 million. As a result of this transaction, Trinity became an indirect, wholly owned subsidiary of Sunrise. On January 3, 2007, Trinity received a subpoena from the Phoenix field office of the Office of the Inspector General of the Department of Health and Human Services ("OIG") requesting certain information regarding Trinity's operations in three locations for the period between January 1, 2000 through June 30, 2006, a period that is prior to the Company's acquisition of Trinity. The Company was advised that the subpoena was issued in connection with an investigation being conducted by the Commercial Litigation Branch of the U.S. Department of Justice and the civil division of the U.S. Attorney's office in Arizona. The subpoena indicates that the OIG is investigating possible improper Medicare billing under the Federal False Claims Act ("FCA"). In addition to recovery of any Medicare reimbursements previously paid for false claims, an entity found to have submitted false claims under the FCA may be subject to treble damages plus a fine of between $5,500 and $11,000 for each false claim submitted. Trinity has complied with the subpoena and continues to supplement its responses as requested.

6

On September 11, 2007, Trinity and Sunrise were served with a Complaint filed on September 5, 2007 in the United States District Court for the District of Arizona. That filing amended a Complaint filed under seal on November 21, 2005 by four former employees of Trinity under the *qui tam* provisions of the FCA. The *qui tam* provisions authorize persons ("relators") claiming to have evidence that false claims may have been submitted to the United States to file suit on behalf of the United States against the party alleged to have submitted such false claims *Qui tam* suits remain under seal for a period of at least 60 days to enable the government to investigate the allegations and to decide whether to intervene and litigate the lawsuit, or, alternatively, to decline to intervene, in which case the *qui tam* Plaintiff, or "relator," may proceed to litigate the case on behalf of the United States. *Qui tam* relators are entitled to 15% to 30% of the recovery obtained for the United States by trial or settlement of the claims they file on its behalf. On June 6, 2007, the Department of Justice and the U.S. Attorney for Arizona filed a Notice with the Court advising of its decision not to intervene in the case, indicating that its investigation was still ongoing. This action followed previous applications by the U.S. Government for extensions of time to decide whether to intervene. As a result, on July 10, 2007, the Court ordered the Compliant unsealed and the litigation to proceed. The matter is therefore currently being litigated by the four individual relators. However, under the FCA, the U.S. Government could still intervene in the future. The amended Complaint alleges that during periods prior to the acquisition by Sunrise, Trinity engaged in certain actions intended to obtain Medicare reimbursement for services rendered to beneficiaries whose medical conditions were not of a type rendering them eligible for hospice reimbursement and violated the FCA by submitting claims to Medicare as if the services were covered services. The relators allege in their amended Complaint that the total loss sustained by the United States is probably in the $75 million to $100 million range. The original Complaint named KRG Capital, LLC (an affiliate of former stockholders of Trinity) and Trinity Hospice LLC (a subsidiary of Trinity) as defendants. The amended Complaint names Sunrise Senior Living, Inc., KRG Capital, LLC and Trinity as defendants. The lawsuit is styled *United States ex rel. Joyce Roberts, et al., v. KRG Capital, LLC, et al.*, CV05 3758 PHX-MEA (D. Ariz.).

Sunrise is unable at this time to estimate the possible loss or range of loss relating to this matter.

IRS Audit. By letter dated August 28, 2007, the Company was advised that the Internal Revenue Service will be auditing its federal income tax return for the year ended December 31, 2005. The Company believes that the audit will consider the pending restatement of the Company's historical financial statements. On September 27, 2007, the Company was orally advised that the IRS will also be auditing the Company's employment tax returns.

Lawsuit Filed by Former CFO. On September 18, 2007, Bradley B. Rush, the Company's former Chief Financial Officer, filed suit against the Company in the Circuit Court of Fairfax County, Virginia, relating to the termination of his employment. As previously

7

disclosed, on April 23, 2007, Mr. Rush was suspended with pay. The action was taken by the Board of Directors following a briefing of the independent directors by Wilmer Hale, independent counsel to the Special Independent Committee. The Board concluded, among other things, that actions taken by Mr. Rush were not consistent with the document retention directives issued by the Company. Mr. Rush's employment thereafter was terminated on May 2, 2007. Mr. Rush's lawsuit asserts that his termination was part of an alleged campaign of retaliation against him for purportedly uncovering and seeking to address accounting irregularities, and it contends that his termination was not for "cause" under the Company's Long Term Incentive Cash Bonus Plan and prior awards made to him of certain stock options and shares of restricted stock, to which he claims entitlement notwithstanding his termination. Mr. Rush also asserts a claim for defamation arising out of comments attributed to the Company concerning the circumstances of his earlier suspension of employment. His complaint seeks compensatory damages in an amount of not more than $13 million, and punitive damages in an amount of not more than $350,000. The Company believes that the allegations in Mr. Rush's complaint lack both factual and legal merit, and it intends to defend vigorously against his claims.

**About Sunrise Senior Living**

Sunrise Senior Living, a McLean, Va.-based company, employs approximately 40,000 people. As of June 30, 2007, Sunrise operated 453 communities in the United States, Canada, Germany and the United Kingdom, with a combined capacity for more than 53,000 residents. At quarter end, Sunrise also had 38 communities under construction in these countries with a combined capacity for 6,000 additional residents. Sunrise offers a full range of personalized senior living services, including independent living, assisted living, care for individuals with Alzheimer's and other forms of memory loss, as well as nursing, rehabilitative and hospice care. Sunrise's senior living services are delivered by staff trained to encourage the independence, preserve the dignity, enable freedom of choice and protect the privacy of residents. To learn more about Sunrise, please visit http://www.sunriseseniorliving.com.

**Forward-Looking Statements**

Certain matters discussed in this press release - including the expected timing for completion of the Special Independent Committee's review - may be forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. Although Sunrise believes the expectations reflected in such forward-looking statements are based on reasonable assumptions, there can be no assurances that its expectations will be realized. Sunrise's actual results could differ materially from those anticipated in these forward-looking statements as a result of various factors, including, but not limited to, completion of the Company's restatement of its historical financial statements, identification of any additional matters requiring restatement, the length of time needed for Sunrise to complete the restatement and for Ernst & Young LLP to complete its procedures for any reason, including the detection of new errors or adjustments, the time required for the Special Independent Committee to complete its review, including with respect to any necessary remedial measures, and for the Company to clear comments with the SEC, the findings of the Special Independent Committee review, including with respect to any necessary remedial measures, the time required for the Company to prepare and file an amended 2005 Form 10-K and its Form 10-Qs for the first three quarters of 2006, its 2006 Form 10-K and its Form 10-Qs for the first and second quarters of 2007 and its Form 10-Qs for subsequent quarters that are delayed, the outcome of the SEC's investigation, the outcome of pending putative class

8

action and derivative litigation, the outcome of the Trinity OIG investigation and *qui tam* proceeding, the outcome of the IRS audit of the Company's tax return for the tax year ended December 31, 2005 and employment tax returns, the outcome of the exploration of strategic alternatives, the delisting of the Company's stock from the NYSE in the event the Company does not file its 2006 Form 10-K prior to the expiration of its NYSE listing extension, the Company's ability to comply with the terms of the amendment of its bank credit facility or to obtain a further extension of the period for providing the lenders with required financial information, development and construction risks, acquisition risks, licensing risks, business conditions, competition, changes in interest rates, the Company's ability to manage its expenses, market factors that could affect the value of the Company's properties, the risks of downturns in general economic conditions, satisfaction of closing conditions, availability of financing for development and acquisitions and other risks detailed in the Company's annual report on Form 10-K filed with the SEC. The Company assumes no obligation to update or supplement forward-looking statements that become untrue because of subsequent events.

**SOURCE:** Sunrise Senior Living

**CONTACT:** Lisa Mayr, Vice President, Investor Relations and Capital Market, Sunrise Senior Living, +1-703-744-1787 CO: Sunrise Senior Living

Created by 10KWizard    www.10KWizard.com

Source: SUNRISE SENIOR LIVIN, 8-K, October 01, 2007

# EXHIBIT  6



# FORM 8-K

## SUNRISE SENIOR LIVING INC - SRZ

**Filed: December 21, 2007 (period: December 19, 2007)**

Report of unscheduled material events or corporate changes.

# Table of Contents

8-K

**Item 5.02.**    Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.

**Item 8.01.**    Other Events.

**Item 9.01.**    Financial Statements and Exhibits.

SIGNATURES
INDEX TO EXHIBITS
EX-99.1 (Exhibits not specifically designated by another number and by investment companies)

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

## FORM 8-K

### CURRENT REPORT PURSUANT TO SECTION 13 OR 15 (d)
### OF THE SECURITIES EXCHANGE ACT OF 1934

Date of Report (Date of earliest event reported): **December 19, 2007**

# SUNRISE SENIOR LIVING, INC.

(Exact name of registrant as specified in its charter)

| **Delaware** | **1-16499** | **54-1746596** |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Commission File Number) | (I.R.S. Employer Identification No.) |

**7902 Westpark Drive**
**McLean, Virginia 22102**
(Address of principal executive offices) (Zip Code)

**(703) 273-7500**
(Registrant's telephone number, including area code)

**Not Applicable**
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 5.02.  Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**

The date of Thomas Newell's separation as President of Sunrise Senior Living, Inc. (the "Company") was December 19, 2007. For additional information, please refer to the Company's press release dated December 20, 2007, a copy of which is attached as Exhibit 99.1 to this Form 8-K and is incorporated herein by reference.

