## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| | ) | |
| IN RE SUNRISE SENIOR LIVING | ) | **MASTER FILE** |
| SECURITIES LITIGATION | ) | 07-CV-00102 (RBW) |
| | ) | |
| This Document Relates to: | ) | **JURY TRIAL** |
| All Cases | ) | **DEMANDED** |
| | ) | |

### CLASS LEAD PLAINTIFFS' MOTION FOR RECONSIDERATION OF THIS COURT'S ORDER GRANTING DEFENDANT SUNRISE'S MOTION TO ENFORCE STATUTORY STAY OF DISCOVERY AND QUASH THIRD-PARTY SUBPOENA

Class Lead Plaintiffs, City of Miami General Employees' & Sanitation Employees' Retirement Trust and Oklahoma Firefighters' Pension & Retirement System ("Lead Plaintiffs"), pursuant to Fed. R. Civ. P. 54(b), hereby move this Court to reconsider its Order of August 6, 2008 ("Minute Order"), which granted the Motion of Sunrise Senior Living, Inc. ("Sunrise") to Enforce Statutory Stay of Discovery and Quash Third-Party Subpoena, and in support thereof state as follows:

1. On August 1, 2008, Defendant Sunrise filed a motion for an order to (a) enforce a stay of discovery under the Private Securities Litigation Reform Act of 1995 ("PSLRA") and (b) quash a subpoena *duces tecum* issued by Lead Plaintiffs and served on Bradley Rush, Sunrise's former Chief Financial Officer (the "Rush Subpoena") (copy attached as Exhibit A to Lead Plaintiffs' accompanying memorandum of law, dated August 15, 2008). ***The Rush Subpoena seeks only the production of a <u>single</u> document,*** namely the transcript of testimony Mr. Rush gave to the Staff of the Securities and Exchange Commission ("SEC") in June 2008 (the "Rush SEC Transcript").

2.   On September 18, 2007, Mr. Rush filed a complaint in the Circuit Court of Fairfax County against Sunrise. Mr. Rush's complaint alleged, among other things, that Sunrise had wrongfully terminated him, in retaliation for his role in uncovering significant improper accounting practices at Sunrise and in bringing them to the attention of Sunrise's senior management, Sunrise's Board of Directors, and the SEC.

3.   In May 2008 Sunrise reached a settlement with Mr. Rush (the "Settlement"). Lead Plaintiffs have been advised that, as a condition of the Settlement, Sunrise not only required Mr. Rush to maintain the confidentiality of his settlement consideration under the agreement, but also required Rush to agree, *inter alia*, that he would refuse to provide information or documents concerning Sunrise (or its wrongful accounting activities) to Lead Plaintiffs in this action ***except*** in response to a subpoena.

4.   Having been advised of Sunrise's efforts to curtail Mr. Rush's ability to cooperate with Lead Plaintiffs' ongoing investigation into Sunrise's fraudulent accounting by making him agree to a "gag provision" in his Settlement, Lead Plaintiffs inquired of Rush's counsel whether his client would object to producing a copy of his SEC testimony if Mr. Rush was served with a subpoena to produce it. Mr. Rush's counsel thereafter informed Lead Plaintiffs that Mr. Rush would *not* object to producing this single document provided that such a request was duly made by subpoena.

5.   The PSLRA expressly provides for a stay of discovery *only* "during the pendency of any motion to dismiss." 15 U.S.C. § 78u-4(b)(3)(B). On July 23, 2008, the date that the Rush Subpoena was served, no defendant had filed a motion to dismiss.

6.   Moreover, even assuming *arguendo* that the PSLRA's discovery stay was in place when the Rush Subpoena was served, the PSLRA expressly provides for an exception to any

such stay "[where] the court finds…that particularized discovery is necessary to preserve evidence *or to prevent undue prejudice*…" *Id.* (emphasis added).  As set forth in Lead Plaintiffs' accompanying memorandum, Lead Plaintiffs are entitled to the limited discovery they seek in the Rush Subpoena on the statutory grounds of "undue prejudice.  The <u>only</u> reason that Lead Plaintiffs cannot obtain the requested Rush SEC Transcript is because Sunrise has affirmatively intervened to prevent Mr. Rush from voluntarily providing documents or information as a condition of Sunrise's settlement agreement with him.  As a matter of public policy, the law does not countenance a defendants' efforts to use the stay provisions of the PSLRA offensively as a sword to prevent plaintiffs from obtaining relevant information from a witness who – but for the defendants' affirmative conduct and interference – would otherwise be willing to provide the information to the plaintiffs voluntarily.

7.   Pursuant to Local Rule 7(b), Lead Plaintiffs' opposition to Sunrise's motion to enforce the purported PSLRA stay and to quash the Rush Subpoena was not due until August 12, 2008.  However, the Court entered its Minute Order granting Sunrise's motion on August 6, 2008 -- more than six days before Lead Plaintiffs' time to file a response to the motion had run.

8.   The Minute Order provides that it is "without prejudice, pending the outcome of the Lead Plaintiffs' Motion to Partially Lift Discovery Stay in case 1:07-CV-00143-RBW, D.E. #62, filed on May 16, 2008."   However, the "Lead Plaintiffs Motion" referred to in the Court's Minute Order refers to a motion to partially lift the discovery stay in the separate *derivative* case, which was filed by the *derivative* "lead plaintiffs," who are entirely different from and unrelated to the (Class) Lead Plaintiffs in this action.  Moreover, the discovery motion in the derivative case referenced in the Court's Minute Order not only requests entirely different (and much broader) discovery than that at issue here (where Lead Plaintiffs seek only the Rush SEC

Transcript, a single document which is not at issue in the derivative plaintiffs' motion), but also does not involve any of the PSLRA-based arguments that Lead Plaintiffs rely on in opposing Sunrise's motion in this action--and in particular, the argument that they have met the "undue prejudice" standard for being allowed to obtain the   limited discovery they seek from an otherwise willing and cooperative witness.

9.   Had this Court had the benefit of Lead Plaintiffs' arguments in response to Sunrise's motion before issuing its Minute Order, it is respectfully submitted that the Court would not have linked the outcome of Sunrise's motion to quash to the outcome of the unrelated "motion to lift stay" in the separate derivative action, and would have denied Sunrise's motion.[1]

**WHEREFORE**, for the reasons set forth herein and in Lead Plaintiffs' accompanying memorandum, Lead Plaintiffs respectfully request that this Court reconsider its Minute Order of August 6, 2008, and that, upon such reconsideration, it enter an order (a) DENYING Defendant Sunrise's motion to enforce stay of discovery and quash subpoena, and (b) GRANTING Lead Plaintiffs permission to obtain the single document (namely, a copy of the transcript of Mr. Rush's sworn testimony to the SEC) that Lead Plaintiffs requested in the Rush Subpoena.

Dated: August 15, 2008

COHEN, MILSTEIN, HAUSFELD
 & TOLL, P.L.L.C.
 /s/  Daniel S. Sommers
Steven J. Toll, D.C. Bar #225623
Daniel S. Sommers, D.C. Bar #416549
Elizabeth S. Finberg, D.C. Bar #468555
1100 New York Ave., N.W.
West Tower, Suite 500
Washington, DC 20005-3965
Tel:    202/408-4600
Fax:    202/408-4699

*Liaison Counsel for the Class*

---

[1]    Counsel for Lead Plaintiffs have contacted counsel for Defendant Sunrise in a good faith effort to resolve the matters raised in this motion, but have been unable to resolve their dispute.

BERMAN DEVALERIO PEASE
  TABACCO BURT & PUCILLO
Michael J. Pucillo
Jay W. Eng
Esperanté Bldg., Suite 900
222 Lakeview Avenue
West Palm Beach, FL 33401
Tel:    561/835-9400
Fax:    561/835-0322

*Attorneys for Lead Plaintiff Oklahoma
Firefighters' Pension and Retirement
System and Co-Lead Counsel for the Class*

BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP
William C. Fredericks
Laura H. Gundersheim
1285 Avenue of the Americas
New York, NY 10019
Tel:    212/554-1400
Fax:    212/554-1444

*Attorneys for Lead Plaintiff City of Miami
General Employees' & Sanitation
Employees' Retirement Trust and Co-Lead
Counsel for the Class*

KLAUSNER & KAUFMAN, PA
Robert D. Klausner
10059 N.W. 1st Court
Plantation, FL 33324
Tel:    954/916-1202
Fax:    954/916-1232

*Additional Counsel for Lead Plaintiff City of
Miami General Employees' & Sanitation
Employees' Retirement Trust*

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| | ) | |
| IN RE SUNRISE SENIOR LIVING | ) | MASTER FILE |
| SECURITIES LITIGATION | ) | 07-CV-00102 (RBW) |
| | ) | |
| This Document Relates to: | ) | **JURY TRIAL** |
| All Cases | ) | **DEMANDED** |
| | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF CLASS LEAD PLAINTIFFS'
MOTION FOR RECONSIDERATION OF THE COURT'S ORDER GRANTING
DEFENDANT SUNRISE'S MOTION TO ENFORCE STATUTORY STAY OF
DISCOVERY AND QUASH THIRD-PARTY SUBPOENA**

**BERMAN DEVALERIO PEASE
TABACCO BURT & PUCILLO**
Michael J. Pucillo
Jay W. Eng
Esperanté Building
222 Lakeview Avenue, Suite 900
West Palm Beach, FL 33401
Phone: (561) 835-9400

*Attorneys for Oklahoma Firefighters'
Pension and Retirement System*

**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**
William C. Fredericks
Laura H. Gundersheim
1285 Avenue of the Americas
New York, NY  10019
Phone: (212) 554-1400

*Attorneys for City of Miami General
Employees' & Sanitation
Employees' Retirement Trust*

*Co-Lead Counsel for Plaintiffs and the Class*

## PRELIMINARY STATEMENT

On August 6, 2008, this Court entered a Minute Order ("Minute Order") granting the motion of Defendant Sunrise Senior Living, Inc. ("Sunrise") to Enforce Statutory Stay of Discovery and Quash Third-Party Subpoena. However, Lead Plaintiffs were not afforded an opportunity, as provided by Local Rule 7(b), to respond to Defendant's motion before the Court issued its Minute Order. Had Lead Plaintiffs been given such an opportunity, the Court would have learned that the subpoena which Lead Plaintiffs served on Sunrise's former CFO, Bradley Rush (the "Rush Subpoena" attached as Exhibit "A"), seeks only a single document, namely the transcript of the testimony Mr. Rush provided to the Securities and Exchange Commission in June 2008 (the "Rush SEC Transcript"). The Court would have also learned that: (1) in September 2007, Mr. Rush filed a complaint in the Circuit Court of Fairfax County against Defendant Sunrise which detailed numerous instances of accounting irregularities Mr. Rush uncovered at Sunrise and brought to the attention of Sunrise senior management, the Sunrise Board of Directors and the SEC; (2) in May of 2008 – before the SEC took Mr. Rush's deposition – Sunrise reached a settlement with Mr. Rush which required Mr. Rush to sign a confidentiality clause whereby Mr. Rush can only provide information or documents in response to a subpoena; (3) Mr. Rush, a non-party to this action, does not object to producing the requested transcript, provided that it is pursuant to a subpoena; and (4) the Rush SEC Transcript is highly relevant to this litigation. Pursuant to Fed. R. Civ. P. 54(b), as interpreted by the courts of this jurisdiction, "justice requires" that the Court consider these facts and arguments before ruling on Defendant Sunrise's motion.

Numerous courts have permitted limited discovery of third parties, notwithstanding any PSLRA discovery stay, where – as here – a confidentiality agreement imposed by defendants precludes the third party from cooperating other than through legal process.  In such circumstances, plaintiffs have been held to have met the "undue prejudice" threshold sufficient to trigger the exception to the PSLRA discovery stay.

For the reasons set forth below, Lead Plaintiffs respectfully submit that upon reconsideration, Defendant Sunrise's motion should be denied and the Lead Plaintiffs should be permitted to obtain the single document requested in the Rush Subpoena – namely the Rush SEC Transcript.

## BACKGROUND

This securities class action was initiated January 16, 2007, and alleges that Defendants caused Sunrise to engage in numerous accounting improprieties between 2004 and 2006.  By June 2007, shortly after the initial complaint was filed, Sunrise publicly announced it would be restating its prior years' financial statements going back to 2002.  In July 2007, the Court appointed the City of Miami General Employees' & Sanitation Employees' Retirement Trust ("Miami Employees") and the Oklahoma Firefighters Pension and Retirement System ("Oklahoma Firefighters") as "Lead Plaintiffs" and entered an Order directing Lead Plaintiffs to file a Consolidated Amended Complaint promptly after Sunrise filed its restatement with the SEC.  On March 24, 2008, Sunrise finally filed its restatement and on June 6, 2008, Lead Plaintiffs filed their Consolidated Amended Complaint (the "Complaint").  The parties thereafter agreed to a briefing schedule, approved by this Court on July 17, 2008, providing that Defendants were to answer or otherwise respond to the Complaint by August 11, 2008.

On September 18, 2007, while Lead Plaintiffs were waiting for Sunrise to complete its

restatement, Bradley Rush – Sunrise's former Chief Financial Officer – filed a complaint in the Circuit Court of Fairfax County against Sunrise (the "Rush Complaint" attached as Exhibit "B"). The Rush Complaint alleged that on May 2, 2007, Sunrise terminated Rush "in retaliation for his discovery and disclosure of Sunrise's improper, and in some cases fraudulent, accounting practices, and as part of Sunrise's campaign to make Mr. Rush the 'fall guy' for its improper and fraudulent behavior" (Rush Complaint ¶1 ). The Rush Complaint further alleged that Rush uncovered "no less than nine significant improper accounting practices" at Sunrise and "brought them to the attention of Sunrise senior management, the Sunrise Board of Directors, and the SEC." (Rush Comp. ¶1) The Rush Complaint also detailed specific instances of accounting irregularities and described how, once the accounting errors were uncovered, Mr. Rush was pressured to "pay short shrift to potential accounting issues and to file a less than accurate and comprehensive restatement." (Rush Complaint ¶ 30).

In May 2008, Sunrise reached a settlement with Mr. Rush. The terms of that settlement have not been publicly disclosed. However, Lead Plaintiffs have been advised by Mr. Rush's counsel that, under the terms of the settlement, Mr. Rush cannot provide any information or documents concerning Sunrise or its accounting improprieties *except* in response to a subpoena or other judicial process.[1] Lead Plaintiffs also learned that Mr. Rush testified for two days in June 2008 before the Staff of the SEC, Division of Enforcement, and that the transcript of Rush's SEC Testimony had been prepared and was in the possession of Mr. Rush's counsel. Lead Plaintiffs requested a copy of the Rush SEC Transcript from Mr. Rush's counsel, but were informed that, while Mr. Rush had no objection to providing the document, he could not provide

---

[1]    If Defendant Sunrise contests Lead Plaintiffs' characterization of the Rush settlement agreement, the Court may wish to examine it *in camera* as it is in the possession of Defendant Sunrise.

the transcript in the absence of a subpoena under the terms of his settlement with Sunrise. Accordingly, on July 23, 2008, Lead Plaintiffs served the Rush Subpoena. *No other documents were sought under the Rush Subpoena, nor did it seek any live testimony*.

Lead Plaintiffs do not intend, and are not seeking to engage in, comprehensive merits discovery prior to a ruling on a motion to dismiss. To the contrary, no discovery at all is sought from Defendant Sunrise, and the Rush Subpoena seeks only a single document from a willing third party. The Rush SEC Transcript can be easily produced with no burden on any party to this litigation. The only reason a subpoena is required is that Defendant Sunrise has contractually precluded Mr. Rush from providing that transcript to Lead Plaintiffs absent a subpoena.

A lawsuit brought by the former Chief Financial Officer of a public company alleging "fraudulent accounting practices" by his former employer is, at best, highly unusual. The testimony of that former Chief Financial Officer, under penalty of perjury before the SEC, is highly relevant to this litigation.[2] But for Defendant Sunrise's attempt to silence Mr. Rush, a subpoena would not even be required.

## ARGUMENT

## I. "JUSTICE REQUIRES" RECONSIDERATION OF THE COURT'S MINUTE ORDER

A district court may revise its own interlocutory decisions "at any time before the entry of judgment adjudicating all the claims and rights and liabilities of all the parties." *Campbell v.*

---

[2]  The discovery sought in the derivative action, case 1:07-cv-00143-RBW, referenced in the Court's Minute Order, seeks completely different discovery on completely different grounds. There, plaintiffs have moved for an order authorizing the discovery of documents produced by Sunrise (1) to the SEC and (2) in a correlative derivative case pending in the Delaware Court of Chancery. *See* Plaintiffs' Motion to Partially Lift Discovery Stay, D.E. #62. In response to the derivative plaintiffs' motion, Sunrise made an argument, irrelevant here, that the discovery sought in the derivative case is not "particularized." *See* Sunrise Memorandum in Opposition to Plaintiffs' Motion to Partially Lift Discovery Stay, D.E. #64 at 12-13.

*U.S. Dept. of Justice*, 231 F. Supp. 2d 1, 6-7 (D.D.C. 2002) (quoting Fed. R. Civ. P. 54(b)); *see also Childers v. Slater*, 197 F.R.D. 185, 190 (D.D.C. 2000).   The *Campbell* court held that "[r]econsideration of an interlocutory decision is available under the standard, 'as justice requires.'" 231 F. Supp. 2d at 7-8 (citing *Childers*, 197 F.R.D. at 190).   *See also Hudert v. Alion Science & Tech. Corp.*, No. 05-545 (RBW), 2007 U.S. Dist. LEXIS 14896 at *7 (D.D.C. Mar. 2, 2007) (Walton, J.) ("'[A]n interlocutory order may be revised as justice requires.'")   The "as justice requires standard" amounts to determining "whether reconsideration is necessary under the relevant circumstances." *Cassanova v. Marathon Corp.*, 246 F.R.D. 376, 378 (D.D.C. 2007) (citing *Judicial Watch v. Dept. of the Army*, 466 F. Supp. 2d 112, 123 (D.D.C. 2006)).   As this Court has noted, "it is appropriate to grant a Rule 54(b) motion 'when the court has patently misunderstood a party, has made a decision outside the adversarial issues presented to the Court by the parties, [or] has made an error not of reasoning but of apprehension.'" *Lemmons v. Georgetown Univ. Hospital*, 241 F.R.D. 15, 22 (D.D.C. 2007) (Walton, J.) (citation omitted). "Errors of apprehension may include [the] Court's failure to consider controlling decisions or data that might reasonably be expected to alter the conclusion reached by the Court." *Id.* Moreover, "it is clear that courts have more flexibility in applying Rule 54(b) than in determining whether reconsideration is appropriate under Rules 59(e) and 60(b)." *Id.* "[T]he standard for reviewing a final order is stricter than the standard applicable to an interlocutory order…[which] may be revised as justice requires pursuant to Rule 54(b) [as opposed to manifest injustice under Rule 60(b)]." *Am. Lands Alliance v. Norton*, No. 00-2339, 2004 U.S. Dist. LEXIS 27533 (D.D.C. June 2, 2004) (Walton, J.).[3]

Here, given that Lead Plaintiffs did not have an opportunity to respond to Defendant's

---

[3]    Copes of on-line opinions cited herein are collectively attached as Exhibit C.

motion and present to the Court all the relevant facts and authority justifying the Rush Subpoena, "justice requires" that the Court's Minute Order be reconsidered.

## II.   LEAD PLAINTIFFS MEET THE TESTS OF PARTICULARIZED DISCOVERY AND UNDUE PREJUDICE

Congress expressly provided for an exception to the PSLRA's stay of "all discovery" where the court finds "particularized discovery is necessary to preserve evidence or to prevent undue prejudice." 15 U.S.C. § 78u-4(b)(3)(B). Had congress wanted to preclude all discovery prior to the pleadings being settled, or limit discovery efforts merely to preserve evidence, it could and would have expressly worded the PSLRA in that way. Instead, the text of the PSLRA provides for an "undue prejudice" exception, in addition to the preservation of evidence exception, and places both exceptions squarely within the district court's discretion. Lead Plaintiffs meet the PSLRA's two-pronged test of highly particularized discovery and undue prejudice articulated in this district and other courts. *In re Fannie Mae Sec. Litig.*, 362 F. Supp. 2d 37 (D.D.C.) (Leon, J.),

### A.   THE RUSH SUBPOENA SEEKS ONLY A SINGLE, SPECIFIED DOCUMENT

The discovery sought in the Rush subpoena could not be more narrowly tailored or particularized. Lead Plaintiffs are only seeking a single document; namely, the transcript of testimony given by Bradley Rush to the SEC on two days in June of 2008. No additional documents are sought. In light of Rush's suit against Sunrise in which he alleges the Company engaged in fraudulent accounting practices, and Sunrise's subsequent settlement of that suit, there is no question that this transcript will contain highly relevant discovery. Similarly, there is no burden whatsoever on Defendants. They need only receive a copy of the transcript produced

pursuant to the subpoena and open their mail when it arrives. This is precisely the type of highly particularized discovery for which exceptions to the discovery stay have been recognized.

### B. PRODUCTION OF THE ONE DOCUMENT SOUGHT IN THE RUSH SUBPOENA IS NECESSARY TO PREVENT "UNDUE PREJUDICE"

A partial lifting of the PSLRA discovery stay is warranted when the "prejudice is improper or unfair under the circumstances." *Fannie Mae*, 362 F. Supp. 2d at 39. Undue prejudice is defined as "improper or unfair treatment amounting to something less than irreparable harm." *In re ViVendi Universal S.A. Sec. Litig.*, 381 F. Supp. 2d 129, 130 (S.D.N.Y. 2003).

Courts have consistently found the PSLRA discovery stay unduly prejudicial when the discovery requested by the plaintiff is directed to a third party who would be entitled to provide information freely and voluntarily, but for the defendant's own actions. Here, Defendant Sunrise has effectively precluded Mr. Rush from cooperating with Lead Plaintiffs by entering into a settlement agreement prior to his SEC testimony which prevents Mr. Rush from communicating with or producing documents to Lead Plaintiffs without the legal process of a subpoena. But for the confidentiality terms in Sunrise's settlement agreement with Mr. Rush, Lead Plaintiffs would not have needed to issue the Rush Subpoena in the first place. This is precisely the type of undue prejudice that the exception to the PSLRA stay was meant to guard against.

Courts have consistently recognized that such affirmative steps by defendants to preclude normal information gathering constitutes undue prejudice for purposes of lifting the discovery stay.[4] Indeed, the instant case is extremely similar to *In re Flir Sys., Inc. Sec. Litig.*, No. 00-360-

---

[4]    In their Motion, Sunrise erroneously characterizes Lead Plaintiffs' reasoning for serving the Rush Subpoena based on one short phone call. The primary intent of that call was to advise defense counsel that the Rush Subpoena was being served, and to ensure that if Sunrise had an objection and intended to file papers, Lead Plaintiffs would suspend the obligation to comply

HA, 2000 U.S. Dist. LEXIS 19391 (D. Or. Dec. 13, 2000). There, like here, the third party from

whom discovery was sought, Palmquist, had "filed a civil complaint in state court that directly

corroborates plaintiff's allegations of fraud." *Id*. at *6. The court found it highly likely that

Palmquist had significant information about defendant's alleged fraud, in light of his complaint.

The court noted, "Palmquist is unavailable only because defendants have taken steps to ensure

that Palmquist could not talk to plaintiffs or provide relevant documents without the protection of

being ordered to do so pursuant to a subpoena." The court went on to permit relief from the

discovery stay.