**Item 8.01. Other Events.**

On December 20, 2007, the Company issued a press release announcing completion of the fact-finding portion of the investigation of the Special Independent Committee of the Board of Directors, personnel changes and the Company's plans to file restated financial statements by no later than March 17, 2008. A copy of the Company's press release is attached as Exhibit 99.1 hereto and is incorporated herein by reference.

**Item 9.01. Financial Statements and Exhibits.**

(a) Not applicable

(b) Not applicable

(c) Not applicable

(d) Exhibits.

| Exhibit No. | Description |
| --- | --- |
| 99.1 | Company press release dated December 20, 2007 |

2

Source: SUNRISE SENIOR LIVIN, 8-K, December 21, 2007

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

SUNRISE SENIOR LIVING, INC.
(Registrant)

Date: December 21, 2007                    By:     /s/ John F. Gaul

John F. Gaul
General Counsel

3

Source: SUNRISE SENIOR LIVIN, 8-K, December 21, 2007

**INDEX TO EXHIBITS**

| Exhibit No. | Exhibit Name | Page No. |
|---|---|---|
| 99.1 | Company press release dated December 20, 2007 | 5 |

4

Source: SUNRISE SENIOR LIVIN, 8-K, December 21, 2007

**NEWS RELEASE**
**For immediate release**
**December 20, 2007**

**Contact: Lisa Mayr**
**Vice President, Investor**
**Relations and Capital Markets**
**(703) 744-1787**

### Sunrise Announces Completion of Special Independent Committee
### Fact Finding Investigation and Personnel Changes

### Plans to File Restated Financial Statements by no later than March 17, 2008

MCLEAN, Va., Dec. 20/PRNewswire-FirstCall/ -- Sunrise Senior Living, Inc. (NYSE: SRZ) today announced the completion of the fact-finding portion of the previously disclosed investigation by the Special Independent Committee of the Board of Directors. As previously reported, this portion of the investigation primarily related to certain accruals and reserves. The Special Independent Committee's review of these issues found that inappropriate accounting occurred during the third quarter of 2003 through the fourth quarter of 2005. The net effect of adjustments arising from these findings, coupled with adjustments to other items, are not expected to increase the previously disclosed total restatement impacts.

Following consideration by the Company's Board of Directors of the results of the Special Independent Committee's work, the Board of Directors today announced the separation from the Company of the following individuals, effective immediately: Thomas Newell, President since April 2000; Larry Hulse, Chief Executive Officer of the Company's insurance captive since August 2005 and the Company's Chief Financial Officer from April 2000 to August 2005; and Carl Adams, Treasurer since November 2005 and former Chief Accounting Officer from 2000 through November 2004.

The entire senior finance team that was in place during the years covered by the pending restatement is now no longer with the Company. Sunrise will complete its restatement under the leadership of a new senior finance team led by Chief Financial Officer Richard J. Nadeau, who joined the Company in September 2007, and Chief Accounting Officer Julie A. Pangelinan, who joined the Company in April 2006.

Stephen D. Harlan, the Chairman of the Audit Committee of the Board of Directors, said: "The Special Committee's investigation and the actions taken by the directors reflect the Board's commitment to accurate financial reporting and strong internal controls and to act in the best interests of the Company and all of its stakeholders, including our investors, residents, their families and team members. These actions are an important step forward in the process of restoring confidence in the Company's management and financial reporting."

The Special Independent Committee's work is continuing with respect to appropriate remedial measures pertaining to internal controls and processes over financial reporting and it will report to the Board, as appropriate, recommended improvements to processes and procedures as soon as practicable.

---

The Company currently plans to file its 2006 Form 10-K no later than the NYSE trading extension date of March 17, 2008. In an effort to provide investors with current financial information at the earliest practicable date, the Company plans first to file its 2006 Form 10-K, which will include restated 2005 and 2004 financial statements and restated 2005 unaudited quarterly financial information as required by the instructions to Form 10-K. The 2006 Form 10-K filing is expected to be followed by the filing of the 2007 Form 10-K, Form 10-Q for the quarter ending March 31, 2008 and Form 10-Qs for the quarters ended March 31, 2007, June 30, 2007 and September 30, 2007. The Company no longer plans to file a 2005 Form 10-K/A or 2006 Form 10-Qs.

**About Sunrise Senior Living**

Sunrise Senior Living, a McLean, Va.-based company, employs approximately 40,000 people. As of September 30, 2007, Sunrise operated 454 communities in the United States, Canada, Germany and the United Kingdom, with a combined capacity for more than 53,000 residents. At quarter end, Sunrise also had 40 communities under construction in these countries with a combined capacity for 6,000 additional residents. Sunrise offers a full range of personalized senior living services, including independent living, assisted living, care for individuals with Alzheimer's and other forms of memory loss, as well as nursing, rehabilitative and hospice care. Sunrise's senior living services are delivered by staff trained to encourage the independence, preserve the dignity, enable freedom of choice and protect the privacy of residents. To learn more about Sunrise, please visit http://www.sunriseseniorliving.com.

**Forward-Looking Statements**

Certain matters discussed in this press release may be forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. Although Sunrise believes the expectations reflected in such forward- looking statements are based on reasonable assumptions, there can be no assurances that its expectations will be realized. Sunrise's actual results could differ materially from those anticipated in these forward-looking statements as a result of various factors, including, but not limited to, completion of the Company's restatement of its historical financial statements; the length of time needed for Sunrise to complete the restatement and for Ernst & Young LLP to complete its audit procedures for any reason, including the detection of new errors or adjustments; the time required for the Special Independent Committee to complete its work on remedial measures pertaining to internal controls and processes over financial reporting that it may determine to be warranted, the time required for the Company to prepare and file its 2006 Form 10-K, 2007 Form 10-K, Form 10-Q for the quarter ending March 31, 2008 and Form 10-Qs for the first three quarters of 2007 and for Ernst & Young to complete its work on its audits of the 2006 and 2007 financial statements and its reviews of the Form 10-Qs; the outcome of the SEC's investigation; the outcomes of pending putative class action and derivative litigation; the outcome of the lawsuit filed by the Company's former CFO; the outcome of the Trinity OIG investigation and qui tam proceeding; the outcome of the IRS audit of the Company's tax return for the tax year ended December 31, 2005 and employment tax returns; the outcome of the exploration of strategic alternatives; the delisting of the Company's stock from the NYSE in the event the Company does not file its 2006 Form 10-K prior to the expiration of its NYSE trading extension; the Company's ability to comply with the terms of the amendment of its bank credit facility or to obtain a further extension of the period for providing the lenders with required financial information; development and construction risks; acquisition risks; licensing risks; business conditions; competition; changes in interest rates; the Company's ability to manage its expenses; market factors that could affect the value of the Company's properties; the risks of downturns in general economic conditions; availability of financing for development and acquisitions; and other risks detailed in the Company's latest annual report on Form 10-K filed with the SEC. The Company assumes no obligation to update or supplement forward-looking statements that become untrue because of subsequent events.

Created by 10K Wizard    www.10KWizard.com

# EXHIBIT 7



# FORM 8-K

## SUNRISE SENIOR LIVING INC - SRZ

**Filed: April 26, 2007 (period: April 23, 2007)**

Report of unscheduled material events or corporate changes.

# Table of Contents

8-K

**Item 5.02.**     Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.

**Item 7.01.**     Regulation FD Disclosure.

**Item 9.01.**     Financial Statements and Exhibits.

SIGNATURES

Exhibit Index

EX-99.1 (Exhibits not specifically designated by another number and by investment companies)

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

# FORM 8-K

### CURRENT REPORT PURSUANT TO SECTION 13 OR 15 (d)

### OF THE SECURITIES EXCHANGE ACT OF 1934

Date of Report (Date of earliest event reported): **April 23, 2007**

# SUNRISE SENIOR LIVING, INC.
(Exact name of registrant as specified in its charter)

| **Delaware** | **1-16499** | **54-1746596** |
|---|---|---|
| (State or other jurisdiction of | (Commission | (I.R.S. Employer |
| incorporation or organization) | File Number) | Identification No.) |

**7902 Westpark Drive**
**McLean, Virginia 22102**
(Address of principal executive offices) (Zip Code)

**(703) 273-7500**
(Registrant's telephone number, including area code)

**Not Applicable**
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 5.02. Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**

On April 23, 2007, Bradley B. Rush, the chief financial officer of Sunrise Senior Living, Inc. (the "Company"), was suspended with pay. The action was taken by the Board following a briefing to the independent directors by independent legal counsel retained by the special independent committee of the Board. As previously disclosed, the special independent committee is reviewing recent insider sales of the Company's stock, the Company's historical practices related to stock option grants and the facts and circumstances relating to the historical accounting treatment of certain categories of transactions in the previously announced pending restatement of the Company's financial statements (the "Special Committee Investigation"). The Board concluded that actions taken by Mr. Rush were not consistent with the document retention directives issued by the Company. Mr. Rush has served as the chief financial officer of the Company since August 2005.