Similarly, in *Anderson v. First Security Corp.*, 157 F. Supp. 2d 1230 (D. Utah July 30,

2001), the court permitted depositions to proceed notwithstanding the PSLRA discovery stay

when, again, a confidentiality agreement imposed by the defendant in the case precluded the

third party from cooperating with plaintiffs other than through legal process. The court went on

to note:

> Being cognizant of the exceptional circumstances required to lift a stay of discovery in
> such cases, the court nevertheless finds that, due to the confidentiality agreement that has
> precluded plaintiffs from obtaining specific information prior to filing their complaint,
> plaintiffs in this case will suffer undue prejudice if they are not permitted to conduct the
> requested limited discovery of these third party individuals.

*Id*. at 1242.

Likewise, in *In re JDS Uniphase Corp. Sec. Litig.*, 281 F. Supp. 2d 1127, 1134 (N.D. Cal.

2002), the court held that the PSLRA "was not intended to provide defendants with a means to

bar all investigation into their conduct" and was "not intended to provide defendants with

immunity from suit, but, rather, was intended to protect defendants from the burdens of

defending against frivolous litigation." *Id.* There, the court permitted plaintiffs to conduct

---

with the subpoena pending a ruling from this Court. There was no attempt in that brief
conversation to articulate Lead Plaintiffs' arguments.

interviews with former JDSU employees, narrowly construing "discovery" not to apply to such conduct. *Id.* *See also Lifting the PSLRA "Automatic Stay" of Discovery*, 80 N.D. L. Rev. 405, 408 (2004) ("The PSLRA is a shield intended to protect security-fraud defendants from costly discovery requirements, not to be a sword with which defendants can destroy the plaintiff's ability to obtain information from third parties who are otherwise willing to disclose it").

As the above demonstrates, Lead Plaintiffs have demonstrated that the limited, particularized discovery in the Rush Subpoena is necessary to prevent undue prejudice.[5]

### C.    THE RUSH SUBPOENA IMPOSES NO BURDEN ON DEFENDANTS

The PSLRA's stay provision was enacted by Congress to protect defendants from being coerced into a premature settlement of a *frivolous* claim (*see* H.R. Conf. Rep. No. 104-369, at 37 (1995), *reprinted* in 1995 U.S.C.C.A.N. 730, 736), and to prevent a "fishing expedition" in search of sustainable claims. *In re Delphi Corp. Sec. Deriv. & ERISA Litig.*, MDL No. 1725, 2007 U.S. Dist. LEXIS 10408 at *12-13 (E.D. Mich. Feb. 15, 2007) (citing *In re Worldcom Sec. Litig.*, 234 F. Supp. 2d 301, 305 (S.D.N.Y. 2002)).

Here, partially lifting the discovery stay for the very limited purpose requested herein would not frustrate Congress' purposes in enacting the PSLRA. Given the SEC's keen focus on Defendants' conduct in this case, it cannot credibly be argued that Lead Plaintiffs' allegations are frivolous or part of a fishing expedition. No fewer than three civil *and criminal* federal

---

[5]    Sunrise secondarily asserts that Lead Plaintiffs cannot obtain the discovery sought in the Rush Subpoena because a Rule 26(f) conference has not yet occurred. However, "courts have wide discretion in discovery matters and have allowed parties to conduct expedited discovery where good cause is shown." *Warner Bros. Records, Inc. v. Does 1-6*, 527 F. Supp. 2d 1 (D.D.C. 2007) (citing *Ellsworth Assoc., Inc. v. U.S.*, 917 F. Supp. 841 (D.D.C. 1996); *Semitool, Inc. v. Tokyo Electron Am., Inc.*, 208 F.R.D. 273, 275-76 (N.D. Cal. 2002) (adopting good cause standard for permitting expedited discovery in advance of the Rule 26(f) scheduling conference)). *See also Cartwright v. Viking Indus., Inc.*, 249 F.R.D. 351, 354 (E.D. Cal. 2008) ("Courts may order expedited discovery before a Rule 26(f) conference upon a showing of good cause.").

government agencies are all currently investigating Sunrise's accounting and/or option backdating practices. *See In re LaBrache Sec. Litig.*, 333 F. Supp. 2d 178, 183 (S.D.N.Y. 2004) (lifting discovery stay, in part, because "the SEC …[is] continuing to investigate the precise schemes alleged by Lead Plaintiffs in the Complaint"). Furthermore, Sunrise has admitted to certain of the alleged accounting manipulations in the Complaint. Thus, the Rush Subpoena is neither a "fishing expedition" nor can it be depicted as an attempt to bolster meritless litigation.

## CONCLUSION

For the foregoing reasons, Lead Plaintiffs respectfully request that this Court reconsider its Minute Order and enter an Order (a) DENYING Defendant Sunrise's motion to enforce statutory stay of discovery and quash subpoena, and (b) GRANTING Lead Plaintiffs permission to obtain the Rush SEC Transcript requested in the Rush Subpoena.

Dated: August 15, 2008

COHEN, MILSTEIN, HAUSFELD
 & TOLL, P.L.L.C.


 /s/  Daniel S. Sommers
Steven J. Toll, D.C. Bar #225623
Daniel S. Sommers, D.C. Bar #416549
Elizabeth S. Finberg, D.C. Bar #468555
1100 New York Ave., N.W.
West Tower, Suite 500
Washington, DC 20005-3965
Tel:    202/408-4600
Fax:    202/408-4699

*Liaison Counsel for Lead Plaintiffs*

BERMAN DEVALERIO PEASE
 TABACCO BURT & PUCILLO
Michael J. Pucillo
Jay W. Eng
Esperanté Bldg., Suite 900
222 Lakeview Avenue
West Palm Beach, FL 33401
Tel:     561/835-9400
Fax:     561/835-0322

*Attorneys for Lead Plaintiff Oklahoma*
*Firefighters' Pension and Retirement*
*System and Co-Lead Counsel for the Class*


BERNSTEIN LITOWITZ BERGER
 & GROSSMANN LLP
William C. Fredericks
Laura H. Gundersheim
1285 Avenue of the Americas
New York, NY 10019
Tel:     212/554-1400
Fax:     212/554-1444

*Attorneys for Lead Plaintiff City of Miami*
*General Employees' & Sanitation*
*Employees' Retirement Trust and Co-Lead*
*Counsel for the Class*


KLAUSNER & KAUFMAN, PA
Robert D. Klausner
10059 N.W. 1st Court
Plantation, FL 33324
Tel:     954/916-1202
Fax:     954/916-1232

*Additional Counsel for Lead Plaintiff City of*
*Miami General Employees' & Sanitation*
*Employees' Retirement Trust*

# EXHIBIT A





# COHEN MILSTEIN
## HAUSFELD & TOLL PLLC

Daniel S. Sommers
dsommers@cmht.com

July 23, 2008

**BY HAND DELIVERY**

John M. Dowd, Esq.
AKIN GUMP STRAUSS HAUER
  & FELD
Robert S. Strauss Building
1333 New Hampshire Ave., N.W.
Washington, DC  20036-1564

     **RE:**   *In Re Sunrise Senior Living Securities Litigation*

Dear Mr. Dowd:

    The undersigned is liaison counsel for lead plaintiffs.  Enclosed please find a subpoena directed to your client, Mr. Bradley B. Rush, relating to the above-referenced case.

Very truly yours,

Daniel S. Sommers

DSS/sah
Enclosure

cc:    Michael J. Pucillo, Esq. (By e-mail, with enclosure)
       William C. Fredericks, Esq. (By e-mail, with enclosure)
       George H. Mernick, III, Esq. (By hand delivery, with enclosure)
       David A. Becker, Esq. (By hand delivery, with enclosure)

390953.1 1

AO88 (Rev. 12/06) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT
### DISTRICT OF COLUMBIA

IN RE SUNRISE SENIOR LIVING SECS. LITIG.

V.

**SUBPOENA IN A CIVIL CASE**

Case Number:[1]   07-CV-00102

TO:   Bradley B. Rush,
c/o John M. Dowd, Esq.,
Akin Gump Straus Hauer & Feld, LLP, 1222 New Hampshire
Avenue, N.W., Washington, D.C., 20036-1564

☐  YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☐  YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|

☑  YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

Transcripts of all testimony of Bradley B. Rush in connection with the Securities and Exchange Commission's investigation into Sunrise Senior Living's financial statements and/or accounting relating to matters alleged in the Consolidated and Amended Class Action Complaint of Lead Plaintiffs Oklahoma Firefighters' Pension and Retirement System and City of Miami General Employees' & Sanitation Employees' Retirement System.

| PLACE   Cohen Milstein Hausfeld & Toll, P.L.L.C., 1100 New York Ave., N.W., West Tower, Suite 500, Washington, D.C. 20005, or otherwise agreed by counsel. | DATE AND TIME 7/30/2008 10:00 am |
|---|---|

☐  YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT)   *Attorney for Plaintiffs* | DATE 7/23/08 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Daniel S. Sommers, Cohen Milstein Hausfeld & Toll, P.L.L.C., 1100 New York Ave., N.W., West Tower, Suite 500, Washington, D.C. 20005, (202) 408-4600

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

AO88  (Rev.  12/06) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

---

Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2006:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.
(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.
(2) (A) A person commanded to produce and permit inspection, copying, testing, or sampling of designated electronically stored information, books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.
(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection, copying, testing, or sampling may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to producing any or all of the designated materials or inspection of the premises — or to producing electronically stored information in the form or forms requested. If objection is made, the party serving the subpoena shall not be entitled to inspect, copy, test, or sample the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production, inspection, copying, testing, or sampling. Such an order to compel shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection, copying, testing, or sampling commanded.
(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it
(i) fails to allow reasonable time for compliance;
(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held;
(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies; or
(iv) subjects a person to undue burden.
(B) If a subpoena
(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or
(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or
(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject

to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.
(1) (A) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.
(B) If a subpoena does not specify the form or forms for producing electronically stored information, a person responding to a subpoena must produce the information in a form or forms in which the person ordinarily maintains it or in a form or forms that are reasonably usable.
(C) A person responding to a subpoena need not produce the same electronically stored information in more than one form.
(D) A person responding to a subpoena need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or to quash, the person from whom discovery is sought must show that the information sought is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.
(2) (A) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial-preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.
(B) If information is produced in response to a subpoena that is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has and may not use or disclose the information until the claim is resolved. A receiving party may promptly present the information to the court under seal for a determination of the claim. If the receiving party disclosed the information before being notified, it must take reasonable steps to retrieve it. The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT. Failure of any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued. An adequate cause for failure to obey exists when a subpoena purports to require a nonparty to attend or produce at a place not within the limits provided by clause (ii) of subparagraph (c)(3)(A).

# EXHIBIT B

VIRGINIA:

FILED
CIVIL INTAKE
2007 SEP 18 AM 11: 39
JOHN T. FREY
CLERK, CIRCUIT COURT
FAIRFAX, VA

IN THE CIRCUIT COURT OF FAIRFAX COUNTY

BRADLEY B. RUSH,                   )
                                   )
        Plaintiff,                 )
                                   )
v.                                 )          Civil Action No. CL **2007 11822**
                                   )
SUNRISE SENIOR LIVING, INC.,       )
        Serve: CT Corporation System )
               4701 Cox Road, Suite 301 )
               Glen Allen, Virginia 23060 )
               (Henrico County)    )
                                   )
        Defendant.                 )

## COMPLAINT

Plaintiff Bradley B. Rush ("Mr. Rush") moves this Court for an entry of judgment in his favor against Defendant Sunrise Senior Living, Inc ("Sunrise"). In support of his Complaint, Mr. Rush avers as follows:

## NATURE OF ACTION

1.      This is an action by Mr. Rush against his former employer, Defendant Sunrise. As detailed herein, Mr. Rush served as Chief Financial Officer ("CFO") for Sunrise from August 4, 2005 until May 2, 2007. At that time, Sunrise abruptly terminated Mr. Rush without cause. Sunrise did this in retaliation for his discovery and disclosure of Sunrise's improper, and in some cases fraudulent, accounting practices, and as part of Sunrise's campaign to make Mr. Rush the "fall guy" for its improper and fraudulent behavior. Indeed, throughout his relatively brief tenure as CFO, Mr. Rush uncovered no less than nine significant improper accounting practices

historically employed by Sunrise, and brought them to the attention of Sunrise senior

management, the Sunrise Board of Directors, and the SEC.

    2.    Mr. Rush worked tirelessly to correct and remedy Sunrise's past accounting

problems. Much to the consternation of Sunrise's senior management and Board of Directors, he

sought to disclose fully to shareholders and the market all of Sunrise's accounting issues and

irregularities. He disclosed these matters both by meeting directly with the SEC and by

preparing a comprehensive and complete restatement of Sunrise's financial statements for the

years 2003 through 2005. Mr. Rush's discovery of Sunrise's accounting improprieties led, not

surprisingly, to both a SEC investigation and the filing of derivative and class action suits by

Sunrise shareholders.

    3.    While Mr. Rush was working toward issuing a complete and comprehensive

restatement, Sunrise's senior management decided to sell Sunrise to private investors — a move

that would result in both the elimination of SEC supervision of the company's financial

accounting, and in extraordinary profits for senior management and all of the members of

Sunrise's Board of Directors. On information and belief, Sunrise's CEO stood to make a profit

of more than $350 million on such a sale; Sunrise's President stood to make a profit of

approximately $40 million; and members of Sunrise's Board of Directors stood to profit by

approximately $3 million to $10 million each.

    4.    Mr. Rush's continued efforts to uncover and address Sunrise's accounting

improprieties threatened to thwart senior management's plans to sell to private investors, and the

enormous financial gain they and the directors would enjoy if such a sale occurred. Senior

managers strongly disapproved of Mr. Rush placing the public's interest in accurate financial

information above their interest in significant financial gain, and they pressured Mr. Rush to be

less thorough and to complete prematurely his analysis of accounting improprieties. Mr. Rush, however, refused to do so.

5.    Accordingly, as negotiations with private investors intensified, senior management and the Board of Directors resolved to simultaneously remove the obstacle Mr. Rush represented and present a scapegoat for Sunrise's many irregularities and improprieties by terminating Mr. Rush's employment without cause.

6..    Leading up to and following Mr. Rush's termination, Sunrise, by and through its senior management, Board of Directors, and counsel, initiated a public and private campaign to defame Mr. Rush directly and through innuendo. It executed this strategy by making false allegations and suggestions that Mr. Rush had destroyed documents and violated certain company policies, and that he had been discharged because he was responsible for and had attempted to conceal Sunrise's accounting improprieties — the very improprieties Mr. Rush had uncovered and was trying to address.

7.    The termination of Mr. Rush was without cause. The only documents Mr. Rush failed to retain were personal documents that Sunrise's general counsel told him did not need to be retained.

8.    The termination, and Sunrise's subsequent conduct, resulted in multiple breaches of its contractual obligations to Mr. Rush. These breaches deprived Mr. Rush of a series of options to purchase large amounts of Sunrise stock, as well as substantial bonus awards.

9.    The improper termination of Mr. Rush based on false grounds, and the related campaign to impugn his character, competence and professional integrity, defamed Mr. Rush and caused substantial and irreparable damage to his reputation, his career prospects, his earning capacity, and his standing in the business community.

3

**PARTIES**

10.    Mr. Rush is a resident and citizen of the County of Loudoun in the Commonwealth of Virginia.

11.    Defendant Sunrise is a Delaware corporation with its principal place of business in McLean, Virginia. At all times relevant to this action, Sunrise's business consisted primarily of the development, construction, sale, and operation of senior citizen assisted living communities throughout North America and Europe.

**JURISDICTION AND VENUE**

12.    This Court has jurisdiction over the subject matter of this action pursuant to Va. Code Ann. §§ 17.1-513 and 16.1-77 because this is a civil action involving a claim for damages in excess of $15,000.

13.    This Court has personal jurisdiction over Defendant Sunrise pursuant to Va. Code Ann. § 8.01-328.1 because Mr. Rush's causes of action arise from Sunrise's transaction of business in the Commonwealth of Virginia, and because Defendant Sunrise committed acts, omissions, and tortious conduct in the Commonwealth of Virginia causing injury and damages to Mr. Rush.

14.    Venue is proper in this forum pursuant to Va. Code Ann. § 8.01-262 because Fairfax County is both the location of Sunrise's principal place of business and the place where Sunrise regularly conducts substantial business activity, and because a substantial part of Defendant's acts, omissions, and tortious conduct giving rise to Mr. Rush's causes of action occurred in Fairfax County.

4

## FACTUAL ALLEGATIONS

### Mr. Rush Joins Sunrise And Is Promoted To Chief Financial Officer

15.     In July 2003, Sunrise acquired Marriott Senior Living Services, Inc., in partnership with CNL Retirement Properties, Inc. At that time, Mr. Rush was employed by CNL Retirement Corporation, advisor to CNL Retirement Properties, Inc., as Senior Vice President for Acquisitions and Finance. After the acquisition was completed, Sunrise hired Mr. Rush as Executive Vice President ("EVP") of Sunrise's Properties Division.

16.     Mr. Rush was named Acting Chief Investment Officer ("CIO") in July 2004, and named CIO on a permanent basis in January 2005.

17.     It was not Mr. Rush's responsibility, either as EVP or as CIO, to review or approve Sunrise's accounting practices; nor did Mr. Rush have the authority to review or approve them.

18.     Between May and July of 2005, Mr. Rush worked with Sunrise's CEO Paul Klaassen, President Thomas Newell, General Counsel John Gaul, and Chief Operating Officer Tiffany Tomasso to reorganize the finance, accounting, and technology functions at Sunrise. As part of the reorganization plan, the CFO and CIO roles were combined into one position that Mr. Rush would fill. On August 4, 2005, Mr. Rush assumed the position of CFO, replacing then-CFO Larry Hulse.

### Mr. Rush Discovers And Addresses Certain Accounting Irregularities

19.     As part of his reorganization of Sunrise's finance and accounting functions, Mr. Rush terminated Sunrise's Treasurer because Mr. Rush suspected he was improperly manipulating accounting figures. Further, Mr. Rush determined that the accounting division was lacking personnel with sufficient real estate transaction experience. Seeking to augment the

division's level of expertise, Mr. Rush hired Julie Pangelinan as Sunrise's Chief Accounting

Officer ("CAO") in April 2006.

20.    Beginning in the Third Quarter 2005 and continuing through and until his

termination in May 2007, Mr. Rush, at times with the assistance of Ms. Pangelinan, discovered

and attempted to address certain issues and irregularities with regard to Sunrise's accounting

methodology. Mr. Rush worked closely with Sunrise's external auditors, Ernst & Young, while

leading the efforts to address these irregularities. As Mr. Rush discovered Sunrise's accounting

issues and developed methodologies to address them, he routinely advised Sunrise's Board of

Directors and Audit Committee of his discoveries and progress through monthly memoranda to

the Board and during quarterly meetings of the Board and Audit Committee.

21.    The first issue arose in the Third Quarter of 2005 when Mr. Rush learned that

Ernst & Young was advising Sunrise to apply the Hypothetical Liquidation at Book Value

("HLBV") methodology to certain joint ventures with equity partners. The HLBV methodology

applies to ventures in which a party extends a "capital preference" to its equity partner that

entitles the equity partner to recover its investment in the joint venture before the party recovers

its own investment. Historically in these situations, Sunrise recognized its share of the profits in

the quarter in which they were earned. However, the HLBV methodology would require Sunrise

instead to take the first losses by writing down its share of the investment to zero until the equity

partner had recovered its investment and the capital preference had expired. Application of the

HLBV methodology did not appear to yield a materially different result than the result produced

using Sunrise's prior accounting methodology. Accordingly, Mr. Rush decided that the HLBV

methodology would be applied on a prospective basis only. Ernst & Young agreed that the result

did not appear to be material and that a prospective application of the HLBV methodology was appropriate.

22.    Second, Sunrise historically had used excess insurance reserves to make up for earnings shortfalls in other areas. Based upon Ernst & Young's recommendation, Mr. Rush determined that Sunrise instead should either recognize all of its excess insurance reserves immediately, or defer recognition of these reserves permanently. Mr. Rush did not believe that Sunrise's historical treatment of its insurance reserves required review or restatement. Ernst & Young agreed that it would be sufficient for Sunrise to change its handling of insurance reserves on a prospective basis. In March 2006, Mr. Rush advised the full Audit Committee and Board of Directors of his decision to modify the accounting treatment of Sunrise's health insurance reserves.

23.    Third, in or about April 2006, Ms. Pangelinan discovered that Sunrise had misapplied Ernst & Young's HLBV spreadsheet and, as a result, had improperly recognized partnership profits in joint ventures where Sunrise's partner held a capital preference. Mr. Rush decided to postpone the filing of Sunrise's Form 10-Q for the First Quarter of 2006 while he and Ms. Pangelinan evaluated the materiality of Sunrise's accounting error to determine whether a restatement of Sunrise's past financials would be necessary. In early May 2006, Mr. Rush informed the Board of Directors and Audit Committee of the error and of the postponement of the filing of the Form 10-Q. On May 11, 2006, Sunrise issued a press release stating that it would "not file its [F]orm 10-Q until it complete[d] its review" of the partnership profits issue.

24.    Fourth, Ms. Pangelinan discovered a problem with Sunrise's accounting treatment of gains on the sale of certain real estate assets that were subject to guarantees and commitments. As part of its joint venture agreements, Sunrise typically extended three to five year guarantees

and commitments to its capital partners and lenders. Under proper real estate accounting

principles, Sunrise should have recognized any gain on the sale of its interest in these joint

ventures only after such guarantees and commitments had expired, or ratably as they expired.

Historically, however, Sunrise had recognized gains on the sale of such assets upon receipt.

25.    Mr. Rush determined that both the real estate guarantees issue and the partnership

profits issue required that Sunrise's financial statements be restated in order to provide the

financial community and the general public with an accurate picture of Sunrise's financial

situation and to alert them that they could not rely on previously issued financial statements. In

late July 2006, Mr. Rush recommended the restatement of Sunrise's financials to the Board of

Directors and Audit Committee.

26.    On July 31, 2006, Sunrise issued a press release stating that it would "restate its

financial statements for the years ended December 31, 2003, 2004, and 2005 primarily to adjust

the accounting treatment related to ventures that contain partner preferences and the timing of

sale accounting and recognition of income from prior sales of real estate." Sunrise also filed

with the SEC a Form 8-K indicating that due to errors, the public could no longer rely on

Sunrise's previously issued financial statements.

27.    After Sunrise announced its intent to restate its financials, the SEC asked that

Sunrise provide it with a written "roadmap" to the issues addressed by the restatement. Sunrise

agreed to provide this roadmap to the SEC once it had identified the issues for restatement.

**Late 2006: Looking To Take Sunrise Private, Sunrise Senior Management And Board Of
Directors Pressure Mr. Rush To Stop Searching For
Accounting Issues And To Complete The Restatement Prematurely**

28.    Shortly after Sunrise announced that it would issue a restatement, Mr. Rush

received calls from an investment bank and investment management firm interested in the

possible privatization of Sunrise.  Mr. Rush responded that he was responsible for Sunrise's

accounting issues only and not for determinations about Sunrise's potential privatization.  On

information and belief, beginning in at least August and September 2006, Sunrise senior

management, including CEO Klaassen and President Newell, were likewise receiving inquiries

from private investors interested in acquiring Sunrise.