Additionally, on April 23, 2007, the board appointed Julie A. Pangelinan, chief accounting officer, to the additional position of acting chief financial officer. Ms. Pangelinan, age 43, joined the Company as its chief accounting officer in April 2006. Prior to joining the Company, Ms. Pangelinan worked as vice president, accounting policy, for Marriott International, Inc., a worldwide operator and franchisor of hotels and related lodging facilities, from April 2003 to April 2006, and as senior director of accounting policy from August 2000 to May 2003. While serving in this capacity, Ms. Pangelinan was responsible for providing proactive leadership on accounting policy for business transactions and deal structures, as well as managing all external financial reporting and regulatory filings and ensuring compliance with the rules of the Securities and Exchange Commission and generally accepted accounting principles.

The Company's press release, dated April 25, 2007, related to the matters discussed under this Item 5.02 is filed herewith as Exhibit 99.1 (the "Press Release").

**Item 7.01. Regulation FD Disclosure.**

On April 25, 2007, representatives of the Company responded to questions from analysts regarding the matters addressed in the Press Release. In response to analyst reports of these conversations, the Company makes the following statements:

The Special Committee Investigation is ongoing, to date, no reports have been rendered by the special independent committee or its counsel, no conclusions have been reached and no assurance can be given as to the special independent committee's ultimate findings and recommendations. Further, no assurance can be given as to the timing for completion of the Special Committee Investigation or the impact the items described in Item 5.02 will have on the pending restatement of the Company's historical financial statements.

**Item 9.01. Financial Statements and Exhibits.**

(a) Not applicable

(b) Not applicable

(c) Not applicable

(d) Exhibits.

| Exhibit No. | Description |
|---|---|
| 99.1 | Press Release dated April 25, 2007 |

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

SUNRISE SENIOR LIVING, INC.
(Registrant)


Date: <u>April 25, 2007</u>                    By: <u>/s/ Thomas B. Newell          </u>
                                       Thomas B. Newell
                                       President

_____

Source: SUNRISE SENIOR LIVIN, 8-K, April 26, 2007

**Exhibit Index**

| Exhibit No. | Description |
|---|---|
| 99.1 | Sunrise Press Release dated April 25, 2007 |

**NEWS RELEASE**
**For Immediate Release**
**April 25, 2007**

**Contact: Lisa Mayr**
**Vice President, Investor**
**Relations and Capital Markets**
**(703) 744-1787**

### SUNRISE SENIOR LIVING SUSPENDS CHIEF FINANCIAL OFFICER AND ANNOUNCES APPOINTMENT OF INTERIM CFO

MCLEAN, VA -- Sunrise Senior Living, Inc. (NYSE: SRZ) announced today that on April 23, 2007, Bradley B. Rush, the Company's chief financial officer, was suspended with pay. The action was taken by the Board following a briefing to the independent directors by independent legal counsel retained by the special independent committee of the Board. As previously disclosed, the special independent committee is reviewing recent insider sales of the Company's stock, the Company's historical practices related to stock option grants and the facts and circumstances relating to the historical accounting treatment of certain categories of transactions in the previously announced pending restatement of the Company's financial statements. The Board concluded that actions taken by Mr. Rush were not consistent with the document retention directives issued by the Company.

The Company also announced that on April 23, 2007, the Board appointed Julie A. Pangelinan, chief accounting officer, to the additional position of acting chief financial officer. Ms. Pangelinan joined the Company as its chief accounting officer in April 2006. Prior to joining the Company, Ms. Pangelinan worked as vice president, accounting policy, for Marriott International, Inc., a worldwide operator and franchisor of hotels and related lodging facilities, from April 2003 to April 2006, and as senior director of accounting policy from August 2000 to May 2003. While serving in this capacity, Ms. Pangelinan was responsible for providing proactive leadership on accounting policy for business transactions and deal structures, as well as managing all external financial reporting and regulatory filings and ensuring compliance with the rules of the Securities and Exchange Commission and generally accepted accounting principles.

---

**About Sunrise**

Sunrise Senior Living, a McLean, Va., based company, employs approximately 40,000 people. As of December 31, 2006, Sunrise operated 440 communities in the United States, Canada, Germany and the United Kingdom, with a combined capacity for more than 52,000 residents. At year end, Sunrise also had 41 communities under construction in these countries with a combined capacity for more than 6,000 additional residents. Sunrise offers a full range of personalized senior living services, including independent living, assisted living, care for individuals with Alzheimer's and other forms of memory loss, as well as nursing, rehabilitative and hospice care. Sunrise's senior living services are delivered by staff trained to encourage the independence, preserve the dignity, enable freedom of choice and protect the privacy of residents. To learn more about Sunrise, please visit http://www.sunriseseniorliving.com.

**Forward-Looking Statements**

*Certain matters discussed in this press release may be forward- looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. Although Sunrise believes the expectations reflected in such forward-looking statements are based on reasonable assumptions, there can be no assurances that its expectations will be realized. Sunrise's actual results could differ materially from those anticipated in these forward- looking statements as a result of various factors, including, but not limited to, risks that are detailed in the Company's annual report on Form 10-K filed with the SEC. The Company assumes no obligation to update or supplement forward-looking statements that become untrue because of subsequent events.*

###

Created by 10K Wizard    www.10KWizard.com

# EXHIBIT  8



# FORM 8-K

## SUNRISE SENIOR LIVING INC - SRZ

**Filed: May 03, 2007 (period: May 02, 2007)**

Report of unscheduled material events or corporate changes.

# Table of Contents

8-K

**Item 5.02.**    Departure of Directors or Certain Officers: Election of Directors:

**Item 9.01.**    Financial Statements and Exhibits.

SIGNATURES

Exhibit Index

EX-99.1 (Exhibits not specifically designated by another number and by investment companies)

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

FORM 8-K

CURRENT REPORT PURSUANT TO SECTION 13 OR 15 (d)
OF THE SECURITIES EXCHANGE ACT OF 1934

Date of Report (Date of earliest event reported): May 2, 2007

SUNRISE SENIOR LIVING, INC.
(Exact name of registrant as specified in its charter)

| Delaware | 1-16499 | 54-1746596 |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Commission File Number) | (I.R.S. Employer Identification No.) |

7902 Westpark Drive
McLean, Virginia 22102
(Address of principal executive offices) (Zip Code)

(703) 273-7500
(Registrant's telephone number, including area code)

Not Applicable
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to
simultaneously satisfy the filing obligation of the registrant under any of the
following provisions:

[_]  Written communications pursuant to Rule 425 under the Securities Act (17
     CFR 230.425)

[_]  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR
     240.14a-12)

[_]  Pre-commencement communications pursuant to Rule 14d-2(b) under the
     Exchange Act (17 CFR 240.14d-2(b))

[_]  Pre-commencement communications pursuant to Rule 13e-4(c) under the
     Exchange Act (17 CFR 240.13e-4(c))

Item 5.02. Departure of Directors or Certain Officers; Election of Directors;
Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.

     Effective May 2, 2007, the Board of Directors of Sunrise Senior Living,
Inc. (the "Company") terminated the employment of Bradley B. Rush for cause. As
previously reported in the Company's current report on Form 8-K dated April 25,
2007 (the "Prior 8-K"), on April 23, 2007, Mr. Rush had been suspended with pay
from his position as the Company's chief financial officer.

     As also previously reported in the Prior 8-K, the Board appointed Julie A.
Pangelinan, chief accounting officer, to the additional position of acting chief
financial officer, effective April 23, 2007.

     The Company's press release, dated May 3, 2007, related to the matters
discussed under this Item 5.02 is filed herewith as Exhibit 99.1 (the "Press
Release").

Item 9.01.  Financial Statements and Exhibits.

          (a) Not applicable

          (b) Not applicable

          (c) Not applicable

          (d) Exhibits.

| Exhibit No. | Description |
|---|---|
| 99.1 | Press Release dated May 3, 2007 |

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

                                    SUNRISE SENIOR LIVING, INC.
                                    (Registrant)


Date: May 3, 2007                   By:  /s/  John F. Gaul
      -----------                        ----------------------
                                         John F. Gaul
                                         General Counsel



                        Exhibit Index



        Exhibit No.                     Description
        -----------                     -----------

          99.1                  Press Release dated May 3, 2007

Source: SUNRISE SENIOR LIVIN, 8-K, May 03, 2007

NEWS RELEASE
For Immediate Release
May 3, 2007

Vice President, Investor
Relations and Capital Markets
(703) 744-1787

SUNRISE SENIOR LIVING TERMINATES EMPLOYMENT OF PREVIOUSLY SUSPENDED
CHIEF FINANCIAL OFFICER

MCLEAN, VA -- Sunrise Senior Living, Inc. (NYSE: SRZ) announced today that,
effective May 2, 2007, its Board of Directors terminated the employment of
Bradley B. Rush for cause. As previously announced in a press release issued by
the Company on April 25, 2007, on April 23, 2007, Mr. Rush had been suspended
with pay from his position as the company's chief financial officer.

As also previously announced on April 25, 2007, the Board appointed Julie A.
Pangelinan, chief accounting officer, to the additional position of acting chief
financial officer, effective April 23, 2007.