29.     During the last months of 2006, it became apparent to Mr. Rush that Sunrise

senior management was actively considering selling Sunrise to private investors.  During this

period, Klaassen and Newell repeatedly pressured Mr. Rush to complete the restatement without

regard to whether all accounting issues had been correctly resolved so the company could go

forward with privatization.  The tenor of their comments was that Mr. Rush needed to rein in

Ernst & Young and Ms. Pangelinan so they would stop finding accounting issues that were

delaying completion of the restatement, regardless of whether these issues were matters of

legitimate concern.

30.     In November 2006, for example, Newell came to Mr. Rush's office and told Mr.

Rush that his "credibility was at risk" with the Board of Directors and the Audit Committee

because Mr. Rush was not "managing" Ernst & Young.  Similarly, on several occasions in this

time period, CEO Klaassen told Mr. Rush that his work on the restatement was taking too long

and that Mr. Rush was letting Ernst & Young "run all over" him.  Mr. Rush resisted this pressure

to pay short shrift to potential accounting issues and to file a less than accurate and

comprehensive restatement.  Instead, he worked methodically to complete a proper restatement.

**December 2006: Mr. Rush Recommends That An Independent Committee Be Formed To**
**Investigate Issues Raised By Shareholders**

31.     On November 20, 2006, one of Sunrise's shareholders, the Service Employees

International Union ("SEIU"), wrote a letter to Sunrise's Board of Directors raising three

9

accounting-related issues. These issues concerned: (i) "[t]he joint venture and revenue

recognition accounting practices that led to the accounting review;" (ii) "[t]he more than $32

million of stock sales by Sunrise executives and Directors between late 2005, when management

stated it first began contemplating the change of accounting methodology, and May 2006, when

Sunrise announced the accounting change;" and (iii) "[t]he timing of and accounting treatment

for executive stock option grants between June 1996 and October 2005 and for the repricing of

options in September 1998." (A copy of the November 20, 2006 letter is attached hereto as

Exhibit A).

32.    On December 4, 2006, Mr. Rush recommended that the Board of Directors form

an Independent Committee to investigate the SEIU's allegations. The Board adopted Mr. Rush's

suggestion and created an Independent Committee consisting solely of Director William Little.

At the recommendation of Sunrise's external counsel at Hogan & Hartson, LLP, Little retained

William McLucas and Laura Wertheimer of WilmerHale, LLP to conduct the independent

investigation.

33.    The Independent Committee was given authority to investigate only the SEIU's

allegations of insider trading and improper options dating. It was not given authority to

investigate the accounting issues that were the subject of the restatement because Mr. Rush, Ms.

Pangelinan, and Ernst & Young were exhaustively reviewing these issues. A press release dated

December 11, 2006, made this division of labor clear. In the press release, Sunrise announced

that it had "appointed a special independent committee to review recent insider sales of Sunrise

stock and the Company's historical practices related to stock option grants." The press release

further noted that the independent committee's review would "be conducted in parallel with the

10

Company's ongoing efforts to complete the previously announced restatement of its financial statements."

### December 2006: Mr. Rush Discovers A Problem With Sunrise's Handling Of Its "Construction In Process" Reserves

34.     In December 2006, Mr. Rush and Ms. Pangelinan identified an additional accounting irregularity.  This one related to Sunrise's handling of its capitalization of certain costs and its treatment of its "construction in process" reserves taken against those capitalized amounts.  Historically, Sunrise had experienced a loss of approximately $6 million per year on projects under development, also referred to as "construction in process," that were terminated before completion.  Sunrise maintained a reserve account for these losses.

35.     Under proper real estate accounting principles, Sunrise should have recognized its actual losses on construction in process as those losses occurred.  Instead, Sunrise spread the historical annual loss figure of $6 million, by recognizing approximately $500,000 each month.

36.     In addition, Sunrise improperly capitalized certain amounts relating to construction in process in an effort to reduce artificially general and administrative expenses for the company.

### December 2006 – January 2007: WilmerHale Interviews Mr. Rush But Shows No Interest In The Substantive Issues Raised By The Shareholders

37.     As part of its investigation, WilmerHale conducted interviews with Sunrise employees.  On December 20, 2006, an attorney with WilmerHale, along with a forensic accountant, interviewed Mr. Rush about his documents and files.  Mr. Rush described the documents in his office and showed the attorney where they were located.  Mr. Rush also told the WilmerHale attorney that he used two computers for work; the desktop computer in his office and a black Macintosh laptop.  The WilmerHale attorney did not ask Mr. Rush any substantive

11

questions about the alleged insider trading or options backdating matters that were the intended subject of WilmerHale's investigation.

38.    A few days later, this same WilmerHale attorney interviewed Mr. Rush again about the documents and files in his office. Although Mr. Rush stated that he did not believe he possessed any documents or files related to the matters WilmerHale was supposed to be investigating, WilmerHale removed approximately eight boxes of documents from Mr. Rush's office. As before, the WilmerHale attorney did not ask Mr. Rush any substantive questions about the matters under investigation.

39.    On January 3, 2007, Sunrise's Technology Group Director, Tracy Woods, notified Mr. Rush that the hard drives of his desktop and laptop computer would be "imaged" (copied) in connection with WilmerHale's investigation. On January 8, 2007, the imaging was completed.

### December 2006 – January 2007: The SEC Interviews Mr. Rush

40.    In late December 2006, the SEC asked to speak with a Sunrise representative about the issues raised in the SEIU letter. Mr. Rush volunteered to meet with the SEC. The meeting was schedule for January 11, 2007. Mr. Rush spent much of the first ten days of January 2007 preparing for the meeting.

41.    On three separate occasions, Mr. Rush met with attorneys from Hogan & Hartson, who provided him with advice on how to handle his scheduled meeting with the SEC.

42.    The meeting with the SEC occurred as scheduled on January 11, 2007. During the meeting, Mr. Rush explained what he knew about the issues raised in the SEIU letter, and about the major accounting issues to be covered in the restatement. Mr. Rush also advised the SEC that Sunrise would not be able to meet the March 1, 2007 deadline for completing the restatement.

12

43.    Sunrise's Board of Directors met on January 12, 2007, to discuss the SEC meeting.  During this meeting, Sunrise's General Counsel John Gaul and Douglas Fellman of Hogan & Hartson, both of whom had been present during the SEC interview, informed the Board that Mr. Rush had done an excellent job during the SEC interview.

**Late January 2007 – Late March 2007: The Campaign Against Mr. Rush Escalates As Sunrise Senior Management And Board Of Directors Actively Pursue Taking Sunrise Private**

44.    In January or February 2007, Mr. Rush participated in a meeting during which Klaassen and Newell described discussions they had with Oak Hill Partners, Morgan Stanley, Citigroup, and other potential private equity investors regarding the potential privatization of the company.  For the first time, Mr. Rush realized that Newell and Klaassen had engaged in extensive negotiations with potential private investors, and had even provided detailed valuation scenarios to them.  In fact, some of the potential investors had made firm offers at a determined price per share.  Sunrise's shareholders and Board of Directors had not been informed of these developments.

45.    Klaassen and Newell admitted that their discussions with private equity firms might conflict with their duties as members of Sunrise's management, because both stood to gain extraordinary profits if Sunrise was acquired.  In fact, on information and belief, Klaassen stood to gain more than $350 million and Newell approximately $40 million.

46.    Klaassen stated that if asked, Klaassen and Newell were going to deny that substantive discussions had occurred and would falsely describe any meetings with potential private equity investors as merely preliminary and conceptual.  Klaassen encouraged Mr. Rush and others present likewise to have consistent "convenient" memories.

13

)

47.     Angered by this pressure from Klaassen, Mr. Rush told General Counsel John

Gaul and others that he would not follow Klaassen's directive and, if asked, would disclose the

true nature and extent of the negotiations.

48.     Sunrise's campaign against Mr. Rush escalated following Mr. Rush's declaration

that he would not follow Klaassen's directive, but rather would answer truthfully all questions

about the nature and extent of negotiations with potential private equity investors.  On February

25, 2007, during a conference call with the Board of Directors, McLucas and Wertheimer of

WilmerHale requested that the scope of their investigative authority be expanded to include the

accounting issues that Mr. Rush had identified and was addressing in the pending restatement.

49.     Notwithstanding Mr. Rush's performance during the SEC interview, which

counsel for Sunrise acknowledged had been excellent, WilmerHale's attorneys claimed that the

SEC was not satisfied with the review being conducted by Mr. Rush, Ms. Pangelinan, and Ernst

& Young, and was pushing for an expanded independent review of the accounting issues at

Sunrise.

50.     During that call, Ms. Wertheimer asked who would know about accounting issues

with regard to year-end 2006.  In response, Mr. Newell asked Ms. Wertheimer if she had spoken

to Mr. Rush.  Wertheimer replied that she had not spoken to Mr. Rush because Mr. Rush was "a

player in all of this."  Mr. Rush, who was on this conference call, was shocked that Wertheimer

would call him "a player." Ms. Wertheimer knew that the accounting issues that were the subject

of the restatement predated Mr. Rush's tenure as CFO.  She also knew that Mr. Rush himself had

taken the lead in identifying and correcting the errors that had occurred under the watch of the

previous CFO.

14

51.    At the conclusion of the call, the Board agreed to grant WilmerHale the increased authority it had requested.

**March 2007: Mr. Rush Completes The "Roadmap" And Is Pressured By Sunrise To Prematurely Terminate His Investigation And Issue A Less Than Complete Restatement**

52.    In March 2007, Mr. Rush and CAO Pangelinan completed work on an eleven-page letter that responded to the SEC's July 2006 request for a "roadmap" to the restatement issues. This roadmap letter identified the accounting issues that Mr. Rush and Ms. Pangelinan had discovered. It explained in detail how the problems had arisen, and delineated the impact of the accounting issues as far back as 1998. The roadmap was reviewed and approved by Ernst & Young.

53.    On March 13, 2007, Mr. Rush presented the roadmap letter to Sunrise's Board of Directors and Audit Committee. At this Board meeting, Mr. Rush was again pressured to rush the restatement to completion notwithstanding the need for more time to fully address the many accounting irregularities and their impact. In the midst of presenting the roadmap document, Director William Little (who comprised the one-man Independent Committee) pounded his fist on the table and yelled at Mr. Rush, "When are you going to finish the restatement?" Directly following this Board meeting, the Board's Compensation Committee held an executive session during which it approved a $75,000 raise for Mr. Rush, but deferred payment of his 2006 bonus until he completed the restatement.

54.    Despite this increasing pressure — including the financial "carrot" to induce Mr. Rush to quickly complete the restatement — Mr. Rush continued to methodically and thoroughly address the accounting irregularities.

55.    Senior management at Sunrise viewed Mr. Rush's insistence on a complete and accurate restatement as an obstacle to its plans to complete the sale of Sunrise to private

15

investors, which would free Sunrise from SEC scrutiny and enrich Sunrise's senior managers and

Board members.

### Late March 2007: WilmerHale Accuses Mr. Rush Of Wrongdoing And Sunrise Refuses To Provide Him With Separate Legal Counsel

56.       Within a few of days of the March 13, 2007 Board meeting, another attorney with

WilmerHale conducted a third interview with Mr. Rush. Once again, Mr. Rush was not asked

any substantive questions about the issues that were the subject of WilmerHale's investigation.

Instead, this WilmerHale attorney insinuated that there was a suspicious lack of handwritten

notes by Mr. Rush in the documents previously collected from him. In response, Mr. Rush stated

that he had files full of handwritten notes and had shown these files to the other WilmerHale

attorney who had interviewed Mr. Rush back in December 2006. Mr. Rush further explained that

throughout his time at Sunrise he had changed how he organized and maintained his notes, but

that he had shown the other WilmerHale attorney all of his files and had made them available for

copying previously. During this third interview of Mr. Rush, this WilmerHale attorney stated

that WilmerHale did not have all of Mr. Rush's notes and removed additional files from his

office.

57.       The tenor and substance of the meeting with the WilmerHale attorney, coupled

with Ms. Wertheimer's comment that Mr. Rush was a "player" in the accounting irregularities,

suggested that WilmerHale was accusing Mr. Rush of having removed documents from his files.

Mr. Rush therefore asked General Counsel Gaul if he could have his own lawyer. Gaul refused

Mr. Rush's request. On two other occasions during this same time period Mr. Rush asked

Sunrise senior management if he could obtain legal counsel to represent him with regard to

WilmerHale's investigation, and in connection with the shareholder derivative and class action

lawsuits in which he and other Sunrise managers were named. His requests were denied.

16

Instead, an attorney with Covington & Burling was retained to represent all management in the shareholder lawsuits.

58.    Around March 18 or 19, 2007, Tracy Woods contacted Mr. Rush about a second laptop previously issued to Mr. Rush by Sunrise. Mr. Rush did not recall the location of this second older laptop that he had previously used for work. In November 2006, Mr. Rush had stopped using this laptop and had transferred all of his work documents and files from this second laptop to his current work laptop (which had already been imaged for WilmerHale).

59.    When reminded by Ms. Woods about this second, older laptop, Mr. Rush initially thought he had given it to his assistant because he was no longer using it. However, he later found it in a box at his home, and immediately thereafter turned it over to WilmerHale.

60.    Mr. Rush had already provided WilmerHale with all work-related documents and files contained in the second laptop. Everything else on this second older laptop consisted of Mr. Rush's personal tax returns, personal passwords, music, and photos.

61.    General Counsel John Gaul previously had told Mr. Rush that personal files and materials did not need to be turned over to WilmerHale. Moreover, Mr. Rush was aware that other Sunrise officers had likewise deleted personal files and materials from their computers before turning them over to WilmerHale for imaging. Therefore, before providing the second older laptop to WilmerHale, Mr. Rush cleared his user ID from this laptop thereby deleting all files (i.e., work-related documents that had already been provided to WilmerHale and personal materials that Mr. Rush was not required to provide) from the computer.

62.    On March 20, 2007, Mr. Gaul sent Mr. Rush a copy of an email from Ms. Wertheimer in which she stated that Mr. Rush had told WilmerHale "that he either did not have a Sunrise issued home computer or that the Sunrise computer issued to him had been provided to

17

his assistant." Ms. Wertheimer further stated that "help desk tickets" and "email traffic" suggested that Mr. Rush did have a Sunrise-issued computer that he had not provided to the company. Mr. Gaul recommended that Mr. Rush meet with Ms. Wertheimer to resolve the "confusion" over the second laptop because WilmerHale appeared to be drawing a "negative inference" from the supposed inconsistency between Mr. Rush's statements and the fact that he did have this second older laptop.

      63.     Mr. Rush called Ms. Wertheimer and left her a voicemail message indicating that there had been a misunderstanding, in that Mr. Rush initially had not realized he still had the second laptop. Yet another attorney with WilmerHale returned Mr. Rush's call and Mr. Rush explained the misunderstanding to her.

### April 2007: On The Eve Of Sunrise's Senior Management And Board Of Directors Moving Forward With Privatization, Mr. Rush Informs Sunrise's President Of Fraudulent Earnings Manipulation At Sunrise

      64.     Eventually a meeting between Mr. Rush and Ms. Wertheimer was scheduled for April 13, 2007. WilmerHale canceled the meeting two hours before it was scheduled to begin. Simultaneously, the Board was trying to schedule a meeting to decide whether to move forward with the potential sale of Sunrise. Paul Klaassen told Mr. Rush that the Board was waiting to meet about this crucial matter until after Mr. Rush met with WilmerHale.

      65.     During this same period, on or about April 18 or 19, 2007, Ms. Pangelinan told Mr. Rush that she had uncovered evidence of fraudulent earnings manipulation by Sunrise's former Treasurer. Specifically, Ms. Pangelinan advised that the status of projects under construction had been fraudulently manipulated in order to "smooth out" Sunrise's quarterly financials. The effect of the Treasurer's manipulations was to artificially adjust the risk of loss on individual projects under construction in order to enable Sunrise to recognize a stable amount

18

of loss on construction in process each month, usually around $500,000, calculated to approximate Sunrise's actual losses based on historical experience. These manipulations thus allowed Sunrise to avoid the recognition of sudden large losses, and to maintain the appearance of stable, steady income.

66.    Mr. Rush promptly informed President Newell of this discovery and advised Newell that, in his view, the Treasurer's actions constituted fraudulent earnings management. This disclosure represented yet another potential obstacle to the sale of Sunrise to private investors. It also constituted potential evidence that shareholders could cite in support of an insider trading claim (i.e., that insiders at Sunrise had profited by trading shares with the benefit of knowledge that the general public lacked about the company's true financial condition).

**April 2007: On The Eve Of Sunrise's Decision To Go Private, Mr. Rush Is Interrogated By WilmerHale And Suspended By Sunrise**

67.    On April 19, 2007, Mr. Rush's meeting with WilmerHale was re-scheduled for April 23, 2007 at 10:00 AM. However, on April 20, 2007, WilmerHale moved the meeting to 8:30 AM. Mr. Klaassen then scheduled the Board meeting for later in the afternoon of April 23, 2007.

68.    During the April 23, 2007 meeting, Mr. Rush, accompanied by an attorney from Covington & Burling, was subjected to several hours of one-sided interrogation. Ms. Wertheimer attacked Mr. Rush with baseless allegations and insinuations of wrongdoing ranging from the misunderstanding surrounding his second older laptop, to software Mr. Rush used and purchased when he was head of Sunrise's Information Technology group, to the fact that Mr. Rush had many different email accounts.

69.    Once again, Ms. Wertheimer did not ask Mr. Rush a single substantive question related to her actual investigatory assignment — i.e., the accounting irregularities that were the

subject of the restatement and the allegations raised by Sunrise shareholders. Ms. Wertheimer questioned Mr. Rush about various matters that she insisted indicated wrongdoing by Mr. Rush, yet she refused to listen to Mr. Rush's efforts to respond to her allegations. Moreover, she never substantiated her claims with any actual evidence that Mr. Rush had deleted materials relevant to the investigation.

70.     Just hours after this April 23, 2007 meeting, Paul Klaassen and President Newell informed Mr. Rush that he was being suspended with pay. Mr. Klaassen and Mr. Newell did not state the reasons for Mr. Rush's suspension. Mr. Rush inquired as to whether he should resign. Mr. Klaassen stated that he should not do so because a resignation by Mr. Rush could adversely affect Mr. Rush's interest in equity and benefits he had been awarded.

71.     On this same date, Mr. Rush learned that Sunrise would not provide to the SEC the eleven-page roadmap letter created by Mr. Rush and Ms. Pangelinan that explained Sunrise's accounting issues, even though the SEC had requested the roadmap and Sunrise had promised to provide it.

72.     On April 25, 2007, Sunrise issued a press release announcing that following a briefing by the special independent committee, the Board decided to suspend Mr. Rush with pay. The press release also stated that

> The special independent committee is reviewing recent insider sales of the Company's stock, the Company's historical practices related to stock option grants and the facts and circumstances relating to the historical accounting treatment of certain categories of transactions in the previously announced pending restatement of the Company's financial statements. The Board concluded that actions taken by Mr. Rush were not consistent with the document retention directives issued by the Company.

73.     In fact, however, Mr. Rush's actions were consistent with the instructions he had received from Sunrise. The only documents that he did not retain and did not provide to

20

WilmerHale were personal files and materials. As noted, Sunrise's general counsel had said these materials did not need to be turned over to WilmerHale, and other Sunrise officials had also not turned over personal files and materials.

74.     On April 26, 2007, the *Washington Post* reported on Mr. Rush's suspension. Its report echoed the Company press release's explanation that Mr. Rush had taken actions that "were not consistent with the document retention directives issued by the Company." However, Sunrise spokeswoman Lisa Mayr went further and accused Mr. Rush of destroying relevant documents. The *Washington Post* quoted her as stating that Mr. Rush had been suspended because Sunrise "'believe[d] some records [related to the SEC's and WilmerHale's investigation] were destroyed.'" Ms. Mayr also stated "Sunrise management maintains that there were no insider stock sales based on inside information and that no stock options were backdated," and that "no other executives were found to have been involved in the alleged document destruction."

75.     These false statements by Sunrise were intended to suggest that Mr. Rush was responsible for, and had tried to conceal, Sunrise's accounting improprieties. Sunrise's intent in this regard was further borne out in the statement of Stephen Abrecht, Director of the SEIU, in the *Washington Post* article that Mr. Rush's suspension "confirm[ed] [SEIU's] worst fears that something is amiss here."

21

**May 2007: Sunrise Terminates Mr. Rush's Employment Without Cause**

76.    On May 2, 2007, without notice, Mr. Klaassen called Mr. Rush and told him that the Board of Directors had decided to terminate Mr. Rush's employment. On May 3, 2007, Sunrise issued a press release stating simply that Sunrise had terminated Mr. Rush's employment for cause.

77.    On May 4, 2007, the *Washington Post* reported on Mr. Rush's termination. The *Washington Post's* report recounted that Mr. Rush had been suspended the week before "for actions 'not consistent with . . . document retention directives.'" It also noted that although Mayr had said the week before that Sunrise "believed some records were destroyed," she now stated in an email that "'no conclusions have been reached that records or documents were destroyed by Mr. Rush . . . . The only conclusion reached was that contained in the press release — that the actions taken by Mr. Rush were not consistent with the document retention directives issued by the company.'"

78.    Sunrise never retracted any of its statements reported in the April 26, 2007 article.

79.    No documents ever possessed by Mr. Rush relating to the restatement or the shareholder lawsuits are missing or alleged to be missing.

80.    Defendant Sunrise terminated Mr. Rush without cause and without affording him a hearing before the Board of Directors or the opportunity to address or rebut any of the allegations against him.

81.    The termination of Mr. Rush's employment without cause served a number of improper purposes. It made Mr. Rush the "fall-guy" for accounting irregularities that pre-dated his responsibility for Sunrise's financial accounting, even though it was Mr. Rush who had uncovered most of these irregularities. It ended his ability to impede, through his diligent efforts

22

on behalf of shareholders, a sale to private equity investors that would vastly enrich senior management and members of the Board of Directors. It also punished Mr. Rush for his past diligence in this regard, which senior management and the Board of Directors bitterly resented.

82.   Sunrise canceled Mr. Rush's health insurance without notice and refused Mr. Rush's request for access to the documents, computers, employees, and information that would establish conclusively that he was fired for baseless reasons and without cause. In addition, Sunrise divested Mr. Rush of 80,000 vested shares awarded pursuant to a September 8, 2005 options grant.

83.   Following his termination, Defendant Sunrise also denied Mr. Rush certain bonus awards, his vested shares awarded pursuant to a September 10, 2003 options grant, and his vested shares in restricted Sunrise stock awarded in January and August 2005.

84.   Defendant Sunrise asserted that Mr. Rush forfeited these benefits because he was terminated for cause. The various contracts and agreements governing the award of all of these benefits carry the same or similar definition of "cause." For example, "cause" is defined, in pertinent part in one of the agreements as where:

> (a) the Executive is found guilty by a court of having committed fraud or theft against the Company and such conviction is affirmed on appeal or the time for appeal has expired; (b) the Executive is found guilty by a court of having committed a crime involving moral turpitude and such conviction is affirmed on appeal or the time for appeal has expired; (c) in the reasonable judgment of the Board, the Executive has compromised trade secrets or other similarly valuable proprietary information of the Company; or (d) in the reasonable judgment of the Board, the Executive has engaged in gross or willful misconduct that causes substantial and material harm to the business and operations of the Company or any of its affiliates, the continuation of which will continue to substantially and materially harm the business and operations of the Company or any of its affiliates in the future.