About Sunrise

Sunrise Senior Living, a McLean, Va., based company, employs approximately
40,000 people. As of December 31, 2006, Sunrise operated 440 communities in the
United States, Canada, Germany and the United Kingdom, with a combined capacity
for more than 52,000 residents. At year end, Sunrise also had 41 communities
under construction in these countries with a combined capacity for more than
6,000 additional residents. Sunrise offers a full range of personalized senior
living services, including independent living, assisted living, care for
individuals with Alzheimer's and other forms of memory loss, as well as nursing,
rehabilitative and hospice care. Sunrise's senior living services are delivered
by staff trained to encourage the independence, preserve the dignity, enable
freedom of choice and protect the privacy of residents. To learn more about
Sunrise, please visit http://www.sunriseseniorliving.com.

Forward-Looking Statements

Certain matters discussed in this press release may be forward- looking
statements within the meaning of the Private Securities Litigation Reform Act of
1995. Although Sunrise believes the expectations reflected in such
forward-looking statements are based on reasonable assumptions, there can be no
assurances that its expectations will be realized. Sunrise's actual results
could differ materially from those anticipated in these forward- looking
statements as a result of various factors, including, but not limited to, risks
that are detailed in the Company's annual report on Form 10-K filed with the
SEC. The Company assumes no obligation to update or supplement forward-looking
statements that become untrue because of subsequent events.

### ### ###

Created by 10KWizard    www.10KWizard.com

# EXHIBIT  9



**SUNRISE**
SENIOR LIVING

## News Release

### Sunrise Announces New $50 Million Repurchase Program

MCLEAN, Va., Nov. 17 /PRNewswire-FirstCall/ -- Sunrise Senior Living, Inc. (NYSE: SRZ) today announced that its Board of Directors has approved a new $50 million repurchase program. This program is effective immediately and extends through December 31, 2007. The Company is authorized under the program to repurchase its common stock or its 5.25 percent convertible subordinated notes due 2009. Sunrise anticipates funding potential repurchases from cash on hand, cash from operations, proceeds from any exercises of options to purchase shares of common stock of the Company, and other available funds of the Company.

"The Board authorized our new repurchase program given the strength of our balance sheet and our expectations for substantial cash flow generation in Q4 2005 and full-year 2006," said Paul Klaassen, chairman and CEO of Sunrise Senior Living. "This announcement reflects our commitment to creating long- term shareholder value and our confidence in our ability to generate strong cash flow from operations."

Under the repurchase program, Sunrise is authorized to make purchases in the open market or in privately negotiated transactions from time to time, subject to market conditions, applicable legal requirements and other factors. The repurchase program does not obligate the Company to repurchase any specific number of shares, and repurchases pursuant to the program may be suspended or resumed at any time or from time to time without further notice or announcement.

Sunrise Senior Living is the nation's largest provider of senior living services. The McLean, Va.-based company employs more than 40,000 people. As of September 30, 2005, Sunrise operated 425 communities in the United States, Canada, Germany and the United Kingdom with a combined capacity for more than 52,900 residents. Sunrise also had 39 communities under construction in these countries with a combined capacity for more than 4,600 residents. Sunrise offers a full range of personalized senior living services, including independent living, assisted living, care for individuals with Alzheimer's and other forms of memory loss, as well as nursing and rehabilitative care. Sunrise's senior living services are delivered by staff trained to encourage the independence, preserve the dignity, enable freedom of choice and protect the privacy of residents. To learn more about Sunrise please visit http://www.sunriseseniorliving.com.

Estimates of future earnings are by definition, and certain other matters discussed in this press release may be, forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. Although Sunrise believes the expectations reflected in such forward-looking statements are based on reasonable assumptions, there can be no assurances that its expectations will be realized. Sunrise's actual results could differ materially from those anticipated in these forward-looking statements as a result of various factors, including, but not limited to, our ability to integrate The Fountains and Greystone into our operations, development and construction risks, acquisition risks, licensing risks, business conditions, competition, changes in interest rates, our ability to manage our expenses, market factors that could affect the value of our properties, the risks of downturns in general economic conditions, satisfaction of closing conditions and availability of financing for development and acquisitions. These and other risks are detailed in the Company's annual report on Form 10-K filed with the Securities and Exchange Commission. The Company assumes no obligation to update or supplement forward-looking statements that become untrue because of subsequent events.

SOURCE Sunrise Senior Living, Inc.

CONTACT:
Dave Spille
Vice President, Investor Relations and Capital Markets
+1-703-744-1787

# EXHIBIT  10



# FORM 8-K

## SUNRISE SENIOR LIVING INC - SRZ

**Filed: November 17, 2004 (period: November 17, 2004)**

Report of unscheduled material events or corporate changes.

# Table of Contents

8-K - FORM 8-K

**Item 5.02.**      Departure of Principal Officers; Appointment of Principal Officers.

SIGNATURES

**UNITED STATES**
## SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

# FORM 8-K

**CURRENT REPORT PURSUANT TO SECTION 13 OR 15 (d)**
**OF THE SECURITIES EXCHANGE ACT OF 1934**

Date of Report (Date of earliest event reported): **November 17, 2004**

# SUNRISE SENIOR LIVING, INC.

(Exact name of registrant as specified in its charter)

| **Delaware** | **1-16499** | **54-1746596** |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Commission File Number) | (I.R.S. Employer Identification No.) |

**7902 Westpark Drive**
**McLean, Virginia 22102**
(Address of principal executive offices) (Zip Code)

**(703) 273-7500**
(Registrant's telephone number, including area code)

**Not Applicable**
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 5.02. Departure of Principal Officers; Appointment of Principal Officers.**

On November 17, 2004, Mr. Carl Adams resigned his position as Senior Vice President and Chief Accounting Officer of Sunrise Senior Living, Inc. (the "Company") in order to accept a new position within the Company as Senior Vice President — Capital Markets.

Effective November 17, 2004, the Board of Directors of the Company appointed Mr. Barron Anschutz as the new Senior Vice President and Chief Accounting Officer of the Company.

Before joining the Company, Mr. Anschutz was a senior manager at Ernst & Young LLP in the Assurance and Advisory Business Services group. His career with Ernst & Young LLP began in 1991. Mr. Anschutz, 35, holds a bachelor of science in accounting from the University of Maryland.

2

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

SUNRISE SENIOR LIVING, INC.
(Registrant)

Date:    November 17, 2004                    By:    /s/ Larry E. Hulse

Larry E. Hulse
Chief Financial Officer

3

Created by 10KWizard    www.10KWizard.com

# EXHIBIT  11



# FORM 3

## SUNRISE SENIOR LIVING INC - SRZ

**Filed: November 23, 2004 (period: November 17, 2004)**

Initial statement of beneficial ownership of securities

FORM 3

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

**INITIAL STATEMENT OF BENEFICIAL OWNERSHIP OF SECURITIESM**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding
Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0104 |
| Expires | February 28, 2011 |
| Estimated average burden | |
| hours per response | 0.5 |

| 1. Name and Address of Reporting Person | 2. Date of Event Requiring Statement (Month/Day/Year) | 3. Issuer Name and Ticker or Trading Symbol SUNRISE SENIOR LIVING INC [SRZ] |
|---|---|---|
| Anschutz Barron | 11/17/2004 | |
| (Last)    (First)    (Middle) | | 4. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
| 7902 WESTPARK DRIVE | | Director      10% Owner |
| (Street) | | X  Officer (give title below)    Other (specify below) |
| MCLEAN    VA    22102 | | Chief Accounting Officer |
| (City)    (State)    (Zip) | | |

| 5. If Amendment, Date of Original Filed (Month/Day/Year) |
|---|
| |
| 6. Individual or Joint/Group Filing (Check Applicable Line) |
| X  Form filed by One Reporting Person |
| Form filed by More than One Reporting Person |

**Table I - Non-Derivative Securities Beneficially Owned**

| 1. Title of Security (Instr. 4) | 2. Amount of Securities Owned (Instr. 4) | 3. Ownership Form: Direct (D) or Indirect (I) (Instr. 5) | 4. Nature of Indirect Beneficial Ownership (Instr. 5) |
|---|---|---|---|
| | | | |

Source: SUNRISE SENIOR LIVIN, 3, November 23, 2004

**Table II - Derivative Securities Beneficially Owned**
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 4) | 2. Date Exercisable and Expiration Date (Month/Day/Year) | | 3. Title and Amount of Securities Underlying Derivative Security (Instr. 4) | | 4. Conversion or Exercise Price of Derivative Security | 5. Ownership Form: Direct (D) or Indirect (I) (Instr. 5) | 6. Nature of Indirect Beneficial Ownership (Instr. 5) |
|---|---|---|---|---|---|---|---|
| | Date Exercisable | Expiration Date | Title | Amount or Number of Shares⁴ | | | |
| Employee Stock Option (right to buy) | 11/17/2005⁽¹⁾ | 11/17/2014 | Common Stock | 10,000 | $ 41.8 | D | |

**Explanation of Responses:**

1. vests 25% annually over four years starting 11/17/2005

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\* If the form is filed by more than one reporting person, see Instruction 5(b)(v).