85.   Mr. Rush never engaged in any conduct constituting "cause" under this and the other similar definitions of "cause," nor has there been any material harm to Sunrise as a result of

23

any action attributable to Mr. Rush. In fact, the conduct Sunrise falsely accused Mr. Rush of committing would not fall within this definition of "cause" even if Mr. Rush had committed it.

86.     The import of Sunrise's false accusations against Mr. Rush was to point to Mr. Rush as responsible for, and even suggest he was attempting to conceal, the problems and improprieties plaguing Sunrise, including the accounting regularities he had discovered and the charges by shareholders of insider trading and backdating of stock options. Indeed, in its statements Sunrise singled out Mr. Rush, and stated that "no other executives were found to have been involved in the alleged document destruction."

87.     Sunrise falsely accused Mr. Rush of incompetence and misconduct in the execution of his job responsibilities and impugned his professional integrity.

88.     Sunrise's defamatory statements were part and parcel of its campaign of retaliation against Mr. Rush who, by uncovering and seeking thoroughly to address accounting irregularities that pre-dated his responsibility for Sunrise's financial accounting, was threatening the Board of Directors' and senior management's efforts to take Sunrise private, and thereby threatening their attempt to escape SEC scrutiny and to obtain the enormous personal profits associated with a sale to private investors.

89.     On information and belief, Sunrise persisted in a far-reaching retaliatory campaign to defame Mr. Rush by suggesting, directly and through innuendo, to other Sunrise employees, individuals at Hogan & Hartson and WilmerHale, Sunrise's external auditors at Ernst & Young, the SEC, Sunrise's shareholders, and other third parties, that Mr. Rush was incompetent, without integrity, and responsible for Sunrise's accounting improprieties.

24

## Causes of Action

### Count I — Breach of Contract

90.    Plaintiff restates and incorporates by reference the foregoing allegations set forth in paragraphs 1 through 89 as if fully set forth herein.

91.    In 2005, Sunrise entered into a valid contractual agreement pursuant to the Long Term Incentive Cash Bonus Plan ("LTICBP"). In consideration for his services to Sunrise, Sunrise awarded Mr. Rush an 8% share in the Bonus Pool as set forth in the LTICBP.

92.    Mr. Rush's employment was not terminated for "cause" as that term is defined in the LTICBP, and thus by the express terms of the LTICBP, Mr. Rush became 100% vested in his bonus award upon his termination on May 2, 2007.

93.    Sunrise refused to provide Mr. Rush his bonus award.

94.    Sunrise thereby breached the terms of the LTICBP.

95.    As a result of this breach, Mr. Rush has been damaged, the full amount and extent of which is not presently capable of being precisely ascertained.

### Count II — Breach of Contract

96.    Plaintiff restates and incorporates by reference the foregoing allegations set forth in paragraphs 1 through 95 as if fully set forth herein.

97.    On September 10, 2003, in consideration for his services to Sunrise, Sunrise granted Mr. Rush an option to purchase 25,000 shares of Sunrise common stock (50,000 following a 2-for-1 stock split). In granting these options, Sunrise and Mr. Rush entered into a valid contractual agreement, the terms of which are set forth in the Nonqualified Stock Option Agreement.

25

98.    Mr. Rush previously exercised 25,000 of the 50,000 shares awarded and by the express terms of the Nonqualified Stock Option Agreement, the remaining 25,000 shares vested at the time of Mr. Rush's termination.

99.    Following Mr. Rush's termination, Defendant Sunrise refused to permit Mr. Rush to exercise these vested options.  Defendant Sunrise claimed that Mr. Rush forfeited his options because he was terminated for "cause."

100.    Mr. Rush was not, however, terminated for "cause" as that term is defined in the Nonqualified Stock Option Agreement.

101.    Sunrise refused to perform its obligations and thereby breached the terms of the Nonqualified Stock Option Agreement.

102.    As a result of this breach, Mr. Rush has been damaged, the full amount and extent of which is not presently capable of being precisely ascertained.

### Count III — Breach of Contract

103.    Plaintiff restates and incorporates by reference the foregoing allegations set forth in paragraphs 1 through 102 as if fully set forth herein.

104.    On January 7, 2005, in consideration for his services to Sunrise, Sunrise granted Mr. Rush 6,591 shares of restricted Sunrise stock (13,182 following a 2-for-1 stock split).  In granting this stock, Sunrise and Mr. Rush entered into a valid contractual agreement, the terms of which are set forth in the Executive Restricted Stock Agreement.

105.    By the express terms of the Executive Restricted Stock Agreement, all of this stock vested at the time of Mr. Rush's termination.

26

106. Following Mr. Rush's termination, Defendant Sunrise refused to grant Mr. Rush these vested stocks. Defendant Sunrise claimed that Mr. Rush forfeited his stock award because he was terminated for "cause."

107. Mr. Rush was not, however, terminated for "cause" as that term is defined in the Executive Restricted Stock Agreement and the Senior Executive Severance Plan incorporated by reference therein.

108. Sunrise refused to perform its obligations and thereby breached the terms of the Executive Restricted Stock Agreement.

109. As a result of this breach, Mr. Rush has been damaged, the full amount and extent of which is not presently capable of being precisely ascertained.

### Count IV — Breach of Contract

110. Plaintiff restates and incorporates by reference the foregoing allegations set forth in paragraphs 1 through 109 as if fully set forth herein.

111. On August 4, 2005, in consideration for his services to Sunrise, Sunrise granted Mr. Rush 25,000 shares of restricted Sunrise stock (50,000 following a 2-for-1 stock split). In granting this stock, Sunrise and Mr. Rush entered into a valid contractual agreement, the terms of which are set forth in the Executive Restricted Stock Agreement.

112. By the express terms of the Executive Restricted Stock Agreement, a portion of this stock vested at the time of Mr. Rush's termination.

113. Following Mr. Rush's termination, Defendant Sunrise refused to grant Mr. Rush his vested stocks. Defendant Sunrise claimed that Mr. Rush forfeited his stock award because he was terminated for "cause."

27

)                                                          i

114.    Mr. Rush was not, however, terminated for "cause" as that term is defined in the Executive Restricted Stock Agreement and the Senior Executive Severance Plan incorporated by reference therein.

115.    Sunrise refused to perform its obligations and thereby breached the terms of the Executive Restricted Stock Agreement.

116.    As a result of this breach, Mr. Rush has been damaged, the full amount and extent of which is not presently capable of being precisely ascertained.

<u>**Count V — Breach of Contract**</u>

117.    Plaintiff restates and incorporates by reference the foregoing allegations set forth in paragraphs 1 through 116 as if fully set forth herein.

118.    On September 8, 2005, in consideration for his services to Sunrise, Sunrise granted Mr. Rush an option to purchase 40,000 shares of Sunrise stock (80,000 post-split) at a base price of $30.02.  In granting these options, Sunrise and Mr. Rush entered into a valid contractual agreement, the terms of which are set forth in the 2001 Stock Option Plan/ Stock Option Agreement.  Pursuant to the terms of this agreement, the options vested 100% upon grant, and became exercisable as of the date they were awarded.

119.    Sunrise refused to provide Mr. Rush his vested shares.

120.    Sunrise thereby breached the terms of the 2001 Stock Option Plan/ Stock Option Agreement.

121.    As a result of this breach, Mr. Rush has been damaged, the full amount and extent of which is not presently capable of being precisely ascertained.

28

## Count VI — Defamation

122.    Plaintiff restates and incorporates by reference the foregoing allegations set forth in paragraphs 1 through 121 as if fully set forth herein.

123.    The factual statements made about the purported reasons for Mr. Rush's termination were false and were published to third parties through the media and other forms of communication.

124.    Defendant knew these statements were false or made these statements with reckless disregard as to whether the statements were false.

125.    The statements were made as part of a campaign against Defendant because of ill will, malice, and a desire to injure Mr. Rush, particularly in his profession and trade, rather than as a fair and truthful comment on the subject of Mr. Rush's termination.

126.    Defendant Sunrise, through its actions prior to, during, and subsequent to the statements being made, authorized and ratified the statements through its continuing attempts to fabricate a record to support these false and defamatory statements. These included, but were not limited to, hiring WilmerHale, who conducted biased pre-determined interviews, ignored or concealed facts, and otherwise employed improper investigatory techniques, all in furtherance of manufacturing a record to support these false, defamatory statements.

127.    As a direct and proximate result of the Defendant making these defamatory statements and publishing them to third parties, Mr. Rush's reputation in the business community and in general has been severely damaged.

128.    As a direct and proximate result of the Defendant making these defamatory statements and publishing them to third parties, Mr. Rush has been injured. These injuries include lost wages, lost benefits, lost bonuses and stock or option awards, lost raises, diminished

29

earning capacity, lost career and business opportunities, litigation expenses including attorney's fees, loss of reputation, embarrassment, humiliation, inconvenience, mental and emotional distress, and other damages, in an amount to be determined by a jury and the Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Bradley B. Rush, by and though his counsel, respectfully prays that judgment be entered in his favor on the foregoing Complaint against Defendant Sunrise, and that this Court in addition:

(a)    Award compensatory damages in the amount as may be shown at trial, but no more than $13,000,000;

(b)    Award punitive damages in the amount as may be shown at trial, but no more than $350,000;

(c)    Award Mr. Rush his costs and attorney's fees incurred in this matter; and

(d)    Award Mr. Rush such other and further relief as may be just.

## JURY DEMAND

Plaintiff Mr. Rush demands a trial by jury.

**BRADLEY B. RUSH**
By Counsel

**LEFFLER & HYLAND**
A Professional Corporation
4163 Chain Bridge Road
Fairfax, Virginia 22030-4102
(703) 293-9300
Facsimile (703) 293-9301

By

Rodney G. Leffler (VSB No. 18742)
Timothy B. Hyland (VSB No. 31163)
Alexa K. Mosley (VSB No. 71300)
Counsel for Plaintiff

30

**Of Counsel:**

John M. Dowd
Richard L. Wyatt, Jr.
Paul W. Butler
Jeffrey M. King
Elizabeth C. Peterson
James E. Sherry
**AKIN, GUMP, STRAUSS, HAUER & FELD, LLP**
Robert S. Strauss Building
1333 New Hampshire Avenue, N.W.
Washington, D.C.  20036-1564s
(202) 887-4000
Facsimile  (202) 887-4288

31

# EXHIBIT A



**SEIU®**

**Stronger Together**

November 20, 2006

Board of Directors
Sunrise Senior Living, Inc.
7902 Westpark Drive
McLean, VA 22102

Dear Members of the Sunrise Board of Directors,

Sunrise Senior Living shareholders have lost $300 million since May 2006, when the company failed to file its first quarter 2006 financial statements. What management first termed a review of accounting affecting a "limited number of Sunrise joint ventures"[1] has since prevented Sunrise from filing financial statements for the past three quarters; required it to restate previously filed financial statements for 2003 to 2005; led it to disclose material weakness in internal controls over financial reporting; and precipitated a corrective letter from the Securities and Exchange Commission regarding the company's disclosure.

The accounting problems alone call into question the performance of the audit committee of the Sunrise board of directors. In addition, our own review has uncovered questionably timed insider stock sales. For example, Ronald V. Aprahamian, chair of the audit committee, sold 20,000 shares for $757,040 just three weeks before the company announced its first filing delay, which triggered a 34% share price decline over the next two months.[2] We have also found improbably dated executive stock option grants, including a grant of 350,000 options to CEO Paul Klaassen on September 11, 2000, the date of the lowest price for the rest of the year.

The SEIU Master Trust is a long-term beneficial owner of Sunrise shares and an active proponent of sound corporate governance as a vital means to protect and enhance shareholder value. These developments at Sunrise raise serious concerns with respect to the Sunrise board, its key committees, and individual directors. We therefore call on the board of directors to immediately appoint an experienced external Monitor who will retain independent counsel to investigate:

1. The joint venture and revenue recognition accounting practices that led to the accounting review and SEC involvement at Sunrise, the timing and handling of disclosure about the accounting review, the impact of projected financial restatements on past executive compensation, and the performance of the audit committee in exercising oversight of the company's accounting and compliance practices;

2. The more than $32 million of stock sales by Sunrise executives and directors between late 2005, when management stated it first began contemplating the change of accounting methodology, and May 2006, when Sunrise announced the accounting change and filing delay that prompted the 34% decline in its share price; and

SERVICE EMPLOYEES
INTERNATIONAL UNION, CLC

**SEIU MASTER TRUST**

1313 L Street, NW
Washington, DC 20005
202.639.0890
800.458.1010
www.SEIU.org
2008 442ma, 9 05

---

[1] Sunrise Senior Living, "Sunrise Reports Preliminary Selected Financial Data For First-Quarter 2006," Press Release, May 11, 2006.
[2] SEC Form 4, Filed April 20, 2006.

3.  The timing of and accounting treatment for executive stock option grants between June 1996 and October 2005 and for the repricing of options in September 1998.

We make the extraordinary request for an external monitor because at least six of the seven directors at Sunrise appear to be involved in the activities within the scope of the proposed investigation. Furthermore, the nature, extent, and seriousness of the issues lead us to insist that both the external Monitor and the independent counsel have no personal or business ties to the company, its officers, or its directors. Counsel should be empowered to investigate the full range of issues raised above, report its findings to the Monitor, and recommend remedies for any past misconduct, including the disgorgement of ill-gotten gains, return of any bonuses and performance-based compensation, and the cancellation of stock options. Counsel should also be authorized to propose cures for any ongoing deficiencies in the areas of accounting, financial controls, compliance, and corporate governance, including measures to enhance the independence and accountability of the board. Because shareholders have a right to understand what has happened and the corrective action that will be taken, we ask that the board make public the counsel's findings and recommendations.

With Sunrise under mounting investor and regulatory scrutiny, we urge you to move swiftly to restore investor confidence in the integrity of the Sunrise board and the accuracy of its financial statements. We therefore request that you respond to this letter by December 15, 2006, informing us as to the appointment of an external Monitor, his or her identity, and the identity of the appointed independent counsel.

We detail our concerns further below.

Accounting Practices
Independent financial analysts have long questioned the clarity and propriety of Sunrise accounting practices, but the most recent accounting problems have had a profoundly adverse material impact on shareholders. The value of our company fell 34% after management delayed the filing of first quarter financial statements, announced a change in accounting methodology, and then went silent for eleven weeks. The market capitalization of the company remains nearly 20% below its pre-announcement level, while the expanding scope, changing content, and continuing nature of the accounting review has shaken shareholder confidence in management and the board of directors.

The growing list of problematic accounting practices at Sunrise includes three areas of concern to the SEC, as delineated in the company's 8-K/A of August 8, 2006. . First, the company's method for accounting for profits, losses, and pre-opening fees from joint ventures where partners receive a preference on cash flow did not meet the provisions of SOP 78-9 Accounting for Investments in Real Estate Ventures. Second, the SEC has requested additional information about how Sunrise determines its equity in earnings or losses. And third, the SEC has questioned the company's application of EITF 04-5 Rights of Limited Partners in Ventures to its unconsolidated joint ventures. It is possible that the SEC would require the company to consolidate some of its joint ventures on its financial statements, eliminating its ability to recognize certain forms of income from real estate transactions, thereby reducing prior and future earnings.

Another significant potential problem is the company's adherence to SFAS 66 Accounting for Sales of Real Estate. According to the same 8-K/A, the company may be required to defer some or all of the income from past sales or to not record certain transactions as sales. This has required the company to review hundreds of transactions, with the impact of that review, which could be quite material, still undetermined.

*Sunrise Sr Living Board of Directors*
*November 20, 2006*

The company stated that it will alter its capitalization of interest to its equity investments that include multiple properties, causing a restatement that will reduce net income in 2003, 2004, and 2005, by approximately $729,000, $1.1 million, and $1.8 million, respectively.[3] Sunrise is also reviewing and may need to adjust its accounting for the recognition of pre-opening fees, the allocation of the company's December 2005 write down of its investment in Sunrise At Home Senior Living Services, Inc., and the valuation of certain guarantees.[4]

Sunrise has said that cumulative impact of its restatements will reduce net income for the years 2003, 2004, and 2005 by $50 million.[5] This represents 26% of total net income for the period.

Sunrise expects it will report a material weakness in its internal controls over financial reporting.[6]

Sunrise's disclosures of its accounting difficulties are troubling for several reasons. First, the company initially underestimated the scope of the accounting review, saying in May the focus was on the accounting treatment of profits and losses at just eight "joint ventures in which Sunrise is a minority partner and the capital partner receives a preference on return of its capital."[7] As the above list of problems makes clear, the accounting review quickly expanded to include many additional accounting practices involving many more activities.

Second, management has not provided complete disclosures about the facts and circumstances that prompted its accounting review. Despite receiving an information request from the SEC dated April 27, 2006, the company did not disclose the SEC's concerns in press releases, an 8-K filing, or a conference call discussing the accounting issues during the period May 9-11, 2006.[8] When Sunrise finally disclosed the SEC's involvement, in a press release dated July 31, 2006, it failed to disclose all of the SEC's concerns. Only after the SEC sent a letter, on August 3, 2006, insisting that the company do so, did the company acknowledge additional SEC concerns.[9]

Third, in all of its public filings, press releases, and conference calls before August 8, 2006, Sunrise mischaracterized its accounting review as a change in accounting methodology, rather than the correction of an accounting error. Originally, the company stated that it had "decided to use a different methodology," and management called the new practice "a more preferable method under generally accepted accounting principles," implying it had a choice in the matter.[10] Again, it took the SEC letter of August 3rd to prompt the company to acknowledge that its prior accounting was in fact improper.

Significant questions remain about the accounting review. Given that the company indicated that neither SEC involvement nor new accounting rules or interpretations stimulated the accounting review, what prompted the company to review its joint venture accounting in the first instance? Could the company have continued its earlier accounting practices while completing the accounting review, thereby avoiding

---

[3] Sunrise Senior Living, Form 8-K/A, Filed August 8, 2006.
[4] Ibid.
[5] Sunrise Senior Living, "Sunrise Reports Preliminary Selected Financial and Operating Data for Third-Quarter 2006," Press Release, November 7, 2006.
[6] Ibid.
[7] Thomson StreetEvents, "SRZ - Q1 2006 Sunrise Senior Living Earnings Conference Call," May 11, 2006, p. 2.
[8] The existence of the April 27, 2006 letter from the SEC is discussed in Bradley B. Rush to Mr. Larry Spirgel, August 8, 2006, available on EDGAR.
[9] Mr. Larry Spirgel to Mr. Bradley Rush, August 3, 2006, available on EDGAR.
[10] Thomson StreetEvents, "SRZ - Q1 2006 Sunrise Senior Living Earnings Conference Call," May 11, 2006, p. 2, 6.

*Sunrise Sr Living Board of Directors*
*November 20, 2006*

the delay in its quarterly filings and the accompanying shareholder anxiety? Which directors and managers were responsible for the decisions surrounding the accounting review and its disclosure? Did the past overstatement of earnings trigger compensation payouts to senior executives and, if so, should compensation based on incorrectly inflated earnings be returned? Is there any connection between the timing of the company's announcement concerning its accounting review and the pattern of insider stock sales described below?

<u>Insider Stock Sales</u>
Sunrise directors and top executives "dodged a bullet" when they realized proceeds of more than $32 million from insider sales in the six months before May 9, 2006, when the company announced its accounting review and associated filing delay. After this date, the Sunrise share price fell 34% over the next two months, eliminating more than $660 million in shareholder value. According to CFO Bradley B. Rush during a conference call on May 11, 2006, financial managers at Sunrise, under the direction of CEO Paul Klaassen and president Thomas B. Newell, began contemplating the change of accounting methodology "late in 2005."[11]

Thus, the public record suggests that insider sales were planned and executed during the same period management was contemplating an accounting change that could have significant adverse impact on the company's share price. At minimum, insiders appear to have acted for their own benefit in a manner misaligned with the interests of other shareholders. We cannot dismiss the possibility that executives and directors were cognizant of material non-public information and structured their share trading, including the adoption of 10b5-1 plans, to take advantage of the strong share price before it fell.

The biggest insider sellers during this period were the biggest shareholders: chairman of the board, CEO, and founder Paul Klaassen and his spouse, Teresa Klaassen, founder, director, chief cultural officer, executive vice president, and secretary. They disposed of 600,000 shares in 12 sales between December 19, 2005, and May 2, 2006, for total proceeds of $21,426,580.[12] Initiated as a series of planned sales in December 2005, around the time the company first contemplated its accounting review, these sales represented the first outright stock sales by the Klaassens since the company went public in 1996.[13] The last two sales, netting more than $3.6 million, took place just one week before the filing delay was announced.

Director Thomas J. Donohue, who sits on all four board committees and chairs the compensation committee, sold 102,666 shares for approximately $3.4 million on November 21, 2005.[14] Presumably, as an audit committee member, he was involved in the decision to adopt the accounting change.

Likewise, Ronald V. Aprahamian, director, audit committee chair, and compensation committee member, was in a position to know of the impending accounting change. He sold 20,000 shares for $757,040 on April 18, 2006, barely three weeks prior to the filing delay.[15]

---

[11] Ibid., p. 14.
[12] SEC Form 4, filed December 30, 2005, January 5, February 3, March 3, April 4, and May 3, 2006.
[13] In May and June of 2005, the Klaassens entered into a prepaid variable forward contract relating to the forward sale of up to 750,000 shares of common stock. They received total payment of approximately $29.8 million, approximately 75% of the then-current value of the shares. SEC Form 4, filed May 31, 2005, and June 1, 13, 17, 2005. Under then-current IRS rules, this payment was considered non-taxable, given the structure of the forward contract, which mimics an equity options collar, rather than a sale. Floyd Norris, "A Clever Tax Strategy May Backfire," *New York Times*, December 30, 2005.
[14] SEC Form 4, Filed November 22, 2006.
[15] SEC Form 4, Filed April 20, 2006.

*Sunrise Sr Living Board of Directors*
*November 20, 2006*

J. Douglas Holladay, chair of the nominating and corporate governance committee, sold 18,000 shares in four sales for $671,000 between November 7, 2005, and March 21, 2006.[16]

Stock Option Grants
According to company proxy statements, Sunrise granted stock options to its CEO and highest paid executives on 13 different occasions between June 1, 1996, and October 1, 2005, which we detail in the attached memorandum. Close to half of these option grants were fortuitously timed, with strike prices at or near periodic or yearly stock price lows that preceded rapid and/or long-term stock price increases. We are concerned about the wide discrepancy between stock price performance before and after the grants, as it raises the possibility that the grants were manipulated.

Overall, we calculate that the average return in the 30 days prior to each grant was negative, -2.7%. In the 30 days after each grant, the average return was positive, 12.1%.[17] Additionally, Sunrise stock performed worse than the overall market before option grants and better after them. During the period the stock traded on NASDAQ (covering a majority of the grants), the average return in the 30 days before an option grant was -4.1%, compared to an average gain of 15% in the 30 days after an option grant. By comparison, the NASDAQ Composite index gained an average of 3.9% in the 30 days before stock option grants and lost an average of 0.6% in the 30 days after. A similar pattern has occurred since the stock moved to the NYSE.[18]

The company's sole instance of option repricing is also troubling. On September 14, 1998, after shareholders watched the company's stock price fall more than 45% in barely four months, the stock option committee, chaired by Thomas J. Donohue, repriced all options with an exercise price (split adjusted) above $14.50, issuing new grants with an exercise price of $12.50.[19] This exercise price was 40 cents above the preceding day's close of $12.09375, which, coincidently, was the third-lowest close of the year, the lowest and second lowest closing prices having occurred the preceding week. Sunrise executives were thus blessed twice: first to have their underwater options repriced and second to have the stock option committee pick the third-lowest closing price of the year as the strike price for their repriced options.