\*\* Intentional misstatements or omissions of facts constitute Federal Criminal Violations See 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, see Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

Barron Anschutz                          11/23/2004
\*\* Signature of Reporting Person          Date

Created by 10KWizard   www.10KWizard.com

Source: SUNRISE SENIOR LIVIN, 3, November 23, 2004

# EXHIBIT  12



# FORM 4

## SUNRISE SENIOR LIVING INC - SRZ

**Filed: November 22, 2005 (period: November 21, 2005)**

Statement of changes in beneficial ownership of securities

FORM 4

Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b)

☐

OMB APPROVAL

| OMB Number: | 3235-0287 |
|---|---|
| Expires: | February 28, 2011 |
| Estimated average burden hours per response | 0.5 |

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

**1. Name and Address of Reporting Person**
Anschutz Barron

| (Last) | (First) | (Middle) |
|---|---|---|

7902 WESTPARK DRIVE

(Street)

| MCLEAN | VA | 22102 |
|---|---|---|
| (City) | (State) | (Zip) |

**2. Issuer Name and Ticker or Trading Symbol**
SUNRISE SENIOR LIVING INC [SRZ]

**3. Date of Earliest Transaction (Month/Day/Year)**
11/21/2005

**4. If Amendment, Date of Original Filed (Month/Day/Year)**

**5. Relationship of Reporting Person(s) to Issuer**
(Check all applicable)

| | Director | | 10% Owner |
|---|---|---|---|
| X | Officer (give title below) | | Other (specify below) |

Chief Accounting Officer

**6. Individual or Joint/Group Filing (Check Applicable Line)**
X  Form filed by One Reporting Person
   Form filed by More than One Reporting Person

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1.Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 11/21/2005 | | M | | 2,000 | A | $ 20.9 | 2,000 | D | |
| Common Stock | 11/21/2005 | | S | | 2,000 | D | $ 33.04 | 0 | D | |
| Common Stock | 11/21/2005 | | M | | 3,000 | A | $ 20.9 | 3,000 | D | |
| Common Stock | 11/21/2005 | | S | | 3,000 | D | $ 33 | 0 | D | |

## Table II – Derivative Securities Acquired, Disposed of, or Beneficially Owned (e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option (right to buy) | $20.9 | 11/21/2005 | | M | | | 2,000 | 11/17/2005 | 11/17/2014 | Common Stock | 2,000 | (1) | 18,000 | D | |
| Employee Stock Option (right to buy) | $20.9 | 11/21/2005 | | M | | | 3,000 | 11/17/2005 | 11/17/2014 | Common Stock | 3,000 | (1) | 15,000 | D | |

**Explanation of Responses:**

1. N/A

Barron Anschutz _____     11/22/2005

** Signature of Reporting Person     Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, see Instruction 4(b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations See 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, see Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

Created by 10KWizard    www.10KWizard.com

# EXHIBIT  13



# FORM 4

## SUNRISE SENIOR LIVING INC - SRZ

**Filed: January 04, 2006 (period: January 03, 2006)**

Statement of changes in beneficial ownership of securities

FORM 4

Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

| OMB APPROVAL | |
|---|---|
| OMB Number | 3235-0287 |
| Expires | February 28, 2011 |
| Estimated average burden hours per response | 0.5 |

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

**1. Name and Address of Reporting Person**
Anschutz Barron

| (Last) | (First) | (Middle) |
|---|---|---|
| 7902 WESTPARK DRIVE | | |

| (Street) | | |
|---|---|---|
| MCLEAN | VA | 22102 |
| (City) | (State) | (Zip) |

**2. Issuer Name and Ticker or Trading Symbol**
SUNRISE SENIOR LIVING INC [SRZ]

**3. Date of Earliest Transaction (Month/Day/Year)**
01/03/2006

**4. If Amendment, Date of Original Filed (Month/Day/Year)**

**5. Relationship of Reporting Person(s) to Issuer** (Check all applicable)

| | Director | | 10% Owner |
|---|---|---|---|
| X | Officer (give title below) | | Other (specify below) |

Chief Accounting Officer

**6. Individual or Joint/Group Filing (Check Applicable Line)**
X  Form filed by One Reporting Person

Form filed by More than One Reporting Person

## Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 01/03/2006 | | S | | 826 [1] | D | $ 32.06 | 100 [1] | D | |
| Common Stock | 01/03/2006 | | S | | 100 [1] | D | $ 32.05 | 0 [1] | D | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
**(e.g., puts, calls, warrants, options, convertible securities)**

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

**Explanation of Responses:**

1. Represents 926 common shares purchased through the Sunrise Employee Stock Purchase Plan on 12/30/2005

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, see Instruction 4(b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations See 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, see Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

Barron Anschutz     01/04/2006

** Signature of Reporting Person     Date

# EXHIBIT  14



# FORM 4

## SUNRISE SENIOR LIVING INC - SRZ

**Filed: December 30, 2005 (period: December 19, 2005)**

Statement of changes in beneficial ownership of securities

FORM 4

Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

OMB APPROVAL

| OMB Number: | 3235-0287 |
| Expires: | February 28, 2011 |
| Estimated average burden hours per response | 0.5 |

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

**1. Name and Address of Reporting Person**
KLAASSEN PAUL J & TERESA M

| (Last) | (First) | (Middle) |

7902 WESTPARK DRIVE

(Street)

| MCLEAN | VA | 22102 |
| (City) | (State) | (Zip) |

**2. Issuer Name and Ticker or Trading Symbol**
SUNRISE SENIOR LIVING INC [SRZ]

**3. Date of Earliest Transaction (Month/Day/Year)**
12/19/2005

**4. If Amendment, Date of Original Filed (Month/Day/Year)**

**5. Relationship of Reporting Person(s) to Issuer**
(Check all applicable)

| X | Director | X | 10% Owner |
| X | Officer (give title below) | | Other (specify below) |

Chairman of the Board and CEO

**6. Individual or Joint/Group Filing (Check Applicable Line)**

| | Form filed by One Reporting Person |
| X | Form filed by More than One Reporting Person |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 12/19/2005 | | S | | 50,000 | D | $ 34.7795 | 5,732,640 [1] | D | |
| Common Stock | 12/20/2005 | | S | | 50,000 | D | $ 34.5796 | 5,682,640 [1] | D | |

Source: SUNRISE SENIOR LIVIN, 4, December 30, 2005

## Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned
### (e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4, and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

---

**1. Name and Address of Reporting Person**[*]
KLAASSEN PAUL J & TERESA M

| (Last) | (First) | (Middle) |
|---|---|---|
| 7902 WESTPARK DRIVE | | |

| (Street) | | |
|---|---|---|
| MCLEAN | VA | 22102 |

| (City) | (State) | (Zip) |
|---|---|---|

---

**1. Name and Address of Reporting Person**[*]
Klaassen Teresa Merritt

| (Last) | (First) | (Middle) |
|---|---|---|
| 7902 WESTPARK DRIVE | | |

| (Street) | | |
|---|---|---|
| MCLEAN | VA | 22102 |

| (City) | (State) | (Zip) |
|---|---|---|

**Explanation of Responses:**

Source: SUNRISE SENIOR LIVIN, 4, December 30, 2005

1 Paul J. & Teresa M. Klaassen - Joint Ownership. Direct ownership -- 5,682,640 Indirect ownership through The Klaassen Family Private Foundation -- 63,290 Paul J. Klaassen - Individual Ownership. Direct -- 103,538.

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, see Instruction 4(b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations See 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, see Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

Created by 10KWizard    www.10KWizard.com

Bradley B. Rush ** Signature of
Reporting Persons As attorney-in-fact    12/30/2005
for Paul J. and Teresa M. Klaassen

Bradley B. Rush                          12/30/2005

** Signature of Reporting Person         Date

# EXHIBIT  15



## News Release

### Sunrise to Reschedule First Quarter Earnings Announcement

MCLEAN, Va., May 9, 2006 /PRNewswire-FirstCall via COMTEX News Network/ -- Sunrise Senior Living, Inc. (NYSE: SRZ), today announced it is rescheduling its first quarter 2006 earnings release to allow additional time for further review of the accounting treatment applied to its investments in unconsolidated senior living communities, and to complete the review of its Form 10-Q for the first quarter ended March 31, 2006. The Company will issue a press release announcing the specific date and time of the rescheduled first quarter earnings call upon completion of this review.

Sunrise Senior Living, a McLean, Va. based company, employs more than 40,000 people. As of March 31, 2006, Sunrise operated 423 communities in the United States, Canada, Germany and the United Kingdom with a combined capacity for more than 51,000 residents. Sunrise also had 46 communities under construction in these countries with a combined capacity for more than 6,000 additional residents. Sunrise offers a full range of personalized senior living services, including independent living, assisted living, care for individuals with Alzheimer's and other forms of memory loss, as well as nursing and rehabilitative care. Sunrise's senior living services are delivered by staff trained to encourage the independence, preserve the dignity, enable freedom of choice and protect the privacy of residents. To learn more about Sunrise, please visit http://www.sunriseseniorliving.com.