---

[16] SEC Form 4, Filed November 23, December 8, December 13, 2005 and March 22, 2006.
[17] Calculated as the average stock price appreciation for the 13 periods before and the 13 periods after the 13 stock grants.
[18] See the attached memorandum, "Sunrise Senior Living Executive Stock Option Grants 1996-2005."
[19] Sunrise Senior Living, Form DEF 14A, Filed April 6, 1999.

*Sunrise Sr Living Board of Directors*
*November 20, 2006*



Sunrise 1998 Option Grants

The stock option committee stipulated that the grants could not be exercised within six months of the grant date or before the price exceeded $16.25 for five trading days. Yet, as the chart above indicates, the price shot past that threshold in just four trading days and returned over 19% in the 30 days after the grant. Additional charts, available in the accompanying memorandum regarding Sunrise stock option grants, illustrate further questions we have about the timing of Sunrise option grants.

Stock options grants are meant to align executives' interests with those of shareholders by encouraging management to engage in actions that increase share price. Thus, to reprice option grants contradicts shareholders' interests. To backdate a repricing would be doubly troubling. Speaking to the *Wall Street Journal*, Arthur Levitt, former chairman of the SEC said stock option backdating "represents the ultimate in greed... It is stealing, in effect. It is ripping off shareholders in an unconscionable way."[20]

Committee Independence
While the current members of the audit and compensation committees may meet the minimal bright-line tests of independence in the NYSE listing standards, we think several conflicts of interest impair their objectivity in setting and enforcing company policy in the key areas of compensation, financial reporting, and compliance.

---

[20] Charles Forelle and James Bandler, "Five More Companies Show Questionable Options Pattern," *Wall Street Journal*, May 2  2, 2006, p. 1.

*Sunrise Sr Living Board of Directors*
*November 20, 2006*

Thomas J. Donohue, Craig R. Callen, and Ronald V. Aprahamian comprise both the audit committee and the compensation committee at Sunrise. Each has or has recently had more than a trivial connection to Sunrise and its executive officers, as detailed in company filings and the press.

Mr. Donohue has numerous personal and business connections to Mr. and Ms. Klaassen. Both Mr. Donohue and Mr. Klaassen sit on the board of directors of the U.S. Chamber of Commerce and its affiliated Foundation. In an interview published in January 2000, Mr. Donohue also revealed that Mr. Klaassen previously worked for him at the Chamber, that Mr. Klaassen and his wife lived with him for a time, and that he invested in the Klaassen's first home.[21] Of even greater concern, the *New York Times* recently reported and company proxy statements confirm that in the mid-1990s, before Sunrise went public, Mr. Donohue more than doubled a $500,000 investment in roughly three years through a related-party transaction with Sunrise.[22] Proxy advisory firm Glass Lewis does not consider Mr. Donohue to be independent.

Mr. Callen's ties to Sunrise are of a business, rather than personal, nature. During virtually his entire seven-year tenure as a Sunrise director, Mr. Callen and/or his employers have done significant business with Sunrise. At the time he joined the Sunrise board in 1999, Mr. Callen was managing director of Health Care Investment Banking at Donaldson, Lufkin & Jenrette Securities Corporation, which provided financial advisory services to Sunrise. DLJ and several of its affiliates also entered into joint ventures with Sunrise to raise up to $70.8 million for the development of assisted living communities. Mr. Callen held a 1.375% membership interest in two of these ventures.[23]

After Credit Suisse First Boston bought DLJ in 2000, Mr. Callen became one of its managing directors and head of its U.S. Health Care Investment Banking, and the relationship with Sunrise expanded. As of January 2001, CSFB affiliates had provided more than $50 million in equity capital to Sunrise joint ventures, bought a tranche of Sunrise convertible subordinated notes, and participated in a $92 million term facility provided to Sunrise.[24] One of the ventures in which Mr. Callen held his interest was sold in 2003, with an undisclosed gain for Mr. Callen. In connection with the formation of Sunrise REIT in December 2004, the second joint venture in which Mr. Callen held an interest was acquired by Sunrise and immediately contributed to Sunrise REIT. Mr. Callen's interest was repurchased as part of this transaction for approximately $137,500.[25]

In April 2004, Mr. Callen joined Aetna as senior vice president, strategic planning and business development. From January 1, 2004, Aetna Healthcare, a subsidiary of Aetna, Inc., has been Sunrise's health plan administrator, dental plan administrator, health benefit stop-loss insurance carrier, and long-term care insurance provider, with Sunrise payments to Aetna Healthcare for property and services accounting for less than 2% of Aetna Healthcare's consolidated gross revenues.[26]

Mr. Aprahamian has been a director at Sunrise for more than a decade, in itself an impediment to independence according to some institutional investors and proxy advisory services. Additionally, while a

---

[21] Kirstie, James "We are playing with courage," *Directors & Boards*, January 1, 2000.
[22] Morgenson, Gretchen, "Taking Care of Business, His Way", *New York Times*, February 20, 2005; Sunrise Senior Living, From DEF 14A, Filed April 28, 1997, p. 10.
[23] Sunrise Senior Living, Form DEF 14A, Filed April 14, 2000, p. 11-12.
[24] Sunrise Senior Living, Form DEF 14A, Filed April 5, 2002, p. 9-10.
[25] Sunrise Senior Living, Form DEF 14A, Filed April 10, 2006, p. 5.
[26] Sunrise Senior Living, Form DEF 14A, Filed April 7, 2005, p. 5.

*Sunrise Sr Living Board of Directors*
*November 20, 2006*

director, Mr. Aprahamian served as a consultant to the company from May 1997 to September 1998. During the first nine months of 1998, he received $63,405 from Sunrise for his consulting services.[27]

The accounting problems at Sunrise, particularly the fact that the company will report a material weakness in its internal controls, further heighten our concerns about the independence of these three directors, who have responsibility for establishing and implementing policies regarding financial reporting, compensation, compliance, and disclosure. In addition, Sunrise has corporate governance policies, such as a classified board and a poison pill, that can insulate the board from accountability to shareholders.

For all these reasons we urge you to select an external Monitor who will appoint an independent counsel empowered to conduct a thorough review of the company's actions and controls related to its accounting review, insider trading, stock option grants, and board composition, and make its results and recommendations public. This action is necessary to assuage shareholder concerns about the integrity of the Sunrise board of directors and the reliability of its financial statements.

Thank you for your prompt attention to this matter. We look forward to hearing from you by December 15, 2006.

Sincerely,

Stephen Abrecht
Executive Director, Benefit Funds

SA:SW:bh

---

[27] Sunrise Senior Living, Form DEF 14A, Filed April 6, 1999, p. 4, 8.

# EXHIBIT C

2007 U.S. Dist. LEXIS 14896, *

LEXSEE 2007 US DIST LEXIS 14896

**MARGARET ANN HUDERT, ET AL., Plaintiffs, v. ALION SCIENCE & TECH. CORP., ET AL., Defendants, v. UNITED STATES OF AMERICA, ET AL., Third-Party Defendants.**

**Civil Action No. 05-545 (RBW)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

*2007 U.S. Dist. LEXIS 14896*

**March 2, 2007, Decided**
**March 2, 2007, Filed**

**SUBSEQUENT HISTORY:** Dismissed by, in part, Summary judgment denied by *Hudert v. Alion Sci. & Tech. Corp.*, 2007 U.S. Dist. LEXIS 87946 (D.D.C., Nov. 30, 2007)

**PRIOR HISTORY:** *Hudert v. Alion Sci. & Tech. Corp.*, 429 F. Supp. 2d 99, 2006 U.S. Dist. LEXIS 20650 (D.D.C., 2006)

**COUNSEL:** [*1] For MARGARET ANN HUDERT, Personal representative of the estate of Joseph Hudert and as Parent and Next Friend to Anthony Joseph Hudert, Plaintiff: Michael H. Burgoyne, LEAD ATTORNEY, Craig K. Ronald, LANDSMAN, BURGOYNE & RONALD, Baltimore, MD; Ronald S. Landsman, LEAD ATTORNEY, Baltimore, MD; Samuel J. Pace, Jr., DUGAN BRINKMANN MAGINNIS & PACE, Philadelphia, PA.

For ELIZABETH HUDERT, Plaintiff: Michael H. Burgoyne, LEAD ATTORNEY, Craig K. Ronald, LANDSMAN, BURGOYNE & RONALD, Baltimore, MD; Ronald S. Landsman, LEAD ATTORNEY, Baltimore, MD; Samuel J. Pace, Jr., DUGAN BRINKMANN MAGINNIS & PACE, Philadelphia, PA.

For ANTHONY JOSEPH HUDERT, Minor and primary beneficiary of the estate of Joseph Hudert, Plaintiff: Michael H. Burgoyne, LEAD ATTORNEY, Craig K. Ronald, LANDSMAN, BURGOYNE & RONALD, Baltimore, MD; Ronald S. Landsman, LEAD ATTORNEY, Baltimore, MD; Samuel J. Pace, Jr., DUGAN BRINKMANN MAGINNIS & PACE, Philadelphia, PA.

For ALION SCIENCE & TECHNOLOGY CORP, Defendant: Daniel R. Lanier, MILES & STOCKBRIDGE, Baltimore, MD; Joseph L. Beavers, MILE & STOCKBRIDGE, P.C., Baltimore, MD.

For GRUNLEY-WALSH JOINT VENTURE LLC, Defendant: James Francis Jordan, LEAD ATTORNEY, [*2] JORDAN, COYNE & SAVITS, Washington, DC; David P. Durbin, JORDAN COYNE & SAVITS, LLP, Washington, DC.

For DISTRICT OF COLUMBIA WATER AND SEWER AUTHORITY, Defendant: Frederick Arnold Douglas, LEAD ATTORNEY, DOUGLAS BOYKIN & ODEN PLLC, Washington, DC; Robert Lee Dillard, Jr., DOUGLAS & BOYKIN, PLLC, Washington, DC.

For M&M WELDING & FABRICATORS, INC., Defendant: Thomas Patrick Ryan, MCCARTHY WILSON, Rockville, MD.

For UNITED STATES OF AMERICA, ThirdParty Defendant: John F. Henault, Jr., LEAD ATTORNEY, U.S. ATTORNEY'S OFFICE, Public Corruption, Washington, DC.

For GENERAL SERVICES ADMINISTRATION, ThirdParty Defendant: John F. Henault, Jr., LEAD ATTORNEY, U.S. ATTORNEY'S OFFICE, Public Corruption, Washington, DC.

For CHERRY HILL CONSTRUCTION INC, ThirdParty Defendant: Erik D. Nadolink, HUNTON & WILLIAMS, Richmond, VA.

For GRUNLEY-WALSH JOINT VENTURE LLC, ThirdParty Plaintiff: David P. Durbin, JORDAN COYNE & SAVITS, LLP, Washington, DC.

For UNITED STATES OF AMERICA, ThirdParty Defendant: John F. Henault, Jr., LEAD ATTORNEY, U.S. ATTORNEY'S OFFICE, Public Corruption, Washington, DC.

2007 U.S. Dist. LEXIS 14896, *

For GENERAL SERVICES ADMINISTRATION, ThirdParty Defendant: John F. [*3] Henault, Jr., LEAD ATTORNEY, U.S. ATTORNEY'S OFFICE, Public Corruption, Washington, DC.

For CHERRY HILL CONSTRUCTION INC, ThirdParty Defendant: Anthony B. Taddeo, Jr., LEAD ATTORNEY, John Michael Fitzpatrick, LEAD ATTORNEY, LECLAIR RYAN, Richmond, VA; Erik D. Nadolink, HUNTON & WILLIAMS, Richmond, VA.

For ALION SCIENCE & TECHNOLOGY CORP, Cross Defendant: Joseph L. Beavers, MILE & STOCKBRIDGE, P.C., Baltimore, MD.

For DISTRICT OF COLUMBIA WATER AND SEWER AUTHORITY, Cross Defendant: Robert Lee Dillard, Jr., DOUGLAS & BOYKIN, PLLC, Washington, DC.

For GRUNLEY-WALSH JOINT VENTURE LLC, Cross Defendant: David P. Durbin, JORDAN COYNE & SAVITS, LLP, Washington, DC.

For CHERRY HILL CONSTRUCTION INC, Cross Defendant: Erik D. Nadolink, HUNTON & WILLIAMS, Richmond, VA.

For M&M WELDING & FABRICATORS, INC., Cross Claimant: Thomas Patrick Ryan, MCCARTHY WILSON, Rockville, MD.

For ALION SCIENCE & TECHNOLOGY CORP, Cross Defendant: Joseph L. Beavers, MILE & STOCKBRIDGE, P.C., Baltimore, MD.

For GRUNLEY-WALSH JOINT VENTURE LLC, Cross Defendant: David P. Durbin, JORDAN COYNE & SAVITS, LLP, Washington, DC.

For ALION SCIENCE & TECHNOLOGY CORP, Cross Defendant: [*4] Joseph L. Beavers, MILE & STOCKBRIDGE, P.C., Baltimore, MD.

For UNITED STATES OF AMERICA, Cross Defendant: John F. Henault, Jr., LEAD ATTORNEY, U.S. ATTORNEY'S OFFICE, Public Corruption, Washington, DC.

For GRUNLEY-WALSH JOINT VENTURE LLC, ThirdParty Plaintiff: James Francis Jordan, LEAD ATTORNEY, JORDAN, COYNE & SAVITS, Washington, DC.

For CHERRY HILL CONSTRUCTION INC, ThirdParty Defendant: Anthony B. Taddeo, Jr., LECLAIR RYAN, Richmond, VA.

**JUDGES:** REGGIE B. WALTON, United States District Judge.

**OPINION BY:** REGGIE B. WALTON

**OPINION**

### *MEMORANDUM OPINION*

Currently before the Court is defendant United States of America's Motion for Reconsideration of this Court's April 18, 2006 Memorandum Opinion and Order ("Def.'s Mot.") [D.E. # 63], pursuant to *Federal Rule of Civil Procedure 54(b)*. The United States seeks relief from the judgment entered by the Court on April 18, 2006, which denied its motion to dismiss defendant Grunley-Walsh Joint Venture, LLC's ("Grunley-Walsh") third-party claim for contribution under the common laws of the District of Columbia. For the reasons set forth below, the United States' motion for reconsideration [*5] is granted and the United States' original motion to dismiss Grunley-Walsh's claim for contribution is granted.

### I. Background

The facts of this case have been fully recited in the Court's Memorandum Opinion issued on April 18, 2006. *Hudert v. Alion Science & Tech. Corp., 429 F. Supp. 2d 99, 102-103 (D.D.C. 2006)*. Thus, the Court will only recite the facts necessary for the resolution of the current motion. In this Court's April 18, 2006 Memorandum Opinion, the United States' Motion to Dismiss, or in the Alternative, for Summary Judgment was denied in part and granted in part. The Court granted the United States' motion to dismiss, pursuant to *Rule 12(b)(1) of the Federal Rules of Civil Procedure*, with respect to Grunley-Walsh's indemnification claim against the United States, but denied the motion with respect to Grunley-Walsh's contribution claim against the United States. *Id. at 110*. The Court did not address the United States' *Rule 12(b)(6)* motion to dismiss the indemnification claim, concluding that it lacked subject matter jurisdiction over this claim. *Id. at 108 n. 3*. The Court [*6] also denied without prejudice the United States' motion for summary judgment under *Rule 56(c)*. *Id. at 110*.

On May 25, 2006, the United States filed its motion for reconsideration of this Court's April 18, 2006 Memorandum Opinion and Order. Grunley-Walsh filed its opposition to the United States' motion and the United States has filed its reply. The arguments advanced in the motion for reconsideration, and Grunley-Walsh's opposition to the motion are the same as those presented in the original motion to dismiss and the opposition thereto. Upon further review, the Court will grant the motion for reconsideration, review the motion to dismiss anew and upon further consideration, grant the motion to

2007 U.S. Dist. LEXIS 14896, *

dismiss. [1]

[1] On June 27, 2006, Grunley-Walsh filed an answer to the plaintiffs' second amended complaint as well as cross-claims against all of the other co-defendants. On August 28, 2006, the United States filed a Renewed Motion to Dismiss the Cross-Claim of Grunley-Walsh. Grunley-Walsh's cross-claim and the United States' renewed motion to dismiss raise the same arguments advanced in the first round of briefs submitted in conjunction with the United States' motion for reconsideration. Because the motions to reconsider the April 18, 2006 opinion and to dismiss Grunley-Walsh's claim for contribution will now be granted, Grunley Walsh's cross-claim against the United States and the United States' renewed motion to dismiss are moot. Therefore, the Court need not consider the United States' renewed motion to dismiss Grunley Walsh's cross claim.

[*7] II. Standard of Review

A. Fed. R. Civ. P. 54(b)

Rule 54(b) of the Federal Rules of Civil Procedure states that "any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties . . . is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties." Under Rule 54(b), "an interlocutory order may be revised as justice requires." Am. Lands Alliance v. Norton, No. Civ.A. 00-2339 (RBW), 2004 U.S. Dist. LEXIS 27533 , 2004 WL 3246687, at *2 (D.D.C. June 2, 2004) (citation omitted).

B. Fed. R. Civ. P. 12(b)(6)

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "On a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to [*8] Rule 12(b)(6), this Court must construe the allegations and facts in the complaint in the light most favorable to the plaintiff and must grant the plaintiff the benefit of all inferences that can be derived from the alleged facts." Raymen v. United Senior Ass'n, Inc., 409 F. Supp. 2d 15, 20 (D.D.C. 2006) (citing Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)). "While the Court must construe the complaint liberally, the Court need not accept the plaintiff's factual inferences if the complaint's factual allegations do not support those inferences, nor must the Court accept the plaintiff's legal conclusions." Hoyte v. Am. Nat. Red Cross, 439 F. Supp. 2d 38, 41-42 (D.D.C.

2006) (citing Nat'l Treasury Employees Union v. United States, 322 U.S. App. D.C. 135, 101 F.3d 1423, 1430 (D.C. Cir. 1996)). "[I]n deciding whether to dismiss a claim under Rule 12(b)(6), the Court can only consider the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." Raymen, 409 F. Supp. 2d at 20 (citing [*9] EEOC v. St. Francis Xavier Parochial Sch., 326 U.S. App. D.C. 67, 117 F.3d 621, 624-25 n. 3 (D.C. Cir. 1997)). "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief." Conley, 355 U.S. at 45-46; Raymen, 409 F. Supp. 2d at 20.

III. Analysis

In the motion now before the Court, the United States seeks reconsideration of the Court's April 18, 2006 opinion, arguing that the contract between Grunley-Walsh and the United States expressly bars Grunley-Walsh from recovering from the United States under a theory of contribution. Def.'s Mot. at 3. The United States argues that "under the [contract between Grunley-Walsh and the United States], if Grunley-Walsh, or any other contractor or subcontractor, is found negligent in any way, Grunley-Walsh may not collect from the United States under any theory -- it expressly bargained away that legal right in the [] contract." Id.

Grunley-Walsh opposes the government's motion on several grounds. First, it argues that the United States' [*10] arguments have already been considered and rejected by this Court.

Opposition of Grunley-Walsh Joint Venture, LLC to the Motion for Reconsideration Filed by the Third-Party Defendant, United States of America ("Pl.'s Opp.") at 3. Next, Grunley-Walsh argues that the United Sates seeks total exculpation from responsibility for an accident which a General Services Administration ("GSA") investigation allegedly demonstrates it likely contributed to. Id. And finally, Grunley-Walsh argues that "[the] contract language precludes contribution in favor of Grunley-Walsh if liability is based upon the acts or omissions of another contractor or subcontractor but does not exclude contribution for liability arising out of the conduct of the United States of America through [the] GSA." Id.

"Contribution is one of several theories used to apportion damages among tortfeasors to an injured party." Hubbard v. Chidel, 790 A.2d 558, 569 (D.C. 2002). In general, contribution is the right of joint tort-feasors to collect from one another so that the plaintiff's losses are equitably shared by all wrongdoers. Id. In its previous memorandum opinion, the court ruled that "[the [*11] United States'] alleged active negligence, if proven

by Grunley-Walsh, would be sufficient to support [Grunley-Walsh's] claim for contribution under District of Columbia law." *Hudert, 429 F. Supp. 2d at 108* (citing *Hubbard, 790 A.2d at 569-70*). Indeed, "[a]n essential prerequisite for entitlement to contribution is that the parties be joint tortfeasors in the sense that their negligence concurred in causing the harm to the injured party." *D.C. v. Wash. Hosp. Ctr., 722 A.2d 332, 336 (D.C. 1998)*. Thus, unless prohibited for some other reason, Grunley-Walsh would have a claim for contribution against the United States if they were both found to be negligent in causing the harm to the injured party. The Court's ruling on this issue was incorrect, because Grunley-Walsh and the United States entered into a contract which provides indemnity to the United States. The language of the contract between the United States and Grunley-Walsh expressly precludes Grunley-Walsh from recovering from the United States for damages resulting in part from Grunley-Walsh's own negligence. Specifically, the contract states:

> [t]he Contractor [*12] shall save harmless and provide indemnity for the Government against any and all liability, claims and costs of whatever kind and nature for injury or death to any person or persons and for loss or damage to any property (Government or otherwise) occurring in connection with or in any way incident to or arising out of the performance of work in connection with this contract, *resulting in whole or in part from the negligent acts or omissions of the contractor* or the subcontractor, or any employee agent, or representative of the contractor or subcontractor.

Third Party Defendant United States of America's Motion to Dismiss, or in the Alternative, for Summary Judgment ("Def.'s Mot. to Dismiss"), Exhibit ("Ex.") 2 (Contract between Grunley-Walsh and the General Services Administration) at 5 (emphasis added). Thus Grunley-Walsh has expressly precluded itself from seeking contribution from the United States. As explained in the Restatement of Torts, "[a] person who has a right of indemnity against another person . . . does not have a right of contribution against that person and is not subject to liability for contribution to that person." *Restatement (Third) of Torts: Apportionment of Liab. § 23(c)* [*13] (2000). Therefore, if Grunley-Walsh is found liable in this matter, by agreeing to indemnify the United States in the event it is found to be negligent, it has bargained away the right to seek contribution from the United States as a joint tortfeasor. *Kaiser v. Ramada Hotel Operating Co., Civ. A. No. 90-0462 (MB), 1991 U.S. Dist. LEXIS 18573, 1991 WL 283726, at *5 (D.D.C.*

*Dec. 19, 1991)*.