Certain matters discussed in this press release may be forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. Although Sunrise believes the expectations reflected in such forward- looking statements are based on reasonable assumptions, there can be no assurances that its expectations will be realized. Sunrise's actual results could differ materially from those anticipated in these forward-looking statements as a result of various factors, including, but not limited to, development and construction risks, acquisition risks, licensing risks, business conditions, competition, changes in interest rates, our ability to manage our expenses, market factors that could affect the value of our properties, the risks of downturns in general economic conditions, satisfaction of closing conditions and availability of financing for development and acquisitions. These and other risks are detailed in the Company's annual report on Form 10-K filed with the Securities and Exchange Commission, as may be updated or supplemented in the Company's Form 10-Q filings. The Company assumes no obligation to update or supplement forward- looking statements that become untrue because of subsequent events.

SOURCE Sunrise Senior Living, Inc.

David Spille, Vice President, Investor, Relations and Capital Markets, +1-703-273-7500, for Sunrise Senior Living, Inc.

# EXHIBIT  16



---

**News Release**

## Sunrise Provides Update on Accounting Treatment Review and Release of First Quarter Financial Results

Further Update Conference Call Scheduled for Thursday, May 11, 2006 at 11:00 am

MCLEAN, Va., May 10 /PRNewswire-FirstCall/ -- Sunrise Senior Living, Inc. (NYSE: SRZ), announced yesterday that it was postponing its first quarter earnings release to allow additional time for review of the accounting treatment applied to its investments in unconsolidated senior living communities and to complete the review of its Form 10-Q for the first quarter ended March 31, 2006. The accounting treatment review is focused on the allocation of profits and losses for a limited number of Sunrise joint ventures where Sunrise is a minority partner and the capital partner receives a preference, either on return of its capital over Sunrise's capital in the event of a refinancing or sale of the venture's properties, or cash flow from operations. Preferences on return of capital are no longer typical.

Sunrise does not expect the outcome of this review to materially affect its guidance for 2006 or 2007. Sunrise will file a Form 12b-25 on Thursday to extend the filing deadline for its Form 10-Q by five days, and will provide preliminary first quarter financial results. Sunrise will hold a conference call at 11:00 am Thursday to discuss these results and answer other investor questions. Call in details will be provided with the preliminary results.

Sunrise Senior Living, a McLean, Va. based company, employs more than 40,000 people. As of March 31, 2006, Sunrise operated 423 communities in the United States, Canada, Germany and the United Kingdom with a combined capacity for more than 51,000 residents. Sunrise also had 46 communities under construction in these countries with a combined capacity for more than 6,000 additional residents. Sunrise offers a full range of personalized senior living services, including independent living, assisted living, care for individuals with Alzheimer's and other forms of memory loss, as well as nursing and rehabilitative care. Sunrise's senior living services are delivered by staff trained to encourage the independence, preserve the dignity, enable freedom of choice and protect the privacy of residents. To learn more about Sunrise, please visit http://www.sunriseseniorliving.com.

Certain matters discussed in this press release may be forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. Although Sunrise believes the expectations reflected in such forward- looking statements are based on reasonable assumptions, there can be no assurances that its expectations will be realized. Sunrise's actual results could differ materially from those anticipated in these forward-looking statements as a result of various factors, including, but not limited to, development and construction risks, acquisition risks, licensing risks, business conditions, competition, changes in interest rates, our ability to manage our expenses, market factors that could affect the value of our properties, the risks of downturns in general economic conditions, satisfaction of closing conditions and availability of financing for development and acquisitions. These and other risks are detailed in the Company's annual report on Form 10-K filed with the Securities and Exchange Commission, as may be updated or supplemented in the Company's Form 10-Q filings. The Company assumes no obligation to update or supplement forward- looking statements that become untrue because of subsequent events.

SOURCE Sunrise Senior Living, Inc.

CONTACT: David Spille, Vice President, Investor, Relations and Capital Markets, of Sunrise Senior Living, Inc., +1-703-273-7500

# EXHIBIT  17



## News Release

## Sunrise Reports Preliminary Selected Financial Data For First-Quarter 2006

Company delays filing of Form 10-Q due to previously announced review of the accounting treatment applied to a limited number of its investments in unconsolidated senior living communities

MCLEAN, Va., May 11 /PRNewswire-FirstCall/ -- Sunrise Senior Living, Inc. (NYSE: SRZ), previously announced that the Company is reviewing its accounting treatment for allocation of profits and losses for the limited number of Sunrise joint ventures where Sunrise is a minority partner and the capital partner receives a preference on return of its capital. As a result of that review, Sunrise has decided to use a different methodology to allocate profits and losses in its joint ventures based on such rights and priorities of the partners. Sunrise is evaluating whether this methodology will require adjustments to prior period financial statements.

Although no resolution has been reached yet, Sunrise does not expect the outcome of this review to adversely affect its earnings guidance for 2006 and 2007 due to the limited number of current joint ventures affected and the various stages of these ventures. Sunrise will not file its Form 10-Q until it completes its review. This review encompasses a multi-year analysis of each affected venture and is being completed as thoroughly and quickly as possible. Sunrise is unable at this time to provide an expected date for filing the Form 10-Q.

"We regret the delay in reporting earnings for the first quarter, but believe that the additional time is important in order to ensure the integrity and accuracy of our financial statements," said Paul Klaassen, Sunrise Senior Living's chairman and CEO. "As we move toward our 25th anniversary, our consistent approach to growth through community operations, new construction, selective acquisitions and balance sheet initiatives has benefited our residents, shareholders and capital partners alike. This accounting issue does not change our business prospects or our enthusiasm for our management services business model."

Sunrise also reported today preliminary selected financial and operating data for the quarter ended March 31, 2006, as set forth below:

Portfolio Growth

- Operated 423 communities
- Capacity increased to over 51,000 residents in four countries
- Added management of eight new communities net of terminations
- Began construction on four new communities and expects to begin construction on 26 additional communities in 2006

Operational Highlights

- Revenue for all communities managed by Sunrise of $531 million
- Management fees from operating communities of $34 million
- Resident and ancillary fees of $97 million
- Community and ancillary expenses of $76 million
- General and administrative expenses of $22 million, or 4.1% of revenue under management
- Community lease expense of $13 million
- Net interest income of $2 million
- 170 communities stabilized in both first quarter of 2006 and 2005
- Revenue grew 6.3%
- Average daily rate increased 3.3%
- Occupancy increased 3.5% to 94.2%

Balance Sheet and Business Highlights

- Cash of $174 million
- Property and equipment of $507 million
- Total debt of $92 million

As previously announced, Sunrise expects to cease management of ten communities on or about August 4, 2006 upon payment of approximately $88 million in buyout fees. The Company expects to redeploy the cash received from the buyout of these contracts into various investment alternatives, which potentially include expanded development activities, investment in additional venture communities, the acquisition of management contracts and/or other senior housing operators, repayment of outstanding debt, share repurchases and other potential investments. The owner's rights to buyout these contracts are not related to Sunrise's performance at any of these communities.

Outlook and Earnings

As previously discussed, Sunrise does not expect the outcome of the current accounting review to adversely affect its guidance for 2006 or 2007. As indicated in our fourth-quarter 2005 earnings press release, our 2006 EPS guidance includes stock option expenses of approximately $0.04 per share and incentive income deferred from a property sale in 2004 of $0.02 per share. In addition, we expect our 2006 earnings to include an additional $0.85 per share over our previous guidance due to the net effect of the payment of the buyout fee mentioned above and related expenses. Sunrise will provide any necessary updates to its guidance for 2006 and 2007 upon filing of first-quarter financial results. Sunrise's 2006 and 2007 EPS is expected to be driven by higher management and professional services revenue resulting from more than 30 construction starts, 26 expected new development openings from Sunrise's expanded development pipeline, full-year contributions from The Fountains and Greystone acquisitions and by further growth in earnings generated by Sunrise's equity investments in unconsolidated ventures.

Conference Call Information

Sunrise will host a conference call today (Thursday, May 11, 2006) at 11:00 a.m. ET to discuss the Company's preliminary selected first-quarter financial data. Paul Klaassen, chairman and chief executive officer, Thomas Newell, president, Tiffany Tomasso, chief operating officer and Bradley Rush, chief financial officer, will host the call. The call-in number is 866-802- 6730 (access code not required). Those interested may also go to the Investor Relations section of the Company's Web site (www.sunriseseniorliving.com) to listen to the earnings call. Those unable to participate in the live call may hear a rebroadcast by dialing 719-457-0820 (access code: 8647163). The rebroadcast will be available through May 18, 2006. In addition, a link to a recording of the call and a copy of this press release will be available on the Company's Web site in the Investor Relations section.

Sunrise Senior Living, a McLean, Va. based company, employs more than 40,000 people. As of March 31, 2006, Sunrise operated 423 communities in the United States, Canada, Germany and the United Kingdom with a combined capacity for more than 51,000 residents. Sunrise also had 46 communities under construction in these countries with a combined capacity for more than 6,000 additional residents. Sunrise offers a full range of personalized senior living services, including independent living, assisted living, care for individuals with Alzheimer's and other forms of memory loss, as well as nursing and rehabilitative care. Sunrise's senior living services are delivered by staff trained to encourage the independence, preserve the dignity, enable freedom of choice and protect the privacy of residents. To learn more about Sunrise, please visit http://www.sunriseseniorliving.com.