In *Kaiser*, a jury found four co-defendants liable for negligence after a valet parking attendant struck a pedestrian while attempting to park a van. *Id.* at *1. In motions for judgment notwithstanding the verdict, defendant Atlantic Garage filed a cross-claim against co-defendant Ramada for contribution and Ramada filed a cross-claim against Atlantic for contractual indemnification pursuant to a lease agreement between the two entities. *Id.* at *4. Ramada's claim was based on a lease between Ramada and Atlantic Garage "which require[d] Atlantic Garage to indemnify and hold Ramada harmless for all losses incurred by reason of Atlantic Garage's neglect or use of the premises which [were] not caused solely by Ramada's negligence." *Id.* Atlantic Garage did not dispute the authenticity or validity [*14] of the contract. *Id.* The Court held that "[s]ince the jury held Atlantic Garage liable for the negligent actions of its agent [the valet attendant], and clearly did not find that Ramada was the sole negligent actor, the express terms of the lease require[d] Atlantic Garage to indemnify Ramada for Ramada's share of the judgment." *Id.* Because Ramada had a valid claim for indemnification against Atlantic Garage, the Court denied Atlantic Garage's cross-claim for contribution against Ramada. *Id.*

Like Ramada in *Kaiser*, the United States asserts that its contract with Grunley-Walsh requires Grunley-Walsh to indemnify it for it's share of any judgment resulting from the present complaint. Def.'s Mot. at 3. While Grunley-Walsh does not dispute the authenticity or validity of the contract, it does dispute the United States' interpretation of the indemnification provision. Pl's Opp. at 3. Grunley-Walsh argues that "[the] contract language precludes contribution in favor of Grunley-Walsh if liability is based upon the acts or omissions of another contractor or subcontractor but does not exclude contribution for liability arising out of the conduct of the United States [*15] of America through [the] GSA." *Id.* This interpretation, however, does not comport with the plain language of the contract, which requires that Grunley-Walsh "shall save harmless and provide indemnity for the Government against any and all liability . . . resulting in whole or in part from the negligent acts or omissions of the contractor or the subcontractor, or any employee agent, or representative of the contractor or subcontractor." Def.'s Mot. to Dismiss, Ex. 2 at 5. While it is true that a valid claim for contribution requires that both parties be found negligent, *Wash. Hosp. Ctr., 722 A.2d at 336*, and the record seems to suggest that the United States may have been negligent, the contract here requires that Grunley-Walsh indemnify the United States for "any and all liability . . . resulting in whole or in part from the negligent acts or omissions of the contractor or the subcontractor, or any employee agent, or representative of the contractor or

2007 U.S. Dist. LEXIS 14896, *

subcontractor." Def.'s Mot. to Dismiss, Ex. 2 at 5. Thus, the express language in the contract prohibits Grunley-Walsh from seeking contribution from the United States, even if both are found to be negligent. [*16] *Kaiser, 1991 U.S. Dist. LEXIS 18573, 1991 WL 283726 at *5.*

Thus, justice requires reconsideration of the United States' motion to dismiss. And accepting as true all of the factual allegations of Grunley-Walsh's third-party complaint, the plain language of the contract clearly bars Grunley-Walsh from acquiring contribution from the United States. *Id.*; Def.'s Mot. to Dismiss, Ex. 2 at 5. Thus, it appears beyond a doubt that Grunley-Walsh can prove no set of facts in support of its claim which would entitle it to contribution from the United States, and therefore the United States' *Rule 12(b)(6)* motion to

dismiss must be granted.

**IV. Conclusion**

For the foregoing reasons, the United States' motion for reconsideration is granted, and Grunley-Walsh's contribution claim against the United States is dismissed.

SO ORDERED this 2nd day of March, 2007.[2]

2    An Order is being issued with this Memorandum Opinion.

REGGIE B. WALTON

United States District Judge [*17]

2004 U.S. Dist. LEXIS 27533, *

LEXSEE 2004 US DIST LEXIS 27533

AMERICAN LANDS ALLIANCE, et al., Plaintiffs, v. GALE A. NORTON, et al., Defendants.

Civil Action No. 00-2339 (RBW)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

*2004 U.S. Dist. LEXIS 27533*

June 2, 2004, Decided

**SUBSEQUENT HISTORY:** Dismissed by *Am. Lands Alliance v. Norton, 2004 U.S. App. LEXIS 15243 (D.C. Cir., July 21, 2004)*

**PRIOR HISTORY:** *Am. Lands Alliance v. Norton, 360 F. Supp. 2d 1, 2003 U.S. Dist. LEXIS 26321 (D.D.C., May 12, 2003)*

**COUNSEL:** [*1]   For AMERICAN LANDS ALLIANCE, THE LARCH COMPANY, Plaintiffs: Amy R. Atwood, Michael Axline, Heather Brinton, WESTERN ENVIRONMENTAL LAW CENTER, Eugene, OR; Ari Micha Wilkenfeld, BERNABEI AND KATZ, PLLC, Washington, DC; Courtney Brown, WESTERN ENVIRONMENTAL LAW CENTER, Portland, OR.

For GALE A. NORTON, in her official capacity as Secretary of the Department of the Interior, U.S. Department of the Interior, MARSHALL JONES, in his official capacity as Acting Director of the United States Fish and Wildlife Service, an agency of the Department of the Interior US Fish and Wildlife Service, Defendants: Katherine W. Hazard, U.S. DEPARTMENT OF JUSTICE, Environment & Natural Resources Division, Appellate Section, Washington, DC; Mauricia Maria Magdalena Baca, U.S. DEPARTMENT OF JUSTICE, ENVIRONMENT & NATURAL RESOURCES, Washington, DC; Seth M. Barsky, U.S. DEPARTMENT OF JUSTICE, Wildlife & Marine Resources Section, ENRD, Washington, DC.

For SINAPU, Plaintiff: Courtney Brown, WESTERN ENVIRONMENTAL LAW CENTER, Portland, OR; Debra Susan Katz, BERNABEI & KATZ, Washington, DC; Amy R. Atwood, Western Environmental Law Center, Eugene, OR.

**JUDGES:** REGGIE B. WALTON, United States District Judge.

**OPINION BY:** REGGIE B. WALTON

**OPINION**

[*2] *ORDER*

This matter comes before the Court on the plaintiffs' Motion for Injunctive Relief ("Pls.' Inj. Mot."). On January 30, 2003, this Court issued a Memorandum Opinion and Order granting the plaintiffs' motion for summary judgment and ordered that the defendants comply with making the mandatory findings pursuant to *16 U.S.C. § 1533(b)(3)* of the *Endangered Species Act* ("ESA") with respect to a petition filed by the plaintiffs to list the Gunnison sage grouse as an endangred species under the ESA. *Am. Lands Alliance v. Norton, 242 F. Supp. 2d 1, 8-12 (D.D.C. 2003)* (Walton, J.). In addition, the Court declared that the United States Fish and Wildlife Service's ("FWS") Petition Management Guidance ("PMG") Policy, that treats public petitions to list a species under the ESA, such as the one the plaintiffs submitted, as "redundant" if a species has already been placed on FWS's candidate list pursuant to its internal process, as violative of the ESA's "notice and comment" requirement embodied in *16 U.S.C. § 1533(h)* and therefore procedurally flawed. *Id. at 12-15*. Finally, the Court [*3] declared that the PMG Policy that treats external petitions as "redundant" is facially invalid because it allows the defendants to avoid their mandatory, non-discretionary duties to issue findings when public petitions are submitted pursuant to *16 U.S.C. § 1533(b)(3)(B)*. *Id. at 15-18*.

On March 17, 2003, following the scheduling of a hearing to address the appropriate relief to be awarded the plaintiffs in this case, the defendants filed a motion for reconsideration ("Defs.' Recon. Mot."). The defendants sought reconsideration of the Court's findings based upon the position that "the court's opinion appears to be premised on an erroneous assumption that issuance of a candidate notice is tantamount to indefinitely postponing the required 12-month finding under section 4(b)(3)(B) of the ESA, *16 U.S.C. § 1533(b)(3)(B)*." Defs.'

2004 U.S. Dist. LEXIS 27533, *

Recon. Mot., Defendants' Memorandum in Support of Motion for Reconsideration ("Defs.' Recon. Mem.") at 2. The defendants went on to assert that "rather, the Service's position is that a properly documented candidate notice serves as both the required 90-day finding and a 12-month warranted but precluded [*4] finding[, which is] in compliance with *ESA section 4(b)(3)(B)(iii)*." *Id.* The defendants also noted that "in the intervening period since summary judgment briefing, the service has published two Candidate Notices of Review ("CNORs") in which it has made explicit 12-month findings of warranted but precluded' regarding the Gunnison sage grouse." *Id.* Based upon this additional information, which was not before the Court when it issued its Memorandum Opinion and Order, the Court vacated its Order requiring that the defendants publish findings mandated by *16 U.S.C. § 1533(b)(3)* because the defendants had already published what purportedly amounted to a 12-month "warranted but precluded" finding. May 13, 2003 Order at 5. However, the Court denied the defendants' request to reconsider its ruling that the FWS's PMG Policy that treats external petitions as "redundant" if a species has already been placed on the FWS's internal candidate list as facially invalid, because it allows the defendants to avoid their obligations mandated by *16 U.S.C. § 1533(b)(3)(B)*. *Id.* at 10.

The first issue that this Court must address regarding [*5] the motion currently before the Court is whether its January 30, 2003 Order was a final order, since the defendants assert that the plaintiffs' motion for injunctive relief is untimely under *Federal Rule of Civil Procedure 59* and does not satisfy the standard for awarding relief under *Federal Rule of Civil Procedure 60(b)*. Defendants' Surreply in Opposition to Plaintiffs' Motion for Injunctive Relief ("Defs.' Inj. Surreply") at 2-3. Specifically, the defendants argue that the plaintiffs' motion under *Rule 59* is untimely because it was filed more than four months after the Court's initial ruling, *id.* at 2, and that the plaintiffs have failed to demonstrate that they meet the standard for granting relief under *Rule 60(b)(1)* or *60(b)(6)*. *Id.* at 3. Both of these arguments stem from the defendants' understanding that the Court's January 30, 2003 Order was in fact a final order. *See id.* at 2-3.

The Court must reject the defendants' arguments, however, because the January 30, 2003 Order was not a final order. Ruling on the defendants' motion for reconsideration, [*6] this Court held that the January 30, 2003 Order was a final order, noting that the only pending matter to be resolved at that time was the attorney's fees issue. May 13, 2003 Order at 3. This pronouncement was erroneous because Judge Jackson, to whom this case was previously assigned, had permitted the plaintiffs to file an amended complaint on November 28, 2000, asking for a nationwide permanent injunction against the defendants. Amended Complaint ("Am.

Compl.") at 3. Thus, because the Court did not rule on whether such relief was appropriate in its January 30, 2003 Order, the Court must now conclude, contrary to its prior ruling, that the January 30, 2003 Order was not a final order. Therefore, the Court should have reviewed the defendants' motion for reconsideration under the standard of review set forth in *Federal Rule of Civil Procedure 54(b)*, which is applicable to interlocutory orders, rather than under the standard of review of *Federal Rule of Civil Procedure 60(b)*, which is applicable to final orders. Although the standard for reviewing a final order is stricter than the standard applicable to [*7] an interlocutory order, *see APCC Servs. v. AT&T Corp., 281 F. Supp. 2d 41, 44 (D.D.C. 2003)* (noting that *Rule 60(b)* requires a showing of manifest injustice while an interlocutory order may be revised as justice requires pursuant to *Rule 54(b)*) (Huvelle, J.), even if the Court had properly reviewed the January 30, 2003 Order under the less stringent interlocutory order review standard, it would have reached the same conclusion in its May 13, 2003 Order. This is because the Court would have still vacated its prior order requiring the defendants to issue a 12-month finding due to the defendants' representation that they had already published what amounted to a 12-month finding, *see* May 13, 2003 Order at 2-3, and would have still declared as invalid the PMG Policy that treats external petitions to list a species under the ESA as "redundant" when a species has already been placed on the internal candidate list since the mere assertion that the invalid policy has been discontinued is insufficient to guard against its future use. *See Id.* at 9. Thus, even if the Court had analyzed the defendants' motion for reconsideration under the "as justice requires" [*8] standard, the Court would not have deviated from Supreme Court and Circuit Court precedent holding that mere discontinuation of an invalid policy is insufficient reason to vacate an earlier judgment. *See City of Mesquite v. Aladdin's Castle Inc., 455 U.S. 283, 289, 71 L. Ed. 2d 152, 102 S. Ct. 1070 (1982)* (denying the city's request for dismissal due to repeal of challenged law because repeal "would not preclude [the city] from reenacting precisely the same provision if the District Court's judgment were vacated"); *United Food & Commercial Workers Int'l Union, AFL-CIO, CLC v. IBP, Inc., 857 F.2d 422, 430 (8th Cir. 1988)* (noting that "courts have refused to dismiss cases where a governmental body discontinued a wrongful practice and promised not to resume it, since present intentions may not be carried out,' and it is not certain that changes in leadership or philosophy might not result in reinstitution of the [challenged] policy'"). Moreover, as the Court noted in its May 13, 2003 Order, the FWS has not only failed to repeal or amend the invalid policy, it continues to acknowledge the validity of the PMG policy. May 13, 2003 Order at 9-10. Therefore, the Court must conclude that [*9] while the defendants' motion for

2004 U.S. Dist. LEXIS 27533, *

reconsideration should have been reviewed under the interlocutory order standard of review articulated in *Rule 54(b)*, that analysis would have resulted in the same conclusion -- that the part of the PMG Policy that treats external petitions to list a species under the ESA as "redundant" when that species is on the FWS's internal candidate list is invalid.

The Court must now turn to the plaintiffs' request for a permanent nationwide injunction. This case presents a situation similar to the one considered by the District of Columbia Circuit in *National Mining Association v. United States Army Corps of Engineers, 330 U.S. App. D.C. 329, 145 F.3d 1399 (D.C. Cir. 1998)*. In that case, the Circuit Court affirmed the district court's issuance of a permanent nationwide injunction upon its conclusion that the agency's rule was facially invalid. *Id. at 1408*. Noting that "district courts enjoy broad discretion in awarding injunctive relief[,]" *id.* (citing *Wagner v. Taylor, 266 U.S. App. D.C. 402, 836 F.2d 566, 575 (D.C. Cir. 1987))*, the *National Mining* Court concluded that once the district court concluded that the rule was illegal, it was not required **[*10]** to make "express findings as to the elements necessary for a permanent injunction[.]" *Id.* Of particular significance to this case, is the Circuit Court's language with respect to the issuance of a permanent nationwide injunction against an agency upon finding a rule facially invalid. The *National Mining* Court explained that

> if persons adversely affected by an agency rule can seek review in the district court for the District of Columbia, as they often may, *see 28 U.S.C. § 1391(e)*, our refusal to sustain a broad injunction is likely merely to generate a flood of duplicative litigation. Even though our jurisdiction is not *exclusive*, an injunction issued here only as to the plaintiff organizations and their members would cause all others affected by the [invalid rule] to file separate actions for declaratory relief in this circuit. Issuance of a broad injunction obviates such repetitious filings.

*Id. at 1409*. This Court finds nothing unique in this case that would justify departing from the Circuit Court's holding in *National Mining*. The Court has already ruled that the provision of the PMG policy that treats external **[*11]** petitions as "redundant" if a species has already been placed on the FWS's candidate list pursuant to its internal process, to be facially invalid. *See Am. Lands, 242 F. Supp. 2d at 15-18*. A mere declaratory judgment without any injunctive relief would create the anomalous result of allowing the FWS to continue applying an invalid regulation. Issuing a nationwide injunction in this situation is therefore called for because the declaratory judgment alone is inadequate when a policy is found to be facially invalid. *Nat'l Mining Assoc., 145 F.3d at 1409*. Furthermore, a permanent nationwide injunction avoids future redundant and duplicative litigation. *Id.*

In conclusion, having held in its January 30, 2003 Memorandum Opinion and Order as invalid that part of the PMG Policy that treats public petitions to list a species under the ESA as "redundant" if a species has already been placed on FWS's candidate list pursuant to its internal process because it violates the ESA's "notice and comment" requirement embodied in *16 U.S.C. § 1533(h)* and because it allows the defendants to avoid the mandatory, non-discretionary obligations articulated **[*12]** in *16 U.S.C. § 1533(b)(3)(B)*, the Court will now issue a permanent injunction prohibiting the FWS from applying this policy. Accordingly, it is hereby this 2nd day of June, 2004

**ORDERED** that the plaintiffs' motion for injunctive relief be **GRANTED**. It is

**FURTHER ORDERED** that the defendants' PMG Policy that treats a public petition to list a species under the ESA as "redundant" if the species has already been identified as a "candidate" for listing under the FWS's internal process is hereby declared invalid and the defendants are enjoined from applying this policy.

**SO ORDERED.**

June 2, 2004

REGGIE B. WALTON

United States District Judge

Page 1

2000 U.S. Dist. LEXIS 19391, *; Fed. Sec. L. Rep. (CCH) P91,308

LEXSEE 2000 US DIST LEXIS 19391

**In re FLIR SYSTEMS, INC. SECURITIES LITIGATION**

**Civil No. 00-360 -HA**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF OREGON**

*2000 U.S. Dist. LEXIS 19391; Fed. Sec. L. Rep. (CCH) P91,308*

**December 13, 2000, Decided**
**December 13, 2000, Filed**

**DISPOSITION:** [*1] Defendants' motion for reconsideration of the court's discovery order, (doc. 36), denied. Defendants' motion for a protective order barring plaintiff's from taking the Palmquist deposition on December 20 and 21, 2000, (doc. 36), and defendant's motion for pending ruling by the Ninth Circuit on the mandamus petition, (doc. 38) granted.

**COUNSEL:** For MICHAEL CONNOR, Plaintiff: Steven Douglas Larson, Stoll Stoll Berne Lokting & Shlachter PC, Portland, OR.

For MICHAEL CONNOR, Plaintiff: William S Lerach, Darren J Robbins, Mark Solomon, Matthew M Rabin, Milberg Weiss Bershad Hynes & Lerach LLP, San Diego, CA.

For MICHAEL CONNOR, Plaintiff: Kathleen A Herkenhoff, Milberg Weiss Bershad Haynes & Learach LLP, Los Angeles, CA.

For MICHAEL CONNOR, Plaintiff: Lawrence G Solicher, Law Office of Lawrence G Solicher, New York, NY.

For FLIR SYSTEMS INC, J MARK SAMPER, Defendants: Lois O Rosenbaum, Stoel Rives LLP, Portland, OR.

For J KENNETH STRINGER, III, Defendant: William F Martson, Jr, Tonkon Torp LLP, Portland, OR.

**JUDGES:** Ancer L. Haggerty, United States District Judge.

**OPINION BY:** Ancer L. Haggerty

**OPINION**

OPINION AND ORDER

HAGGERTY, District Judge:

**I. Introduction and Background.**

[*2] Pending before the court are two motions: (1) defendants' joint motion for reconsideration or, in the alternative, stay of order permitting discovery; and (2) defendants' joint motion for a protective order. These motions relate to this court's Order of November 14, 2000, in which the court, pursuant to *15 U.S.C. § 78u-4(b)(3)(B)*, allowed the plaintiffs to depose former-Flir employee Steven Palmquist. That order arose out of a November 13, 2000 hearing on defendants' motion to dismiss plaintiffs' complaint for failure to meet the heightened scienter pleading requirements of the Private Securities Litigation Reform Act ("PSLRA").

In response to the defendants' motion, plaintiffs submitted a copy of a complaint filed in Oregon state court by Palmquist. In his state-court complaint, Palmquist alleged, among other things, that Flir's Chief Financial Officer, Defendant Mark Samper, and Flir's President, Defendant Ken Stringer, had engaged in "improper accounting and reporting practices relating to falsely booking sales and revenue, and then subsequently reversing or substituting the factitious sales after the relevant reporting period had closed." (Palmquist [*3] Complaint at P 8.) The court found that the plaintiffs had "identified a former Flir employee who has filed a lawsuit alleging that defendants willfully engaged in the same type of accounting irregularities that are at the core of plaintiffs' complaint." (Order at 2.) Palmquist, however, refused to talk to plaintiffs' attorneys unless he was required to do so pursuant to a subpoena. (*Id.*) As a result, the court ruled that "undue prejudice would result if it were to grant defendants' motion to dismiss without allowing plaintiffs to depose Palmquist so that they may plead, if they can, particularized facts corroborating their allegations that defendants willfully engaged in fraud." (Order at 2.) The court also denied defendants' motion to dismiss without prejudice, and allowed plaintiffs to replead their allegations in an amended complaint. Plaintiffs have now submitted an affidavit averring that Palmquist refused to talk to them because defendants

2000 U.S. Dist. LEXIS 19391, *; Fed. Sec. L. Rep. (CCH) P91,308

essentially threatened Palmquist with legal action if he did so. (Larson Aff. at P 5.)

On November 29, 2000, defendants filed their motion for reconsideration, arguing that this court erred in allowing limited discovery as to Palmquist [*4] under *SG Cowen Sec. v. United States District Court for the Northern District of Cal.*, 189 F.3d 909 (9th Cir. 1999). At the time of the hearing and the court's order, neither the parties nor the court were aware of the *Cowen* decision. On December 7, 2000, defendants filed a motion for a protective order barring the plaintiffs from taking Palmquist's deposition, which is currently scheduled for December 20 and 21, 2000, pending resolution of their motion for reconsideration or a petition for writ of mandamus from the Ninth Circuit. On December 8, 2000, defendants also petitioned the Ninth Circuit for a writ of mandamus directing this court to vacate its limited discovery order. The court notes that even if the Ninth Circuit issues a writ of mandamus regarding the Palmquist discovery, the court has already given plaintiffs leave to file an amended complaint so that their new allegations can be reviewed.

## II. Discussion.

In *Cowen*, a district court allowed limited discovery to proceed against the defendants despite the stay imposed by the PSLRA. *Id. at 911-12*. The district court in *Cowen* believed that the plaintiffs' allegations [*5] did not satisfy the PSLRA's scienter requirement, but came close to doing so. *Id. at 912*. The district court allowed plaintiffs to attempt to obtain those facts by ordering limited discovery from the defendants. The Ninth Circuit found that the district court erred, stating that "as a matter of law, failure to muster facts sufficient to meet the Act's pleading requirements cannot constitute the requisite 'undue prejudice' to the plaintiff justifying a lift of the discovery stay under *§ 78u-4(b)(3)(B)*." *Id. at 913*. The case at bar is significantly different than *Cowen*.

As an initial matter, the discovery in *Palmquist* was directed against *the defendants*. In this case discovery has been allowed to proceed only as to *a single third party*. This distinction is not without importance. The PSLRA's stay on discovery was "intended to prevent unnecessary imposition of discovery costs on defendants." *Id. at 911* (quoting H.R. Conf. Rep. No. 104-369, 104th Cong. 1st Sess. at 32 (1995), *reprinted in* 1995 U.S.C.C.A.N. Sess. 731). Congress was concerned, for example, that "the threat that time of key employees will be spent responding [*6] to discovery requests, including providing deposition testimony, often forces coercive settlements . . . ." *Id.* (quoting 1995 U.S.C.C.A.N. Sess. at 733). Those concerns are not present here. Palmquist is not a defendant, nor is he a current employee of defendant. As a result, the reasons for the PSLRA's stay of discovery are diminished when discovery is sought only from a single third party, not a defendant.

Additionally, unlike *Cowen*, the court has not allowed his deposition merely as part of a fishing expedition in hope that the person subject to the discovery might be able to provide something helpful to the plaintiffs. Here, Palmquist has filed a civil complaint in state court that directly corroborates plaintiff's allegations of fraud. By placing in his civil complaint allegations of Flir's accounting fraud, Palmquist has verified that his allegations "are supported by evidence." Oregon Rule of Civil Procedure 17(providing sanctions for unsubstantiated allegations in civil complaints). As a result, it is highly likely that Palmquist, a third party, has significant information about defendants' alleged fraud, information which Palmquist has already certified in [*7] state court documents to be true.