The preliminary financial data and estimates of future earnings included in this press release are by definition, and certain other matters discussed in this press release may be, forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. Although Sunrise believes the expectations reflected in such forward-looking statements are based on reasonable assumptions, there can be no assurances that its expectations will be realized. Sunrise's actual results could differ materially from those anticipated in these forward-looking statements as a result of various factors, including, but not limited to, the results of the accounting review and completion of the first quarter Form 10-Q, development and construction risks, acquisition risks, licensing risks, business conditions, competition, changes in interest rates, our ability to manage our expenses, market factors that could affect the value of our properties, the risks of downturns in general economic conditions, satisfaction of closing conditions and availability of financing for development and acquisitions. These and other risks are detailed in the Company's annual report on Form 10-K filed with the Securities and Exchange Commission, as may be updated or supplemented in the Company's Form 10-Q filings. The Company assumes no obligation to update or supplement forward-looking statements that become untrue because of subsequent events.

```
                      Sunrise Senior Living, Inc.
                        Supplemental Information
                         As of March 31, 2006
             ($ in millions except average daily rate and per share amounts)
```

|  | Communities | | Resident Capacity | |
|---|---|---|---|---|
|  | Q1 06 | Q1 05 | Q1 06 | Q1 05 |
| **Community Data** |  |  |  |  |
| Communities managed for third-party owners | 200 | 194 | 26,283 | 24,208 |
| Communities in ventures | 162 | 130 | 17,025 | 11,485 |
| Communities consolidated | 61 | 60 | 7,979 | 7,943 |
| Total communities operated (1) | 423 | 384 | 51,287 | 43,636 |

| Percentage of Total Operating Portfolio |  |  |  |  |
|---|---|---|---|---|
| Assisted Living |  |  | 67% | 69% |
| Independent Living |  |  | 24% | 22% |
| Skilled Nursing |  |  | 9% | 9% |
| Total |  |  | 100% | 100% |

**Selected Operating Results**

| Same-Community Owned Portfolio Operating Results (2) | Q1 06 | Q1 05 | % Change |
|---|---|---|---|
| Number of communities | 170 | 170 | - |
| Resident capacity | 17,493 | 17,493 | - |
| Revenue | $211.1 | $198.5 | 6.3% |
| Facility operating expense (3) | $138.9 | $131.4 | 5.7% |
| Occupancy | 94.2% | 91.0% | 3.5% |
| Average daily rate (4) | $139.18 | $134.69 | 3.3% |

| Selected Total Portfolio Operating Results (5) | Q1 06 | Q1 05 |
|---|---|---|
| Total revenue of communities under management | $530.6 | $467.0 |
| Total G&A expenses as a percentage of total revenue of communities under |  |  |

```
        management                          4.1%    3.9%

                                            Q1 06   Q1 05
Development Information
    Construction in progress              $151.4   $85.5
    Capitalized interest                    $1.2    $1.7
    Capital expenditures                   $55.1   $22.8

Number of Development Communities to
 be Opened (Resident Capacity)
                                    Q2 06   Q3 06   Q4 06   Q1 07
Consolidated communities (6)       2(185)   1(94)  2(190)   1(77)
Venture communities                8(692)  2(196)  2(209)   5(402)
Managed communities                1(72)       -       -       -
```

Notes

(1) During the first quarter of 2006, Sunrise opened eight communities and
    assumed management of three communities.  There were also three
    management contracts terminated in the first quarter.
(2) Same-community owned portfolio consists of all communities in which
    Sunrise has an ownership interest and that were stabilized in the
    first quarter of 2006 and 2005.  This includes consolidated and
    venture communities.
(3) Facility operating expense excludes management fees paid to Sunrise
    with respect to same-community ventures in order to make comparisons
    between consolidated and venture communities consistent.
(4) Average daily rate excludes community fees.
(5) Includes revenue for all communities operated by Sunrise.
(6) Communities are expected to be acquired by a third party or joint
    venture prior to opening.

SOURCE Sunrise Senior Living, Inc.

CONTACT: David Spille, Vice President, Investor Relations and Capital Markets of Sunrise Senior Living, Inc., +1-703-273-7500

# EXHIBIT 18



**News Release**

## Sunrise Provides Update On Accounting Review

```
Company to Restate 2003 - 2005 Financial Statements to Adjust Timing of Net
                                 Income;
              No Change to Cash Flow or Business Prospects;
   Cumulative Net Income to be Reduced for 2003-2005 and Recaptured in Future
                                 Periods;
     Earnings Guidance Expected to Increase for the period 2006 through 2007

   First-Quarter and Second-Quarter Results to be Reported upon Completion of
                             Accounting Review
```

MCLEAN, Va., July 31 /PRNewswire-FirstCall/ -- Sunrise Senior Living, Inc. (NYSE: SRZ), today provided an update to its ongoing accounting review and said the Company will restate its financial statements for the years ended December 31, 2003, 2004 and 2005 primarily to adjust the accounting treatment related to ventures that contain partner preferences and the timing of sale accounting and recognition of income from prior sales of real estate. The cumulative impact of the restatement is expected to reduce net income for all periods impacted, including the years 1999 through 2005, by an estimated $60 million to $110 million. The Company expects the substantial majority of the reduction to be recaptured in 2006 and 2007. Sunrise is unable at this time to provide the precise impacts of the restatement since its review of these issues has not yet concluded. A further discussion of the accounting review appears later in this press release. The Company noted that its previously issued audited consolidated financial statements for the years ended December 31, 2003, 2004 and 2005, including the associated auditor's report currently on file with the SEC in the Company's 2005 Form 10-K, and its unaudited quarterly financial statements during these years should no longer be relied upon.

"We are committed to maintaining the highest possible standards of financial reporting and have expanded our complicated and detailed accounting review to include every venture and every significant real estate transaction," said Brad Rush, Sunrise Senior Living's chief financial officer. "This restatement does not affect the cumulative amount of profits and losses we generate from our venture partnerships or sales of real estate, but rather the timing of the income we recognize. With no impact to the Company's cash flow or the operations of our communities, and with continued high demand for our resident-centered approach to senior living, we fully expect to maintain our strong financial momentum in the fast-growing senior living industry."

Upon completion of its accounting review, Sunrise will report relevant financial information and file amendments to its 2005 Form 10-K and 2005 Form 10-Qs, as well as its Form 10-Qs for the first and second quarters ended March 31, 2006 and June 30, 2006. Adjustments for periods prior to 2003 will be reflected in the opening balance for retained earnings in 2003. As announced in a separate release today, Sunrise will provide a further update on August 8, 2006, when it provides its preliminary second-quarter selected financial and operating data.

Discussion of Accounting Review

In the last several years, the accounting for real estate ventures has received increased attention and new interpretations of the accounting treatment for ventures have developed. The accounting for real estate ventures is determined in accordance with SOP 78-9, Accounting for Investments in Real Estate. Sunrise, in consultation with its auditors, considered these new interpretations and its accounting for the profits and losses of its ventures. A discussion of this consideration is addressed in the first bullet below. As this review unfolded, Sunrise looked not only at partner preferences, but also at all guarantees and commitments provided to our venture partners and third party investors. Certain of these guarantees and commitments should have been considered at the time of the sale of real estate to these entities. Consequently, Sunrise is reviewing the timing of its income recognition associated with the sale of real estate and the potential financial statement presentation of the associated real estate. This area of the review is discussed in the second bullet below. The following is a summary of Sunrise's restatement by category.

```
    - Allocation of profits and losses in those ventures in which Sunrise's
      partners receive a preference on cash flow.  This area of review
      focused on the timing of both the recognition of profits and losses
      from ventures and the recognition of pre-opening fees from ventures in
      which our partners receive a cash flow preference.  As Sunrise
      previously indicated, neither of these areas of review impact the total
      economics to be received from these ventures, but rather the timing of
      the recognition of profits and losses.  A limited number of Sunrise's
      ventures have these cash flow preferences.  In recent years, Sunrise
      has been moving away from providing preferences to partners.  In the
      future, Sunrise will no longer offer preferences on cash flows for its
      ventures.  Sunrise will account for its equity in earnings of
      unconsolidated ventures by a method known as Hypothetical Liquidation
      at Book Value (HLBV), rather than on its historical method based upon
      percentage of equity ownership.  The principal difference between the
      two methods is that HLBV presumes liquidation at the depreciated book
      value in considering cash flow preferences when allocating income and
      losses, while historically Sunrise has allocated profits and losses on
      the basis of percentage of equity ownership, taking into consideration
      any potential reduction in basis due to an assumed hypothetical
```

liquidation at fair value. An example demonstrating the difference
between the two methodologies can be found at the end of this press
release.

The impact of this restatement will require Sunrise to record
additional losses in prior periods for those ventures with cash flow
preferences.  Sunrise expects to recapture these amounts as additional
income in future periods upon the recapitalization, refinancing or sale
of these ventures, most of which are expected to occur in 2006 and
2007.  Sunrise believes that it will recapture these amounts because
the ventures impacted are now generally older ventures in which the
investment partner has indicated an interest in recapitalizing,
refinancing or selling their partnership interests.  Several
recapitalization transactions are currently scheduled for 2006 and
Sunrise expects the others to occur in 2007.  Based on current market
conditions, a recapitalization, refinancing or sale of these ventures
would trigger the recognition of income by Sunrise and the recapture of
the reduction of net income caused by the restatement.