Finally, the only reason Palmquist has not already shared his information with the plaintiffs is that the defendants have essentially threatened him with legal action if he does so. In response to the motion for reconsideration, plaintiffs' have attached an affidavit of Steve Larson, one of plaintiffs' attorneys, which states as follows:

> 3. In the course of our investigation of this matter, plaintiffs' counsel learned that Steve Palmquist, the Vice President of Engineering, sent a memo to Ken Stringer, the CEO of Flir, in March, 1999 outlining accounting concerns. We also learned that Stringer and Flir refused to change these accounting practices so Palmquist resigned in July, 1999. According to Mr. Palmquist's attorney, Palmquist sent a resignation letter to the company that outlines the accounting misrepresentations.

> . . .

> 5. In mid-March, 2000, I contacted Mr. Palmquist's attorney, Samuel Nicholls, to ask for copies of the March, 1999 memo to String and the resignation letter. Mr. Palmquist's attorney told me he would provide documents to us, and he would allow us to meet with Mr. Palmquist. However, a day or so later, Mr. Palmquist's [*8] attorney informed us that the attorney for Flir defending Palmquist's lawsuit had demanded that the resignation letter and the March memorandum, as well as any other documents that Mr. Palmquist had regarding Flir, be returned to Flir or Palmquist would be in violation of confidentiality provision of an

2000 U.S. Dist. LEXIS 19391, *; Fed. Sec. L. Rep. (CCH) P91,308

employment contract. Mr. Palmquist's attorney told us that because of this assertion by Flir, he would not be able to provide us with copies of the documents and he would not be able to make Mr. Palmquist available for an interview, absent a subpoena.

(Larson Aff. at P 5.) Thus, Palmquist is unavailable only because defendants have taken steps to ensure that Palmquist could not talk to plaintiffs or provide relevant documents without the protection of being ordered to do so pursuant to a subpoena.

In their motion for reconsideration, defendants claim that deposing Palmquist is inappropriate and contrary to the PSLRA; yet, defendants have arranged that the information Palmquist possesses can be obtained only if he is deposed. The PSLRA is a shield intended to protect security-fraud defendants from costly discovery requirements, *Cowen, 189 F.3d at 911*, not to [*9] be a sword with which defendants can destroy the plaintiffs' ability to obtain information from third parties who are otherwise willing to disclose it. Allowing defendants to seek dismissal of plaintiffs' complaint without affording plaintiffs the opportunity to discover Palmquist's information regarding defendants' fraud--information

which is known to exist and which has been withheld only as a result of defendants' efforts to silence Palmquist--would result in "undue prejudice" to plaintiffs.

III. Conclusion.

For the foregoing reasons, defendants' motion for reconsideration of the court's discovery order, (doc. 36), is denied. In order to allow the Ninth Circuit to decide defendants' petition for mandamus, however, the court shall grant defendants' motion for a protective order barring plaintiffs from taking the Palmquist deposition on December 20 and 21, 2000, (doc. 36), and defendants' motion for a stay of discovery pending a ruling by the Ninth Circuit on the mandamus petition, (doc. 38). The Clerk of the Court shall immediately send a copy of this Opinion and Order to the Ninth Circuit Court of Appeals for inclusion in the materials for its mandamus decision.

[*10] **IT IS SO ORDERED.**

Dated this *13* day of December, 2000.

Ancer L. Haggerty

United States District Judge

Page 1

2007 U.S. Dist. LEXIS 10408, *

LEXSEE 2007 US DIST LEXIS 10408

IN RE: DELPHI CORPORATION SECURITIES, DERIVATIVE & "ERISA"
LITIGATION

MDL No. 1725, Master Case No. 05-md-1725, This Opinion and Order Relates to 06-
10026

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
MICHIGAN, SOUTHERN DIVISION

*2007 U.S. Dist. LEXIS 10408*

February 15, 2007, Argued
February 15, 2007, Decided
February 15, 2007, Filed

**SUBSEQUENT HISTORY:** Motions ruled upon by,
Settled by, Class certification granted by, Costs and fees
proceeding at *In re Delphi Corp. Secs, 2008 U.S. Dist.
LEXIS 2207 ( E.D. Mich., Jan. 11, 2008)*

**PRIOR HISTORY:** *In re Delphi Corp. Sec., Derivative
& "ERISA" Litig., 458 F. Supp. 2d 455, 2006 U.S. Dist.
LEXIS 95155 ( E.D. Mich., 2006)*

**COUNSEL:** For Carolyn Hanners, Plaintiff: Arthur N.
Abbey, LEAD ATTORNEY, Abbey & Ellis, new York,
NY; Marc L. Newman, LEAD ATTORNEY, The Miller
Law Firm (Rochester), Rochester, MI.

For Vanessa Jones, Plaintiff: Eric J. Belfi, LEAD
ATTORNEY, Murray, Frank, New York, NY.

For Shawn Dangerfield, derivatively on behalf of Delphi
Corp., Plaintiff: Travis E. Downs, III, LEAD
ATTORNEY, Lerach, Coughlin, San Diego, CA, us;
Patrick E. Cafferty, Cafferty Faucher (Ann Arbor), Ann
Arbor, MI.

For Policemens Annuity and Benefit Fund of Chicago,
Plaintiff: Frederic S. Fox, LEAD ATTORNEY, Kaplan,
Fox, (New York), New York, NY.

For Steven Kramer, Plaintiff: John P. Zuccarini, LEAD
ATTORNEY, Elwood S. Simon Assoc., Birmingham,
MI; Robert I. Harwood, LEAD ATTORNEY, Wechsler
Harwood, New York, NY.

For Ira Gaines, Plaintiff: Christopher S. Hinton, LEAD
ATTORNEY, Wolf, Haldenstein, New York NY, us.

For Neal C. Folck, Thomas Kessler, Greg Bartell,
Kimberly Chase-Orr, Don McEvoy, Irene Polito
Plaintiffs: Cari C. Laufenberg, Lynn L. Sarko, LEAD

ATTORNEYS, Keller Rohrback (Seattle), Seattle, WA

For Neal C. Folck, Plaintiff: Robert A. Izard, LEAD
ATTORNEY, Schatz & Nobel, Hartford, CT, us.

For Edward Hammer, Plaintiff: Dennis J. Johnson,
LEAD ATTORNEY, Johnson and Perkinson (South
Burlington), South Burlington, VT; John P. Zuccarini,
LEAD ATTORNEY, Elwood S. Simon Assoc.,
Birmingham, MI.

For Nextra Investment Management, S.G.R. S.p.A.,
Plaintiff: Christopher J. Keller, LEAD A TTOHNE Y,
Labaton, Scharow, New York, NY, us.

For Frank J. Fosbre, derivatively on behalf of Delphi
Corp., Plaintiff: Leigh K. Lasky, LEAD ATTORNEY,
Lasky & Rifkind, New York, NY, US.

For Sidney Bernstein, Plaintiff: Abraham Rappaport,
LEAD ATTORNEY, Boca Raton, FL, us; Gary S.
Graifman, LEAD ATTORNEY, Kantrowitz, Goldhamer
(Chestnut Ridge), Chestnut Ridge, NY, us; Howard T.
Longman, LEAD ATTORNEY, Stull, Stull, New York,
NY, us; Stephen F. Wasinger, Stephen F. Wasinger
(Royal Oak), Royal Oak, MI, US.

For Thomas Kessler, James Shiets, Plaintiffs: Sara L.
Madsen, LEAD ATTORNEY, Lockridge, Grindal,
(Minneapolis), Minneapolis, MN.

For Mary M. Brewer, Plaintiff: J. Brian McTigue, LEAD
ATTORNEY, McTigue & Porter, Washington DC.

For Chris Glinka, Plaintiff: Bruce F. Rinaldi, LEAD
ATTORNEY, Cohen, Milstein, (Washington),
Washington, DC.

For Daniel Lazor, Plaintiff: Jacqueline Sailer, LEAD

2007 U.S. Dist. LEXIS 10408, *

ATTORNEY, Rabin & Peckel, New York, NY; John P. Zuccarini, LEAD ATTORNEY, Elwood S. Simon Assoc., Birmingham, MI

For Kimberly Chase-Orr, Plaintiff: Sherrie R. Savett, LEAD ATTORNEY, Berger & Montague, Philadelphia, PA.For Thomas Morrison, Plaintiff: Richard S. Schiffrin, LEAD ATTORNEY, Schiffrin, Barroway, (Radnor), Radnor, PA.

For Steven Willis, Plaintiff: David R. Scott, LEAD ATTORNEY, Scott & Scott (Colchester), Colchester, CT; John P. Zuccarini, LEAD ATTORNEY, Elwood S. Simon Assoc., Birmingham, MI.

For Thomas A. Reilly, Jr., Larry A. Williams, Plaintiffs: Elwood S. Simon, John P. Zuccarini, LEAD ATTORNEYS, Elwood S. Simon Assoc., Birmingham, MI.

For Johnnie Cox, Plaintiff: Evan J. Smith, LEAD .ATTORNEY, Brodsky & Smith, Bala Cynwyd, PA.For Clemie Hunter, Plaintiff: John P. Zuccarini, LEAD ATTORNEY, Elwood S. Simon Assoc., Birmingham, MI; Lee Squitieri, LEAD ATTORNEY, Squitieri and Fearon (New York), New York, NY.

For Robert Hillman, Plaintiff: Carl L. Stine, LEAD ATTORNEY, Wolf, Popper, New York, NY.

For Don McEvoy, Irene Polito, Michael Polito, Plaintiffs: Jane B. Stranch, LEAD ATTORNEY, Branstetter, Kilgore, (Nashville), Nashville, TN.

For Oklahoma Law Enforcement Retirement System, Plaintiff: Susan Whatley, LEAD ATTORNEY, Nix, Patterson, (Daingerfield), Daingerfield, TX, US.

For Public Employees' Retirement System of Mississippi, Raiffeisen Kapitalanlage-Gesellschaft m.b.H., Stichting Pensioenfond ABP, Teachers Retirement System of Oklahoma, Plaintiffs: Bradley E. Beckworth, Jeffrey J. Angelovich, Susan Whatley, LEAD ATTORNEYS, Nix, Patterson, (Daingerfield), Daingerfield, TX, us; Debra B. Pevos, LEAD ATTORNEY, Sullivan, Ward, (Southfield), Southfield, MI; Hannah Greenwald, John Patrick Coffey, Matthew C. Moehlman, LEAD ATTORNEYS, Bernstein, Litowitz, (New York), New York, NY; Jodi L. Murland, Michael K. Yarnoff, LEAD ATTORNEYS, Schiffrin, Barroway, (Radnor), Radnor, PA; James J. Sabella, Sharan Nirmul, Stuart M. Grant, Grant & Eisenhofer (Wilmington), Wilmington, DE.

For Raiffeisen Kapitalanlage-Gesellschaft m.b.H., Stichting Pensioenfond ABP, Teachers Retirement System of Oklahoma, Plaintiffs: Sean M. Handler,

LEAD ATTORNEY, Schiffrin, Barroway, (Radnor), Radnor PA.

For Illinois Fund, Plaintiff: Jean-Marc Zimmerman, LEAD ATTORNEY, Zimmerman & Levi, Westfield, NJ, US.

For SETECH, Inc., Defendant: Clark C. Johnson, LEAD ATTORNEY, Stites and Harbison (Louisville), Louisville, KY, US.

For J. T. Battenberg, III, Defendant: Joe R. Caldwell, Jr., Michael G. Yattillo, Jr., William H. Jeffress, Jr., LEAD ATTORNEYS, Bridget M. Moore, Baker Botts (Washington), Washington, DC; Joseph E. Papelian, LEAD ATTORNEY, Delphi Corporation Legal Staff, Troy, MI.

For John G. Blahnik, Defendant: Joseph E. Papelian, LEAD ATTORNEY, Delphi Corporation Legal Staff, Troy, MI; William A. Sankbeil, LEAD ATTORNEY, Fred K. Herrmann, Ken, Russell, (Detroit), Detroit, MI.

For Terry D. Bondreau, Robert H. Brust, Virgis W. Colbert, Delphi Corporation, formerly known as Delphi Automotive Systems, Delphi Corporation Board of Directors, Delphi Corporation Board of Directors Executive Committee, Delphi Mechatronic Board of Directors, Delphi Trust I, Employee Benefit Plans Committee, David N. Farr, Michael S. Fligstein, Bernd Gottschalk, Shoichiro Irimajiri, Susan A. McLaughlin, Craig G. Naylor, Oscar De Paula Bernades Neto, Cynthia Niekamp, Rodney O'Neal, John D. Opie, Roger S. Penske, Donald S. Runkle, John .D. Sheehan, Thomas Sprunger, Patricia C. Sueltz, James P. Whitson, Thomas H Wyman, Defendants: Joseph E. Papelian, LEAD ATTORNEY, Delphi Corporation Legal Staff, Troy, MI; Stuart Baskin LEAD ATTORNEY, Shearman& Sterling, New York, NY.

For Alan S. Dawes, Defendant: Robert M. Stern, LEAD ATTORNEY, Robert N. Eccles, O'Melveny & Meyers, Washington, DC, US.

For Delphi Employee Benefits Plan Executive Committee, Defendant: Arthur N. Abbey, LEAD ATTORNEY, Abbey & Ellis, New York, NY; Marc L. Newman, LEAD ATTORNEY, The Miller Law Firm (Rochester), Rochester, MI.

For Deloitte and Touche, L. L. P., Defendant: Daniel F. Kolb, LEAD ATTORNEY, Frances Bivens, Davis, Polk, (New York), New York, NY; Dennis J. Levasseur, Maya S. Hamie, LEAD ATTORNEYS, Bodman (Detroit), Detroit, MI; Thomas J. Tallerico, LEAD A TTORNEY, Bodman (Troy), Troy, MI.

2007 U.S. Dist. LEXIS 10408, *

For General Motors Investment Management Corporation, Defendant: Robert J. Kopecky, LEAD ATTORNEY, Jonathan E. Moore, Kirkland & Ellis (Chicago), Chicago, IL; Dennis M. Barnes, Barris, Sott, Detroit, MI.

For General Motors Investment Management Corporation, J. Michael Losh, Harry J. Pearce, John F. Smith, Jr., Defendants: Timothy A. Duffy, LEAD ATTORNEY, John W. Reale, Kirkland & Ellis (Chicago), Chicago, IL.

For Paul R. Free, Defendant: Richard A. Rossman, LEAD ATTORNEY, Matthew J. Lund, Pepper Hamilton (Detroit), Detroit, MI.

For Merrill Lynch, Pierce, Fenner and Smith, Incorporated, Morgan Stanley and Company, Incorporated, UBS Securities, LLC, Wachovia Capital Markets, LLC, Defendants: Andrew W. Stern, LEAD ATTORNEY, Sidley, Austin, (New York), New York, NY; Michael P. Coakley, Ruth H. Swartout, W. Scott Turnbull, Miller, Canfield, (Detroit), Detroit, MI.

For JP Morgan Chase and Company, formerly known as Bank One, Defendant: Brad S. Karp, Christopher H. Giampapa, LEAD ATTORNEYS, Paul, Weiss, New York, NY, US; Jill M. Wheaton, LEAD ATTORNEY, Dykema Gossett (Ann Arbor), Ann Arbor, MI.

For BBK, Limited, Defendant: Gregory S. Bruch, LEAD ATTORNEY, Foley & Lardner, Washington, DC, us; Robert S. Scher, LEAD ATTORNEY, Foley & Lardner, New York, NY, us; Scott T. Seabolt, LEAD ATTORNEY, Foley & Ladner (Detroit), Detroit, MI.

For State Street Bank and Trust Company, Defendant: James D. VandeWyngearde, Richard A. Rossman, LEAD ATTORNEYS, Pepper Hamilton (Detroit), Detroit, MI; Steven W. Kasten, LEAD ATTORNEY, McDermott, Will, (Boston), Boston, MA; Wilber H. Boies, LEAD ATTORNEY, Nancy G. Ross, McDermott, Will, (Chicago), Chicago, IL.

For Delphi Trust II, Defendant: Stuart Baskin, Shearman & Sterling, New York, NY.

For Investment Policy Committee, Defendant: Stuart Baskin, LEAD ATTORNEY, Shearman & Sterling, New York, NY.

For Government Employees Retirement System of the Virgin Islands, Police and Fire Retirement System of the City of Detroit, Interested Partys: Regina M. Calcaterra, LEAD ATTORNEY, Barrack, Rodos, Philadelphia, PA, us.

For San Diego City Employees' Retirement System, Interested Party: Hannah Greenwald, LEAD ATTORNEY, Bernstein, Litowitz, (New York), New York, NY.

For Chernofsky Family, Louisiana District Attorneys' Retirement System, Interested Partys: Stanley M. Grossman, LEAD ATTORNEY, Pomerantz, Haudek, New York, NY.

For Institutional Funds, Interested Party: Samuel H. Rudman, LEAD ATTORNEY, Lerach, Coughlin, Melville, NY, US.

For Institutional Investor Group, Interested Party: Steven G. Schulman, LEAD ATTORNEY, Milberg, Weiss, New York, NY.

For Secure Trading Croup, Incorporated, Interested Party: William W. Wickersham, LEAD ATTORNEY, Entwistle & Cappucci, New York, NY.

**JUDGES:** [*1] Gerald E. Rosen, United States District Judge.

**OPINION BY:** Gerald E. Rosen

**OPINION**

**OPINION AND ORDER REGARDING LEAD PLAINTIFFS' MOTION FOR PARTIAL MODIFICATION OF PSLRA DISCOVERY STAY**

At a session of said Court, held in the U.S. Courthouse, Detroit, Michigan on February 15, 2007

PRESENT: Honorable Gerald E. Rosen United States District Judge

**I. INTRODUCTION**

This matter is presently before the Court on the Motion filed by the Securities Fraud Lead Plaintiffs to lift the PSLRA's discovery stay to allow them to obtain, through discovery, copies of certain documents that Delphi Corporation and certain other named Defendants and third-parties have already produced to federal authorities and others in connection with investigations conducted by Delphi, the SEC, the Department of Justice, the FBI and the U.S. Postal Inspectors. The Defendants have responded and oppose this Motion, and the Lead Plaintiffs have replied.

Having reviewed and considered the parties' briefs and the applicable law, the Court has determined that oral argument is not necessary. Therefore, pursuant to Eastern District of Michigan Local Rule 7.1(e)(2), this matter will be decided on the briefs. [*2] This Opinion and Order sets forth the Court's ruling.

**II. PERTINENT FACTS**

Case 1:07-cv-00294-RBW     Document 26-2     Filed 08/15/2008     Page 76 of 82

Page 4
2007 U.S. Dist. LEXIS 10408, *

On March 3, 2005, Delphi Corporation, one of the largest suppliers of automotive parts in the world, announced the findings of a six-month long internal investigation which revealed accounting improprieties dating back to Delphi's birth as an independent publicly traded company and warned investors that its financial statements for 2001 and beyond were unreliable. Thereafter, on June 30, 2005, the Company restated five years of financial statements -- all of the financial statements it had issued since becoming a public company. Delphi's revelations rocked the U.S. automotive industry and its investors, and ultimately led to the Company filing for bankruptcy.

Within days of Delphi's announcement of the findings of its internal investigation, Delphi investors commenced litigation. The first Delphi securities fraud class action complaint was filed in Southern District of New York on March 7, 2005. Six more securities fraud complaints were filed in the Southern District of New York on March 8, 10, 15, 29, April 1 and May 6, 2005. These complaints were subsequently consolidated and the consolidated [*3] action was re-titled "In re Delphi Corp. Securities Litigation." [1]

> 1   Additional securities fraud actions were also filed in the Southern District of Florida and the Eastern District of Michigan. The plaintiffs in the Michigan cases subsequently voluntarily dismissed their complaints, opting instead to prosecute their securities claims in the consolidated New York action. All of the securities fraud cases were subsequently consolidated with ERISA class actions and derivative actions also arising out of the Delphi accounting improprieties and transferred to this Court by the Judicial Panel on Multi-District Litigation.

Thereafter, on September 30, 2005, the Lead Plaintiffs filed a Consolidated Class Action Securities Fraud Complaint against Delphi, certain officers and directors, Delphi's auditors and underwriters, and several outside parties. It was barely a week later, on October 8, 2005, when Delphi and substantially all of its active U.S. subsidiaries, filed for Chapter 11 bankruptcy. [2]

> 2   Lead Plaintiffs are creditors, equity holders and parties-in-interest in the bankruptcy proceeding.

[*4]  At the same time that Delphi was conducting its internal investigation, the United States Securities and Exchange Commission was conducting its own investigation into certain Delphi transactions. In connection with its investigation, the SEC subpoenaed records from Delphi, its former parent, General Motors, and several current and former Delphi executives and mid-level employees. Several Delphi executives were also subpoenaed to appear and testify before the Commission. The FBI, the U.S. Postal Inspector and the Department of Justice also launched criminal investigations into the conduct at issue in this litigation.

According to media reports of these various investigations, Delphi produced "hundreds of thousands of pages" of records to the federal agencies, [3] and SEC investigators and the FBI conducted "more than a dozen interviews with current and former [Delphi] employees." See "Feds Expand Delphi Probe," The Detroit News, David Shepardson, June 30, 2005.

> 3   Delphi, Delphi employees, GM, EDS, Bank One, Deloitte & Touche and BBK all produced documents to the SEC and the FBI pursuant to the federal investigations.

[*5]  The SEC investigation culminated in the filing of a civil action on October 30, 2006 against Delphi, nine of its former executives, and four employees of outside firms for their alleged involvement in Delphi's accounting fraud. See SEC v. Delphi Corporation, E.D. Mich. No. 06-14891. [4] Many of the defendants in the SEC action are also named as Defendants in the instant action. Consent judgments have since been entered in the SEC case against Delphi and six of the charged individuals, including at least two of the named Defendants in this action. [5] However, as to a number of other individuals who are named as defendants in both the SEC case and the instant action -- notably J.T. Battenberg, III, Delphi's former president, CEO and chairman of the board of directors; Paul Free, former chief accounting officer and controller of the Company; and John Blahnik, former company treasurer and vice president of treasury -- the SEC case is still ongoing. [6] (A few of the individuals named as defendants in the SEC action have not yet been served with process. Presumably, once all defendants are served, discovery will commence in the case.) [7]

> 4   No criminal charges have yet been brought against any of the parties.

[*6]

> 5   In addition to agreeing to a permanent injunction, Defendant Alan Dawes, Delphi's former vice chairman and CFO, consented to a Judgment against him for $ 687,000. Defendant B.N. Bahadur founder, sole owner and principal of Defendant BBK, Ltd., consented to a Judgment against him in the amount of $ 569,257.
> 6   On November 22, 2006, Delphi filed a motion in the bankruptcy action requesting the bankruptcy court to authorize its decision to not advance legal fees and costs to certain former Delphi officers, including Paul Free and John Blahnik, stating that "it could not in good faith

2007 U.S. Dist. LEXIS 10408, *

pay advancements to former employees whose actions the Audit Committee found were linked to the [financial] restatement and all related negative consequences."

7    With respect to the criminal investigations, although media reports indicated that the U.S. Attorney would decide whether to file criminal charges by January 2007, no action has yet been taken in this regard.

Meanwhile, early on in the bankruptcy action, on November 15, 2005, the Lead Plaintiffs in the instant action filed a Motion for [*7] a Limited Modification of the Automatic Bankruptcy Stay. In that motion, Lead Plaintiffs sought permission to obtain from Delphi copies of all documents and materials that the Company produced or provided to its internal investigators, the DOJ and the SEC. The Bankruptcy Court refused to grant the relief requested. 8

8    Judge Drain, instead, directed Lead Plaintiffs to first seek relief from the PSLRA stay in this Court, and stated that if this Court granted Lead Plaintiffs relief from the PSLRA stay, they could then return to the Bankruptcy Court and renew their motion to lift the bankruptcy stay. See Order Modifying Automatic Stay, Lead Plaintiffs' Ex. E.