- Effect of certain Sunrise guarantees and commitments on timing of sale
  accounting and recognition of income upon sale of real estate.
  Primarily during the period from 2000 to 2003, Sunrise sold mature
  senior living properties to ventures or independent third parties.  In
  addition, as part of its development program, Sunrise sometimes owns
  real estate during the zoning and permit process and then sells or
  contributes the real estate to a venture or third party investor.
  Sunrise historically has recognized income upon the completion of such
  sales. In connection with some of Sunrise's sales of real estate,
  either mature properties or development properties, Sunrise has
  provided limited guarantees or commitments.  These guarantees or
  commitments have included construction completion, operating cash flow
  deficit guarantees to lenders and ventures, limited guarantees of net
  operating income (credit support) and certain limited debt guarantees.
  The existence of these guarantees, as well as the amounts funded by
  Sunrise, have been previously disclosed in Sunrise's publicly filed
  financial statements.  In accordance with SFAS 66, Accounting for Sales
  of Real Estate, based on the nature of the guarantee or commitment,
  Sunrise may be required to defer some or all of the income or may not
  be able to immediately record the transaction as a sale.  Sunrise's
  review is currently focusing on the nature of the guarantees and
  commitments it has previously provided and determining whether the
  Company may be required to defer income and/or not achieve sale
  accounting over the life of the guarantee or commitment.

  Deferral of income recognition or delay in achieving sale accounting
  does not change the ultimate economics of a sale, but rather the timing
  of the recognition of income.  Sunrise will recapture the recognition \
  of this deferred income when the guarantees or commitments expire or
  the ventures are recapitalized, refinanced or sold, which Sunrise
  believes will occur primarily in 2006 or 2007. This will result in full
  sale accounting for the prior transactions and the recapture of
  deferred income.  This accounting issue should not recur as Sunrise
  does not expect to offer guarantees to new ventures or lenders that
  would preclude sale accounting or require the deferral of income.

- Other. As part of the restatement, Sunrise will also adjust its
  financial statements for certain other miscellaneous items described in
  the Company's Form 8-K filed with the SEC earlier today, the estimated
  impact of which are included in our estimated range of reduction in net
  income.

Additional Accounting Item Under Review

EITF 04-5 - Rights of limited partners in ventures. The Company typically serves as the general partner or managing member of its ventures. EITF 04-5, effective January 1, 2006 for all ventures, provides guidance that the general partner or managing member in a venture is not deemed to control and, therefore, does not consolidate the venture when the limited partners have certain substantive participating rights within the venture. Sunrise believes its partners have substantive participating rights. From time to time, the SEC will review public company filings as part of its standard review cycle. Sunrise received such a comment letter from the SEC accounting staff with respect to its Form 10-K for the year ended December 31, 2005 which included a request for additional information regarding the application of EITF 04-5 to Sunrise's unconsolidated ventures. Sunrise has responded to the comment letter but is unable to predict the timing or outcome of the SEC accounting staff's review of its response.

Outlook

Excluding the impact of accounting adjustments described above, Sunrise's business has performed in line with expectations through the first half of the year. The

Company continues to experience strong occupancy, increasing average daily rates, the benefits of the industry leading development pipeline (which has produced 16 new community openings adding 1,400 to resident capacity in the first half of 2006) and robust acquisition opportunities. As announced in a separate press release today, Sunrise will acquire three additional communities in the San Francisco Bay area. This accretive acquisition, as well as Sunrise's anticipated acquisition of management of six Florida communities announced on June 30, 2006, which is also expected to be accretive in 2007, should add to Sunrise's EPS in 2007. As of June 30, 2006, Sunrise's balance sheet remains strong with cash in excess of $250 million and the lowest debt levels in over 10 years.

Sunrise anticipates that its earnings guidance for the period 2006 through 2007 will be increased due to the expected recapture in those years of the substantial majority of the expected $60 million to $110 million reduction in prior period income from the accounting adjustments. Sunrise will provide updated earnings guidance for 2006 and 2007 when it has completed its accounting review and filed its restated financial statements.

Conference Call Information

Sunrise will host a conference call today, Monday, July 31, 2006 at 8:30 a.m. ET to discuss the restatement of prior period financial results. Paul Klaassen, chairman and chief executive officer, Thomas Newell, president, Tiffany Tomasso, chief operating officer and Brad Rush, chief financial officer, will host the call. The conference call can be accessed by dialing (719) 457-2654 or (888) 208-1812 (access code not required) or via the Investor Relations section of the Company's web site (www.sunriseseniorliving.com). Those unable to participate in the live call may hear a rebroadcast by dialing (719) 457-0820 or (888) 203-1112 (access code: 4773234). The rebroadcast will be available through August 7, 2006. In addition, a link to a recording of the call and a copy of this earnings release will be available on the Company's Web site in the Investor Relations section.

About Sunrise

Sunrise Senior Living, a McLean, Va. based company, employs approximately 40,000 people. As of June 30, 2006, Sunrise operated 422 communities in the United States, Canada, Germany and the United Kingdom with a combined capacity for approximately 50,000 residents. Sunrise also had 43 communities under construction in these countries with a combined capacity for more than 6,000 additional residents. Sunrise offers a full range of personalized senior living services, including independent living, assisted living, care for individuals with Alzheimer's and other forms of memory loss, as well as nursing and rehabilitative care. Sunrise's senior living services are delivered by staff trained to encourage the independence, preserve the dignity, enable freedom of choice and protect the privacy of residents. To learn more about Sunrise, please visit http://www.sunriseseniorliving.com.

Forward-Looking Statements

The estimated range of the financial statement impacts of the Company's restatement, the Company's expected recapture of restatement amounts in future periods, the anticipated earnings contributions from the two recent acquisitions and the anticipated increase in Sunrise's earnings guidance are, and certain other matters discussed in this press release may be, forward- looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. Although Sunrise believes the expectations reflected in such forward-looking statements are based on reasonable assumptions, there can be no assurances that its expectations will be realized. Sunrise's actual results could differ materially from those anticipated in these forward- looking statements as a result of various factors, including, but not limited to, completion of Sunrise's accounting review and finalization of the restatement, the actual performance of the recent acquisitions, development and construction risks, licensing risks, business conditions, competition, changes in interest rates, Sunrise's ability to manage its expenses, market factors that could affect the value of its properties, the risks of downturns in general economic conditions, satisfaction of closing conditions, availability of financing for development and acquisitions and other risks set forth in the Company's annual report on Form 10-K filed with the SEC. The Company assumes no obligation to update or supplement forward-looking statements that become untrue because of subsequent events.

                    Example of Venture Allocations

Assumes a single community venture, revenues from the community of $6,000,000 with NOI of $2,000,000 upon stabilization, 33% margin after a 7% management fee, annual debt service of $1,000,000, and refinancing of the community at the end of year three. Assumes that venture partner has a preference in the return of capital, and that they also apply HLBV. Refinancing assumed value of $28,500,000 based upon a 7% cap rate applied to year three NOI of $2,000,000. Sunrise receives a 10% incentive upon a capital event.

| | | Former Method | | HLBV | |
| | | 20% Sunrise | 80% Partner | 20% Sunrise | 80% Partner |
|---|---|---|---|---|---|
| Community value | 20,000,000 | | | | |
| Debt | 15,000,000 | | | | |
| Equity | 5,000,000 | 1,000,000 | 4,000,000 | 1,000,000 | 4,000,000 |
| Results of Operations | | | | | |
| Year One | | | | | |
| Income (loss) from operations | (1,000,000) | (200,000) | (800,000) | (900,000) | (100,000) |
| Less cash distributed | 500,000 | 100,000 | 400,000 | 100,000 | 400,000 |
| Balances at end of Year One | 3,500,000 | 700,000 | 2,800,000 | - | 3,500,000 |
| Year Two | | | | | |
| Income (loss) from operations | 750,000 | 150,000 | 600,000 | 200,000 | 550,000 |
| Less cash | | | | | |

```
     distributed        1,000,000    200,000      800,000    200,000      800,000
Balances at end
  of Year Two           3,250,000    650,000    2,600,000        -       3,250,000

Year Three
  Income (loss)
    from
    operations          2,000,000    400,000    1,600,000    200,000    1,800,000
Less cash
  distributed           1,000,000    200,000      800,000    200,000      800,000
Balances at end of
  Year Three            4,250,000    850,000    3,400,000        -       4,250,000

Refinancing
  proceeds             21,500,000
Less debt balance,
  incl costs          15,000,000
Net proceeds            6,500,000

Cash distributed
  to partners from
  refinance,
  30% to Sunrise
                                     1,950,000   4,550,000   1,950,000   4,550,000
Gain from refinancing                1,100,000   1,150,000   1,950,000     300,000

Initial investment                 (1,000,000) (4,000,000) (1,000,000) (4,000,000)
Cash distributed                     2,450,000   6,550,000   2,450,000   6,550,000
Income (loss) allocated,
  including gain                     1,450,000   2,550,000   1,450,000   2,550,000
```

SOURCE Sunrise Senior Living, Inc.

CONTACT: David Spille, Vice President, Investor Relations and Capital Markets, Sunrise Senior Living, Inc., +1-703-744-1787