Although Lead Plaintiffs have been denied discovery in the bankruptcy proceeding, the Unsecured Creditors Committee (the "UCC") was provided access to the records Lead Plaintiffs had requested. On March 29, 2006, Delphi agreed to provide the UCC with the documents the Company produced to the SEC, the DOJ and the U.S. Postal Inspector. 9 After reviewing [*8] those records, on July 27, 2006, the UCC filed a Motion in the bankruptcy court for an order authorizing the Committee to prosecute claims against General Motors and certain of Delphi's former officers, i.e., some of the same individuals named as Defendants in this action. In its Motion, the UCC confirmed that

In researching and preparing the [proposed adversary] Complaint, 10 the Committee used, and the Complaint and Demand Letter contain, information produced by the Debtors [i.e., Delphi and its subsidiaries] relating to ongoing investigations of the Debtors including investigations by the Securities and Exchange Commission.

See S.D.N.Y. Bankr. Ct. No. 05-44481, 7/27/06 Ex-Parte Motion of the Official Committee of Unsecured Creditors, P 5. 11

9    According to the Affidavit of Mark A. Broude,

counsel for the UCC, Delphi provided the Committee with the information pursuant to a confidentiality agreement. See Broude Affidavit, P 6.

10    The adversary complaint was submitted to the bankruptcy court under seal.

11    On September 5, 2006, Delphi's Equity Committee filed an objection to the UCC's motion. In its objection Delphi's Equity Committee stated that it, too, had received access to the same documents that Delphi produced to the UCC.

[*9]  In the Affidavit filed in support of its Motion, counsel for the UCC stated that one reason the Committee filed its motion is because extensive settlement negotiations are currently taking place between GM and Delphi, and the Unsecured Creditors want a "seat at the table in negotiations." See Affidavit of Mark A. Broude, counsel for the UCC, P5. 12

12    Earlier in the bankruptcy proceeding, Delphi filed a Motion to Implement a Key Employee Compensation Program ("KECP"). Lead Plaintiffs objected to that Motion. In conjunction with the KECP Objection, Delphi requested documents from Lead Plaintiffs going to Lead Plaintiffs' securities fraud claims, and Lead Plaintiffs complied by producing all non-privileged documents sought by Delphi. However, when Lead Plaintiffs in turn put the identical requests to Delphi, the Company invoked the PSLRA discovery stay.

Based upon the foregoing developments, Lead Plaintiffs now ask the Court to lift the PSLRA discovery stay for the limited purpose of allowing them (1) [*10] to serve Defendants (other than Delphi) and certain third parties with discovery requests and (2) to return to Judge Drain in the bankruptcy proceeding to seek permission to serve Delphi with discovery requests to produce the following evidence that has already been produced to federal authorities:

a. A copy of all documents produced in conjunction with the internal investigation conducted by the Delphi Audit Committee of its Board of Directors, represented by Wilmer Cutler, outside counsel, and PriceWaterhouseCooper, forensic accountants, including, but not limited to (a) all e-mails and any other documents gathered and/or produced during the course of this investigation; and (b) all documents relating to Delphi's Restatement of June 30, 2005; [and]

b. A copy of all documents produced

in conjunction with the SEC, U.S. Postal Inspectors, DOJ and/or FBI investigations, including but not limited to: (a) records turned over to federal authorities by GM relating to transactions with Delphi; (b) the results of Delphi's internal investigation turned over to the SEC in June 2005; (c) the database created by Delphi containing more than a million company e-mails, created by "imaging" [*11] or copying the hard drives of computes of top executives; (d) the results of the searches of the aforementioned database for specific phrases, including, but not limited to searches for the terms "fraud" and "accounting" or "jail" and "accounting"; (e) any other records produced by Delphi or any present or former Delphi employee to federal authorities; (f) documents produced in connection with and leading up to the DOJ's issuance of a "target letter" to a former mid-level Delphi executive, meaning that the government has "substantial evidence" linking him or her to the commission of a crime; (g) records produced by EDS either voluntarily or pursuant to a subpoena by the SEC for records connected to a rebate transaction between EDS and Delphi; and (h) any and all documents produced by GM, EDS, BBK, Deloitte & Touche, and Bank One to federal authorities. "

13   Lead Plaintiffs also requested "any and all documents previously or to be produced in the consolidated ERISA Actions pending in this Court." The Court notes, however, that on the same date that Lead Plaintiffs filed their Motion for Relief from the PSLRA Discovery Stay, Defendants (with the exception of Delphi, against whom the action is stayed pursuant to the Bankruptcy Code) reached an agreement with the ERISA Lead Plaintiffs to stay all discovery in the ERISA action during the pendency of the motions to dismiss, allowing only for the informal provision of a very limited set of ERISA plan-specific documents. [See Memorandum of Law filed by Delphi and Certain Delphi Officer and Director Defendants, p. 4.]

[*12] **III. DISCUSSION**

A. THE PSLRA DISCOVERY STAY

The PSLRA provides for a stay of discovery during the pendency of any motion to dismiss a private securities fraud action:

> In any private action arising under this chapter, all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss, unless the court finds upon the motion of any party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party.

*15 U.S.C. § 78u-4(b)(3)(B).*

The legislative history of the PSLRA indicates that Congress enacted the discovery stay to minimize the incentives for plaintiffs to file frivolous securities class actions in the hope either that the corporate defendants will settle those actions rather than bear the high costs of discovery, *see* H.R. Conf. Rep. No. 104-369, at 37 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 736, or that the plaintiffs will find during discovery some sustainable claim not alleged in the complaint, *see* S. Rep. No. 104-98 at 14 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 693. *See also In re Worldcom, Inc. Securities Litigation, 234 F. Supp. 2d 301, 305 (S.D.N.Y. 2002)* [*13] (noting that the rationale underlying the PSLRA's discovery stay is to prevent plaintiffs from filing a complaint to initiate a "fishing expedition" in search of sustainable claims and to prevent plaintiffs from forcing defendants to settle an otherwise frivolous class action.)

As the House and Senate managers noted in their Joint Explanatory Statement of the Committee of Conference:

> The cost of discovery often forces innocent parties to settle frivolous securities class actions. According to the general counsel of an investment bank, "discovery costs account for roughly 80% of total litigation costs in securities fraud cases." In addition, the threat that the time of key employees will be spent responding to discovery requests, including providing deposition testimony, often forces coercive settlements.

1995 U.S.C.C.A.N. at 736.

Congress, however, did not impose an absolute stay on discovery. Rather, it expressly provided courts with discretion to allow limited discovery during the stay "upon the motion of any party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party." *15 U.S.C. § 78u-*

2007 U.S. Dist. LEXIS 10408, *

*4(b)(3)(B)* **[\*14]** . Lead Plaintiffs maintain that their request meets the requirements of the statutory stay's exception.

### B. PARTICULARITY

As an initial matter, the Court must determine whether the limited discovery sought by Lead Plaintiffs is sufficiently particularized. Lead Plaintiffs contend that they meet this requirement because they seek only "the closed universe of materials that Delphi and third parties have already assembled and produced to other entities in the course of the ongoing investigations." [Plaintiffs' Brief at 16.] Defendants counter that the particularity requirement is not met here because the request sweeps too broadly and targets "a voluminous set of privileged and non-privileged materials." [Certain Defendants' Brief at 15.]

These arguments are substantially similar to the arguments of the parties in *In re Ahold, N.V. Securities & ERISA Litig., 220 F.R.D. 246 (D. Md. 2004).* In that case the plaintiffs argued that a request for documents previously produced in connection with internal and external investigations was particularized within the meaning of the PSLRA. The defendants countered that a set of documents consisting of more than one million **[\*15]** pages is not "particularized" simply because it is "identifiable." The Court found no merit in the defendants' argument:

> [I]f "particularized" is not synonymous with "identifiable," neither does it necessarily mean "small." The meaning of the phrase in any particular case must take into account the nature of the underlying litigation, and in this case the complaint alone extends for 430 pages and alleges multibillion dollar accounting errors by a firm with operations on at least four continents. The volume of requested documents is not unreasonable in light of this background. Moreover, unlike cases rejecting virtually unlimited discovery requests, the motion at issue here describes a "clearly defined universe of documents," and the burden of producing the materials should be slight, considering that the defendants have previously produced them to other entities. ¹⁴ Thus, under the circumstances, the plaintiffs' request satisfies the threshold requirement of particularity.

*220 F.R.D. at 250* (citations omitted).

14   Although the court recognized in a footnote

that the defendants might need to review the documents for privilege, it rejected the defendants' argument of undue burden because "the larger task of compiling the materials should already be complete." *220 F.R.D. at 250 n. 11.*

**[\*16]** Similarly, in *In re WorldCom, Inc. Sec. Litig., 234 F. Supp. 2d 301 (S.D.N.Y. 2002),* the court was satisfied that the lead plaintiffs' requested discovery was sufficiently particularized where, as in this case, the plaintiffs sought to obtain copies of certain documents and materials which Worldcom had produced to the U.S. House of Representatives Committee on Energy and Commerce, the House Committee on Financial Services, the DOJ, and the SEC, as well as documents and materials that WorldCom had produced to counsel representing its internal Special Investigative Committee. *Id. at 302.* The court found that, because the plaintiffs' request "involved a clearly defined universe of documents," and because the plaintiffs "[were] not in any sense engaged in a fishing expedition or an abusive strike suit and . . . thereby not acting in contravention of the fundamental rationales underlying the PSLRA discovery stay. . . the defendants [could] not call upon the ambiguous notion of 'particularized' discovery to bend *Section 78u-4(b)(3)(B)* to a purpose for which it was not intended." *Id. at 306. See also In re Enron Corp. Securities, Derivative & ERISA Litigation,* 2002 U.S. Dist. LEXIS 26261, 2002 WL 31845114 (S.D. Tex. 2002) **[\*17]** (Particularity requirement met where plaintiff sought production of "all documents and materials produced by [Enron] related to any inquiry or investigation by any legislative branch committee, the executive branch, including the Department of Justice and the Securities and Exchange Commission, and all transcripts of witness interviews and or depositions related to those inquiries.")

As in the above cases, Lead Plaintiffs' request here is sufficiently particularized to satisfy the PSLRA's requirement. As the court in *In re Royal Ahold* noted, the meaning of "particularized" in any specific case must "take into account the nature of the underlying litigation." *220 F.R.D. at 250.* Here, the Lead Plaintiffs' Consolidated Class Action Complaint is more than 250 pages long and alleges hundreds of millions of dollars worth of sham transactions and accounting irregularities which inflicted billions of dollars of losses on investors. The fraud was allegedly perpetrated by Delphi, six of its officers, 15 members of the Company's board of directors, the Company's outside auditors, and three "third-party" defendants who allegedly participated in transactions with Delphi that **[\*18]** were intended to manipulate the Company's financial statements. The alleged fraudulent activities span a period of more than five years. Given the breadth of these allegations, the volume of requested documents is not unreasonable.

Furthermore, Lead Plaintiffs have adequately

2007 U.S. Dist. LEXIS 10408, *

specified the target of the requested discovery: They only request the production of materials that have already been assembled and produced to Delphi's internal investigators and the federal authorities. Under these circumstances, the Court finds that Lead Plaintiffs' request satisfies the particularity requirement.

## C. NECESSARY TO PRESERVE EVIDENCE OR TO PREVENT UNDUE PREJUDICE

Once the particularity requirement is satisfied, the Court must then determine whether the requested discovery "is necessary to preserve evidence or to prevent undue prejudice to that party." *15 U.S.C. § 78u-4(b)(3)(B)*.

### 1. The Relief Requested by Lead Plaintiffs Is Not Necessary to Preserve Evidence

Lead Plaintiffs first argue that the corporate reorganization that Delphi is undertaking through its bankruptcy filing, coupled with the departure of several key executives from the Company, creates [*19] a reasonable concern that documents may be lost. [15] Therefore, they argue that the discovery they have requested is necessary to preserve evidence. The Court is not persuaded by this argument. Such speculative allegations of possible loss of documents is wholly insufficient to justify lifting the PSLRA stay. *See e.g., Sarantakis v. Gruttadauria, 2002 U.S. Dist. LEXIS 14349, 2002 WL 1803750 at *2 (N.D. Ill. 2002)* (plaintiff must present more than "mere generalizations of fading memories and allegations of possible loss or destruction" of documents to lift PSLRA stay); *Selbst v. McDonald's Corp., 432 F. Supp. 2d 777, 2006 WL 566450 at *3 (N.D. Ill. 2006)* ("To lift the PSLRA stay based on such generalized concerns would open a loophole in the stay that would undermine the statutory scheme enacted by Congress.")

> 15  This argument, of course, does not apply to Lead Plaintiffs' request for production of documents produced to federal authorities by GM, EDS, BBK, Deloitte & Touche, and Bank One.

[*20]  Furthermore, Lead Plaintiffs have failed to show any ongoing record keeping violations, nor have they demonstrated that any relevant existing records are at risk of being destroyed. Plaintiffs are "required to make a specific showing that the loss of evidence is imminent as opposed to merely speculative." *Sarantakis, supra*. Indeed, because Plaintiffs seek documents that have already been produced and are in the custody of the

federal authorities, "the risk that evidence will be lost is negligible," at best. *In re Lantronix, Inc., 2003 U.S. Dist. LEXIS 19593, 2003 WL 22462393 at *1 (C.D. Calif. 2003)*.

### 2. Undue Prejudice

The Court, however, is persuaded by Lead Plaintiffs' undue prejudice argument. "Undue prejudice" has been defined as "improper or unfair treatment rising to a level somewhat less than irreparable harm." *See Faulkner v. Verizon Communications, Inc., 156 F. Supp. 2d 384, 404-405 (S.D.N.Y. 2001); see also In re CFS-Related Sec. Fraud Litig., supra, 179 F. Supp. 2d at 1265*. Lead Plaintiffs here argue that without discovery of documents already made available to other litigants and the federal authorities, [*21] they will be unfairly disadvantaged in pursuing litigation and settlement strategies.

Courts that have addressed whether the PSLRA allows for a partial lift of the discovery stay when the material sought have already been disclosed to government agencies have reached contrary conclusions. *Compare In re WorldCom, supra; In re Enron, supra; In re FirstEnergy Corp. Secs. Litig., 229 F.R.D. 541 (N.D. Ohio 2004); Singer v. Nicor, Inc., 2003 U.S. Dist. LEXIS 26189, 2003 WL 22013905 (N.D. Ill. 2003)* (all partially lifting discovery stay when documents had already been given to governmental entities) with *Grant v. AOL Time Warner, Inc. (In re AOL Time Warner, Inc.), 2003 WL 21729842 (S.D.N.Y. 2003); In re Vivendi Universal, S.A. Sec. Litig., 381 F. Supp. 2d 129 (S.D.N.Y. 2003); In re Fannie Mae Secs. Litig., 362 F. Supp. 2d 37 (D.D.C. 2005); In re Lantronix, supra* (all declining to lift discovery stay although documents had already been given to governmental entities).

In *In re WorldCom*, a case upon which Lead Plaintiffs here heavily rely, the court found that a partial lifting of the discovery stay was warranted [*22] because the lead plaintiff

> would be prejudiced by its inability to make informed decisions about its litigation strategy in a rapidly shifting landscape. It would essentially be the only major interested party in the criminal and civil proceedings against WorldCom without access to documents that currently form the core of those proceedings.

*234 F. Supp. 2d at 305. See also In re FirstEnergy, supra, 229 F.R.D. at 545* (holding that "[w]ithout discovery of documents already made available to government entities, Plaintiffs would be unfairly disadvantaged in pursuing litigation and settlement strategies."); *In re Enron, supra* (granting motion for partial relief from the PSLRA stay to allow discovery of

2007 U.S. Dist. LEXIS 10408, *

documents already made available to and reviewed by numerous governmental entities and others noting that the PSLRA stay "was not designed to keep secret from counsel in securities cases documents that have already become available for review by means other than discovery in the securities case." 2002 U.S. Dist. LEXIS 26261, 2002 WL 31845114 at *1.)

Defendants, by contrast, argue that Plaintiffs will suffer no prejudice because no settlement [*23] of this case is imminent. This was the basis for the courts' refusal to lift the stays in *In re AOL Time Warner* and *In re Vivendi*. Defendants, however, overlook the fact that settlements have already occurred in the SEC case and settlement discussions are ongoing in the bankruptcy action. It was precisely because the defendants in *Enron* and *WorldCom* were bankrupt and subject to other civil lawsuits that a partial lifting of the PSLRA stay was necessary "to prevent the securities plaintiffs from being left with nothing if their litigation did not keep pace with the bankruptcy and other proceedings." *See Singer v. Nicor, Inc., supra, 2003 U.S. Dist. LEXIS 26189, 2003 WL 22013905 at *2.*

Lead Plaintiffs here, too, face "being left with nothing" if this litigation does not keep pace with the bankruptcy and the SEC action. Given that several of the Defendants in this case have already consented to substantial money judgments in the SEC case, Lead Plaintiffs here already face the prospect that they may not be able to recover from those Defendants in this action because of the substantial consent judgments they have taken in the SEC case. Furthermore, in the bankruptcy action, the Unsecured [*24] Creditors Committee and Delphi's Equity Committee -- two groups of claimants who are vying for substantially the same pool of funds as our Lead Plaintiffs and the Class they represent -- have already been given copies of the same records which Lead Plaintiffs seek in this action. Armed with those documents, the UCC intends to press for participation in the settlement negotiations which have already begun between Delphi and GM. Lead Plaintiffs, however, are not being given the same opportunity in this case. As the court found in *WorldCom*, under these circumstances, the Class that Lead Plaintiffs represent "faces the very real risk that it will be left to pursue its action against defendants who no longer have anything or at least as much to offer." *In re WorldCom, 234 F. Supp. 2d at 306.*

Based upon the foregoing, the Court finds that Lead Plaintiffs have adequately demonstrated that the discovery they are seeking is necessary to prevent undue prejudice. Without discovery of documents already made available to federal authorities and to interested parties in the Delphi bankruptcy action, Plaintiffs would be unfairly disadvantaged in pursuing litigation and settlement [*25] strategy. Furthermore, maintaining the discovery stay as to materials already provided to the

federal authorities and to the Unsecured Creditors Committee does not further the policies behind the PSLRA. As indicated above, in enacting the PSLRA stay, Congress was motivated by a belief that "the cost of discovery often forces innocent parties to settle frivolous securities class actions." *See* H.R. Conf. Rep. No. 104-369, *supra*, at 37. The fact that the SEC brought an action predicated upon the very same accounting irregularities alleged in the Consolidated Class Action Complaint and named as defendants in that action many of the same Delphi officers and directors and third parties named in this suit, coupled with the fact that Defendants are consenting to judgment in that action, demonstrates that this is not a "frivolous securities class action" brought against innocent parties. [16]

> 16   Although the Court finds that this is not a "frivolous" securities class action, this should not be viewed as reflecting any view of the Court as to the merits of Defendants' Motions to Dismiss.

**[*26] CONCLUSION**

For all of the foregoing reasons, the Court **GRANTS** Lead Plaintiffs' request for a partial modification of the discovery stay. Subject to any claims of privilege or attorney work-product, [17] Lead Plaintiffs may obtain discovery (1) from the named Defendants and third-parties GM and EDS, limited to materials already produced to the SEC, DOJ, FBI, and U.S. Postal Inspector; and (2) of materials produced by any of the Defendants in conjunction with the internal investigation conducted by the Delphi Audit Committee of its Board of Directors, represented by Wilmer Cutler, outside counsel, and PriceWaterhouseCooper, forensic accountants.

> 17   As indicated by the Court at the February 8, 2006 Status Conference, as to any documents upon which there is a claim of privilege, Defendants shall submit to the Court and opposing counsel, a privilege log, along with a description to the Court of all material issues upon which the privilege is claimed that are contained in the document. Defendants shall also produce for *in camera* inspection along with the description in the privilege log copies of the documents themselves or of relevant portions of the documents. [See 2/8/06 Tr. pp. 56-57.]

Before proceeding with this ponderous and time-consuming process, however, the Court urges the parties themselves to alleviate -- or at least mitigate -- any privilege concerns by utilizing any, or all, of the various techniques suggested in the recent amendments to the Federal Rules of Civil Procedure, including a "sneak-peek" (or "quick-peek") preview protocol and "claw back agreements," (see *Fed. R. Civ. P.*

2007 U.S. Dist. LEXIS 10408, *

*26* Advisory Committee Note, 2006 Amendment to Subdivision (f)), and the procedure set forth in new *Rule 26(b)(5)(B)*.

[*27]  s/ Gerald E. Rosen

United States District Judge

Dated: February 15, 2007

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| IN RE SUNRISE SENIOR LIVING SECURITIES LITIGATION | ) ) ) ) | MASTER FILE 07-CV-00102 (RBW) |
| This Document Relates to: All Cases | ) ) ) ) | **JURY TRIAL** **DEMANDED** |

## [PROPOSED] ORDER GRANTING LEAD PLAINTIFFS' MOTION FOR RECONSIDERATION AND DENYING DEFENDANTS' MOTION TO ENFORCE STATUTORY STAY OF DISCOVERY AND QUASH THIRD-PARTY SUBPOENA

Upon Lead Plaintiffs' Motion for Reconsideration of the Court's August 6, 2008 Minute Order and consideration of the facts, circumstances and authorities cited in support thereof, IT IS:

ORDERED, that the Lead Plaintiffs' Motion for Reconsideration be and hereby is GRANTED; and

FURTHER ORDERED, that Defendant Sunrise's motion to enforce statutory stay of discovery and quash subpoena is DENIED. The statutory stay of discovery is lifted for the purpose of permitting Lead Plaintiffs permission to obtain the Rush SEC Transcript requested in the Rush Subpoena.

Entered this _____ day of August, 2008.

_____
Judge, United States District Court

## <u>CERTIFICATE OF SERVICE</u>

I certify that on August 15, 2008, the foregoing Class Lead Plaintiffs' Motion for Reconsideration of this Court's Order Granting Defendant Sunrise's Motion to Enforce Statutory Stay of Discovery and Quash Third-Party Subpoena, Memorandum of Law in Support, and [Proposed] Order were filed with the Clerk of the Court, using the Court's generic email address (dcd_cmecf@dcd.uscourts.gov), which will send notification of such filing to counsel of record in this matter who are registered on the CM/ECF system.  I further certify that, in addition to notification via the CM/ECF system, copies of the foregoing were sent by email on counsel for defendants, as follows:

**HOGAN & HARTSON, LLP**
Joseph M. Hassett, D.C. Bar #123935
George H. Mernick, III, D.C. Bar #294256
555 Thirteenth Street, N.W.
Washington, D.C.  20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
ghmernick@hhlaw.com
jmhassett@hhlaw.com

**LATHAM & WATKINS LLP**
David A. Becker
555 11th Street, N.W.
Suite 1000
Washington, D.C.  20004
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
david.becker@lw.com

**HOGAN & HARTSON, LLP**
N. Thomas Connally, D.C. Bar #448355
Jon M. Talotta, D.C. Bar #473626
8300 Greensboro Drive, Suite 1100
McLean, Virginia  22102
Telephone: (703) 610-6100
Facsimile: (703) 610-6200
ntconnally@hhlaw.com
jmtalotta@hhlaw.com

*Counsel for Defendants*

 /s/ Daniel S. Sommers_____
Daniel S. Sommers, Esq.